# 20-2578

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

BRUTUS TRADING, LLC,

*Plaintiff-Appellant,*

ABC,

*Plaintiff,*

—against—

STANDARD CHARTERED BANK, STANDARD CHARTERED PLC,
STANDARD CHARTERED TRADE SERVICES CORPORATION,

*Defendants-Appellees,*

UNITED STATES OF AMERICA,

*Interested Third Party-Appellee,*

DEF,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK CITY

## APPELLANT'S BRIEF & SPECIAL APPENDIX

PATRICK M. MCSWEENEY
MCSWEENEY CYNKAR
  & KACHOUROFF, PLLC
3358 John Tree Hill Road
Powhatan, Virginia 23139
(804) 937-0895

ROBERT J. CYNKAR
MCSWEENEY CYNKAR
  & KACHOUROFF, PLLC
10506 Milkweed Drive
Great Falls, Virginia 22066
(703) 621-3300

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Plaintiff-Appellant, certifies that Brutus Trading, LLC is a privately held Wyoming Limited Liability Corporation.

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..................................................... iii

STATEMENT OF JURISDICTION ............................................. 1

STATEMENT OF ISSUES PRESENTED ..................................... 1

STATEMENT OF THE CASE .................................................. 2

    A.  Nature of the Case ...................................................... 2

    B.  Factual Background ..................................................... 4

        1.  The U.S. Sanctions Regime ....................................... 4

        2.  The Settlements of Standard Chartered Bank's Violations of the Iran Sanctions ............................................. 4

SUMMARY OF ARGUMENT ................................................. 9

ARGUMENT ................................................................. 12

    I.  The District Court Abused Its Discretion under 31 U.S.C. § 3730(c)(2)(A) by Failing to Conduct an Evidentiary Hearing on the Government's Motion to Dismiss ............................ 12

    II.  The District Court's Failure to Hold a Hearing on the Government's Motion to Dismiss in the Face of a Sharply Conflicting Evidentiary Record Violated Due Process. ............. 17

    III.  The District Court Violated 31 U.S.C. § 3730(c)(2)(B) by Dismissing the Case Without Considering Whether the Government's 2019 Settlements with Defendants-Appellees Were "Fair, Adequate, and Reasonable Under All the Circumstances." ....................................................... 19

    IV.  Relator Has Stated a Valid Reverse False Claim ..................... 22

i

A. The "obligation to pay" that can be illicitly concealed in violation of the FCA's reverse false claim regime can be "established" even if not "fixed" or otherwise adjudicated so as to require immediate payment................. 24

B. Under the civil forfeiture regime, SCB's violations of the Iran sanctions create obligations to pay the Government within the meaning of the FCA................................... 32

V. The Court Should Hold This Appeal in Abeyance While the District Court Adjudicates Relator's Motion for an Indicative Ruling Under FED.R.CIV.P. 62.1..................................... 39

CONCLUSION ............................................................... 42

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Calderon v. Sessions*,
330 F.Supp.3d 944 (S.D.N.Y. 2018) ....................................... 19

*Caplin & Drysdale, Chartered v. U.S.*,
491 U.S. 617 (1989) ....................................................... 33

*Ching v. Mayorkas*,
725 F.3d 1149 (9th Cir. 2013) .............................................. 18

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) ....................................................... 17

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ....................................................... 18

*In re Halpin*,
566 F.3d 286 (2d Cir. 2009) ................................................ 27

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016) ................................................ 27

*John Wiley & Sons, Inc. v. DRK Photo*,
882 F.3d 394 (2d Cir. 2018) .............................................. 26, 27

*Johnson v. Thompson-Smith*,
203 F.Supp.3d 895 (N.D.Ill. 2016) ......................................... 18

*Kane ex rel. United States v. Healthfirst, Inc.*,
120 F.Supp.3d 370 (S.D.N.Y. 2015) ...................................... 29, 30

*Khan v. Gonzales*,
495 F.3d 31 (2d Cir. 2007) ................................................. 19

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982) ....................................................... 18

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ....................................................... 18

*Noel v. New York City Taxi & Limousine Comm'n*,
687 F.3d 63 (2d Cir. 2012) .............................................. 13, 17

*Swift v. United States*,
  318 F.3d 250 (2003) ............................................. 12, 13, 14

*United States ex rel. Bahrani v. Conagra, Inc.*,
  465 F.3d 1189 (10th Cir. 2006) ..................................... 30, 31

*United States ex rel. CIMZNHCA v. UCB, Inc.*,
  970 F.3d 835 (7th Cir. 2020) ........................................ 12, 14

*United States ex rel. Conroy v. Select Medical Corp.*,
  211 F.Supp.3d 1132 (S.D.Ind. 2016) ..................................... 18

*United States ex rel. Customs Fraud Investigations, LLC, v.
  Victaulic Co.*,
  839 F.3d 242 (3d. Cir. 2016) ........................................... 28

*United States ex rel. Harris v. EMD Serono, Inc.*,
  370 F.Supp.3d 483 (E.D.Pa. 2019)....................................... 13

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
  929 F.3d 721 (D.C. Cir. 2019) .......................................... 31

*United States ex rel. Landis v. Tailwind Sports Corp.*,
  160 F. Supp. 3d 253 (D.D.C. 2016)...................................... 27

*United States ex rel. Landis v. Tailwind Sports Corp.*,
  51 F. Supp.3d 9 (D.D.C. 2014)........................................... 32

*United States ex rel. Matheny v. Medco Health Solutions, Inc.*,
  671 F.3d 1217 (11th Cir. 2012) ......................................... 29

*United States ex rel. Sequoia Orange Co. v. Baird-Neece
  Packing Corp.*,
  151 F.3d 1139 (1998) ............................................. 12, 14, 21

*United States ex rel. Simoneaux v. E.I. duPont de Nemours*,
  843 F.3d 1033 (5th Cir. 2016)........................................... 31

*United States v. $41,305.00 in Currency & Travelers Checks*,
  802 F.2d 1339 (11th Cir. 1986) ......................................... 36

*United States v. 1314 Whiterock & Improvements, San Antonio,
  Bexar Cty., Tex.*,
  571 F. Supp. 723 (W.D. Tex. 1983) ...................................... 36

*United States v. All Assets Held at Bank Julius Baer & Co.*,
  772 F. Supp. 2d 191 (D.D.C. 2011) .......................................... 36

*United States v. Bermudez*,
  413 F.3d 304 (2d Cir. 2005) ................................................ 38

*United States v. Chowaiki*,
  369 F.Supp.3d 565 (S.D.N.Y. 2019) ......................................... 37

*United States v. Daugerdas*,
  892 F.3d 545 (2d Cir. 2018) ............................................ 36, 37

*United States v. McHan*,
  345 F.3d 262 (4th Cir. 2003) ............................................... 36

*United States v. Neifert-White Co.*,
  390 U.S. 228 (1968) ........................................................ 24

*United States v. Pemco Aeroplex, Inc.*,
  195 F.3d 1234 (11th Cir. 1999) ............................................. 30

*United States v. Simmons*,
  No. 17-cr-127, 2019 WL 3532113 (S.D.N.Y. Aug. 02, 2019) ............ 36

*United States v. Stowell*,
  133 U.S. 1 (1890) .......................................................... 34

*United States v. Thoms*,
  684 F.3d 893 (9th Cir. 2012) ............................................... 18

*United States v. Watts*,
  786 F.3d 152 (2d. Cir. 2015) ........................................... 35, 36

*United States v. Wolf*,
  375 F. Supp. 3d 428 (S.D.N.Y. 2019) ....................................... 36

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003) ................................................. 22

*Vermont Agency for Nat. Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) ........................................................ 18

## Statutes

18 U.S.C. § 981(a)(1)(C) ....................................................... 32

18 U.S.C. § 981(a)(2)(A) ....................................................... 32

18 U.S.C. § 981(f) ............................................................... 33

18 U.S.C. § 983(d) ............................................................... 37

18 U.S.C. § 983(i)(2)(D) ....................................................... 38

18 U.S.C. § 984 .................................................................. 38

18 U.S.C. § 1956(c)(7)(D) ..................................................... 33

19 U.S.C. § 1304(i) ............................................................. 28

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

31 U.S.C. §§ 3729 *et seq.*, Federal False Claims Act................... *passim*

31 U.S.C. § 3729(a)(1)(G) ........................................ 1, 25, 37, 38

31 U.S.C. § 3729(b)(3) ..................................................... 26, 39

31 U.S.C. § 3730(c)(2) ......................................................... 17

31 U.S.C. § 3730(c)(2)(A) ................................................ *passim*

31 U.S.C. § 3730(c)(2)(B) ................................................ *passim*

31 U.S.C. § 5311 ................................................................. 39

42 U.S.C. § 1320a-7k(d)(1) ................................................... 29

Affordable Care Act ............................................................. 29

International Emergency Economic Powers Act ............................. 9

Tariff Act ........................................................................ 28

## Rules

Fed. R. Civ. P. 41(a)(1)(A)(i)................................................. 12

Fed. R. Civ. P. 60 ............................................................... 41

FED. R. CIV. P. 60(b)(1) ....................................................... 41

FED. R. CIV. P. 60(b)(2) ....................................................... 41

FED. R. CIV. P. 60(b)(3) ....................................................... 41

FED. R. CIV. P. 62.1 ....................................................... *passim*

**Regulations**

31 C.F.R. Part 560 ............................................................ 4

**Other Authorities**

134 CONG. REC. S17365 (daily ed. Nov. 10, 1988) ........................... 35

Stefan Cassella, ASSET FORFEITURE LAW IN THE UNITED STATES (2d ed. 2013) .................................................................. 38

Claire Sylvia, *The Evolving Debate over the Government's Dismissal Authority under the False Claims Act*, 62 GOVERNMENT CONTRACTOR, No. 35 (September 23, 2020) ............................ 12

https://home.treasury.gov/news/press-releases/sm647 ........................ 8

https://www.justice.gov/usao-dc/pr/standard-chartered-bank-admits-illegally-processing-transactions-violation-iranian ...................... 9

K. Katzman, *Iran Sanctions* (Cong. Research Serv., Nov. 15, 2019) ........ 4

Robert A. Katzmann, JUDGING STATUTES (2014) ....................... 24, 26

Jason Leopold *et al., FinCEN Files: Thousands of secret suspicious activity reports offer a never-before-seen picture of corruption and complicity – and how government lets it flourish,* https://www.buzzfeednews.com/article/jasonleopold/fincen-files-financial-scandal-criminal-networks ..................................... 21

RESTATEMENT (SECOND) OF CONTRACTS § 316 (1981) ...................... 27

S. Rep. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266 ............. 25

S. Rep. No. 111-10 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430 .......... 25

U.S. Constitution, Fifth Amendment ....................................... 22

U.S. Dep't of the Treasury, *Terrorism and Illegal Finance*, https://www.home.treasury.gov/ policy-issues/terrorism-and-illegal-finance..........................................................4

Xian, *The Price of Justice: Deferred Prosecution Agreements in the Context of Iranian Sanctions*, 28 NOTRE DAME J.L., ETHICS & PUB. POL'Y 631, 634 (2014) .................................................21

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331.
The district court entered final judgment dismissing the case on July 2, 2020. On
July 31, 2020, Plaintiff-Appellant filed a timely notice of appeal. This Court has
jurisdiction over the district court's final order pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

1. Whether the district court abused its discretion under 31 U.S.C. §
3730(c)(2)(A) by failing to conduct an evidentiary hearing on the Government's
motion to dismiss.

2. Whether the district court's failure to hold a hearing on the Government's
motion to dismiss in the face of a sharply conflicting evidentiary record violated
due process.

3. Whether the district court erred under 31 U.S.C. § 3730(c)(2)(B) by
dismissing the case without considering whether the Government's 2019
settlement with Defendants-Appellees was "fair, adequate, and reasonable under
all the circumstances."

4. Whether the Second Amended Complaint stated a valid reverse false
claim under 31 U.S.C. § 3729(a)(1)(G).

5. Whether this Court should hold this appeal in abeyance while the district court adjudicates Relator's motion for an indicative ruling pursuant to FED.R.CIV.P. 62.1.

## STATEMENT OF THE CASE

### A. Nature of the Case

This appeal involves a claim asserted by Plaintiff-Appellant Brutus Trading, LLC, the Relator in this case, under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* Relator is a Wyoming limited liability company formed in October 2012 by Julian Knight and Robert Marcellus, who had previously been communicating with the New York State Department of Financial Services ("DFS"), the Department of the Treasury and the Department of Justice about their allegations that Defendants-Appellees, Standard Chartered Bank and its affiliated entities (collectively, "SCB"), were engaging in systematic and massive violations of the United States' Iran sanctions regime. The United States is a party plaintiff by statute and an Appellee in this appeal.

The initial Complaint was filed in December 2012 and voluntarily dismissed without prejudice on September 19, 2017. SPA-2. A new Complaint was filed on November 29, 2018 and amended on July 19, 2019. JA-1; SPA-3. In July 2019, the district court ordered the First Amended Complaint to be unsealed. Thereafter, leave was granted for Relator to file a Second Amended Complaint on September

20, 2019. JA-6; SPA-3. The Government filed a motion to dismiss the Second Amended Complaint on November 21, 2019. SPA-3. On July 2, 2020, District Judge Paul A. Engelmayer entered an Opinion and Order dismissing the Second Amended Complaint. JA-9-10; SPA-1-11. The Opinion and Order is available at 2020 WL 3619050.

In a related case, Julian Knight and Anshuman Chandra, both former employees of SCB who were instrumental in providing the information about SCB's violations of the Iran sanctions to the Government, filed a retaliation complaint on May 22, 2020 against SCB in the district court. No. 19-cv-11739 (S.D.N.Y.)(PAE). SCB has filed a motion to dismiss, which is pending.

Following disclosure by media outlets in September 2020 of suspicious activity reports filed by SCB and other financial institutions with the Department of the Treasury that contradict the Government's representations to the district court, Relator filed a motion for a ruling pursuant to FED. R. CIV. P. 62.1 in the district court on October 27, 2020, requesting the court for a ruling indicating, if the case were remanded, that it would withdraw its Opinion and Order dismissing the case and proceed to discovery and an evidentiary hearing more thoroughly examining the Government's arguments for dismissal. On October 28, 2020 Relator moved this Court to hold this appeal in abeyance while the district court

adjudicated the Rule 62.1 motion. This Court had not ruled on that motion as of the deadline by which this brief had to be filed.

## B. Factual Background

### 1. The U.S. Sanctions Regime

Beginning in 1979 with E.O. 12170, the United States imposed a variety of economic sanctions on the Government of Iran and parties associated with it. *See* K. Katzman, *Iran Sanctions* (Cong. Research Serv., Nov. 15, 2019). The stated purpose of the sanctions was to pressure the Iranian leadership to cease its support for terrorist organizations and the development of nuclear weapons. U.S. Dep't of the Treasury, *Terrorism and Illegal Finance,* https://www.home.treasury.gov/policy-issues/terrorism-and-illegal-finance. A principal component of this sanctions regime is the regulatory program to restrict Iran's access to the U.S. financial system, which was established pursuant to congressional authorization and executive orders in 31 C.F.R. Part 560. Those regulations require the blocking of transactions that involve or benefit persons subject to U.S. sanctions when they are based in U.S. dollars and when the jurisdiction of the United States touches the transaction.

### 2. The Settlements of Standard Chartered Bank's Violations of the Iran Sanctions.

SCB operates globally from a London headquarters as a major financial institution. JA-64. It processes trillions of dollars of financial transactions annually.

4

*Id.* SCB had pre-tax profits of $6.7 billion in 2012 and $4.1 billion in 2014. By far the largest share of its revenue is derived from transactions originating in Asia, Africa and the Middle East. Most of its transactions are in U.S. dollars, the world's dominant currency. JA-58-59, 604-05.

To facilitate access to the U.S. financial system for its Iranian customers, SCB has developed methods to evade U.S. sanctions on transactions involving U.S. dollars that require clearing by the Federal Reserve Bank in New York. JA-60, 65. SCB's trading systems, including particularly its online trading platform, have been operated to disguise the ultimate beneficiary of the transactions so that blocking of the transaction in New York can be avoided. SCB employees frequently have accomplished this by using "sundry accounts," which disclose the counterparty as a branch of SCB rather than by identifying the person for whom the transaction is actually being processed. SCB also allows its customers to initiate U.S. dollar transactions through a telephone or fax communication with SCB, which allows SCB to process the transaction using a sundry account.

Sundry accounts were originally developed for the purpose of allowing transactions to be processed despite input errors or the practical inability to identify a customer in a timely manner. When the transaction is ultimately settled, the true beneficiary is identified on the bank's records. SCB began to use sundry accounts for fraudulent purposes to evade U.S. sanctions long before the 2012 settlements.

Through this method of evasion, SCB has processed tens of billions of U.S. dollar transactions for sanctioned persons. JA-68-72, 454, 459, 466-67.

After an investigation of SCB's dealings with sanctioned Iranian persons, the Department of Justice and the Department of the Treasury reached settlements with SCB in 2012 with respect to another SCB method of evasion of U.S. sanctions – "wire-stripping." That method involved simply removing the identity of the true beneficiary from the transaction information submitted at the time of clearing the transaction at the Federal Reserve Bank in New York. Before the settlements with the federal agencies were reached, the State of New York, through DFS, reached a separate settlement with SCB. JA-65-66, 68-69.

Upon learning of the DFS settlement, Julian Knight, formerly Global Head of Transaction Banking Foreign Exchange Sales at SCB, JA-63, 478, and Robert Marcellus, an American currency trader, JA-63-63, 446, were doubtful that the full extent of SCB's fraudulent practices had been uncovered by DFS. Working together with access to SCB records that Mr. Knight retained when he left SCB, the two men concluded that SCB had managed to settle with DFS without disclosing the use of sundry accounts for fraudulent purposes, as well as the extent of its trading with Iranian parties in U.S. dollars in violation of U.S. sanctions. JA-450-52, 480-81. They approached DFS and the Office of Foreign Assets Control (OFAC) of the Department of the Treasury with their allegations of

sanctions violations not covered by the DFS settlement. JA-455-60, 481. On the advice of then-DFS General Counsel Daniel S. Alter, Messrs. Knight and Marcellus retained legal counsel to pursue claims under the federal False Claims Act ("FCA"). JA-459-60. They established Brutus Trading, LLC for the purpose of having that entity serve as the relator in the FCA litigation. JA-481.

Despite the information provided to OFAC in September 2012 by Messrs. Knight and Marcellus, OFAC reached a settlement with SCB that Relator concluded was grossly inadequate. JA-455-56. Relator filed a False Claims Act complaint in December 2012 and assisted Mr. Alter of DFS in drafting a letter from him to counsel for SCB requesting information about several matters, which letter was sent on December 20, 2012. JA-464, 481. The letter reached the Department of Justice and prompted it to arrange for Messrs. Knight and Marcellus to attend a meeting with participating members of a joint investigation of SCB in New York City on January 16, 2013. At that meeting, the two principals of Relator provided detailed information to the investigators, including SCB records and explanations of the methods employed by SCB to evade sanctions. JA-464-67, 482. They continued to offer assistance to the investigators throughout 2013.

In the spring of 2013, an SCB employee in the Dubai branch, Anshuman Chandra, contacted Mr. Knight to offer assistance to him in bringing SCB's sanctions violations to light. Mr. Chandra forwarded SCB records to Relator,

which were then given to the FBI. JA-468-69, 483, 495-96. In September 2013, the FBI directed Mr. Chandra to deliver several computer discs containing more than 20,000 SCB files to the U.S. Consulate in Dubai. He did so on September 17, 2013. JA-471, 484, 496. This bears repeating: "Chandra provided *20,000 actual records* that were significantly different from what had been available previously, including records of SCB's sundry transactions, evidence of hidden cells in SCB's spreadsheets, an account-opening record for Bank Saderat with the date removed, an analysis of the Iranian connection of numerous SCB customers, records showing the state of SCB's Iran Group customer base, evidence of the tactics employed by Promontory Financial Group, LLC to manipulate computer systems and records of SCB Dubai in 2013, and evidence of SCB's deliberate 'flaws' in its anti-money laundering system in the electronic trading platform." JA-719-20 (emphasis in original).

The joint investigation, however, had "wrapped up" the investigation in August 2013. Mr. Chandra continued to provide information about SCB's dealings with Iranian customers to the FBI through December 2016. JA-500.

On April 9, 2019, the Government entered into separate settlement agreements with SCB. The Department of the Treasury settled its civil claims against SCB for apparent violations of U.S. economic sanctions for $639 million. https://home. Treasury.gov/news/press-releases/sm647. The Department of Justice

entered into a deferred prosecution agreement ("DPA") with SCB in which SCB agreed to pay a forfeiture of $240 million and a fine of $480 million, and to extend the previous DPA for two years for conspiring to violate the International Emergency Economic Powers Act ("IEEPA") by processing U.S. dollar transactions on behalf of Iranian entities. https://www.justice.gov/usao-dc/pr/standard-chartered-bank-admits-illegally-processing-transactions-violation-iranian. The violations of the Iran sanctions covered by the settlements were limited to SCB's transactions for companies owned by Mahmoud Reza Elyassi and did not include other transactions identified by Relator. The Government refused to award a share of the recovery to Relator. JA-76-78.

## SUMMARY OF ARGUMENT

The FCA guarantees a relator "an opportunity for a hearing" on a Government motion to dismiss a *qui tam* case. 31 U.S.C. § 3730(c)(2)(A). It is within the discretion of the district court whether that hearing includes the presentation of witness testimony and other evidence. Here, the Government offered the declarations of several participants in the joint Federal/New York investigation of SCB to support its claim that Relator's allegations concerning SCB's systemic, and very lucrative, violations of the Iran sanctions were meritless and the evidence supporting those allegations was worthless. For its part, Relator submitted extensive documentation and declarations of whistleblowers starkly

contesting the factual representations of the Government's declarants. In addition, Relator sought to obtain and present the testimony of former DFS General Counsel Alter, who had launched the DFS investigation of SCB.

This posture of the case called for the district court to permit the deposition and testimony of Mr. Alter and hold an evidentiary hearing. The district court refused to do either; in fact, it held no hearing of any kind. This was a gross abuse of the district court's discretion under § 3730(c)(2)(A).

Moreover, the district court's refusal to allow Relator to effectively test the veracity, accuracy, and substance of the representations made by the Government's declarants and to present the testimony of Mr. Alter in support of Relator's allegations in the face of a sharply conflicting evidentiary record deprived Relator of its due process right to be heard at a meaningful time and in a meaningful manner.

The district court's blanket dismissal of Relator's case effectively accepted the Government's contention that its 2019 settlements with SCB were not based on any information provided by Relator, and so Relator could not receive its statutory share of those settlements, notwithstanding the detailed information presented by Relator contradicting the Government's representations. By ruling in this way, the district court failed to undertake the analysis of whether those settlements were "fair, adequate, and reasonable" as required by 31 U.S.C. § 3730(c)(2)(B).

Far from being a "novel liability theory," Relator's allegation that SCB's carefully and systematically concealed violations of the Iran sanctions are reverse false claims rests on long-standing and well-established congressional commitments to vest the property right to the proceeds of certain criminal acts – here money laundering in aid of Iran and its terrorist clients – in the Government at the time of the criminal act, and so deprive the malefactor of the benefits of its crime. When the property right to those proceeds shifts to the Government, that malefactor has a legal obligation to transmit them to the Government. When it conceals its wrongdoing, and so covers up those forfeited proceeds, that criminal commits another wrong – a reverse false claim defrauding the Government of the money it is owed and is liable for treble damages for the cover-up.

Finally, newly discovered evidence, Treasury Department suspicious activity reports disclosed by various media outlets, dramatically contradict the Government's factual representations on which the district court relied. Pursuant to FED.R.CIV.P. 62.1, Relator has sought a ruling from the district court indicating, if the case were remanded, that it would withdraw its Opinion and Order dismissing the case and proceed to discovery and an evidentiary hearing more thoroughly examining the Government's arguments for dismissal. With the factual record under such a cloud, this Court should hold this appeal in abeyance until the district court resolves the Rule 62.1 motion.

# **ARGUMENT**

### I. The District Court Abused Its Discretion under 31 U.S.C. § 3730(c)(2)(A) by Failing to Conduct an Evidentiary Hearing on the Government's Motion to Dismiss.

This Court has not adopted a standard for review of a dismissal of an FCA claim under 31 U.S.C. § 3730(c)(2)(A). The courts of appeals are divided on the issue. The Ninth Circuit adopted a test in *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.,* 151 F.3d 1139 (1998) that the Government must demonstrate a valid governmental purpose for dismissing an FCA case and a rational relationship between dismissal and the asserted governmental purpose. The District of Columbia Circuit adopted a test sharply at odds with that of the Ninth Circuit in *Swift v. United States,* 318 F.3d 250 (2003), holding that the Government has "unfettered right" to dismiss FCA cases. *Id.* at 253. A majority of courts have followed the Ninth Circuit formulation. Claire Sylvia, *The Evolving Debate over the Government's Dismissal Authority under the False Claims Act,* 62 GOVERNMENT CONTRACTOR, No. 35 (September 23, 2020). In *United States ex rel. CIMZNHCA v. UCB, Inc.,* 970 F.3d 835 (7th Cir. 2020), the court ruled that the Government may dismiss an FCA case under FED. R. CIV. P. 41(a)(1)(A)(i) before the opposing party files an answer or motion for summary judgment, but noted that a substantive hearing would be proper when there are non-frivolous allegations of fraud on the court or other exceptional circumstances. 970 F.3d at 851-52. *Swift*

also recognized that an evidentiary hearing would be proper in those situations. 318 F.3d at 253.

In *United States ex rel. Harris v. EMD Serono, Inc.,* 370 F.Supp.3d 483 (E.D.Pa. 2019), the court rejected the *Swift* test, saying: "If the government's right to dismiss is 'unfettered,' as the District of Columbia Circuit has held, a hearing would be superfluous, rendering the requirement of a hearing a nullity." *Id.* at 488. Relator submits that the proper standard to apply in the circumstances of this case where a dismissal was ordered without an evidentiary hearing to resolve the conflict in evidence is the abuse of standard test. *See Noel v. New York City Taxi & Limousine Comm'n,* 687 F.3d 63, 68 (2d Cir. 2012).

Section 3730(c)(2)(A) mandates that a relator be notified of the filing by the Government of a motion to dismiss the relator's complaint and be provided "an opportunity for a hearing on the motion." The nature of the hearing depends upon the circumstances of each case. Where there has been extensive activity by the Government in responding to the relator's allegations of fraudulent conduct by the defendant, sharp conflict in the evidence regarding the merits of those allegations, and evidence of possible misconduct by the Government in responding to the allegations, an evidentiary or substantive hearing is necessary to resolve those issues. Review on a written record in those circumstances would be inadequate. Every court that has addressed this question appears to agree that an evidentiary or

substantive hearing is appropriate in that situation. *E.g. CIMZNHCA,* 970 F.3d at 851-53; *Swift,* 318 F.3d at 253; *Sequoia Orange,* 151 F.3d at 1146.

In a December 3, 2019, letter motion, Relator requested the opportunity to obtain and present the testimony of Daniel S. Alter "either through permitting it to depose Mr. Alter before the hearing required by 31 U.S.C. § 3730(c)(2)(A) or by permitting Mr. Alter to testify at that hearing." JA-388. Relator represented to the district court that Mr. Alter, the former General Counsel of the New York State Department of Financial Services who precipitated the joint investigation of Standard Chartered Bank, was unavailable to Relator and that his testimony could only be obtained through a subpoena. The district court denied the request stating:

> Relator has not shown how the testimony of Mr. Alter, to the extent it concerns non-privileged material, is warranted or appropriate on a motion to dismiss…. [T]he Court can resolve, without Mr. Alter's testimony, whether there is a basis to contend that the governments (sic) proffered rationale for dismissing the complaint is "fraudulent, arbitrary and capricious, or illegal."

JA-444.

To the contrary, Relator had explained in great detail what Mr. Alter was expected to provide in his testimony:

> Mr. Alter is expected to testify as a matter of fact and as a participant in the joint investigation that the Government failed to take steps, some of which he had taken, that would have confirmed the validity of Relator's allegations after Relator submitted documentation supporting those allegations and that he received documents from Relator that corroborated its allegations that Defendants had transacted business with Iranian customers in U.S. dollars after December 2007. Mr. Alter can

testify that he began a new investigation of Defendants after meeting with a principal of Relator in September 2012 that prompted his December 20, 2012, letter to Defendants' counsel…. Mr. Alter can also describe the numerous meetings and communications with Relator and its counsel in 2012 and 2013, including (a) submission of Julian Knight's 2010 presentation to SCB management concerning Project Green that identified flaws in SCB's electronic system and other methods that allowed for evasion of U.S. sanctions, (b) Relator's powerpoint presentation to him on November 7, 2012…, and (c) Relator's input into his December 20, 2012, letter to Defendants' counsel. Those communications also related to Defendants' Curve Campaign to pursue new business with Iranians after 2008; the hidden cells in Defendants' software and how to uncover the hidden information; the methods employed by Defendants to evade U.S. sanctions; Relator's explanation of the nature of foreign exchange transaction financing; the thousands of SCB records from the production by Anshuman Chandra, an employee of SCB Dubai, including the Juniper 35 files, that were shared with Mr. Alter in 2013; and the Defendants' spreadsheets showing the allocation of profit among SCB Dubai personnel during the period 2007-2014 from transactions with parties subject to U.S. sanctions. Mr. Alter would be in a position to testify concerning the DFS estimate of $250 billion as of August 2008 as the total value of transactions by Defendants with Iranians that violated U.S. sanctions; the sharing of information among the participants in the joint investigation; and actions taken by DFS, including the imposition of fines and penalties on Promontory Financial Group, LLC, based upon the DFS Report of Investigation of Promontory. He can testify to the disclosure to SCB by the joint investigation of the identity and participation of Julian Knight, which immediately resulted in SCB's attacks on Mr. Knight's character and credibility.

JA-441.

Dismissing Relator's Second Amended Complaint without providing

Relator with an opportunity for Relator to offer the testimony of Mr. Alter and to

challenge the statements of several participants in the joint investigation whose

declarations had been submitted in support of the Government's motion to dismiss

was contrary to the requirement of 31 U.S.C. § 3730(c)(2)(A). It was an abuse of discretion for the district court to deny Relator the opportunity to present Mr. Alter's testimony on the basis that it was unwarranted and inappropriate while relying on the declarations of four other participants in the same investigation to justify the Government's decision to dismiss Relator's complaint. SPA-6 ("The declarations describe in detail the Government's investigation of the defendants, the steps that the agencies took to investigate relator's claims, and the reasons why the investigating agencies concluded that the evidence did not substantiate relator's allegations that the defendants had engaged in additional sanctions-violating conduct."). If the presentation of the testimony of some participants in the investigation was appropriate, there was no justification for the district court's decision that Mr. Alter's testimony was inappropriate and for its denial of an opportunity for Relator to present Mr. Alter's testimony before it ruled on the Government's motion to dismiss.

Relator vigorously disputed the Government's representation that there was no merit in Relator's allegations. It submitted extensive documentation and declarations in support of its position and directly contradicting the representations of the Government's declarants. *E.g.,* JA-446-476, 477-493, 494-501, 510-42, 594-97, 731-51, 752-67, 768-69, and 770-71. The conflict in the record evidence could only be resolved properly through the process traditionally employed for that

purpose – an evidentiary hearing at which witnesses would be under oath and subject to cross-examination. Review of the written record was no substitute. Indeed, the district court's opinion did not even reflect the written record before it. The district court cited the Government's declarants, and accepted their representations, without once citing to the competing representations of Relator's declarants or explaining why it so willingly and uncritically accepted the Government's representations. SPA-6-7.

The district court's refusal to conduct a hearing, which would have allowed Relator to present the testimony of Mr. Alter and to test the representations of the Government's declarants, constitutes an abuse of discretion and a violation of 31 U.S.C. § 3730(c)(2)(A), and warrants reversal and remand with instructions to allow such a hearing. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405 (1990); *Noel,* 687 F.3d at 68.

## II. The District Court's Failure to Hold a Hearing on the Government's Motion to Dismiss in the Face of a Sharply Conflicting Evidentiary Record Violated Due Process.

The standard of review of a decision dismissing a complaint without conducting an evidentiary hearing to resolve disputes of material fact is abuse of discretion. *See Noel,* 687 F.3d at 68.

The district court's dismissal of Relator's Second Amended Complaint without conducting the hearing required by 31 U.S.C. § 3730(c)(2) was also a

denial of Relator's due process rights, which is an independent basis for reversal. The submissions by the parties of legal memoranda and supporting exhibits does not constitute a hearing under the circumstances for purposes of the Due Process Clause. *See Goldberg v. Kelly,* 397 U.S. 254, 267, 269 (1970). Relator was entitled to a hearing at which it could test the veracity, accuracy and substance of the statements submitted by the Government's declarants and present the testimony of Mr. Alter in support of Relator's claims. *Id.; Ching v. Mayorkas,* 725 F.3d 1149, 459 (9th Cir. 2013); *United States v. Thoms,* 684 F.3d 893, 900 (9th Cir. 2012).

Relator had a right to due process based on its interest in the lawsuit. *Vermont Agency for Nat. Res. v. United States ex rel. Stevens,* 529 U.S. 765, 772-78 (2000) ("[The False Claims Act] gives the relator an interest in the lawsuit, and not merely the right to retain a fee out of the recovery."); *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428 (1982) (a cause of action is a species of property protected by due process); *United States ex rel. Conroy v. Select Medical Corp.,* 211 F.Supp.3d 1132, 1151-52 (S.D.Ind. 2016) (Due process protection extends to civil litigants who seek recourse in the courts and protects them against arbitrary treatment.).

A fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976); *Johnson v. Thompson-Smith,* 203 F.Supp.3d 895, 906 (N.D.Ill. 2016).

The arbitrary denial of an opportunity for Relator to offer the testimony of Mr. Alter and to challenge the statements of several participants in the joint investigation whose declarations had been submitted in support of the Government's motion to dismiss deprived Relator of due process and tilted the proceedings decidedly in favor of the Government. The district court's decision to rely on the untested statements of the Government's declarants while refusing to allow Relator to submit the testimony of another participant in the joint investigation was the very definition of arbitrary and capricious treatment. *Cf. Calderon v. Sessions,* 330 F.Supp.3d 944, 958-59 (S.D.N.Y. 2018) (due process prohibits arbitrary treatment).

### III. The District Court Violated 31 U.S.C. § 3730(c)(2)(B) by Dismissing the Case Without Considering Whether the Government's 2019 Settlements with Defendants-Appellees Were "Fair, Adequate, and Reasonable Under All the Circumstances."

The standard of review of a discretionary determination that applied an erroneous legal standard is de novo. *Khan v. Gonzales,* 495 F.3d 31, 35 (2d Cir. 2007).

The district court failed to apply the appropriate standard in ruling on the Government's motion to dismiss. The Government argued that the investigations that led to the 2019 settlements were not based on any information provided by Relator. JA-324; JA-98-99. Relator disputed that contention with detailed information that contradicted the Government's representations. *E.g.,* JA-446-476,

477-493, 494-501, 510-42, 594-97, 731-51, 752-67, 768-69, and 770-71. The

proper standard to apply in those circumstances, therefore, is set out in 31 U.S.C. §

3730(c)(2)(B). Under that standard, the test is whether the settlement was "fair,

adequate, and reasonable under all the circumstances."

In dismissing Relator's complaint, the district court failed to address the

Government's numerous misrepresentations of fact and law, particularly those

highlighted in Relator's Sur-Reply. SPA-2-9; JA-713 -26. It summarily rejected

Relator's claim that the Government's conduct was arbitrary and capricious

without explaining why the specific actions and decisions of the Government

alleged by Relator did not constitute arbitrary and capricious conduct. The district

court erroneously concluded that Relator's opposition to the Government's motion

to dismiss amounted to nothing more than a "difference of opinion" and a

"subjective disagreement with the Government's investigative strategy and

ultimate decision." SPA-8. This ignored the considerable evidence that Relator

produced in support of its allegations, as detailed above.

The district court concluded that dismissal of the complaint was

"particularly compelling in this case, where the Government has already recovered

hundreds of millions of dollars from defendants after two multi-agency

investigations that spanned a decade." SPA-7. As has been noted by

commentators,[1] the 2012 Deferred Prosecution Agreement imposed a miniscule amount of the fines and penalties compared to the total dollar amount of the proceeds of SCB's transactions on behalf of Iran entities and the enormous profit enjoyed by SCB from those unlawful dealings. For that reason, the 2012 DPA failed to serve as a disincentive to SCB to abandon its dealings with Iranian parties. The 2012 investigation was clearly flawed as demonstrated by the fact that the investigation was reopened based on Mr. Alter's December 20, 2012, letter, which led to the forfeiture, penalties and fines paid by SCB related to sanctions violations not covered by the previous 2012 settlements. JA-543.

The fact that the two periods of investigation nominally spanned a decade says nothing about whether those investigations were proper or whether, on the other hand, they were "fraudulent, arbitrary and capricious, or illegal." *Sequoia Orange,* 151 F.3d at 1145. The passage of time bears no necessary relationship to the quality of the investigations. The district court was obliged to consider Relator's allegations, documents and testimony before blithely accepting the Government's conclusory responses. Its denial of that opportunity and its arbitrary treatment by allowing the Government to submit the testimony of participants in

---

[1] Xian, *The Price of Justice: Deferred Prosecution Agreements in the Context of Iranian Sanctions,* 28 NOTRE DAME J.L., ETHICS & PUB. POL'Y 631, 634 (2014); Jason Leopold *et al., FinCEN Files: Thousands of secret suspicious activity reports offer a never-before-seen picture of corruption and complicity – and how government lets it flourish,* https://www.buzzfeednews.com/article/jasonleopold/fincen-files-financial-scandal-criminal-networks.

the joint investigation but refusing to allow Relator to submit the testimony of Mr. Alter, a key participant in that investigation, to counter the Government's contentions deprived Relator of its right to due process protected by the Fifth Amendment to challenge the fairness, adequacy and reasonableness of the 2019 settlements under the standard set by 31 U.S.C. § 3730(c)(2)(B).

The district court applied the wrong standard in deciding whether the Second Amended Complaint should be dismissed. Title 31 U.S.C. § 3730((c)(2)(B) provides:

> The Government may settle the action with the defendant notwithstanding the objection of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

Relator challenged the 2019 settlements in its Second Amended Complaint. JA-77-78. The fairness, adequacy and reasonableness of the 2019 settlements were necessarily bound up in that Complaint. The district court's dismissal of the Second Amended Complaint constituted approval of the 2019 settlements and called for review under 31 U.S.C. § 3730(c)(2)(B). Its failure to apply the correct standard is grounds for reversal and remand.

## IV. Relator Has Stated a Valid Reverse False Claim.

This Court reviews *de novo* a district court decision that involves an issue of law. *United States v. Yousef,* 327 F.3d 56, 140 (2d Cir. 2003).

In the proceedings below, the Government argued that Relator's claim is not cognizable under the "reverse false claim" provision of the FCA. The district court did not rule on that argument, but stated that it viewed the legal viability of Relator's claim "with skepticism." SPA-8, at 8 n.2. That said, the district court, somewhat confusingly, went on to note that even if Relator's claim was viable, Relator would have to "defend [its] novel liability theory on appeal." *Id.* (internal citation omitted). Relator proceeds to do so here.

Relator contends that the money laundered by SCB for Iran and related entities is forfeited to the United States by statute, creating an obligation to pay the Government that SCB concealed – a classic reverse false claim. JA-78-79. For its part, the Government argues that Relator is advancing a "'facially invalid legal theory' because 'an act giving rise to a potential civil forfeiture, even once the United States files a forfeiture action, does not create an obligation owed by the holder of the forfeitable party to the United States, and therefore does not create a reverse false claim to the Government.'" SPA-8, at 8 n.2. To the contrary, the Government's argument conflates an FCA lawsuit – seeking treble damages for defrauding the Government – with a forfeiture action – seeking possession of the particular proceeds of a crime. In doing so, the Government is at war (a) with well-established legislative and judicial understandings of an FCA reverse false claim,

and (b) with the central dynamic of the forfeiture mechanism that prevents the bad guys from dissipating the proceeds of their crimes.

### A. The "obligation to pay" that can be illicitly concealed in violation of the FCA's reverse false claim regime can be "established" even if not "fixed" or otherwise adjudicated so as to require immediate payment.

1. The False Claims Act "was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). That is why, "[i]n the various contexts in which questions of the proper construction of the Act have been presented, the Court has consistently refused to accept a rigid, restrictive reading." *Id.* Indeed, judicial construction of the Act has been driven by its real-world purpose. *Cf.* Robert A. Katzmann, JUDGING STATUTES, at 69 (2014). Most fundamentally, the FCA's treble damages create a critical incentive to obey the law in the face of the Government's limited ability to discover illegal conduct concealed by fraud.

This dynamic is seen in Congress' addition of the reverse false claim provision in 1986 expressly recognizing that just as the Government can by fraud pay money it does not owe, it can also by fraud be deprived of money it is owed. Before the existence of an explicit reverse false claim provision, some courts had ruled the Act did not cover reverse false claims; others had ruled it did. Congress believed that the Act was intended to cover reverse false claims, and so added an

express provision addressing fraud that conceals an obligation to pay money to the Government. *See* S. Rep. 99-345, at 18-19 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5283-84. In 2009 Congress further underscored the extensive reach of the FCA reverse false claim by adding a definition of "obligation" to the Act. As the Senate Judiciary Committee explained:

> The term "obligation" … includes fixed and contingent duties owed to the Government–including fixed liquidated obligations such as judgments, and fixed, unliquidated obligations such as tariffs on imported goods…. [T]he Committee supports the position of the Department of Justice that current section 3729(a)(7) "speaks of an 'obligation,' not a 'fixed obligation.' By including contingent obligations such as, "implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship," this new section reflects the Committee's view, held since the passage of the 1986 Amendments, that an "obligation" arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that "results in a duty to pay the Government money, whether or not the amount owed is yet fixed."

S. Rep. No. 111-10, at 14 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 441.

In its current form, then, the FCA's reverse false claims provision mandates that any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

is liable to the Government for treble damages plus a civil penalty for each such "reverse false claim." 31 U.S.C. § 3729(a)(1)(G). "[T]he term 'obligation' means

an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

Several attributes of an "obligation to pay" as used in the FCA are clear from the text. An obligation to pay can be "established" even though the amount owed is not yet fixed. This means that the obligation to pay need not be formally recognized and enforced in court to be established. Indeed, if establishment of an obligation to pay is construed to require an adjudication, there would no longer be any prospect of concealing that obligation, and no reverse false claim would ever be possible. Such a construction would clearly defeat the purpose of the statute. *See* Katzmann, *supra,* at 31 ("[L]egislation is a purposive act, and judges should construe statutes to execute that legislative purpose.").

The kind of "obligation to pay" on which a reverse false claim rests is not a novelty in the law. It is simply the converse of a classic chose in action, that is, "an interest in property not immediately reducible to possession," which includes "a financial interest such as a debt, a legal claim for money, or a contractual right." *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 407 n.6 (2d Cir.)(2018)(quoting *Sprint Communications Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 275 (2008)). As this Court has explained, "The chose in action is the

right of the creditor to be paid, while the debt is the obligation of the debtor to pay." *In re Halpin*, 566 F.3d 286, 290 (2d Cir. 2009) (internal citation omitted). A chose in action is a well-recognized, constitutionally protected property interest. *John Wiley & Sons* 882 F.d3 at 407 n.6; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 241 (2d Cir. 2016); RESTATEMENT (SECOND) OF CONTRACTS § 316 (1981)(A chose in action "includes debts of all kinds, tort claims, and rights to recover ownership or possession of real or personal property; it has been extended to instruments and documents embodying intangible property rights, to such intangible property as patents and copyrights, and even to equitable rights in tangible property.").

Finally, the FCA's reverse false claims provision creates a distinct cause of action to address a distinct wrong – a species of fraud against the Government – along with a distinct remedy for that wrong – treble damages plus a civil penalty. In the breach of contract context, for example, if the defendant concealed its liability to the Government for that breach, the Government could recover the FCA's treble damages and penalty, plus whatever contract damages to which it might be entitled.

2. "[W]hether an 'obligation' exists depends entirely on what the relevant legal instrument – be it a contract, regulation, statute, or judicial order – requires a party to do." *U.S. ex rel. Landis v. Tailwind Sports Corp.,* 160 F. Supp. 3d 253,

272 (D.D.C. 2016). Accordingly, when imported merchandise is not properly marked for tariff purposes, the Tariff Act imposes a 10 percent duty (in addition to any other duty) that is "deemed to have accrued at the time of importation." 19 U.S.C. § 1304(i). The Third Circuit explained that if the importer "knowingly failed to disclose … that its goods were unmarked or improperly marked despite its affirmative obligation to do so … and if such goods nevertheless escaped detection and were released into the United States, [the importer] would be liable under the [reverse false claims provision of the] FCA." *U.S. ex rel. Customs Fraud Investigations, LLC, v. Victaulic Co.,* 839 F.3d 242, 255 (3d. Cir. 2016). Thus the obligation to pay was established by the importation of unmarked merchandise even though the amount was not fixed (though the formula for determining the amount was set by the 10 percent duty).

The *Victaulic* Court went on to underscore the distinct purpose of the FCA's treble damage remedy -- creating an incentive to obey the law in the face of the Government's limited ability to discover illegal conduct concealed by fraud:

> if the importer believes the value of bringing unmarked or improperly marked goods into the country exceeds the risk that the deception will be discovered and the ten percent ad valorem duty will be owed, an importer may decline to mention that its goods are mismarked, since the chance that some goods will be discovered as mismarked and that marking duties will be owed would still result in a net gain to the company. Reverse false claims liability changes that value proposition because a finding of deception carries the possibility of treble damages.

839 F.3d at 255-56.

In *United States ex rel. Matheny v. Medco Health Solutions, Inc.,* 671 F.3d 1217 (11th Cir. 2012), a corporate integrity agreement with the Department of Health and Human Services required the defendant government contractor to refund payments from the government that lacked sufficient documentation or were duplicates. The defendant hid millions in overpayments by transferring them to unrelated patient accounts or to fictitious accounts, or eliminated any record of them through a computer program called "datafix." *Id.,* at 1220-21. The Eleventh Circuit readily found a valid reverse false claim grounded on such facts. *Id.*, at 1222-31.

Similarly, the Affordable Care Act requires a person who receives an overpayment from Medicare or Medicaid to "report and return" the overpayment to the government. 42 U.S.C. § 1320a-7k(d)(1).[2] In *Kane ex rel. U.S. v. Healthfirst, Inc.,* 120 F.Supp.3d 370 (S.D.N.Y. 2015), Kane, an employee of Healthfirst, in response to an inquiry from the New York State Comptroller produced a spreadsheet listing 900 claims with erroneous billing codes, about half of which had resulted in overpaid claims. *Id.*, at 377. Healthfirst returned none of this money. In adjudicating allegations of reverse false claims, the court concluded that "after Kane put [Healthfirst] on notice of a set of claims likely to contain numerous

---

[2] The statute expressly confirmed that this repayment requirement was an FCA obligation to pay, but the court did not rely on that provision in its analysis.

overpayments, [Healthfirst] had an established duty to report and return wrongly collected money," even though Kane had not precisely identified all the overpayments or the amounts overpaid. *Id.*, at 388.

A contract was the relevant legal instrument in *U.S. v. Pemco Aeroplex, Inc.,* 195 F.3d 1234, 1237-38 (11th Cir. 1999). There, a government contractor had an ongoing contractual obligation to account for excess government property in its possession, and violated the FCA's reverse false claims provision when it purchased that property from the government for far less than its market value because of the contractor's deliberate mis-identification of the property.

A final example, involving an Agriculture Department regulation, is *U.S. ex rel. Bahrani v. Conagra, Inc.,* 465 F.3d 1189, 1204 (10th Cir. 2006). The regulation provided that significant errors or omissions in export certificates required the exporter to obtain replacement certificates and pay the accompanying fee. To avoid paying that fee, Conagra employees altered the original certificates. The Tenth Circuit concluded that an FCA obligation to pay arose when the exporter determines a certificate contains a significant error or omission. *Id.,* at 1202-1203. The *Bahrani* Court quoted a Government *amicus* brief:

> According to the government, two kinds of obligations may be the subject of a reverse false claims action under § 3729(a)(7):
>
> (1) "[t]here may be a fixed obligation, spelled out by a judgment, contract, statute, or regulation, that imposes a duty on the person to pay money or transmit property to the government. This fixed obligation

may be liquidated as with a judgment, or it may be unliquidated but easily determinable [;]" Amicus Br. at 10; and

(2) there are other obligations that are "not yet 'fixed' in all particulars"; these "obligations" may be present "by virtue of the relationship between the government and the person who owes the government money or property." *Id.* For example, such obligations may exist "[w]hen the person and the government have a contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship." *Id.*

*Id.,* at 1201. The court agreed with the Government that Conagra's obligation to pay fell in the second category. *Id.*

To be sure, most regulatory sanctions do not give rise to an FCA obligation to pay. *See, e.g., U.S. ex rel. Simoneaux v. E.I. duPont de Nemours,* 843 F.3d 1033, 1040 (5th Cir. 2016)(explaining that "the customs law [in *Victaulic*] imposes a duty to *pay*. In contrast, most regulatory statutes, such as TSCA, impose only a duty to obey the law, and the duty to *pay* regulatory penalties is not 'established' until the penalties are assessed.")(emphases in original); *U.S. ex rel. Kasowitz Benson Torres LLP v. BASF Corp.,* 929 F.3d 721 (D.C. Cir. 2019).

At the same time, the *Simoneaux* Court underscored an important distinction between an unassessed penalty and an unliquidated FCA obligation to pay. "[T]he fact that further governmental action is required to collect a fine or penalty does not, standing alone, mean that a duty is not established." *Simoneaux,* 843 F.3d at 1039-40. *See also Bahrani,* 465 F.3d at 1204 ("Some discretion inheres in a wide variety of government decisions. For example, government officials may have

discretion as to whether to insist on a party's performance under a contract or whether to file a breach of contract action if a party does not perform. However, a contractual obligation falls within the scope of [the reverse false claim provision].”); *U.S. ex rel. Landis v. Tailwind Sports Corp.,* 51 F. Supp.3d 9, 59 (D.D.C. 2014) (“Accepting the … argument [that the discretion to bring an action means no obligation exists] would also have the detrimental and counterproductive effect of allowing those with knowledge of contractual breaches or other non-compliance to make false statements about those matters, without penalty, unless and until the government files a lawsuit.”).

### B. Under the civil forfeiture regime, SCB's violations of the Iran sanctions create obligations to pay the Government within the meaning of the FCA.

1. The fact that SCB's violations of the Iran sanctions created obligations to pay the Government both the money involved in the illegal conversion transactions and the revenue that SCB earned from these sanction violations is clear from the face of the relevant statutes of the civil forfeiture regime:

• Under 18 U.S.C. § 981(a)(1)(C), “[a]ny property … which constitutes or is derived from proceeds traceable to … [a] 'specified unlawful activity'” is subject to forfeiture.

• Under 18 U.S.C. § 981(a)(2)(A), “[i]n cases involving … illegal services … 'proceeds' means property of any kind obtained directly or indirectly, as a result of the commission of the offense … and any property traceable thereto, and is not limited to the net gain or profit realize from the offense.”

• Under 18 U.S.C. § 981(f), "[a]ll right, title, and interest in [such proceeds] shall vest in the United States upon commission of the act giving rise to forfeiture under this section."

• Under 18 U.S.C. § 1956(c)(7)(D),"'specified unlawful activity' means … an offense under … section 206 … of the International Emergency Economic Powers Act. [IEEPA]."

SCB's violations of the Iran sanctions are violations of IEEPA. JA-79. Accordingly, under these statutes, the billions of dollars involved in SCB's illegal clearing transactions were proceeds of an unlawful activity subject to forfeiture, and at the time of those transactions, all "right, title, and interest" in those proceeds vested in the United States. As of the time of that vesting, SCB had an obligation to transmit this tainted money to its new owner, the Government.

2. Section 981(f), the "relation-back" provision, "reflects the application of the long-recognized and lawful practice of vesting title to any forfeitable assets, in the United States, at the time of the criminal act giving rise to forfeiture." *Caplin & Drysdale, Chartered v. U.S.,* 491 U.S. 617, 628 (1989). The Court explained that "the *property rights* given the Government by virtue of the forfeiture statute are more substantial than petitioner acknowledges. … Congress dictated that '[a]ll right, title and interest in property' obtained … via the illicit means described in the statute 'vests in the United States upon the commission of the act giving rise to forfeiture.'" *Id.,* at 627 (internal citations omitted, emphasis added). To illustrate

the long pedigree of this practice, the Court quoted *U.S. v. Stowell,* 133 U.S. 1, 19

(1890):

> In *Stowell,* the Court explained the operation of a similar forfeiture
> provision … as follows:
>> "As soon as [the possessor of the forfeitable asset committed the
>> violation] of the internal revenue laws, the forfeiture under those laws
>> took effect, and (though needing judicial condemnation to perfect it)
>> operated from that time as a statutory conveyance to the United States
>> of all the right, title and interest then remaining in the [possessor];
>> and was as valid and effectual, against all the world, as a recorded
>> deed. The right so vested in the United States could not be defeated
>> or impaired by any subsequent dealings of the ... [possessor]."

*Id*.

To be sure, like any chose in action, the interest of the Government in the

forfeited property – here, money that was the proceeds of SCB's violations of the

Iran sanctions -- does require further judicial action to give the Government

possession of that property. But that does not mean that the obligation of SCB to

pay that money to the Government does not exist, or make SCB's concealment of

that obligation any less of a reverse false claim. No obligation to pay under the

FCA's reverse false claim provision is self-executing in the sense that no judicial

enforcement is required. A contractor's concealment of his obligation to pay the

Government damages for a breach of contract is a reverse false claim even though

subsequent proceedings must establish the contract breach.

In a real sense, the FCA's reverse false claim provision is itself a "relation-

back" mechanism. The reverse false claim provision recognizes that liability for a

debt – an obligation to pay – legally exists before that liability is formally confirmed and damages set in court, and that a defendant's prior concealment of that liability constitutes a legal wrong distinct from the liability for the debt – a fraud designed to hide from the Government the fact that it is owed money so that the Government never exercises its right to secure payment of that money. The design of the FCA – with its treble damages and fines – promises that the punishment for the cover-up may be more severe than the punishment for the wrong covered-up, as the *Victaulic* Court pointed out.

3. Any notion that the forfeited proceeds of money-laundering (such as that in which SCB was engaged) do not constitute an FCA obligation to pay does not bear scrutiny in light of a rich body of statutory and case law. As this Court has made clear, under the operation of the relation-back provision, those illegal proceeds "belong to the government from the moment they came into existence." *U.S. v. Watts,* 786 F.3d 152, 166-67 (2d. Cir. 2015) (internal citations omitted). "It is the intent of Congress that a person who conducts his financial transactions in violation of the anti-money laundering statutes forfeits his right to the property involved." 134 CONG. REC. S17365 (daily ed. Nov. 10, 1988)(statement of Sen. Biden). As a result, SCB had a duty to transmit those proceeds to the Government, and their concealment of that duty constitutes an FCA reverse false claim. Indeed,

the *Watts* Court pointed out that the Government's right to those proceeds made it a creditor under New York law. *Id.,* at 155, 164.

The clear weight of judicial opinion concurs with the *Watts* Court. *See, e.g., U.S. v. Daugerdas,* 892 F.3d 545, 553 (2d Cir. 2018) (The "relation-back doctrine causes the government's interest in offense proceeds to vest as soon as they come into existence, and that vested interest will trump the claim of every subsequent gratuitous transferee."); *U.S. v. McHan,* 345 F.3d 262, 271 (4th Cir. 2003) (Illegal proceeds are " forfeited to the United States at the time of the criminal conduct giving rise to the forfeiture."); *U.S. v. $41,305.00 in Currency & Travelers Checks*, 802 F.2d 1339, 1346 (11th Cir. 1986) ("Illegal use immediately vests title to the property in the sovereign, and cuts off the rights of third parties to obtain legally protectible interests in the property."); *U.S. v. Simmons,* No. 17-cr-127, 2019 WL 3532113, at *4 (S.D.N.Y. Aug. 02, 2019) (Illegal proceeds "belong to the government from the moment they come into existence.") (quoting *Watts,* 786 F.3d at 166-67); *U.S. v. Wolf*, 375 F. Supp. 3d 428, 436 (S.D.N.Y. 2019) (same); *U.S. v. All Assets Held at Bank Julius Baer & Co.*, 772 F. Supp. 2d 191, 201 (D.D.C. 2011) ("Because the government's interest is considered to vest at the time of the commission of the acts giving rise to forfeiture, and interests acquired after that point are cognizable only if they are the interests of a "bona fide purchaser or seller for value."); (*U.S. v. 1314 Whiterock & Improvements, San Antonio, Bexar Cty.,*

*Tex.*, 571 F. Supp. 723, 725 (W.D. Tex. 1983) ("From a long line of decisions dating back to *United States v. Stowell,* … it is clear that, when property is subject to forfeiture for violation of the law, title vests absolutely in the sovereign at the date of the illegal act. Seizure and a subsequent judicial decree of forfeiture merely confirm the forfeiture that has already taken place.").

Nor does civil forfeiture procedure somehow undermine the Government's property interest in SCB's money laundering proceeds or SCB's correlative obligation to transmit them to the Government. Certainly, in a civil forfeiture action, the Government must establish, by a preponderance of the evidence, that property is subject to forfeiture – here, that the money at issue is the proceeds of SCB's systematic violation of the Iran sanctions. That undertaking no more excludes forfeited money laundering proceeds from the scope of the FCA's "obligation to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(1)(G), than does the need to prove damages for a contract breach or any other duty to pay arising from the "spectrum of possibilities" noted by the Senate Judiciary Committee, *supra.*

Once the forfeitability of the proceeds is established, in the normal case, the only question that remains is whether an innocent third party who was a bona fide purchaser for value has a claim. 18 U.S.C. § 983(d)(the "innocent owner" defense); *Daugerdas,* 892 F.3d at 548; *United States v. Chowaiki,* 369 F.Supp.3d 565, 571-

72 (S.D.N.Y. 2019); Stefan Cassella, ASSET FORFEITURE LAW IN THE UNITED STATES, 494-98 (2d ed. 2013)(" ASSET FORFEITURE LAW"). Whether such an "innocent owner" has subsequently come into possession of forfeited property may have relevance for the ultimate award of possession of that property in forfeiture proceedings,[3] but it assuredly does not excuse the defendant's original obligation to pay or culpability for a reverse false claim. After all, a reverse false claim action seeks treble damages for fraud, not possession of the forfeited property. By concealing its duty to transmit these proceeds to the Government, and then transferring those proceeds to a third party so that they are out of reach of the Government, a defendant further 'improperly avoids … an obligation to pay or transmit money or property to the Government" in violation of the FCA. 31 U.S.C. § 3729(a)(1)(G). So even if an innocent third party subsequently acquires the illegal proceeds, the reverse false claim remains.

Moreover, this is not a run-of-the-mill forfeiture case. Following 9/11, Congress expressly exempted forfeitures for IEEPA violations, such as those at issue here, from the statutory innocent purchaser defense. 18 U.S.C. §

---

[3] Where money is the forfeited proceeds in the money laundering context, the fact that the money laundered was transferred to an innocent third party may have no relevance even in a forfeiture proceeding. *See United States v. Bermudez,* 413 F.3d 304, 306-07 (2d Cir. 2005)(Congress intended money launderers who are not low-level intermediaries to be liable for forfeiture of the total amount laundered and to forfeit substitute assets in that amount even if they did not retain the money for themselves.); 18 U.S.C. § 984(civil forfeiture of fungible property); ASSET FORFEITURE LAW, at 773-75.

983(i)(2)(D). That exemption arose in part from a congressional finding that "correspondent banking facilities are one of the banking mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions." 31 U.S.C. § 5311 note. That finding aptly describes the circumstances from which this case arose.

At bottom, the FCA's reverse false claim provision expressly recognizes that an obligation to pay may be created by the operation of a statute. 31 U.S.C. § 3729(b)(3). Our claim that SCB concealed such an obligation to pay rests on the well-established understanding of Congress' design for civil forfeiture under which SCB's violations of the Iran sanctions created SCB's obligation to transmit to the Government the proceeds of those violations. Our claim is neither "novel" nor simply a "theory," but a faithful application of two statutory regimes – the sanctioning of reverse false claims and the forfeiture of the proceeds of money laundering.

### V. The Court Should Hold This Appeal in Abeyance While the District Court Adjudicates Relator's Motion for an Indicative Ruling Under FED.R.CIV.P. 62.1.

The district court rested its decision to grant the Government's motion to dismiss on two propositions. First, "[o]n the detailed record presented," the court concluded that the Government had "proffered 'a valid government purpose,'"

specifically, that Relator's "factual allegations are meritless." SPA-6-7. Second, according to the court, the Government reasonably wished to avoid expending resources on discovery in "a matter that it has found meritless." SPA-7.

Newly discovered evidence now exposes the Government's representations concerning the merits of Relator's allegations as untrue, and that the record upon which the district court based its ruling was anything but "detailed," at least in the sense of presenting the court with an accurate picture of the facts generated in a process comporting with elementary notions of fairness and effective truth-finding. On September 20, 2020, BuzzFeed News, the British Broadcasting Company, and the International Consortium of Investigative Journalists began publishing reports – collectively referred to as the *FinCEN Files* -- based on the content of suspicious activity reports (SARs) maintained by the Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) that FinCEN had received *after* Relator had presented its allegations and supporting evidence to the Government. Those SARs were available to the Government *before* it settled with Defendants and *before* it moved to dismiss the complaint. Drawing from those SARs, these journalists described numerous transactions by Defendants with Iran and Iran-related parties that violated U.S. sanctions, including many transactions that had been reported earlier to the Government by Relator but apparently ignored by the Government.

These disclosures of the information contained in the SARs reveal that Relator's allegations and information were far from "meritless," and justify withdrawal of the district court's Opinion and Order dismissing this case and the initiation of a far more searching examination of the Government's claims under FED.R.CIV.P. 60, either as newly discovered evidence, Rule 60(b)(2), as serious misrepresentations arising out of the Government's "mistake" or "excusable neglect," Rule 60(b)(1), or, more troubling, as a fraud upon the district court. Rule 60(b)(3). However, given the current appellate posture of this case, the district court does not have jurisdiction over a Rule 60 motion. Accordingly, Relator has moved pursuant to FED.R.CIV.P. 62.1 for an indicative ruling that the district court would, if the case were remanded here, grant relief under Rule 60, or at the very least that this motion raises a substantial issue concerning the integrity of the Opinion and Order dismissing this case.

In these circumstances, this Court should exercise its inherent authority to hold this appeal in abeyance pending the district court's resolution of the Rule 62.1 motion. It is premature and a waste of resources for this Court to adjudicate the merits of this case in its present posture, clouded by very troubling newly discovered evidence that calls into question the factual foundation of the ruling below.

## CONCLUSION

For the foregoing reasons, this Court should (1) hold this appeal in abeyance pending the district court's resolution of the pending Rule 62.1 motion, or (2) if the Court proceeds to adjudicate this appeal, the Court should reverse the district court's dismissal of the Second Amended Complaint, and remand the case for further proceedings.

November 6, 2020

Respectfully submitted,
BRUTUS TRADING, LLC

By:    /s/ Patrick M. McSweeney

Patrick M. McSweeney
McSweeney, Cynkar & Kachouroff, PLLC
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
patrick@mck-lawyers.com

Robert J. Cynkar
McSweeney, Cynkar & Kachouroff, PLLC
10506 Milkweed Drive
Great Falls, VA 22066
(703) 621-3300
rcynkar@mck-lawyers.com

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because this brief contains no more than 10,036 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 14-point Times New Roman font.

Dated:     November 6, 2020     /s/ Patrick M. McSweeney____
                                                Patrick M. McSweeney

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion and Order of the Honorable Paul A. Engelmayer,
  dated July 2, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-1

Judgment, dated July 2, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, *ex rel.* BRUTUS
TRADING, LLC,

                                          Plaintiffs,

                    -v-

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD CHARTERED
TRADE SERVICES CORPORATION,

                                          Defendants.

---

18 Civ. 11117 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

    This is a *qui tam* action brought on behalf of the United States by relator Brutus Trading,

LLC ("relator"), alleging that defendants Standard Chartered Bank, Standard Chartered PLC, and

Standard Chartered Trade Services Corporation (together, "defendants" or "Standard Chartered")

engaged in banking practices that violated U.S. sanctions against Iran.  Before the Court is the

Government's motion to dismiss relator's *qui tam* complaint.  For the reasons that follow, the

Court grants the motion.

## I.      Background

    The Court assumes familiarity with the facts and procedural history of this case.  In brief,

this matter stems from defendants' admitted practice, between 2001 and 2007, of deceptively

facilitating U.S. Dollar transactions by Iranian clients, in violation of U.S. sanctions and various

New York and federal banking regulations.  *See* Dkt. 18[1] (Second Amended Complaint, or "SAC")

¶¶ 27–32.  Following a multi-year, multi-agency investigation, defendants entered into a 2012

---

[1] Except where specified, citations to the docket refer to the docket of the instant case,
No. 18 Civ. 11117 (PAE).

Deferred Prosecution Agreement ("DPA") with the Department of Justice ("DOJ")—and related settlements or consent agreements with the Office of Foreign Asset Control ("OFAC"), the Federal Reserve, the New York County District Attorney's Office ("DANY"), and the New York Department of Financial Services ("DFS")—to resolve the matter, for which defendants paid hundreds of millions of dollars in fines and penalties.  *See id.*; *id.*, Ex. A.  The 2012 DPA was publicly announced on December 10, 2012.  *Id.* ¶ 29.

On December 17, 2012, relator—an entity formed by Julian Knight and Robert Marcellus for the purpose of pursuing this action—filed a *qui tam* action that was assigned to Judge Forrest, in which it alleged that the defendants had misled the Government in negotiating the 2012 DPA. *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank et al.*, No. 12 Civ. 9160 (KBF) ("*Brutus Trading I*"), Dkt. 36.  Specifically, relator alleged that defendants had continued to engage in sanctions-violating conduct beyond 2007, notwithstanding their representations to the Government that they had thereafter ceased doing so.  *Id.* ¶¶ 25–34.  The Government, as discussed *infra*, investigated relator's allegations but ultimately found them unsupported.

In approximately August 2013, the Government informed relator's counsel that it intended to decline to intervene in the case.  Dkt. 31 ("Gov't Mem.") at 8; Dkt. 32 ("Komar Decl.") ¶¶ 24–25.  The Government kept the complaint under seal, however, while it pursued a separate investigation of potential Iran sanctions violations by defendants (the "2013 Investigation"). Gov't Mem. at 8; Komar Decl. ¶ 31.  On May 10, 2017, Judge Forrest unsealed the case, *Brutus Trading I*, Dkt. 19, and on July 14, 2017, the Government informed Judge Forrest that it would not be intervening, *id.*, Dkt. 24.  On September 19, 2017, relator dismissed its complaint without prejudice.  *Id.*, Dkt. 35.

On November 29, 2018, relator re-filed its complaint. *See* SAC ¶ 37.  It was assigned to this Court, Judge Forrest having left the bench.  Dkt. 1.  In March 2019, the Government again declined to intervene, Gov't Mem. at 12, and the case was later unsealed, Dkt. 3.  On April 9, 2019, DOJ announced a new DPA (the "2019 DPA") with defendants—and OFAC, the Federal Reserve, and DFS announced new settlement or consent agreements with defendants—stemming from the results of the 2013 Investigation. *See* SAC ¶¶ 60–61; *see also* Dkt. 35 ("Bryan Decl.") ¶¶ 11–16; Dkt. 58 ("Nochlin Decl.") ¶¶ 13–14.  On July 19, 2019, relator filed its First Amended Complaint, Dkt. 15 ("FAC"), in which, *inter alia*, it added the allegation that the 2019 DPA, like the 2012 DPA, "did not address the broader course of conduct by [defendants] in violation of the Iran sanctions" alleged by relator's complaint, *id.* ¶ 62.  The FAC also advanced a new theory of recovery based on alleged reverse false claims, *see* 31 U.S.C. § 3729(a)(1)(G), by defendants. *Id.* ¶¶ 63–65.  On September 20, 2019, relator filed its Second Amended Complaint, in which it added allegations that it had been the initial source of the information leading to the 2019 DPA and related agreements, *see* SAC ¶¶ 64–65, and was therefore entitled to a share of the Government's recovery from those agreements, *id.* ¶ 69.

On November 21, 2019, the Government filed a motion to dismiss the SAC, Dkt. 30; a supporting memorandum of law, Gov't Mem.; the declaration of FBI Special Agent Matthew Komar, Komar Decl., with attached exhibits; the declaration of FBI Special Agent Wayne Boddy, Dkt. 33 ("Boddy Decl."), with attached exhibits; the declaration of Alexandre Manfull, Dkt. 34 ("Manfull Decl."), with attached exhibits; and the declaration of Patrick Bryan, Bryan Decl., with attached exhibits.  On January 10, 2020, relator filed a memorandum of law in opposition, Dkts. 48–49 ("Relator Mem."), with attached exhibits, including the declaration of Robert Marcellus, Dkt. 48-1 ("Marcellus Decl."), the declaration of Julian Knight, Dkt. 48-2

("Knight Decl."), the declaration of Anshuman Chandra, Dkt. 48-3 ("Chandra Decl."), and the

declaration of Dennis Sweeney, Dkt. 48-4 ("Sweeney Decl.").  On February 28, 2020, the

Government filed a reply memorandum of law, Dkt. 54 ("Gov't Reply"); the reply affirmation of

Agent Komar, Dkt. 55 ("Komar Reply Decl."); the reply affirmation of Agent Boddy, Dkt. 56

("Boddy Reply Decl."), with attached exhibits; the reply affirmation of Alexandre Manfull,

Dkt. 57 ("Manfull Reply Decl."); and the affirmation of Elizabeth Nochlin, Nochlin Decl., with

attached exhibits.  On March 13, 2020, relator filed a sur-reply, Dkt. 61 ("Relator Sur-Reply"),

with attached exhibits.

## II.      Standard of Review

The False Claims Act ("FCA" or the "Act"), 31 U.S.C. § 3729 *et seq.*, permits a private

party (a "relator") to bring a civil suit, known as *qui tam* action, in the name of the United States

to enforce the Act's prohibitions of the submission of false claims to the Government.  *See id.*

§ 3730(b)(1).  The Government retains the ability to exercise significant control over such suits.

*See id.* § 3730(b)–(c).  Among other rights, the FCA permits the Government to intervene in

such suits, *id.* § 3703(b)(2), and, relevant here, to move to dismiss them even when it has

declined to intervene, *see id.* § 3703(c)(2)(A).

The Second Circuit has not definitively established the standard of review for a motion

by the Government to dismiss a *qui tam* action.  *See U.S. ex rel. Stevens v. State of Vt. Agency of

Nat. Res.*, 162 F.3d 195, 201 (2d Cir. 1998).  In general, courts have followed one of two

approaches.  The first, articulated by the D.C. Circuit in *Swift v. United States*, 318 F.3d 250

(D.C. Cir. 2003), analogizes the United States' motion to dismiss a *qui tam* action to a decision

not to prosecute.  Thus, at least where a defendant has not yet been served, the D.C. Circuit has

concluded that dismissal is the Government's "unfettered right," and all but unreviewable absent

fraud on the court.  *Swift*, 318 F.3d at 252–53; *see also Hoyte v. Am. Nat'l Red Cross*,

518 F.3d 61, 65 (D.C. Cir. 2008). The second approach, set out by the Ninth Circuit in *United States ex rel., Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139 (9th Cir. 1998), is somewhat less deferential. Under the *Sequoia Orange* standard, the Government must first identify "a valid government purpose" and "a rational relation between dismissal and accomplishment of the purpose." *Id.* at 1145; *see also Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 936 (10th Cir. 2005) (adopting the *Sequoia Orange* standard). The burden then shifts to the relator "to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." *Sequoia Orange*, 151 F.3d at 1145.

Like other courts in this District to have considered this question, the Court concludes that it need not definitively determine the appropriate standard of review to resolve this case. That is because the Government has carried its burden even under the more searching *Sequoia Orange* standard. *See United States ex rel. Borzilleri v. AbbVie, Inc.*, No. 15 Civ. 7881 (JMF), 2019 WL 3203000, at *2 (S.D.N.Y. July 16, 2019) ("The Court need not take a side in the dispute, however, because it concludes that the Government may dismiss the case even under the more stringent standard articulated in *Sequoia Orange*."); *United States ex rel. Amico v. Citigroup, Inc.*, No. 14 Civ. 4370 (CS), 2015 WL 13814187, at *4 (S.D.N.Y. Aug. 7, 2015) ("While this Court is more inclined toward *Swift* than *Sequoia*, the question need not be resolved because dismissal is required under either standard."); *see also U.S. ex rel. Piacentile v. Amgen Inc.*, No. 04 Civ. 3983 (SJ), 2013 WL 5460640, at *4 (E.D.N.Y. Sept. 30, 2013) ("[E]ven if the government's right to dismiss ought to be conditioned on a demonstrable nexus to a valid government purpose, this Court finds that nexus to be present."). *But see United States v. Cooperatieve Bank U.A.*, No. 17 Civ. 2708 (LGS), 2019 WL 5593302, at *3 (S.D.N.Y. Oct. 30, 2019) ("The Court adopts the *Sequoia* standard[.]").

### III.    Discussion

Although the Government advocates application of the *Swift* test, Gov't Mem. at 16–19, in recognition of the potential use of a more searching inquiry it proffers three independent bases for its decision to move to dismiss relator's complaint, *id.* at 19–30.  The Court need only address the first two, each of which it finds satisfy *Sequoia Orange*'s threshold test.

First, the Government represents that relator's allegations did not lead to the discovery of any new FCA violations by defendants and were not the impetus for the 2013 Investigation.  *Id.* at 23–28; Gov't Reply at 8–14.  In support, the Government has submitted declarations from the successive lead FBI case agents on the investigation, *see* Komar Decl.; Boddy Decl.; Komar Reply Decl.; Boddy Reply Decl.  It has also submitted declarations from leading members of the investigation teams of OFAC, *see* Manfull Decl.; Manfull Reply Decl.; the Federal Reserve, *see* Bryan Decl.; and DFS, *see* Nochlin Decl.  These declarations describe in detail the Government's investigation of defendants, the steps that the agencies took to investigate relator's claims, and the reasons why the investigating agencies concluded that the evidence did not substantiate relator's allegations that defendants had engaged in additional sanctions-violating conduct.  *See* Komar Decl. ¶¶ 7–25; Manfull Decl. ¶¶ 22–38; Bryan Decl. ¶¶ 5–10; Nochlin Decl. ¶¶ 6–10, 20; Manfull Reply Decl. ¶¶ 20–25, 29.  These declarations also explain concretely the reasons why the information provided by relator did not contribute to the 2013 Investigation that resulted in the 2019 DPA.  *See* Komar Decl. ¶¶ 26–41; Boddy Decl. ¶¶ 4–10, 16–18; Manfull Decl. ¶¶ 39–56; Bryan Decl. ¶¶ 11–16; Manfull Reply Decl. ¶¶ 26–30, 34; Nochlin Decl. ¶¶ 12–20; *see generally* Komar Reply Decl.

On the detailed record presented, the Court has no difficulty finding that the Government has proffered "a valid government purpose" for seeking to dismiss the *qui tam* action—namely, the early termination of actions as to which the Government has determined that the factual

allegations are meritless—and has articulated a more than "rational relation between dismissal and accomplishment of th[at] purpose." *Sequoia Orange*, 151 F.3d at 1145; *see, e.g.*, *United States v. Gilead Scis., Inc.*, No. 11 Civ. 941 (EMC), 2019 WL 5722618, at *7 (N.D. Cal. Nov. 5, 2019); *United States v. EMD Serono, Inc.*, 370 F. Supp. 3d 483, 490 (E.D. Pa. 2019); *Nasuti ex rel. U.S. v. Savage Farms, Inc.*, No. 12 Civ. 30121 (GAO), 2014 WL 1327015, at *11 (D. Mass. Mar. 27, 2014), *aff'd sub nom. Nasuti v. Savage Farms Inc.*, No. 14-1362, 2015 WL 9598315 (1st Cir. Mar. 12, 2015).

Second, the Government argues that dismissal is appropriate because, were the case to proceed to discovery, the Government would be required to expend resources on a matter that it has found meritless. Gov't Mem. at 28–30; Gov't Reply at 14. This is a well-established basis for the dismissal of a *qui tam* complaint. *See Cooperatieve Bank*, 2019 WL 5593302, at *3; *Borzilleri*, 2019 WL 3203000, at *2; *Amico*, 2015 WL 13814187, at *4; *see also Sequoia Orange*, 151 F.3d at 1146. It is particularly compelling in this case, where the Government has already recovered hundreds of millions of dollars from defendants after two multi-agency investigations that spanned nearly a decade. *See* Gov't Mem. at 4–5 & n.1, 10–11 & n.5. The Court finds the Government's considered decision not to expend additional resources on this litigation to be an independent "valid government purpose" justifying dismissal. *Sequoia Orange*, 151 F.3d at 1145.[2]

---

[2] Having found the Government's first two proffered bases for dismissing this action to be well-founded, the Court does not need to delve into the third: that the theory underpinning relator's reverse false claim allegations is legally unsupported. *See Borzilleri*, 2019 WL 3203000, at *2 (court may grant Government's motion to dismiss under the *Sequoia Orange* test so long as it has "demonstrate[d] at least one valid government purpose for seeking dismissal" (internal quotation marks omitted)). Relator contends that *all* funds involved in *any* sanctions-violating transactions are *automatically* forfeited to the Government "by operation of statute." *See* SAC ¶¶ 8, 66, 71; Relator Opp'n at 17 ("Thus, the billions of dollars involved in the Defendants' illegal clearing transactions became, at the time of those transactions, the property of the United States, though still in the hands of the Defendants."). The Government argues that this is a

"Because the Government offers a valid purpose for dismissal, the burden shifts to [relator] to show that the dismissal is nonetheless 'fraudulent, arbitrary and capricious, or illegal.'" *Borzilleri*, 2019 WL 3203000, at *2 (quoting *Sequoia Orange*, 151 F.3d at 1145). Relator has failed to carry its burden.  As to the Government's contention that it investigated relator's claims and found them to be without merit, as well as its contention that relator's submissions were not the source of the 2013 Investigation, relator argues that the Government either failed to properly investigate its contentions or failed to understand the import of the evidence it provided.  Relator Mem. at 1–14, 20–30.  But "[t]he Government's memoranda reveal, and the Court has no basis to doubt, that the Government undertook a lengthy, costly, and substantial investigation into [relator]'s claims that spanned several years and multiple offices and agencies.  [Relator]'s subjective disagreement with the Government's investigative strategy and ultimate decision does not provide the Court with a basis to second-guess the Government's decision to dismiss the case." *Borzilleri*, 2019 WL 3203000, at *2 (internal citations omitted); *see also Cooperatieve Bank*, 2019 WL 5593302, at *3; *EMD Serono, Inc.*, 370 F. Supp. 3d 483, 490 (E.D. Pa. 2019); *Piacentile*, 2013 WL 5460640, at *3.  That relator would have reached a

---

"facially invalid legal theory," because "an act giving rise to a potential civil forfeiture, even once the United States files a forfeiture action, does not create an obligation owed by the holder of the forfeitable party to the United States, and therefore does not constitute a reverse false claim to the Government."  Gov't Mem. at 20–21.  The Court need not resolve this dispute in light of the independent bases for dismissal.  But even assuming *arguendo* that such a theory were legally viable—and the Court views that premise with skepticism—there would be good reasons for dismissal under the *Sequoia Orange* framework.  Relator "asserts a never-before-recognized liability theory that is a long way from striking pay dirt.  Even if [relator] prevails at the trial-court level, [defendants] would no doubt force [it] to defend [its] novel liability theory on appeal."  *United States ex rel. Vanderlan v. Jackson HMA, LLC*, No. 3:15 Civ. 767 (DPJ), 2020 WL 2323077, at *12 (S.D. Miss. May 11, 2020).  The Government, as a repeat player with a vested stake in the precedential impact of such a legal theory, would thus need to expend time and resources monitoring, if not actively participating in, each stage of the litigation, thereby increasing the burden of costs from a matter it considers meritless, against defendants from which it has already recovered millions of dollars.

different result than the one reached by two U.S. Attorney's Offices, the FBI, OFAC, the Federal

Reserve, DANY, and DFS does not make the Government's decision arbitrary and capricious.

Relator makes a similarly ineffective attempt to undercut the Government's argument

that dismissing this case would preserve Government resources.  Relator argues that such an

argument is irrational because the Government "makes no effort to come to grips with the

information [r]elator has produced," Relator Mem. at 22, and characterizes the Government's

investigation as an "inexcusable expenditure of time, taxpayer money and other resources," *id.*

at 30, because it did not reach the conclusion that relator deems correct.  For the reasons

discussed above, on the record proffered by the Government, relator's difference of opinion is

insufficient to transform the Government's decision into one that is arbitrary and capricious.

Because the Court finds that relator has failed to establish that either of the Government's

stated reasons for moving to dismiss the complaint are arbitrary and capricious, and relator has

not alleged that the decision was fraudulent or illegal, relator has not carried its burden under

*Sequoia Orange*.

## CONCLUSION

For the reasons stated above, the Court finds that at least two of the reasons proffered by

the Government in support of dismissal qualify as "valid government purpose[s]" and that the

Government has articulated "a rational relation between dismissal and accomplishment of th[ose]

purpose[s]."  *Sequoia Orange*, 151 F.3d at 1145.  The Court further finds that relator has not

carried its burden of showing that either, let alone both, of these reasons "is fraudulent, arbitrary

and capricious, or illegal."  *Id.*  The Court therefore grants the Government's motion to dismiss

the Second Amended Complaint.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 30

and close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 2, 2020
        New York, New York

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
UNITED STATES OF AMERICA, ex rel.
BRUTUS TRADING, LLC,

                        Plaintiffs,

      -against-

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

                        Defendants.
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/2/2020

18 **CIVIL** 11117 (PAE)

## JUDGMENT

      It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in the Court's Opinion & Order dated July 2, 2020, the Court finds that at least two of the reasons proffered by the Government in support of dismissal qualify as "valid government purpose[s]" and that the Government has articulated "a rational relation between dismissal and accomplishment of th[ose] purpose[s]." Sequoia Orange, 151 F.3d at 1145. The Court further finds that relator has not carried its burden of showing that either, let alone both, of these reasons "is fraudulent, arbitrary and capricious, or illegal." Id. The Government's motion to dismiss the Second Amended Complaint is granted; accordingly, this case is closed.

**Dated:**  New York, New York

      July 2, 2020

                                   **RUBY J. KRAJICK**
                                   **Clerk of Court**

  **BY:**

                                   **Deputy Clerk**