# 20-2578

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❧

BRUTUS TRADING, LLC,

*Plaintiff-Appellant,*

ABC,

*Plaintiff,*

—against—

STANDARD CHARTERED BANK, STANDARD CHARTERED PLC,
STANDARD CHARTERED TRADE SERVICES CORPORATION,

*Defendants-Appellees,*

UNITED STATES OF AMERICA,

*Interested Third Party-Appellee,*

DEF,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK CITY

## JOINT APPENDIX
## VOLUME I OF III
### (Pages JA-1 to JA-285)

ANTONIO J. PEREZ-MARQUES
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
*Attorneys for Defendants-Appellees*

JEAN-DAVID BARNEA
BENJAMIN H. TORRANCE
UNITED STATES ATTORNEY'S OFFICE
SDNY, CIVIL DIVISION
86 Chambers Street
New York, New York 10007
(212) 637-2800
*Attorneys for Interested Third Party-
  Appellee*

PATRICK M. MCSWEENEY
MCSWEENEY CYNKAR
  & KACHOUROFF, PLLC
3358 John Tree Hill Road
Powhatan, Virginia 23139
(804) 937-0895

ROBERT J. CYNKAR
MCSWEENEY CYNKAR
  & KACHOUROFF, PLLC
10506 Milkweed Drive
Great Falls, Virginia 22066
(703) 621-3300
*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

PAGE

Docket Entries ........................................................ JA-1

Complaint, dated November 28, 2018 ................................. JA-12

Order of the Honorable Paul A. Engelmayer,
    dated March 20, 2019 ............................................ JA-28

First Amended Complaint, dated July 18, 2019 ........................ JA-30

Stipulation and Order Extending Time to Answer,
    Move or Otherwise Respond to the Complaint
    and to Stay Discovery, dated July 22, 2019........................ JA-52

Memo Endorsement, dated August 28, 2019 ........................... JA-55

Plaintiff's Motion for Leave to Amend Complaint,
    dated September 20, 2019 ........................................ JA-57

    Exhibit 1 to Motion for Leave—
    Second Amended Complaint, dated September 20, 2019 ........... JA-58

    Exhibit 6 to Motion for Leave—
    Declaration of Patrick M. McSweeney, for Plaintiff,
    in Support of Motion for Leave to Amend Complaint,
    dated September 19, 2019 ........................................ JA-82

Memo Endorsement Granting Plaintiff's Motion for Leave
    to Amend Complaint, dated September 20, 2019.................... JA-84

Government's Notice of Motion to Dismiss Relator's Second
    Amended Complaint, dated November 21, 2019 ................... JA-85

PAGE

Declaration of Special Agent Matthew F. Komar, for Government,
in Support of Motion to Dismiss Relator's Second Amended
Complaint, dated November 21, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-87

Exhibit 1 to Komar Declaration—
Deferred Prosecution Agreement, dated July 12, 2012 . . . . . . . . . . . JA-101

Exhibit 2 to Komar Declaration—
Complaint, dated December 17, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . JA-159

Exhibit 3 to Komar Declaration—
First Amended Complaint in *United States v. Standard Chartered
Bank et al.,* Case No. 12-CV-9160, dated November 14, 2014 . . . . . JA-173

Declaration of Special Agent Wayne C. Boddy, for Government,
in Support of Motion to Dismiss Relator's Second Amended
Complaint, dated November 21, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-188

Exhibit 1 to Boddy Declaration—
Amended Deferred Prosecution Agreement in *United States
v. Standard Chartered Bank,* Case No. 12-CR-262,
fully executed April 9, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-194

Exhibit 2 to Boddy Declaration—
Indictment in *United States v. Mahmoud Reza Elyassi,*
Case No. 19-CR-000117, dated July 9, 2018 . . . . . . . . . . . . . . . . . . . . JA-286

Exhibit 3 to Boddy Declaration—
Unsealing Order in *United States v. Standard Chartered Bank
et al.,* Case No. 12-CV-9160, dated May 10, 2017 . . . . . . . . . . . . . . . JA-297

Exhibit 4 to Boddy Declaration—
Notice of Non-Intervention in *United States of America
ex rel. Brutus Trading v. Standard Chartered Bank et al.,*
Case No. 12-cv-9160, dated July 14, 2017 . . . . . . . . . . . . . . . . . . . . . . JA-298

Exhibit 5 to Boddy Declaration—
Scheduling Order in *United States of America ex rel.
Brutus Trading v. Standard Chartered Bank et al.,*
Case No. 12-cv-9160, dated July 26, 2017 . . . . . . . . . . . . . . . . . . . . . . JA-300

PAGE

Exhibit 6 to Boddy Declaration—
Plaintiff-Relator's Notice of Voluntary Dismissal
in *United States v. Standard Chartered Bank et al.,*
Case No. 12-CV-9160, dated September 19, 2017 ...............JA-302

Declaration of Alexandre Manfull, for Government,
in Support of Motion to Dismiss Relator's Second Amended
Complaint, dated November 21, 2019 ...........................JA-303

Exhibit 1 to Manfull Declaration—
Settlement Agreement between the Office of Foreign assets
Control and Standard Chartered Bank,
fully executed December 10, 2012 ..............................JA-325

Exhibit 2 to Manfull Declaration—
Settlement Agreement between the Office of Foreign Assets
Control and Standard Chartered Bank,
fully executed April 9, 2019 ....................................JA-333

Declaration of Patrick M. Bryan, for Government,
in Support of Motion to Dismiss Relator's Second Amended
Complaint, dated November 21, 2019 ...........................JA-351

Exhibit A to Bryan Declaration—
Cease and Desist Order of the Board of Governors of the Federal
Reserve System *in re Standard Chartered PLC*,
Docket Nos. 12-069-B-FB and 12-069-B-FBR,
dated December 12, 2012 .......................................JA-355

Exhibit B to Bryan Declaration—
Order of Assessment of a Civil Money Penalty of the Board
of Governors of the Federal Reserve System *in re Standard
Chartered PLC,* Docket No. 12-069-CMP-FB,
dated December 10, 2012 .......................................JA-370

PAGE

Exhibit C to Bryan Declaration—
Order to Cease and Desist and Order of Assessment of Civil
Money Penalty of the Board of Governors of the Federal Reserve
System *in re Standard Chartered PLC*,
Docket Nos. 19-011-B-FB and 19-011-CMP-FB,
dated April 8, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-377

Letter from Patrick M. McSweeney to the Honorable
Paul A. Engelmayer, dated December 3, 2019 . . . . . . . . . . . . . . . . . . . . JA-388

Letter from Kevin J. Bishop to the Honorable Paul A. Engelmayer,
dated December 11, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-391

Letter from Jean-David Barnea to the Honorable Paul A. Engelmayer,
dated December 11, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-394

Exhibit 1 to Barnea Letter—
Consent Order Under New York Banking Law §§ 39 and 44
of the New York State Department of Financial Services,
*in re Standard Chartered Bank*, dated April 9, 2019 . . . . . . . . . . . . . . JA-398

Exhibit 2 to Barnea Letter—
New York State Department of Financial Services - Report
of Investigation of Promontory Financial Group, LLC,
dated August 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-423

Letter from Antonio J. Perez-Marques to the Honorable
Paul A. Engelmayer, dated December 11, 2019 . . . . . . . . . . . . . . . . . . . JA-439

Letter from Patrick M. McSweeney to the Honorable
Paul A. Engelmayer, dated December 16, 2019 . . . . . . . . . . . . . . . . . . . JA-441

Order of the Honorable Paul A. Engelmayer,
dated December 23, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-444

Exhibits to Relator's Memorandum of Law in Opposition
to Motion to Dismiss the Second Amended Complaint,
dated January 10, 2020

Exhibit 1 to Memorandum of Law—
Declaration of Robert G. Marcellus, for Relator,
in Opposition to Motion to Dismiss, dated January 10, 2020 . . . . . . JA-446

Exhibit 2 to Memorandum of Law—
Declaration of Julian M. Knight, for Relator,
in Opposition to Motion to Dismiss, dated January 10, 2020 . . . . . . JA-477

Exhibit 3 to Memorandum of Law—
Declaration of Anshuman Chandra, for Relator,
in Opposition to Motion to Dismiss, dated January 10, 2020 . . . . . . JA-494

Exhibit 4 to Memorandum of Law—
Declaration of Dennis A. Sweeney, for Relator,
in Opposition to Motion to Dismiss, dated January 9, 2020 . . . . . . . . JA-502

Exhibit 6 to Memorandum of Law—
Email Chain from Matthew Tuchband to Jonathan Thomas
and Dennis Wood, dated September 24, 2012
and September 25, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-508

Exhibit 7 to Memorandum of Law—
Relator's Presentation to the New York State Department
of Financial Services, dated November 11, 2012 . . . . . . . . . . . . . . . . . JA-510

Exhibit 8 to Memorandum of Law—
Letter from Daniel S. Alter to H. Rodgin Cohen,
dated December 20, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-543

Exhibit 9 to Memorandum of Law—
Standard Chartered Bank's Presentation,
dated February 8, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-546

Exhibit 10 to Memorandum of Law—
Memorandum of David A. Koenigsberg,
dated September 24, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-594

Exhibit 13 to Memorandum of Law—
Decision Notice of the Financial Conduct Authority,
dated February 5, 2019..........................................JA-598

Supplemental Declaration of Special Agent Matthew F. Komar,
    for Government, in Support of Motion to Dismiss Relator's
    Second Amended Complaint, dated February 28, 2020............JA-658

Second Declaration of Special Agent Wayne C. Boddy, for
    Government, in Support of Motion to Dismiss Relator's Second
    Amended Complaint, dated February 28, 2020 ...................JA-663

Exhibit A to Boddy Declaration—
Press Release of the Financial Conduct Authority titled "FCA
fines Standard Chartered Bank £102.2 million for poor AML
controls," dated September 4, 2019 .............................JA-668

Supplemental Declaration of Alexandre Manfull, for Government,
    in Support of Motion to Dismiss Relator's Second Amended
    Complaint, dated February 28, 2020 ............................JA-671

Declaration of Elizabeth Nochlin, for Government,
    in Support of Motion to Dismiss Relator's Second Amended
    Complaint, dated February 28, 2020 ............................JA-686

Exhibit 1 to Nochlin Declaration—
Consent Order Under New York Banking Law § 44 of the New
York State Department of Financial Services, *in re Standard
Chartered Bank*, dated September 21, 2012 ......................JA-692

Exhibit 2 to Nochlin Declaration—
Consent Order Under New York Banking Law §§ 39 and 44
of the New York State Department of Financial Services *in re
Standard Chartered Bank*, dated August 19, 2014 ................JA-701

PAGE

Relator's Sur-Reply to the Government's Reply Memorandum
of Law, in Opposition to Motion to Dismiss Relator's Second
Amended Complaint, dated March 13, 2020 . . . . . . . . . . . . . . . . . . . . . .JA-713

Exhibit 1 to Relator's Sur-Reply—
Standard Chartered Bank Memorandum,
dated October 23, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .JA-727

Exhibit 2 to Relator's Sur-Reply—
Relator's Disclosure Statement in *United States of America, ex
rel. Brutus Trading, LLC, v. Standard Chartered Bank et al.*,
Case No. 12-CV-9160, dated December 19, 2012 . . . . . . . . . . . . . . . .JA-731

Exhibit 3 to Relator's Sur-Reply—
Letter from David A. Koenigsberg to Jean-David Barnea,
dated January 9, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .JA-752

Exhibit 4 to Relator's Sur-Reply—
Juniper 35 Master List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .JA-757

Exhibit 5 to Relator's Sur-Reply—
Declaration of David A. Koenigsberg, for Relator,
in Opposition to Motion to Dismiss, dated March 12, 2020 . . . . . . . .JA-768

Exhibit 6 to Relator's Sur-Reply—
Supplemental Declaration of Robert G. Marcellus,
for Relator, in Opposition to Motion to Dismiss,
dated March 13, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .JA-770

Opinion and Order of the Honorable Paul A. Engelmayer,
dated July 2, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .JA-772

Judgment, dated July 2, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .JA-782

Notice of Appeal, dated July 31, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . . .JA-783

CLOSED,APPEAL,ECF

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:18-cv-11117-PAE

UNITED STATES OF AMERICA, ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.
Assigned to: Judge Paul A. Engelmayer
Related Case: 1:19-cv-11739-PAE
Case in other court: U.S. Court of Appeals, 2nd Circ., 20-02578
Cause: 31:3729 False Claims Act

Date Filed: 11/29/2018
Date Terminated: 07/02/2020
Jury Demand: Plaintiff
Nature of Suit: 376 Qui Tam (31 U.S.C. § 3729(a))
Jurisdiction: Federal Question

**Plaintiff**

**ABC**
*TERMINATED: 07/10/2019*

**Plaintiff**

**United States of America**                    represented by    **Jean-David Barnea**
U.S. Attorney's Office, SDNY (Chambers Street)
86 Chambers Street
New York, NY 10007
(212) 637-2679
Fax: (212) 637-2717
Email: jean-david.barnea@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick M McSweeney**
Patrick M. McSweeney, Attorney at Law
3358 John Tree Hill Road
Powhatan, VA 23139
804-937-0895
Email: patrick@mck-lawyers.com
*ATTORNEY TO BE NOTICED*

**Robert J. Cynkar**
McSweeney Cynkar & Kachouroff PLLC
10506 Milkweed Drive
Great Falls, VA 22066
703-621-3300
Email: rcynkar@mck-lawyers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brutus Trading, LLC**                    represented by    **David A. Koenigsberg**
Menz Bonner Komar & Koenigsberg L.L.P.
One N. Lexington Ave, Suite 1550

White Plains, NY 10601
(914)-949-0222
Fax: (914)-997-4117
Email: dkoenigsberg@mbklawyers.com
*TERMINATED: 08/07/2019*

**Patrick M McSweeney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert J. Cynkar**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DEF**
*TERMINATED: 07/10/2019*

**Defendant**

**Standard Chartered Bank**                    represented by    **Antonio Jorge Perez-Marques**
Davis Polk & Wardwell LLP (NYC)
450 Lexington Avenue
New York, NY 10017
(212)-450-4559
Fax: (2122)-450-3559
Email: antonio.perez@dpw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Standard Chartered PLC**                     represented by    **Antonio Jorge Perez-Marques**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Standard Chartered Trade Services**          represented by    **Antonio Jorge Perez-Marques**
**Corporation**                                                 (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**NYS Department of Financial Services**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/29/2018 | | Magistrate Judge James L. Cott is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary |

| | | |
|---|---|---|
| | | form at the following link: http://nysd.uscourts.gov/forms.php. (mhe) (Entered: 11/29/2018) |
| 11/29/2018 | 1 | SEALED DOCUMENT placed in vault.(mhe) (Entered: 11/29/2018) |
| 01/02/2019 | 2 | SEALED DOCUMENT placed in vault.(mhe) (Entered: 01/02/2019) |
| 07/10/2019 | 3 | ORDER IT IS HEREBY ORDERED THAT: The complaint shall be unsealed 30 days after entry of this Order.All documents previously filed in this action shall remain under seal and not be made public, except for, 30 days after the date of entry of this Order, plaintiff-relator's qui tam complaint, this Order, and the United States' Notice of Election to Decline Intervention.SO ORDERED (Signed by Judge Paul A. Engelmayer on 3/20/19) (rz) (Entered: 07/11/2019) |
| 07/10/2019 | 4 | COMPLAINT against STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED TRADE SERVICES CORPORATION. Document filed by BRUTUS TRADING, LLC. This document was previously filed under in envelope document no. 1. (rjm) (Entered: 07/11/2019) |
| 07/10/2019 | 5 | CIVIL COVER SHEET. This document was previously filed under in envelope document no. 1. (rjm) (Entered: 07/11/2019) |
| 07/10/2019 | 6 | RULE 7.1 STATEMENT. No Corporate Parent. Document filed by BRUTUS TRADING, LLC. This document was previously filed under in envelope document no. 1. (rjm) (Entered: 07/11/2019) |
| 07/12/2019 | 7 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Robert J. Cynkar to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17238181. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by BRUTUS TRADING, LLC. (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Text of Proposed Order)(Cynkar, Robert) Modified on 7/15/2019 (wb). (Entered: 07/12/2019) |
| 07/15/2019 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 7 MOTION for Robert J. Cynkar to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17238181. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Virginia;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (wb)** (Entered: 07/15/2019) |
| 07/15/2019 | 8 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Robert J. Cynkar to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by BRUTUS TRADING, LLC. (Attachments: # 1 Declaration in support, # 2 Certificate of Good Standing, # 3 Proposed Order)(Cynkar, Robert) Modified on 7/15/2019 (wb). (Entered: 07/15/2019) |
| 07/15/2019 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 8 MOTION for Robert J. Cynkar to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Virginia, NOT THE STATE BAR OF VIRGINIA. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (wb)** (Entered: 07/15/2019) |
| 07/16/2019 | 9 | MOTION for Robert J. Cynkar to Appear Pro Hac Vice . **Motion and supporting papers** |

| | | |
|---|---|---|
| | | to be reviewed by Clerk's Office staff. Document filed by BRUTUS TRADING, LLC. (Attachments: # 1 Declaration in Support of Motion, # 2 Cert. of Good Standing from Va. Supreme Court, # 3 Proposed Order)(Cynkar, Robert) (Entered: 07/16/2019) |
| 07/16/2019 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 9 MOTION for Robert J. Cynkar to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (jc) (Entered: 07/16/2019) |
| 07/17/2019 | 10 | ORDER FOR ADMISSION PRO HAC VICE: granting 9 Motion for Robert J. Cynkar to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 7/17/2019) (ama) (Entered: 07/17/2019) |
| 07/17/2019 | 11 | MOTION for Patrick Michael McSweeney to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17261667. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by BRUTUS TRADING, LLC. (Attachments: # 1 Letter to clerk, # 2 Declaration of counsel, # 3 Va. Sup. Ct. certificate, # 4 Order of Admission pro hac vice)(McSweeney, Patrick) (Entered: 07/17/2019) |
| 07/17/2019 | 12 | PROPOSED ORDER FOR SUBSTITUTION OF ATTORNEY. Document filed by BRUTUS TRADING, LLC. (Koenigsberg, David) (Entered: 07/17/2019) |
| 07/18/2019 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 11 MOTION for Patrick Michael McSweeney to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17261667. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb) (Entered: 07/18/2019) |
| 07/18/2019 | 13 | **FILING ERROR - DEFICIENT PLEADING - FILER ERROR** - FIRST AMENDED COMPLAINT amending 4 Complaint against STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED TRADE SERVICES CORPORATION with JURY DEMAND.Document filed by BRUTUS TRADING, LLC. Related document: 4 Complaint. (Attachments: # 1 Exhibit 2012 Deferred Prosecution Agreement, # 2 Exhibit 2019 Deferred Prosecution Agreement)(Cynkar, Robert) Modified on 7/19/2019 (jgo). (Entered: 07/18/2019) |
| 07/18/2019 | 14 | ORDER FOR ADMISSION PRO HAC VICE granting 11 Motion for Patrick M. McSweeney to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 7/18/2019) (anc) (Entered: 07/18/2019) |
| 07/19/2019 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Robert J. Cynkar to RE-FILE Document No. 13 Amended Complaint,. The filing is deficient for the following reason(s): all of the filers were not selected for the pleading. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (jgo) (Entered: 07/19/2019) |
| 07/19/2019 | 15 | FIRST AMENDED COMPLAINT amending 4 Complaint, 13 Amended Complaint, against STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED TRADE SERVICES CORPORATION with JURY DEMAND.Document filed by BRUTUS TRADING, LLC, UNITED STATES OF AMERICA. Related document: 4 Complaint, 13 Amended Complaint,. (Attachments: # 1 Exhibit 2012 Deferred Prosecution Agreement, # 2 Exhibit 2019 Deferred Prosecution Agreement)(Cynkar, Robert) (Entered: 07/19/2019) |
| 07/20/2019 | 16 | PROPOSED STIPULATION AND ORDER. Document filed by BRUTUS TRADING, LLC. (Cynkar, Robert) (Entered: 07/20/2019) |

| 07/22/2019 | 17 | STIPULATION AND ORDER EXTENDING TIME TO ANSWER, MOVE OR OTHERWISE RESPOND TO THE COMPLAINT AND TO STAY DISCOVERY: THE PARTIES HEREBY STIPULATE AND AGREE, through their respective counsel, subject to the approval of the Court, as follows: 1. Defendants' counsel agrees to accept service of the Amended Complaint on Defendants' behalf, but each Defendant expressly reserves all rights, defenses, or other objections (other than insufficient process or insufficient service of process); 2. Defendants shall file their motion to dismiss or otherwise respond to the Amended Complaint by September 27, 2019; 3. Plaintiff shall file its opposition to Defendants' motion to dismiss by November 15, 2019; 4. Defendants shall file their reply to Plaintiffs opposition by December 17, 2019; 5. Plaintiff and Defendants agree to stay all disclosures and discovery in this action until the Court rules on the motion to dismiss to be filed by Defendants. IT IS SO ORDERED. (STANDARD CHARTERED BANK answer due 9/27/2019; STANDARD CHARTERED PLC answer due 9/27/2019; STANDARD CHARTERED TRADE SERVICES CORPORATION answer due 9/27/2019. Motions due by 9/27/2019. Responses due by 11/15/2019. Replies due by 12/17/2019.) (Signed by Judge Paul A. Engelmayer on 7/22/2019) (anc) (Entered: 07/22/2019) |
|---|---|---|
| 07/22/2019 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Robert J. Cynkar. The party information for the following party/parties has been modified: Standard Chartered Bank; Standard Chartered PLC; Standard Chartered Trade Services Corporation; Brutus Trading, LLC. The information for the party/parties has been modified for the following reason/reasons: party name was entered in all caps. (sj)** (Entered: 07/22/2019) |
| 07/29/2019 | 18 | **FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR -** SECOND AMENDED COMPLAINT amending 15 Amended Complaint, against Brutus Trading, LLC, United States of America with JURY DEMAND.Document filed by Brutus Trading, LLC, United States of America. Related document: 15 Amended Complaint,. (Attachments: # 1 Exhibit 2012 Deferred Prosecution Agreement, # 2 Exhibit 2019 Deferred Prosecution Agreement, # 3 Exhibit Elyassi Indictment)(McSweeney, Patrick) Modified on 7/30/2019 (pc). (Entered: 07/29/2019) |
| 07/30/2019 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Patrick M McSweeney to RE-FILE re: Document No. 18 Amended Complaint,,. The filing is deficient for the following reason(s): the wrong party/parties whom the pleading is against were selected; Court's leave has not been granted. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. File the Exhibit to Pleading event found under the event list Other Documents and attach either opposing party's written consent or Court's leave. (pc)** (Entered: 07/30/2019) |
| 08/07/2019 | 19 | CONSENT ORDER GRANTING SUBSTITUTION OF ATTORNEY: Notice is hereby given that, subject to approval by the court, BRUTUS TRADING, LLC substitutes ROBERT J. CYNKAR, Pro Hac Vice, as counsel of record in place of DAVID A. KOENIGSBERG. Attorney Robert J. Cynkar for Brutus Trading, LLC added. Attorney David A. Koenigsberg terminated. (Signed by Judge Paul A. Engelmayer on 8/7/2019) (mro) (Entered: 08/07/2019) |
| 08/28/2019 | 20 | LETTER addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 8/28/19 re: Government Motion to Dismiss. Document filed by United States of America. (Barnea, Jean-David) (Entered: 08/28/2019) |
| 08/29/2019 | 21 | MEMO ENDORSEMENT on re: 20 Letter filed by United States of America. ENDORSEMENT: Granted. The Court hereby adjourns the briefing schedule for |

| | | |
|---|---|---|
| | | defendants' motion to dismiss and sets the following schedule for the Government's motion to dismiss: Government's motion to dismiss is due October 31, 2019; realtor's opposition is due December 13, 2019; and Government's reply is due January 13, 2020. SO ORDERED. (Motions due by 10/31/2019, Responses due by 12/13/2019, Replies due by 1/13/2020.) (Signed by Judge Paul A. Engelmayer on 8/29/2019) (jca) (Entered: 08/29/2019) |
| 09/20/2019 | 22 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION to Amend/Correct *Complaint*. Document filed by Brutus Trading, LLC. (Attachments: # 1 Amended complaint, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Memorandum in support, # 6 Affidavit Declaration)(McSweeney, Patrick) Modified on 12/5/2019 (db). (Entered: 09/20/2019) |
| 09/23/2019 | 23 | MEMO ENDORSEMENT granting 22 Motion to Amend/Correct. ENDORSEMENT: Granted. The Court accepts filing of the Second Amended Complaint. The briefing schedule set out at Dkt. 21 remains in effect: Government's motion to dismiss is due October 31, 2019; realtor's opposition is due December 13, 2019; and Government's reply is due January 13, 2020. (Signed by Judge Paul A. Engelmayer on 9/20/2019) (rro) (Entered: 09/23/2019) |
| 09/23/2019 | | Set/Reset Deadlines: Motions due by 10/31/2019. Responses due by 12/13/2019 Replies due by 1/13/2020. (rro) (Entered: 09/23/2019) |
| 10/24/2019 | 24 | LETTER MOTION for Extension of Time to File *Motion to Dismiss and to Unseal Original Qui Tam Complaint* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 10/24/19. Document filed by United States of America.(Barnea, Jean-David) (Entered: 10/24/2019) |
| 10/25/2019 | 25 | ORDER granting 24 Letter Motion for Extension of Time to File. The Court grants the motion for additional time and adopts the jointly proposed briefing schedule. The Government shall file its motion to dismiss on November 21, 2019, the relator will file its opposition on January 10, 2020, and the Government will file its reply on February 7, 2020. As to the parties' request to unseal the relator's original complaint in 12-cv-9160, the Court is amenable to doing so but requests that the parties provide the specific ECF document number to be unsealed and the date that it was filed. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 10/25/2019) (kv) (Entered: 10/25/2019) |
| 10/25/2019 | | Set/Reset Deadlines: Motions due by 11/21/2019. Responses due by 1/10/2020 Replies due by 2/7/2020. (kv) (Entered: 10/25/2019) |
| 10/28/2019 | 26 | LETTER addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 10/28/19 re: Unsealing Qui Tam Complaint. Document filed by United States of America. (Barnea, Jean-David) (Entered: 10/28/2019) |
| 10/28/2019 | 27 | MEMO ENDORSEMENT on re: 26 Letter filed by United States of America. ENDORSEMENT: The Clerk of Court is respectfully directed to unseal the original complaint, filed on December 17, 2012, in the related (and now closed) matter: 12-cv-9160 (KBF). (Signed by Judge Paul A. Engelmayer on 10/28/2019) (jwh) Transmission to Sealed Records Clerk for processing. (Entered: 10/28/2019) |
| 11/18/2019 | 28 | LETTER MOTION for Leave to File Excess Pages *in Motion to Dismiss* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 11/18/19. Document filed by United States of America.(Barnea, Jean-David) (Entered: 11/18/2019) |
| 11/19/2019 | 29 | ORDER granting 28 Letter Motion for Leave to File Excess Pages: Granted. (Signed by Judge Paul A. Engelmayer on 11/19/2019) (jwh) (Entered: 11/19/2019) |
| 11/21/2019 | 30 | MOTION to Dismiss *Relator's Second Amended Complaint*. Document filed by United States of America.(Barnea, Jean-David) (Entered: 11/21/2019) |
| 11/21/2019 | 31 | MEMORANDUM OF LAW in Support re: 30 MOTION to Dismiss *Relator's Second |

| | | |
|---|---|---|
| | | *Amended Complaint.* . Document filed by United States of America. (Barnea, Jean-David) (Entered: 11/21/2019) |
| 11/21/2019 | 32 | DECLARATION of FBI Special Agent Matthew F. Komar in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint.*. Document filed by United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Barnea, Jean-David) (Entered: 11/21/2019) |
| 11/21/2019 | 33 | DECLARATION of FBI Special Agent Wayne C. Boddy in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint.*. Document filed by United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Barnea, Jean-David) (Entered: 11/21/2019) |
| 11/21/2019 | 34 | DECLARATION of Alexandre Manfull (OFAC) in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint.*. Document filed by United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Barnea, Jean-David) (Entered: 11/21/2019) |
| 11/21/2019 | 35 | DECLARATION of Patrick M. Bryan, Board of Governors of Federal Reserve System in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint.*. Document filed by United States of America. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Barnea, Jean-David) (Entered: 11/21/2019) |
| 12/03/2019 | 36 | LETTER MOTION for Discovery addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated December 3, 2019. Document filed by Brutus Trading, LLC. (McSweeney, Patrick) (Entered: 12/03/2019) |
| 12/06/2019 | 37 | LETTER addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 12/6/19 re: Timing of Response to Relator's Request to Take a Deposition. Document filed by United States of America.(Barnea, Jean-David) (Entered: 12/06/2019) |
| 12/09/2019 | 38 | MEMO ENDORSEMENT on re: 37 Letter. ENDORSEMENT: After reviewing Relator's submission, Dkt. 36, the Court concludes that it would benefit from the views of the Government and DFS before ruling on Relator's request. The Court therefore construes the Government's letter as a motion for an extension of time to respond, which it grants nunc pro tunc. The Government is reminded that the procedure for discovery disputes is outlined in the Court's individual rules, which require a response within 3 business days absent a request for more time. The letters in opposition are due by December 11, 2019. (Set Deadlines/Hearing as to 36 LETTER MOTION for Discovery: Responses due by 12/11/2019) (Signed by Judge Paul A. Engelmayer on 12/9/2019) (jwh) (Entered: 12/09/2019) |
| 12/11/2019 | 39 | LETTER addressed to Judge Paul A. Engelmayer from Kevin J. Bishop dated December 11, 2019 re: Opposition to Discovery Request. Document filed by NYS Department of Financial Services.(Bishop, Kevin) (Entered: 12/11/2019) |
| 12/11/2019 | 40 | LETTER addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 12/11/19 re: Request for Deposition. Document filed by United States of America. (Attachments: # 1 Exhibit, # 2 Exhibit)(Barnea, Jean-David) (Entered: 12/11/2019) |
| 12/11/2019 | 41 | NOTICE OF APPEARANCE by Antonio Jorge Perez-Marques on behalf of Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation. (Perez-Marques, Antonio) (Entered: 12/11/2019) |
| 12/11/2019 | 42 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate Standard Chartered PLC, Other Affiliate Standard Chartered Holdings Limited for Standard Chartered Bank; Other Affiliate Standard Chartered Bank, Other Affiliate Standard Chartered Holdings, Inc. for Standard Chartered Trade Services Corporation. |

| | | Document filed by Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation.(Perez-Marques, Antonio) (Entered: 12/11/2019) |
|---|---|---|
| 12/11/2019 | 43 | LETTER addressed to Judge Paul A. Engelmayer from Antonio J. Perez-Marques dated December 11, 2019 re: Request for Deposition. Document filed by Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation.(Perez-Marques, Antonio) (Entered: 12/11/2019) |
| 12/12/2019 | 44 | FIRST LETTER MOTION for Leave to File Letter motion addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated December 12, 2019. Document filed by Brutus Trading, LLC.(McSweeney, Patrick) (Entered: 12/12/2019) |
| 12/12/2019 | 45 | ORDER granting 44 Letter Motion for Leave to File Document: The relator's request to file a consolidated reply by December 16, 2019, is granted. (Signed by Judge Paul A. Engelmayer on 12/12/2019) (jwh) (Entered: 12/12/2019) |
| 12/12/2019 | | Set/Reset Deadlines as to 36 LETTER MOTION for Discovery: Replies due by 12/16/2019. (jwh) (Entered: 12/12/2019) |
| 12/16/2019 | 46 | SECOND LETTER MOTION for Discovery addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated December 16, 2019. Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit, # 2 Exhibit)(McSweeney, Patrick) (Entered: 12/16/2019) |
| 12/23/2019 | 47 | ORDER denying without prejudice 36 Letter Motion for Discovery. The Court need notand, to be clear, does not in this Order resolving Relator's motion to depose Mr. Alterdecide the applicable standard of review for the United States' motion to dismiss Relators complaint. That is because Relator has not shown how the testimony of Mr. Alter, to the extent it concerns non-privileged material, is warranted or appropriate on a motion to dismiss. Even under the more demanding standard, the Court can resolve, without Mr. Alter's testimony, whether there is a basis to contend that the governments proffered rationale for dismissing the complaint is "fraudulent, arbitrary and capricious, or illegal." Sequoia Orange Co., 151 F.3d at 1145. A deposition of Mr. Alter is simply not necessary at this stage of the litigation. Relator's motion to depose Mr. Alter is therefore denied, without prejudice to Relator renewing its application if the complaint survives the United States' motion to dismiss. The Clerk of Court is respectfully directed to terminate the motion pending at docket 36. (And as further set forth herein.) SO ORDERED.. (Signed by Judge Paul A. Engelmayer on 12/23/2019) (jca) (Entered: 12/23/2019) |
| 01/10/2020 | 48 | **FILING ERROR - DEFICIENT DOCKET ENTRY (SEE DOCUMENT #49) -** MEMORANDUM OF LAW in Opposition re: 30 MOTION to Dismiss *Relator's Second Amended Complaint.* . Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit)(McSweeney, Patrick) Modified on 1/23/2020 (ldi). (Entered: 01/10/2020) |
| 01/22/2020 | 49 | RESPONSE in Opposition to Motion re: 30 MOTION to Dismiss *Relator's Second Amended Complaint. [corrected]*. Document filed by Brutus Trading, LLC. (McSweeney, Patrick) (Entered: 01/22/2020) |
| 01/30/2020 | 50 | LETTER MOTION for Extension of Time to File Response/Reply as to 30 MOTION to Dismiss *Relator's Second Amended Complaint.*, 49 Response in Opposition to Motion addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 1/30/20. Document filed by United States of America.(Barnea, Jean-David) (Entered: 01/30/2020) |
| 01/31/2020 | 51 | ORDER granting 50 Letter Motion for Extension of Time to File Response/Reply re 30 MOTION to Dismiss: Granted. (Replies due by 2/28/2020.) (Signed by Judge Paul A. Engelmayer on 1/31/2020) (jwh) (Entered: 01/31/2020) |

| | | |
|---|---|---|
| 02/25/2020 | 52 | LETTER MOTION for Leave to File Excess Pages *for Reply Brief* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 2/25/20. Document filed by United States of America..(Barnea, Jean-David) (Entered: 02/25/2020) |
| 02/25/2020 | 53 | ORDER granting 52 Letter Motion for Leave to File Excess Pages. The request to file a reply brief not to exceed 15 pages is granted. Counsel is urged not to use more pages than is necessary. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 2/25/2020) (rj) (Entered: 02/26/2020) |
| 02/28/2020 | 54 | REPLY MEMORANDUM OF LAW in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*. . Document filed by United States of America..(Barnea, Jean-David) (Entered: 02/28/2020) |
| 02/28/2020 | 55 | REPLY AFFIRMATION of FBI Special Agent Matthew F. Komar in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*.. Document filed by United States of America..(Barnea, Jean-David) (Entered: 02/28/2020) |
| 02/28/2020 | 56 | REPLY AFFIRMATION of FBI Special Agent Wayne C. Boddy in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*.. Document filed by United States of America. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Barnea, Jean-David) (Entered: 02/28/2020) |
| 02/28/2020 | 57 | REPLY AFFIRMATION of Alexandre Manfull (OFAC) in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*.. Document filed by United States of America..(Barnea, Jean-David) (Entered: 02/28/2020) |
| 02/28/2020 | 58 | REPLY AFFIRMATION of Elizabeth Nochlin (DFS) in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*.. Document filed by United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4).(Barnea, Jean-David) (Entered: 02/28/2020) |
| 03/02/2020 | 59 | LETTER MOTION for Leave to File Sur-reply addressed to Judge Paul A. Engelmayer from Patrick M. McSweeney dated 03/02/2020. Document filed by Brutus Trading, LLC.. (McSweeney, Patrick) (Entered: 03/02/2020) |
| 03/05/2020 | 60 | ORDER: granting 59 Letter Motion for Leave to File Document. Granted. Relator may file a brief sur-reply by March 13, 2020. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 3/05/2020) (ama) (Entered: 03/05/2020) |
| 03/05/2020 | | Set/Reset Deadlines: Surreplies due by 3/13/2020. (ama) (Entered: 03/05/2020) |
| 03/13/2020 | 61 | REPLY MEMORANDUM OF LAW in Opposition re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*. . Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit SCB bulletin 10-23-08, # 2 Exhibit Relator's disclosure statement, # 3 Exhibit Letter to AUSA, # 4 Exhibit Master List, # 5 Exhibit Koenigsberg Declaration, # 6 Exhibit Marcellus Supp. Declaration).(McSweeney, Patrick) (Entered: 03/13/2020) |
| 07/02/2020 | 62 | OPINION & ORDER re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*: For the reasons stated above, the Court finds that at least two of the reasons proffered by the Government in support of dismissal qualify as "valid government purpose[s]" and that the Government has articulated "a rational relation between dismissal and accomplishment of th[ose] purpose[s]." Sequoia Orange, 151 F.3d at 1145. The Court further finds that relator has not carried its burden of showing that either, let alone both, of these reasons "is fraudulent, arbitrary and capricious, or illegal." Id. The Court therefore grants the Government's motion to dismiss the Second Amended Complaint. The Clerk of Court is respectfully directed to terminate the motion pending at docket 30 and close this case. (Signed by Judge Paul A. Engelmayer on 7/2/2020) (jwh) Transmission to Orders and Judgments Clerk for processing. (Entered: 07/02/2020) |

| | | |
|---|---|---|
| 07/02/2020 | 63 | CLERK'S JUDGMENT re: 62 Memorandum & Opinion in favor of United States of America against Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion & Order dated July 2, 2020, the Court finds that at least two of the reasons proffered by the Government in support of dismissal qualify as "valid government purpose[s]" and that the Government has articulated "a rational relation between dismissal and accomplishment of th[ose] purpose[s]." Sequoia Orange, 151 F.3d at 1145. The Court further finds that relator has not carried its burden of showing that either, let alone both, of these reasons "is fraudulent, arbitrary and capricious, or illegal." Id. The Government's motion to dismiss the Second Amended Complaint is granted; accordingly, this case is closed. (Signed by Clerk of Court Ruby Krajick on 7/2/2020) (Attachments: # 1 Right to Appeal) (km) (Entered: 07/02/2020) |
| 07/31/2020 | 64 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL -** NOTICE OF APPEAL. Document filed by Brutus Trading, LLC. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (McSweeney, Patrick) Modified on 7/31/2020 (tp). (Entered: 07/31/2020) |
| 07/31/2020 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney McSweeney, Patrick to RE-FILE Document No. 64 Notice of Appeal. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type *Corrected Notice of Appeal* found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (tp)** (Entered: 07/31/2020) |
| 08/03/2020 | 65 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL -** CORRECTED NOTICE OF APPEAL re: 64 Notice of Appeal,. Document filed by Brutus Trading, LLC. (McSweeney, Patrick) Modified on 8/3/2020 (tp). (Entered: 08/03/2020) |
| 08/03/2020 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney McSweeney, Patrick to RE-FILE Document No. 65 Corrected Notice of Appeal. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type *Corrected Notice of Appeal* found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (tp)** (Entered: 08/03/2020) |
| 08/03/2020 | 66 | CORRECTED NOTICE OF APPEAL re: 64 Notice of Appeal, 62 Memorandum & Opinion,,,. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 08/03/2020) |
| 08/03/2020 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 66 Corrected Notice of Appeal. (tp) (Entered: 08/03/2020) |
| 08/03/2020 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 66 Corrected Notice of Appeal filed by Brutus Trading, LLC were transmitted to the U.S. Court of Appeals. (tp) (Entered: 08/03/2020) |
| 08/03/2020 | | Appeal Fee Due: for 66 Corrected Notice of Appeal. $505.00 Appeal fee due by 8/17/2020..(nd) (Entered: 08/04/2020) |
| 08/31/2020 | | Appeal Fee Payment: for 66 Corrected Notice of Appeal. Filing fee $ 505.00, receipt number ANYSDC-21412038..(McSweeney, Patrick) (Entered: 08/31/2020) |
| 09/03/2020 | | USCA Case Number 20-2578 from the U.S. Court of Appeals, 2nd Circ. assigned to 66 Corrected Notice of Appeal filed by Brutus Trading, LLC..(nd) (Entered: 09/03/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/20/2020 23:25:40 | | | |
| **PACER Login:** | teamrpacc | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-11117-PAE |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA, *ex rel.*
BRUTUS TRADING,  LLC,

                Plaintiffs,

      -against-

STANDARD CHARTERED BANK,
STANDARD CHARTERED PLC and
STANDARD CHATERED TRADE SERVICES
CORPORATION,

               Defendants.

-------------------------------------------------------------x

18 CV _____

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C.**
**§ 3730(b)**

**COMPLAINT**

**JURY TRIAL DEMANDED**

## Introduction

    Relator-Plaintiff Brutus Trading, LLC ("Relator"), through its attorneys, Menz Bonner Komar & Koenigsberg LLP, makes this Complaint and Demand for Jury Trial under seal, against Standard Chartered Bank, Standard Chartered PLC and Standard Chartered Trade Services Corporation ("collectively Defendants").  Relator alleges, based upon personal knowledge, relevant documents and information and belief, as follows:

## I. NATURE OF ACTION

    1.    Relator brings this action on behalf of the United States against Defendants for treble damages and civil penalties arising from Defendants' violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

    2.    In connection with providing foreign exchange bank services to international customers, Defendants made false statements to the United States and thereby (a) knowingly presented and caused to be presented false and fraudulent claims for payment and

approval; (b) knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims; (c) knowingly, made, used or caused to be used, false records or statements material to an obligation to pay or transmit money and/or concealed, avoided and decreased an obligation to pay money; and (d) conspired to defraud the United States by means of false statements and false claims; all in violation of 31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G).

## II.  JURISDICTION & VENUE

3.      This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331 (Federal question), § 1345 (United States as plaintiff) and 31 U.S.C. § 3732(a) (False Claims Act).

4.      This Court has personal jurisdiction over the Defendants named in the Complaint pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants can be found, resides, and/or transacts business in the Southern District of New York and because an act proscribed by 31 U.S.C. § 3729 occurred within this District.  Section 3732(a) further provides for nationwide service of process.

5.      This action is not precluded by the public disclosure bar of the False Claims Act, 31 U.S.C. § 3730(e)(4).  Upon information and belief, no "public disclosure" of the matters alleged herein occurred before December 14, 2012, when Relator voluntarily provided the information to the United States Government.  This action is not "based upon" any publicly available information and in any event, Relator, through its principals, has "direct and independent knowledge" of the instant allegations. Therefore, to the extent any of these allegations are deemed to have been based upon a public disclosure, Relator is an "original

source" of this information within the meaning of the False Claims Act and is expressly not subject to its public disclosure bar.

6.    Venue is proper in the Southern District of New York, under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because (a) the Defendants reside in this District, (b) a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729 alleged in the Complaint occurred in this District, and (c) because at least one of the Defendants can be found and transacts business within this District.

### III.    PARTIES

7.    The United States is the real party in interest plaintiff in this action.

8.    Relator Brutus Trading, LLC ("Brutus"), is a Wyoming Limited Liability Corporation, and brings this action for violations of the False Claims Act on behalf of itself and the United States.  Brutus's principals possess extensive knowledge and experience with international foreign exchange transactions and banking and possess personal knowledge to support and establish the claims asserted in this Complaint.

9.    Defendant Standard Chartered PLC ("SC"), is a leading international banking institution with headquarters in London, England.  SC has over 1,700 offices around the world.

10.    SC's wholly-owned subsidiary, Standard Chartered Bank ("SCB"), offers a complete range of banking products and services to its personal, business and wholesale banking clients worldwide.  SCB has been licensed by the New York State Banking Department[1] to operate a foreign bank branch in New York State since 1976, which branch is currently

---

[1]    In 2011, the State's Banking Department and Insurance Department were merged to create the New York Department of Financial Services ("DFS").

located at 1095 Avenue of the Americas, New York, NY 10036. The New York branch office is referred to hereinafter as SCB-NY.

11.     Defendant Standard Chartered Trade Services Corporation, a wholly-owned subsidiary of SCB, is a Delaware corporation registered to do business in New York State as a foreign business corporation.

## IV.     STANDARD CHARTERED'S ILLEGAL CONDUCT

### A.     The Bank's Project Green and Sundry Account Practices

12.     SCB-NY primarily conducts a U.S. dollar clearing business which clears approximately $195 billion per day on the Clearing House International Payment System ("CHIPS"). While SCB claims not to service retail customers in the United States, it does offer wholesale banking services, including trade finance services, cash management, treasury, foreign exchange and interest rate products, commodity finance, and structured import and export finance services. As of March 31, 2012, SCB-NY held $40.8 billion in total assets.

13.     Defendants' conduct of the U.S. dollar clearing business and use of U.S.-based U.S. dollar Nostro facilities for the purposes of settling any form of foreign exchange transaction with a U.S. dollar leg or component requires it to clear transactions through SCB-NY and the correspondent U.S. dollar bank accounts domiciled in SCB-NY, used to facilitate such clearing transactions. SCB was required to use U.S. dollar clearing systems such as Fedwires for any account conversions from U.S. dollars or into U.S. dollars against any other currency, whether or not the accounted was domiciled in the United States. As a result, SCB and SCB-NY must comply with the rules and regulation imposed by the U.S. Treasury's economic sanctions regulations. In short, those regulations forbid or restrict the conduct of financial transactions by institutions located in the United States with certain foreign governments and their various

instrumentalities and any person or entity that has been identified on the list of Specially

Designated Nationals ("SDN") issued by the United States Treasury Department's Office of

Foreign Assets Control ("OFAC").

      14.     Notwithstanding its legal obligation to comply with the U.S. sanctions

regulations, since at least 2002, SC operated a program known internally to high level SC

officials as "Project Green." This was a program run by trade finance experts and senior

geographical branch chief executive officers with no compliance officers involved in its

management. Project Green was designed to assist, conspire, aid and abet non-United States

customers that have been made the subject of United States economic sanctions to evade those

sanctions and engage in international financial transactions. SC continued to operate Project

Green until 2012, when SC began the process of winding down Project Green. Project Green

was largely operated out of SCB's Dubai branch with support from SCB's Chennai, India

offices.

      15.     In addition to pursuing a policy of assisting, conspiring, aiding, and

abetting its clients to operate in defiance of international economic sanctions, SC also failed to

operate with proper financial controls and procedures in the processing and settling of foreign

exchange transactions for its foreign customers. One example of SC's loose financial controls

was the "Transaction Bank Sundry Foreign Exchange Account," in "OLT3" – the online trading

system for all of the bank's transactional business. This system was at the heart of SCB's client

back office for on line conversions from U.S. dollars to another currency from a client account in

Straight 2 Bank ("S2B") operation. The system architecture around this platform prevented

Anti-Money Laundering ("AML") procedures from being effective and transactions from being

monitored for the purpose of OFAC compliance. This account was where SC booked banking

revenues from transactions that were not properly matched up and settled on SCB's books.  As a result of failing to have proper controls for closing out transactions, by 2008 the Transaction Bank Sundry Foreign Exchange Account had grown to a balance of approximately $100 million in unassigned revenues.  The revenues assigned to this account should have been matched to the branches of the client relationship managers and the branches that provided services to the bank's clients for the particular transaction, but instead were left without being properly attributed.  In addition, because these revenues were not properly matched up to the customer, identifying whether the revenues were derived from customers on the SDN list or from entities associated with foreign governments, such as Iran, subject to economic sanctions, would prove very difficult, if not impossible, for any SCB-NY employee.

16.     Normally, transactions performed for clients are associated with the bank's internal client identifier code number, labeled as the "SCI Customer ID" number.  This number is used on internal bank spread sheets to associate transactions and revenues with the particular client.   Banking employees have computer access to the SCI Customer ID number to obtain on-line the customers' profile information and transaction history.  A New York based employee conducting a U.S. dollar clearing transaction for a customer would be able to query the bank's customer data base using the SCI Customer ID to pull up a full profile of that customer.  This was true even if the client originated from the SCB Dubai Small Medium Enterprise ("SME") client office.

17.     For example, if the bank processed a U.S. dollar clearing transaction for a client that earned the bank a fee of $50,000, up to 1/3 of that fee should have been booked as revenue earned by the SCB-NY branch for the services it performed in processing the U.S. dollar clearing transaction.  But, because those revenues were not assigned to any particular branch,

revenues that should have been assigned to the New York branch were not included in the income and assets of the New York branch.   OLT3, by design, did not process end counterparties to trades, leaving counterparties in Iran Group transactions and Dubai-based Iranian backed SME's labeled simply as "SCB Dubai."

**B.     The Bank's Settlement with the
N.Y. Department of Financial Services**

18.     On August 6, 2012, the New York Department of Financial Services ("DFS") issued an order pursuant to New York Banking Law § 39 requiring SCB-NY to explain why SCB-NY's license to operate in New York should not be revoked due to SCB's violations of various bank secrecy and anti-money laundering laws. *See In Re Standard Chartered Bank, New York Branch,* Order Pursuant to Banking Law § 39 (N.Y.S. Dep't of Fin'l Services) (Aug. 6, 2012) (the "Order"). The Order explained in great detail that SCB had concealed from regulators at DFS and OFAC, approximately 59,000 transactions conducted for Iranian clients that violated rules and regulations issued by DFS and OFAC.  The Order provided that the Department's investigation initially focused upon SCB's systematic misconduct on behalf of Iranian customers but the investigation also uncovered evidence of similar schemes to do business with other countries that were subject to U.S. sanctions.  Order at n. 1.

19.     On September 21, 2012, DFS and SCB entered into a Consent Order under New York Banking Law § 44 (the "Consent Order"), whereby SCB agreed to pay a civil monetary penalty to DFS in the amount of $340 million, and SCB consented to having a compliance monitor on premises who reported directly to DFS and to conduct a comprehensive review of the bank's compliance programs, policies and procedure.

20.     According to the Consent Order, from January 2001 through 2007, SCB provided U.S. dollar clearing services to Iranian state and privately owned banks, corporations

and individuals.  In processing such transactions, SCB removed or omitted Iranian information from U.S. dollar wire payment messages to avoid having to comply with OFAC banking rules and regulations.  This removal or stripping of wire transfer identifying information occurred with respect to approximately 59,000 transactions with nominal value of approximately $250 billion. Consent Order ¶ ¶ 2-3.

21.    By its terms, the size of the civil penalty was determined based upon the 59,000 transactions that occurred during the period January 2001 through 2007 that SCB had disclosed to DFS in the course of the Department's investigation.  Thus, in the Consent Order, DFS agreed that so long as SCB complied with the terms of the Consent Order, "no further action will be taken by the Department against SCB for the conduct set forth in the Consent Order or the August 6th Order, including the investigation referenced in footnote 1 of the August 6th Order."  Consent Order ¶ 21.  The Consent Order provided, however, that "the Department may undertake enforcement action against SCB for transactions or conduct that SCB did not disclose to the Department in written materials that SCB submitted to the Department in connection with this matter."  Consent Order ¶ 21.

C.    **The Bank's $327 Million Settlement with the
United States Departments of the Treasury and
Justice and the Federal Reserve Board of Governors**

22.    On December 10, 2012, SCB entered into a global settlement with the United States Departments of the Treasury and Justice and the Board of Governors of the Federal Reserve System (the "Federal Reserve") by agreeing to pay a total of $327 million for SCB's violations of the laws and regulations administered by OFAC.

23.    On December 10, 2012, SCB entered into a settlement with OFAC, agreeing to pay $132,000,000 to settle its civil liability arising out of SCB's violations of

OFAC's rules and regulations. *See* Settlement Agreement between OFAC and SCB, ¶ 32 (Dec. 10, 2012) ("OFAC Settlement Agreement"). The OFAC Settlement Agreement states that "SCB has taken remedial action by terminating its business and prohibiting new business since 2007 with Iranian customers." OFAC Settlement Agreement, ¶ 26. Under the OFAC Settlement Agreement, SCB's obligation to pay the $132,000,000 would be satisfied by payment of an equal or greater amount that satisfied the penalty assessed by United States or county officials. *Id.* ¶ 32.

24.     On December 10, 2012, SCB consented to the filing of a criminal information by the United States Attorney's Office for the District of Columbia, which charged that from 2001 until 2007, SCB facilitated U.S. Dollar transactions for financial institutions and other parties affiliated with Iran. Information, *United States v. Standard Chartered Bank,* 12-CR.-262 (JEB) (D.D.C. Dec. 10, 2012) (Dkt. # 1). The same day, SCB entered into a Deferred Prosecution Agreement ("DPA") with the Asset Forfeiture and Money Laundering Section of the United States Department of Justice and the United States Attorney's Office for the District of Columbia. *United States v. Standard Chartered Bank,* 12-CR-262 (D.D.C.) (Dkt. # 2). Pursuant to the DPA, SCB agreed to pay the United States forfeiture in the amount of $227,000,000. DPA ¶ 3. The payment was made in order to "settle any and all civil and criminal claims currently held by the United States for any act within the scope of or related to the Factual Statement," Exhibit A to the DPA, and for which SCB accepted and acknowledged responsibility. *Id.* at ¶¶ 2, 4(f).

25.     According to the Factual Statement, beginning in "2001 and ending in 2007, SCB violated U.S. and New York State laws by illegally sending payments through the U.S. financial system on behalf of entities subject to U.S. economic sanctions." Factual

Statement ¶ 2; *see also id.* ¶¶ 42 & 43.  In addition, "[o]n October 30, 2006, SCB informed the [Federal Reserve Bank of New York] that it was ending its U.S.-dollar clearing activity for all the Iranian banks.  The bank ended its U.S.-dollar activity by March 2007." *Id.* ¶ 103.  The Factual Statement further states that "[f]rom August 2007, SCB suspended all new Iranian business in any currency." *Id.* ¶ 104.

      26.    On December 10, 2012, SCB consented to a Cease and Desist Order ("Cease and Desist Order ") with the Federal Reserve.  The Cease and Desist Order recites that the Federal Reserve, along with DOJ, the DANY [District Attorney of New York] and OFAC "have been conducting an investigation into the practices of the Bank concerning the transmission of funds to and from the United States by and through entities and individuals subject to sanctions regimes . . . administered by OFAC."  Cease and Desist Order at 2.  In addition, SCB consented to an Order of Assessment of a Civil Money Penalty ("Order of Assessment") by the Federal Reserve in the amount of $100 million.  The Order of Assessment states "in order to resolve the investigations, Standard Chartered has agreed to enter into settlement agreements with DOJ, DANY, and OFAC."  Order of Assessment at 2. The Order of Assessment states that the Federal Reserve had obtained information that "[f]rom at least 2001 through early 2007" SCB had violated U.S. law in the processing of payments involving parties subject to OFAC sanctions.  Order of Assessment at 3. As a consequence, the Federal Reserve assessed SCB a "civil money penalty" in the amount of $100,000,000, with $65,000,000 assessed for violations of OFAC regulations and $35,000,000 assessed for providing false information to Federal Reserve examiners. Order of Assessment at 5.  But, in negotiating the settlement with each of the Government agencies, SCB failed to fully disclose the complete extent of the bank's "unsafe and unsound practices" with regard to its dealings with sanctioned

entities and individuals, as well as the significant number of compromised transactions with Iran

Group Clients, Dubai-based Iranian-backed SME's, and OFAC identified SDNs.

**D.     Defendants Fraudulently Induced the Settlements With the
Treasury and Justice Departments and the Federal Reserve**

27.     Contrary to the representations that defendants made to induce the

Treasury and Justice Departments and the Federal Reserve to enter into the OFAC Settlement

Agreement, the DPA, and the Federal Reserve's Cease and Desist Order and Order of

Assessment, after 2007, defendants knowingly engaged in U.S. dollar clearing and other

financial transactions with and for the benefit of Iranian government entities and Iranian SDNs in

at least 2008 and 2009 and as late as 2012 through the client franchise based in SCB Dubai,

conducing transactions for Dubai-based, Iranian backed SME clients.

28.     Defendants' records show that since at least 2006, SC and SCB identified

and targeted as customers the following Iranian government entities or SDNs:  Bank Keshavarzi,

Bank Markazi, Bank Maskan, Bank Mellat, Bank Melli, Bank Tejarat, Export Development

Bank of Iran, Bank Saderat and Sepah Bank.  In addition, since at least 2008, SCB's client lists

included the National Iranian Oil Company ("NIOC") and its subsidiaries as clients.  In 2008,

OFAC identified NIOC as an entity owned or controlled by the Government of Iran within the

meaning of the Iranian Transactions Regulations.  OFAC also identified NIOC as an affiliate of

the Islamic Revolutionary Guard Corps ("IRGC").  OFAC added IRGC to the SDN list on

October 21, 2007.

29.     The following are examples of the many trades performed by SCB on

behalf of banned Iranian government entities or Iranian related SDNs after 2007 or evidence that

SCB was performing transactions after 2007 on behalf of clients that were banned Iranian

entities, contrary to SCB's representations to representatives of the United States that "[f]rom August 2007, SCB suspended all new Iranian business in any currency." *See* ¶ 24, *supra*.

30.     In or about January 2009, SCB performed an export finance transaction for Bank Tejerat, a bank owned by the Government of Iran.   Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

31.     In or about January 2009, SCB performed three structured trade finance transactions for National Iranian Tanker Company ("NITC"), an entity owned by the Iranian government and a subsidiary of NIOC.  Relator understands that such transactions necessarily involved dollar clearing by SCB's New York branch.[2]

32.     SCB conducted a U.S. dollar letter of credit transaction between Bank Markazi and four exporters in or about December 2009.  Bank Markazi-Iran-CB was added to OFAC's SDN list as of October 22, 2008.   Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

33.     SCB performed a trade finance and cash management transaction for the Iran Ministry of Economic Affairs and Finance in or about December 2009.  Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

34.     SCB records further show that it performed transactions in August, November and December 2009 with the Ministry of Energy of Iran Group, an agency of the Government of Iran, with nominal value of $2,546,419, and cash management and trade finance revenues to the bank in the amount of $259,602.77.  Significant transactional foreign exchange revenues were also earned from this client during the period from August 2009 through

---

[2]     OFAC fined a U.S. corporation, General Reinsurance, for making reinsurance payments in 2005 for the benefit of NITC.

December 2009.   Relator understands that such transactions including U.S. dollar foreign exchange trades necessarily involved dollar clearing by SCB's New York branch.

35.     According to SCB records, as of June 2008, Bank Saderat had the authority to conduct foreign exchange transactions directly through SCB's OLT3 system with a $1 million limit per transaction and a total settlement limit of $10 million.  This meant that Bank Saderat was independently and remotely able to log into SCB's OLT3 computer system to initiate U.S. dollar foreign exchange transactions that necessarily involved SCB-NY.  In addition, each of the Industrial Development and Renovation Organization of Iran and the Iranian Offshore Engineering Company had on-line trading access and independent authority to engage in U.S. dollar foreign exchange transactions in 2008 and 2009.  Any such foreign exchange trades would have involved SCB-NY.

36.     As of 2008, SCB had on its books significant approved U.S. dollar foreign exchange trading limits for the following entities that were listed as SDNs:  Bank Sepah, Bank Keshavarzi, and the Iranian Export Development Bank.

37.     SCB's continued efforts to do business with banned Iranian entities continue into 2009 and beyond.  In March 2009, SCB executives developed a list of priority accounts to be target for business development because they each had "good revenue potential." The target list included National Iranian Tanker Company and National Iranian Oil Company.

38.     In April 2009, SCB targeted Iran as a source of business as part of "The Curve Campaign," a global financial markets campaign to cross-sell interest rate products to selected high value potential clients.

39.     SCB internal reports showed that as of August 2009, the bank enjoyed profits of $4,365,000 from Iranian related transactions and customers.

40.     A report of customer transactions from August 2009, showed eight transactions with Bank Tejerat, 10 transactions with Iranian Tanker Company, seven transactions with Iran & Dubai Co., LLC, and transactions with Pasian High Voltage, Khorasan Steel, and Khouzestan Steel Company.

41.     As a result of SCB's false statements and concealment of information from the Government during the negotiations, the global settlement amount of $327,000,000 would have been materially greater, and each of the components of the $327,000,000 would have been materially greater.

42.     This is Relator's second lawsuit filed in this district that makes these allegations. The first action was filed by Relator on December 17, 2012, pursuant to the qui tam provisions of the False Claims Act and assigned docket number 12 CV 9160.  *See United States ex rel. Brutus Trading LLC v. Standard Chartered Bank, et al.*, 12 CV 9160 (KBF) (S.D.N.Y.). That action was unsealed by court order on May 10, 2017.  On September 19, 2017, Relator filed with respect to that action a Notice of Voluntary Dismissal without prejudice which the Court approved the same day.  Doc. 35, No. 12 CV 9160 (KBF).

### FIRST CAUSE OF ACTION
(31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G))

43.     Relator incorporates by reference paragraphs 1 through 42 of this Complaint, as if fully set forth herein.

44.     Defendants, by failing to disclose to the United States Treasury and Department of Justice and the Federal Reserve that after 2007 they were performing U.S. dollar foreign exchange transactions for Iranian government entities and Iranian SDNs, made false statements to the Treasury and Justice Departments and the Federal Reserve to induce them and each of them to settle their investigation for less than they would have if the true and complete

facts had been disclosed. By failing to disclose fully all facts concerning defendants' dealings with Iranian government entities and Iranian SDNs, defendants (a) knowingly presented, and caused to be presented false and fraudulent claims for payment and approval; (b) knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims; (c) knowingly made, used or caused to be used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government all in violation of 31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G).

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of itself, and acting on behalf of, and in the name, of the United States of America, demands and prays that judgment be entered against the Defendants as follows:

1. That judgment shall be entered against Defendants in the amount of three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000.00 for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a), with interest; and

2. That Relator shall be awarded the maximum amount available under 31 U.S.C. § 3730(d) of the Federal False Claims Act for bringing this action, namely, 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes in the matter (or pursues its claim through any alternate remedy available to the United States, 31 U.S.C. § 3730(c)(5)), or, alternatively, 30 percent of the proceeds of the action or settlement of the claim, if the Government declines to intervene.

3.     That Relator shall be awarded all reasonable expenses necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d).

4.     And, such other relief shall be granted in the favor of the United States and Relator as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

5.     Relator hereby demands trial by jury of any issue of fact triable of right by a jury.

Dated:     New York, New York
November 28, 2018

Respectfully submitted,

MENZ BONNER KOMAR & KOENIGSBERG LLP

By:     _____
David A. Koenigsberg

One North Lexington Avenue, Suite 1550
White Plains, New York 10601
Tel.: (914) 949-0222

*Attorneys for Relator Brutus Trading, LLC*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/10/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.* BRUTUS
TRADING, LLC,

                    Plaintiffs,

          v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD CHARTERED
TRADE SERVICES CORPORATION,

                    Defendants.

18 Civ. 11117 (PAE)

### ORDER

The United States of America (the "United States") having declined to intervene in this action pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(4)(B),

IT IS HEREBY ORDERED THAT:

1.    The complaint shall be unsealed 30 days after entry of this Order.   In the event that plaintiff-relator has not moved to dismiss the action, service upon defendants by plaintiff-relator shall be authorized at that time.   If plaintiff-relator seeks to voluntarily dismiss the complaint pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure before serving defendants, plaintiff-relator may seek to modify this Order with the consent of the United States or by motion on notice to the United States.

2.    The Notice of Election to Decline Intervention filed by the United States shall be served by plaintiff-relator upon defendants only after service of the complaint.

3.    All documents previously filed in this action shall remain under seal and not be made public, except for, 30 days after the date of entry of this Order, plaintiff-relator's *qui tam* complaint, this Order, and the United States' Notice of Election to Decline Intervention.

4.      Upon the unsealing of the complaint, the seal shall be lifted as to all other matters occurring in this action subsequent to the entry of this Order.

5.      The parties shall serve all pleadings, motions, and notices of appeal filed in this action, including supporting memoranda and materials, upon the United States.   The United States may order any deposition transcripts.   The United States is entitled to intervene in this action, for good cause, at any time or to seek dismissal of this action.

6.      All orders of this Court shall be sent to the United States by plaintiff-relator.

7.      Should plaintiff-relator or defendants propose that this action be dismissed, settled, or otherwise discontinued, the party or parties proposing such relief will solicit the written consent of the United States before applying to the Court for such relief.


SO ORDERED:                    3/20/19

*Paul A. Engelmayer*

THE HONORABLE PAUL A. ENGELMAYER
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | ) | |
| BRUTUS TRADING, LLC, | **)** | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 18-cv-11117** |
| -against- | ) | |
| | ) | |
| STANDARD CHARTERED BANK, | ) | **FIRST AMENDED COMPLAINT** |
| STANDARD CHARTERED PLC and | ) | |
| STANDARD CHARTERED TRADE SERVICES | ) | |
| CORPORATION, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Relator-Plaintiff Brutus Trading, LLC ("Relator"), through its attorneys, makes

this First Amended Complaint and Demand for Jury Trial against Standard Chartered Bank,

Standard Chartered PLC and Standard Chartered Trade Services Corporation (collectively

"SCB"). Relator alleges, based upon personal knowledge, relevant documents and information

and belief, as follows:

## I.  NATURE OF THE CASE

1.     Relator brings this action on behalf of the United States against SCB for treble

damages and civil penalties arising from SCB's violations of the False Claims Act, 31 U.S.C. §§

3729 *et seq.*

2.     This case arises out of the financing of brutal terrorist atrocities across the globe

through the elaborate inter-bank system in the United States by which banks clear and settle

credits and debits in their Eurodollar[1] accounts with other banks around the world on a daily

---

[1] "Eurodollar" refers to a time deposit denominated in U.S. dollars that is maintained by a bank outside the United
States.

# JA-31

basis. This U.S. dollar clearing and settlement system is central to the operation of the global economy, among other things providing financial institutions and nations with essential access to global trade-finance credit denominated in U.S. dollars.

3.      Because over half of the Iranian government's revenues and the vast majority of Iran's export revenues originate from the sale of oil and gas, a market largely denominated in U.S. dollars, known as "petrodollars," and because Iran's currency, the Rial, is one of the world's least valued currencies, the Iranian regime is dependent on access to the U.S. dollars it maintains in the Eurodollar market and the interest income on its petrodollar funds.

4.      Important for this case, this financial dynamic also means that Iran depends on access to U.S. dollars to fuel its efforts to acquire weapons of mass destruction and to buy the increasingly sophisticated weaponry relied upon by its terrorist proxies.  For example, moving beyond the "improvised explosive devices" ("IEDs") from which American, British, and other Coalition personnel in Iraq have been protected by armored vehicles, Iran finances the manufacture of "explosively formed penetrators" ("EFPs") that requires sophisticated manufacturing equipment not found in Iraq to produce the specially formed copper disk inside an EFP which is central to its lethality. The detonation of an EFP inverts the copper plate into a deadly slug traveling over a mile per second that can punch through armor even 300 feet away.

5.      Thus in late 2005, shortly after EFPs were introduced, the BBC reported:

> An armour-piercing version of the [IED] – blamed for the deaths of eight British
> soldiers this year – marks the latest advance in the insurgents' arsenal. The U.K.
> has accused Iran of supplying the new weapon to militants in southern Iraq, via
> the Lebanese Hezbollah militia group, although Tehran has denied this.

6.      The United States designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act. The United States and other Western governments

intensified their actions against terrorism financing after the September 11, 2001 attacks on the United States.

7.      Nevertheless, Iran redoubled its efforts to access the U.S. financial system while evading U.S. sanctions intended to circumscribe Iran's access to that system. Iran's financing of terrorism as a fundamental element of its foreign policy – including sponsorship of terrorist attacks on Coalition Forces in Iraq – would have been severely constrained by U.S. economic sanctions without the covert operational and technical assistance it received from SCB and other financial institutions to move its funds undetected through the Eurodollar market.

8.      From early 2001 to at least 2014, SCB illegally moved hundreds of billions of dollars in thousands of transactions through the U.S. financial system on behalf of individuals, businesses, and financial institutions that were subject to U.S. economic sanctions because of their links to Iran. Executive Orders Nos. 13059, 13590, 13599, 13628, and 31 CFR Part 560. By operation of U.S. law, these funds vested in the United States and were forfeited to the United States at the time of each illicit transaction. *See* 18 U.S.C. §§ 981(a)(1)(C), 981(f) & 1956(c)(7)(D); 50 U.S.C. § 1705(a). Accordingly, the amount of each illicit transaction became at the time the transaction was effected an obligation of SCB "to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) & (b)(3).

9.      To avoid subsequent detection of these illegal transactions and revelation of the forfeited money involved in them, SCB knowingly falsified the electronic records and documentation by which these transactions were effected, knowingly falsified business records, and knowingly failed to maintain accurate books and records. In addition, the SCB knowingly made deceptive and misleading responses to the inquiries of Federal financial regulators. Finally, by knowingly making false and deceptive representations, SCB deprived the Justice Department

of full and accurate knowledge of the extent of SCB's illegal financial transactions, the full

amount of SCB's existing obligations to pay or transmit hundreds of billions of dollars already

forfeited to the Federal Government, and the fact that SCB's wrongdoing was ongoing.

10.     As a result of SCB's concealment of the extent and amount of their financial

transactions in violation of the Iran sanctions and of the fact that such illegal transactions were

ongoing, in 2012 the Justice Department agreed to defer prosecution of the SCB for those crimes

and accept the forfeiture of an amount grossly below the true amount of SCB's then-existing

obligations to pay or transmit money to the Federal Government.

11.     Thus SCB knowingly concealed its obligations to pay or transmit money to the

Federal Government in violation of 31 U.S.C. § 3729(a)(G). Accordingly, this action seeks

damages (a) in the amount of money forfeited to, but not yet paid to, the Federal Government as

a result of the SCB' illegal financial transactions between 2012 and at least 2014, or whenever

those transactions truly ended, and (b) the full amount of money forfeited to, but not paid to, the

Federal Government in 2012 as a result of SCB's illegal transactions between 2001 and 2012,

less the amount forfeited by the SCB in 2012, all trebled. In addition, this action seeks the

imposition of the maximum penalty for each concealed illegal financial transaction that gave rise

to SCB's obligation to pay or transmit money to the Federal Government between 2001 and at

least 2014, or whenever those transactions truly ended.

12.     At bottom, as the New York Department of Financial Services has put it:

"Motivated by greed, [Standard Chartered Bank] acted … without any regard for the legal,

reputational, and national security consequences of its flagrantly deceptive actions. Led by its

senior management, SCB designed and implemented an elaborate scheme by which to use its

New York branch as a front for prohibited dealings with Iran – dealings that indisputably helped

sustain a global threat to peace and stability." New York State Department of Financial Services, Order Pursuant to Banking Law § 39, *In the Matter of Standard Chartered Bank, New York Branch,* at 22 (Aug. 6, 2012).

13.     Indeed, SCB's staggering greed and its disdain for its obligations under U.S. law were strikingly on display in the brazen retort of Standard Chartered Bank's Group Executive Director, Richard Meddings: "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians?" *Id.* at 5.

14.     SCB's conduct is so reprehensible by any civilized measure of morality and justice that refusing to respond to such a question would be amply justified. Beneath the green-eyeshade complexity and deception of the international financial transactions involved in this case, the unavoidable fact is that SCB used its resources to help terrorists kill and wound American, British, and other Coalition military personnel and thousands of innocent civilians.

15.     That SCB would express such contempt for the sanctions regime -- designed to prevent the use of the revenues derived from SCB's sanctioned transactions to fund the despicable actions which resulted in such injuries and death -- underscores the compelling need for this action to force SCB to disgorge the full amount of the blood money that, by statute, it has forfeited to the United States pursuant to the sanctions regime.

## II.  JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331 (Federal question), § 1345 (United States as plaintiff) and 31 U.S.C. § 3732(a) (False Claims Act).

17.     This Court has personal jurisdiction over the Defendants named in the Complaint pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants can be found, resides,

and/or transacts business in the Southern District of New York and because an act proscribed by

31 U.S.C. § 3729 occurred within this District.  Section 3732(a) further provides for nationwide

service of process.

18.     This action is not precluded by the public disclosure bar of the False Claims Act,

31 U.S.C. § 3730(e)(4).  Upon information and belief, no "public disclosure" of the matters

alleged herein occurred before December 14, 2012, when Relator voluntarily provided

information to the United States Government not previous known by it.  This action is not "based

upon" any publicly available information and in any event, Relator, through its principals, has

"direct and independent knowledge" of the instant allegations. Therefore, to the extent any of

these allegations are deemed to have been based upon a public disclosure, Relator is an "original

source" of this information within the meaning of the False Claims Act and is expressly not

subject to its public disclosure bar.

19.     Venue is proper in the Southern District of New York, under 28 U.S.C.

§§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because (a) the Defendants reside in this District,

(b) a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729

alleged in the Complaint occurred in this District, and (c) because at least one of the Defendants

can be found and transacts business within this District.

### III.     <u>PARTIES</u>

20.     The United States is the real party in interest plaintiff in this action.

21.     Relator Brutus Trading, LLC ("Brutus"), is a Wyoming Limited Liability

Corporation, and brings this action for violations of the False Claims Act on behalf of itself and

the United States.  One of Brutus's principals was the Global Head of Transaction Banking and

Foreign Exchange Sales for Standard Chartered Bank. The other principal is an American

currency trader who is expert in trading systems including those used by SCB. He has advised

members of Congress and the U.S. Federal Reserve on global currency markets. Both principals

have spoken at global investment conferences on foreign exchange issues. Accordingly, both

possess extensive knowledge and experience with international foreign exchange transactions

and banking and possess personal knowledge to support and establish the claims asserted in this

First Amended Complaint.

22.     Defendant Standard Chartered PLC, is a leading international banking institution

with headquarters in London, England.  Standard Chartered has $637 billion in assets with over

1,700 offices around the world.

23.     SC's wholly-owned subsidiary, Standard Chartered Bank, offers a complete range

of banking products and services to its personal, business and wholesale banking clients

worldwide.  Standard Chartered Bank has been licensed by the New York Department of

Financial Services ("DFS") to operate a foreign bank branch in New York State since 1976,

which branch is currently located at 1095 Avenue of the Americas, New York, NY 10036.  The

New York branch office is referred to hereinafter as SCB-NY. SCB-NY also constitutes a "U.S.

person" within the meanings of 31 C.F.R. § 560.314 and 18 U.S.C. § 2332d(b)(2).

24.     Defendant Standard Chartered Trade Services Corporation, a wholly-owned

subsidiary of Standard Chartered Bank, is a Delaware corporation registered to do business in

New York State as a foreign business corporation.

### IV.     GENERAL ALLEGATIONS

25.     SCB-NY is the seventh largest U.S. dollar correspondent bank in the world,

clearing and settling approximately $195 billion per day.  While SCB claims not to service retail

customers in the United States, it does offer wholesale banking services, including trade finance

# JA-37

services, cash management, treasury, foreign exchange and interest rate products, commodity finance, and structured import and export finance services.

26.     SCB's conduct of the U.S. dollar clearing business requires it to clear transactions through SCB-NY and the correspondent U.S. dollar bank accounts domiciled in SCB-NY used to facilitate such clearing transactions.  As a result, SCB and SCB-NY must comply with the rules and regulation imposed by the U.S. Treasury's economic sanctions regulations.  In short, those regulations forbid or restrict the conduct of financial transactions by institutions located in the United States with certain foreign governments and their various instrumentalities and any person or entity that has been identified on the list of Specially Designated Nationals ("SDN") issued by the United States Treasury Department's Office of Foreign Assets Control ("OFAC").

### A.     **Prior Proceedings**

27.     On September 21, 2012, DFS and SCB entered into a Consent Order under New York Banking Law § 44. *See In Re Standard Chartered Bank, New York Branch,* Consent Order Under New York Banking Law § 44 (N.Y.S. Dep't of Fin'l Services) (Sept. 21, 2012) (the "Consent Order"). According to the Consent Order, from January 2001 through 2007, SCB illegally provided U.S. dollar clearing services to Iranian state and privately owned banks, corporations and individuals.  In processing such transactions, SCB stripped or omitted Iranian-identifying information from U.S. dollar wire payment messages to avoid having to comply with OFAC banking rules and regulations. Approximately 59,000 transactions with nominal value of approximately $250 billion were involved.  Consent Order ¶ ¶ 2-3.

28.     SCB agreed to pay a $340 million civil monetary penalty to DFS, consented to having a compliance monitor on premises, and agreed to conduct a comprehensive review of the bank's compliance programs, policies and procedure.

29.     Federal authorities addressed the same wrongdoing by SCB later in 2012. On December 10, 2012, SCB entered into a Deferred Prosecution Agreement (the "2012 DPA") with the Justice Department in which SCB consented to the filing of a criminal information by the United States Attorney's Office for the District of Columbia, which charged that from 2001 until 2007, SCB illegally facilitated U.S. dollar transactions for financial institutions and other parties affiliated with Iran. (A copy of the 2012 DPA is attached as Exhibit A and is incorporated by reference herein.) In the Factual Statement of the 2012 DPA, SCB acknowledged that beginning in "2001 and ending in 2007, SCB violated U.S. and New York State laws by illegally sending payments through the U.S. financial system on behalf of entities subject to U.S. economic sanctions."  2012 DPA, Factual Statement ¶ 2 (Exh. A); *see also id.* ¶¶ 42 & 43.  In addition, "[o]n October 30, 2006, SCB informed the [Federal Reserve Bank of New York] that it was ending its U.S.-dollar clearing activity for all the Iranian banks.  The bank ended its U.S.-dollar activity by March 2007."  *Id.* ¶ 103.  Furthermore, "[f]rom August 2007, SCB suspended all new Iranian business in any currency."  *Id.* ¶ 104.

30.     SCB acknowledged that "at least $227 million" was involved in the 2001 to 2007 transactions covered by the 2012 DPA, and agreed to forfeit that amount. 2012 DPA ¶ 3 (Exh. A).

31.     On December 10, 2012, SCB also entered into a settlement with OFAC, agreeing to pay $132,000,000 to settle its civil liability arising out of SCB's violations of OFAC's rules and regulations. *See* Settlement Agreement between OFAC and SCB, ¶ 32 (Dec. 10, 2012) ("OFAC Settlement Agreement").  The OFAC Settlement Agreement states that "SCB has taken remedial action by terminating its business and prohibiting new business since 2007 with Iranian customers."  OFAC Settlement Agreement, ¶ 26.  Under the OFAC Settlement Agreement,

SCB's obligation to pay the $132,000,000 penalty would be satisfied by payment of an equal or greater amount that satisfied any penalty assessed by United States or county officials. *Id.* ¶ 32.

32.     Finally, on December 10, 2012, SCB also consented to a Cease and Desist Order ("Cease and Desist Order") with the Federal Reserve and agreed to pay a civil money penalty of $100 million, once again for violating U.S. law in the processing of payments involving parties subject to OFAC sanctions from at least 2001 through early 2007.

### B.     Relator's False Claims Act Litigation

33.     On December 17, 2012, Relator filed its first False Claims Act lawsuit against the same Defendants as in this case. *See United States ex rel. Brutus Trading LLC v. Standard Chartered Bank, et al.*, 12 CV 9160 (KBF) (S.D.N.Y.) (the "2012 Case").

34.     In that case, and in meetings that followed with the Federal and New York State authorities, the Relator brought to the attention of those authorities information, drawn from SCB's own records provided by the Relator, that SCB's course of conduct violating the Iran sanctions was far more extensive and elaborate during the 2001- 2007 period than had been portrayed to those authorities and, contrary to SCB's representations, was continuing. (This course of conduct by SCB exposed by the Relator's information is discussed below.)

35.     Indeed, the information provided by the Relator was so useful to the authorities that in early 2013 the FBI and Justice Department asked one of the principals of the Relator to try to get more data from a source in Dubai. The operation took several months to set up, but eventually that principal arranged for a contact with an individual in Dubai with that information, and delivered that information to the FBI on two data sticks containing 79 files showing thousands more illegal transactions by SCB through 2013 and 2014, along with other information. That contact has left Dubai.

36.     The 2012 Case was unsealed by the Court on May 10, 2017. On September 19,

2017, the 2012 Case was voluntarily dismissed without prejudice.

37.     The 2012 Case was effectively re-filed in the form of this case on November 28,

2018. The United States ultimately declined to intervene, and, by Order of March 20, 2019, the

Court ordered this case to be unsealed on April 20, 2019.

**C.     SCB's Course of Conduct Violating the Iran Sanctions**

38.     To evade the Iran sanctions in a clearing transaction, SCB had two basic tasks.

First, SCB had to process the transaction in a way that would not trigger software programs

designed to identify and stop transactions involving sanctioned parties. Second, SCB had to

ensure that no record that the transaction involved a sanctioned party was created that could be

subject to scrutiny after-the-fact either by in-house compliance officers or by government

authorities. SCB had to adopt procedures so the illicit transaction would always execute and the

Iranian connection would never be discovered.

39.     The method for SCB's violation of the sanctions on which the 2012 DPA focused

was "wire-stripping" or "repairing," that is, the removal of any reference to Iran in the SWIFT[2]

payment messages by which clearing transactions are effected. *See* 2012 DPA, Factual Statement

¶¶ 23, 26-28, 37 (Exh. A). Based on SCB's representations, the 2012 DPA accepted the notion

that SCB had stopped this process in March 2006. *Id.,* ¶ 99.

40.     The 2012 DPA also identified only $227 million as "at least" the amount of illegal

clearing transactions in which SCB engaged between 2001 and 2007. 2012 DPA ¶ 3 (Exh. A);

---

[2] "SWIFT" refers to the Society for Worldwide Interbank Financial Telecommunications, which is the international
system to transmit payment messages to financial institutions around the world. SWIFT messages contain various
informational fields that are manipulated in wire-stripping or repairing to avoid disclosing any Iranian connection in
a clearing transaction.

Factual Statement ¶ 2 (Exh. A). And SCB promised not to engage in any more illicit clearing transactions. 2012 DPA ¶ 5 (Exh. A).

41.     SCB's scheme to capture the lucrative rewards of a line of business that depended on evading the Iran sanctions – indeed, that evasion *was* the service offered by SCB – was far more robust, cunning, and extensive than the picture presented to Justice Department authorities in negotiating the 2012 DPA. A conservative estimate of the annual value of clearing transactions processed by SCB violating the Iran sanctions (excluding exempt transactions) in the 2001-2007 period is approximately $40 billion. It was the Relator who, in filing the 2012 Case and related disclosures, brought the following facts to the attention of Federal and New York State authorities.

42.     SCB's course of conduct to develop its Iran-related business and to evade the Iran sanctions was no haphazard affair. That course of conduct was the handiwork of a deliberate, if concealed, organizational structure.

        (a) Since at least 2002, SCB operated a program known internally to high level SCB officials as "Project Green."  This was a program run by trade finance experts and senior geographical branch chief executive officers, deliberately excluding compliance officers.  Project Green was initiated at SCB London Headquarters and was headed by SCB's Iraq and Afghanistan CEO Stuart Horsewood and Managing Director Vikram Kukreja, a trade finance expert. Horsewood considered Iran to be a "major new market" for SCB. Project Green was designed to assist, conspire, aid and abet non-United States customers that have been made the subject of United States economic sanctions to evade those sanctions and engage in international financial transactions.  SCB continued to

operate Project Green at least until 2012, when SCB began the process of winding it down.

(b) SCB's Originations and Client Coverage Group ("OCC") covered all SCB clients and had more personnel than SCB's sales staff. OCC in Dubai was deployed to create fraudulent records that allowed Iranian-connected clients to open accounts without their Iranian connection being detected. In addition, OCC was very active in trying to get new clients in Iran even after 2010, when SCB was supposed to be "winding down" its Iran business. Indeed, the law does not allow for the "winding down" of illegal, sanctioned transactions. These transactions are crimes that must be halted.

(c) The Iran Committee was staffed by people from OCC, Global Cash Operations, and Global Trade Operations. The mandate of the Committee was to develop strategies to evade the Iran sanctions.

(d) The Iran Group operated from 2008 to 2014. It housed all of the management information systems ("MIS") concerning Iranian-client transactions and profitability. The MIS disseminated this information throughout the SCB organization, from low-level employees up to the Deputy CEO of SCB, Mike Rees.

(e) The Iran Cont Client Group focused on development of and services to a subset of SCB's Iran business, small to medium enterprises, many of which were located in Dubai.

(f) SCB-Dubai played a central role in SCB's scheme to evade the Iran sanctions in order to expand SCB's Iran business due to its proximity to Iran and the number of Iranian businesses in Dubai. Indeed, the actions of SCB-Dubai personnel often concealed

illegal clearing transactions from personnel in SCB-NY, who had to process every transaction clearing U.S. dollars.

(g) SCB's office in Iran – SCB-Tehran – was the "on-the-ground" representative of SCB with a significant outreach to potential Iranian clients.

43.     SCB employed various means, beyond the wire stripping or repairing addressed by the 2012 DPA, to aggressively evade the Iran sanctions and conceal the fact that it did so.

(a) Perhaps the most egregious measure SCB adopted to evade the Iran sanctions was the OLT3 system. OLT3 provided online trading for foreign exchange linked directly to the Straight-to-Bank SCB Client System, the main online portal to SCB's client accounts. OLT3 allowed Iranian clients to enter SCB's computer system on their own and conduct illegal foreign exchange transactions. OLT3 was designed to have no ability to suspend or block a deal potentially violating the sanctions and to create no record of the illegal transaction.

(b) SCB used hundreds of "sundry" accounts to conceal transactions violating the Iran sanctions. Sundry accounts have also been called "error" accounts because they were intended to be accounts in which to temporarily book a transaction in which a counterparty was not properly identified, or some other error was made.  As a result, such a transaction could not immediately be reconciled with an SCB customer account. Taking advantage of this device for the Iran scheme, SCB personnel would change some small part of the counterparty's name, such as changing a letter or dropping a word, so that the transaction would be executed, but then go into a sundry account. Because these revenues were not properly matched up to the customer, identifying whether the revenues were derived from customers on OFAC's list of Specially Designated Nationals ("SDNs") or

from entities otherwise associated with Iran, and so subject to sanctions, would prove very difficult, if not impossible, for any SCB-NY employee or Government official.

(c) Similarly, Customer Due Diligence records would be manipulated by the misspelling of names to avoid running afoul of the OFAC SDN list.

(d) Employees in SCB-Dubai would fill out and sign account paperwork for clients based in Iran, under the coordination of the Middle East North Africa OCC team, again to conceal the true account holder.

(e) In 2013, after the filing of the predecessor of this action and the related disclosures brought to light for Government authorities the central role of SCB-Dubai in SCB's course of conduct to evade the Iran sanctions, SCB engaged a consultant, Promontory Financial Group, LLC, to clean the SCB-Dubai servers of information that would disclose to investigators the extent and details of SCB's program to evade the Iran sanctions.

(f) A number of the accounts of Iranian-owned businesses were moved from the Iran Group to the SCB-Dubai Corporate Group to conceal their existence.

44.     Contrary to the representations that SCB made to induce the Justice Department to enter into the 2012 DPA, SCB continued to engage in U.S. dollar clearing and other financial transactions with and for the benefit of Iranian government entities and Iranian SDNs until at least 2014.

45.     SCB's records show that since at least 2006, SCB identified and targeted as customers, among others, the following Iranian government entities or SDNs:  Bank Keshavarzi, Bank Markazi, Bank Maskan, Bank Mellat, Bank Melli, Bank Tejarat, Export Development Bank of Iran, Bank Saderat and Sepah Bank.  In addition, since at least 2008, SCB's client lists

included the National Iranian Oil Company ("NIOC") and its subsidiaries as clients.  In 2008, OFAC identified NIOC as an entity owned or controlled by the Government of Iran within the meaning of the Iranian Transactions Regulations.  OFAC also identified NIOC as an affiliate of the Islamic Revolutionary Guard Corps ("IRGC").  OFAC added IRGC to the SDN list on October 21, 2007.

46.     The following are examples (a) of the many trades performed by SCB on behalf of banned Iranian government entities or Iranian related SDNs after 2007 or (b) of evidence that SCB was performing transactions after 2007 on behalf of clients that were banned Iranian entities, contrary to SCB's representations to representatives of the United States that "[f]rom August 2007, SCB suspended all new Iranian business in any currency."

47.     In or about January 2009, SCB performed an export finance transaction for Bank Tejerat, a bank owned by the Government of Iran.   Such a transaction necessarily involved dollar clearing by SCB-NY.

48.     In or about January 2009, SCB performed three structured trade finance transactions for National Iranian Tanker Company ("NITC"), an entity owned by the Iranian government and a subsidiary of NIOC.  Such transactions necessarily involved dollar clearing by SCB-NY.

49.     SCB conducted a U.S. dollar letter of credit transaction between Bank Markazi and four exporters in or about December 2009.  Bank Markazi-Iran-CB was added to OFAC's SDN list as of October 22, 2008.  Such a transaction necessarily involved dollar clearing by SCB-NY.

50.     SCB performed a trade finance and cash management transaction for the Iran Ministry of Economic Affairs and Finance in or about December 2009.  Such a transaction necessarily involved dollar clearing by SCB-NY.

51.     SCB records further show that it performed transactions in August, November, and December 2009 with the Ministry of Energy of Iran Group, an agency of the Government of Iran, with nominal value of $2,546,419, and cash management and trade finance revenues to the bank in the amount of $259,602.77.  Significant transactional foreign exchange revenues were also earned from this client during the period from August 2009 through December 2009.  Such transactions including U.S. dollar foreign exchange trades necessarily involved dollar clearing by SCB-NY.

52.     According to SCB records, as of June 2008, Bank Saderat had the authority to conduct foreign exchange transactions directly through SCB with a $1 million limit per transaction and a total settlement limit of $10 million.  This meant that Bank Saderat was independently and remotely able to log into SCB's OLT3 computer system to initiate U.S. dollar foreign exchange transactions that necessarily involved SCB-NY.  In addition, the Industrial Development and Renovation Organization of Iran and the Iranian Offshore Engineering Company had on-line trading access and independent authority to engage in U.S. dollar foreign exchange transactions in 2008 and 2009. Similarly, Bank Tejerat still had an account at SCB-Dubai (Master No. 3239713) open in 2012.  Any such foreign exchange trades would have involved SCB-NY.

53.     As of 2008, SCB had on its books significant approved U.S. dollar foreign exchange trading limits for the following entities that were listed as SDNs:  Bank Sepah, Bank Keshavarzi, and the Iranian Export Development Bank.

54.     SCB's continued efforts to do business with banned Iranian entities continued into

2009 and beyond.  In March 2009, SCB executives developed a list of priority accounts to be

targeted for business development because they each had "good revenue potential."  The target

list included National Iranian Tanker Company and National Iranian Oil Company.

55.     In April 2009, SCB targeted Iran as a source of business as part of "The Curve

Campaign," a global financial markets campaign to cross-sell interest rate products to selected

high value potential clients and acquire term U.S. dollar deposits from these clients.

56.     SCB internal reports showed that as of August 2009, the bank enjoyed profits of

$4,365,000 from Iranian related transactions and customers.

57.     A report of customer transactions from August 2009, showed eight transactions

with Bank Tejerat, 10 transactions with Iranian Tanker Company, seven transactions with Iran &

Dubai Co., LLC, and transactions with Pasian High Voltage, Khorasan Steel, and Khouzestan

Steel Company.

58.     Between 2009 and 2014, SCB continued its course of conduct to execute illegal

clearing transactions for its Iranian-connected or Iranian owned customers such as: Amesco, FZE

($6 billion), Bank Markazi Jomhouri Islami Iran ($5 billion), Bright Crescent Trading Co. ($2

billion), Caspian Petrochemical ($5 billion), Iran & Dubai Co. ($6 billion), Iran Overseas

Investment Bank, Ltd. ($1 billion), M& H Trading ($5 billion), Mahan Air General Trading LLC

($2 billion), PICO International Dubai ($2 billion), Piston Trading ($2 billion), and

Schlumberger Overseas SA/Well Services of Iran ($6 billion).

59.     A reasonable, conservative calculation of the dollar-value of the clearing

transactions in violation of the Iran sanctions that SCB handled between 2009 and 2014 is

approximately $56.75 billion.

**D.**     **The 2019 Amended Deferred Prosecution Agreement**

60.     On April 8, 2019, the Justice Department and SCB entered into an Amended

Deferred Prosecution Agreement (the "2019 DPA"). (A copy of the 2019 DPA is attached as

Exhibit B and is incorporated by reference herein.) The 2019 DPA included the original Factual

Statement from the 2012 DPA plus a Supplemental Statement of Facts ("Facts Supp.").

61.     In the 2019 DPA, SCB admitted that it had processed $240 million of clearing

transactions in violation of the Iran sanctions between 2007 and 2011, contrary to what it had

represented in the 2012 DPA.  2019 DPA, Fact Supp. ¶¶ 4-5 (Exh. B). SCB agreed to forfeit that

amount. 2019 DPA ¶ 11 (Exh. B).

62.     The 2019 DPA did not address the broader course of conduct by SCB in violation

of the Iran sanctions set out in this action. Nor did it address the far greater sums that, by

operation of statute, had been forfeited by SCB to the United States as a consequence of that

conduct.

**CAUSE OF ACTION**
**(31 U.S.C. § 3729(a)(1)(G))**

63.     The allegations in the foregoing paragraphs of this First Amended Complaint are

incorporated here by reference.

64.     As set out above, the SCB adopted a course of conduct to conceal from the

Government hundreds of billions of dollars of clearing transactions in which they engaged from

2001 through 2014 in violation of applicable United States sanctions on Iran.  As part of this

scheme and course of conduct to conceal these enormously profitable transactions, the SCB

concealed the extent of this illegal activity during the period 2001 through 2007 and concealed

the fact that this illegal activity continued after that time in order to induce the Department of

Justice to enter into a Deferred Prosecution Agreement with SCB in 2012 that required SCB to

pay an amount billions of dollars less than the amounts of all the illegal transactions undertaken by SCB which had already been forfeited and which SCB was obliged and remain obliged to pay to the United States by operation of law:

(a) Title 18 U.S.C. § 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to … any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" is "subject to forfeiture to the United States."

(b) Further, Title 18 U.S.C. § 981(f) provides that "[a]ll right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section."

(c) A "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(D) means "an offense under … section 206 … of the International Emergency Economic Powers Act."

(d) Section 206 of the International Emergency Economic Powers Act (50 U.S.C. § 1705(a)) provides that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."

(e) Every transaction of SCB violating United States sanctions on Iran constitutes a violation of regulations and orders issued pursuant to the International Emergency Economic Powers Act, and, accordingly, by operation of 18 U.S.C. §§ 981(a)(1)(C) & (f), 18 U.S.C. § 1956(c)(7)(D), and 50 U.S.C. § 1705(a), every dollar in each of those transactions was forfeited to the United States at the instant those transactions took place.

65.     (a) By concealing the true amount of money that had already been forfeited to the United States by the illegal clearing transactions that occurred within the time period addressed

by the 2012 Deferred Prosecution Agreement, an amount which SCB was obliged to pay the United States in full, and (b) by concealing the illegal clearing transactions in which SCB engaged after that period through 2014, the amounts of which have been forfeited and which SCB is obliged to pay to the United States, SCB knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of itself, and acting on behalf of, and in the name of, the United States of America, demands and prays that judgment be entered against SCB as follows:

1.     That the United States be awarded judgment in the amount of three times the amount of damages the United States has sustained because of SCB's actions (that is, the amount already forfeited to the United States by SCB but not yet paid by SCB), plus the maximum civil penalty for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a);

2.     That pre- and post-judgment interest be awarded;

3.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

3.     That Relator be awarded all costs of this action, including attorneys' fees and expenses, as provided by 31 U.S.C. § 3730(d).

4.     That this Court award such other and further relief as it deems just and proper.

# JA-51

**DEMAND FOR JURY TRIAL**

Pursuant to FED. R. CIV. P. 38, Relator demands trial by jury of any and all issues

in this action so triable by right.

Dated:          New York, New York
                July 18, 2019

Respectfully submitted,

BRUTUS TRADING, LLC

By:      /s/ Robert J. Cynkar

Robert J. Cynkar
McSweeney, Cynkar & Kachouroff, PLLC
10506 Milkweed Drive
Great Falls, VA 22066
(703) 621-3300
rcynkar@mck-lawyers.com

*Attorney for Brutus Trading, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA ex rel.
BRUTUS TRADING, LLC,

                    Plaintiff,

       - against -

STANDARD CHARTERED BANK,
STANDARD CHARTERED PLC, and
STANDARD CHARTERED TRADE
SERVICES CORPORATION,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/22/19_

Case No. 18-cv-11117 (PAE)

STIPULATION AND ORDER
EXTENDING TIME TO ANSWER,
MOVE OR OTHERWISE
RESPOND TO THE COMPLAINT
AND TO STAY DISCOVERY

WHEREAS, on November 29, 2018, the United States of America ex rel. Brutus Trading LLC ("Plaintiff") filed an action under seal against defendants Standard Chartered Bank, Standard Chartered PLC, and Standard Chartered Trade Services Corporation (collectively, "Defendants") asserting a claim under the False Claims Act, 31 U.S.C. § 3729, *et seq*.;

WHEREAS, the United States of America declined to intervene in the action;

WHEREAS, the Court ordered on March 20, 2019 that the complaint be unsealed;

WHEREAS, on July 19, 2019, Plaintiff filed a First Amended Complaint (the "Amended Complaint," Dkt. No. 15);

WHEREAS, the parties have conferred and agreed upon the acceptance of service by Defendants' counsel, a motion to dismiss briefing schedule, and a stay of all discovery pending the resolution of Defendants' motion to dismiss;

NOW, THEREFORE, THE PARTIES HEREBY STIPULATE AND AGREE, through their respective counsel, subject to the approval of the Court, as follows:

1.      Defendants' counsel agrees to accept service of the Amended Complaint on Defendants' behalf, but each Defendant expressly reserves all rights, defenses, or other objections (other than insufficient process or insufficient service of process);

2.      Defendants shall file their motion to dismiss or otherwise respond to the Amended Complaint by September 27, 2019;

3.      Plaintiff shall file its opposition to Defendants' motion to dismiss by November 15, 2019;

4.      Defendants shall file their reply to Plaintiff's opposition by December 17, 2019;

5.      Plaintiff and Defendants agree to stay all disclosures and discovery in this action until the Court rules on the motion to dismiss to be filed by Defendants.

Dated:  July19, 2019          McSWEENEY, CYNKAR &
                                      KACHOUROFF, PLLC

                    By:    */s/* Robert J. Cynkar

                                  Robert J. Cynkar*
                                  10506 Milkweed Drive
                                  Great Falls, VA 22066
                                  Tel.: (703) 631-3300
                                  rcynkar@mck-lawyers.com

                                  *Attorneys for Plaintiff*

                                   *Admitted pro hac vice*

Dated:  July 19, 2019         DAVIS POLK & WARDWELL LLP

                    By:    */s/* Antonio J. Perez-Marques

                                  Antonio J. Perez-Marques
                                  450 Lexington Avenue
                                  New York, New York 10017
                                  Tel.: (212) 450-4000
                                  antonio.perez@davispolk.com

                                  *Attorneys for Defendants*

\*     \*     \*

## ORDER

IT IS SO ORDERED.

DATED:    7/22/19

                      THE HONORABLE PAUL A. ENGELMAYER
                      UNITED STATES DISTRICT JUDGE

Case 1:18-cv-11117-PAE   Document 20   Filed 08/28/19   Page 1 of 2

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

August 28, 2019

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  8/29/19
```

**BY ECF**
The Honorable Paul A. Engelmayer
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

Re:   *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,*
       No. 18 Civ. 11117 (PAE)

Dear Judge Engelmayer:

I write respectfully on behalf of the United States of America (the "Government") in this action filed by relator Brutus Trading, LLC, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733, in which the Government has declined to intervene, ECF No. 3.  Upon careful consideration, the Government has decided to move to dismiss this action pursuant to its authority under 31 U.S.C. § 3730(c)(2)(A).  Unlike a traditional motion to dismiss under Federal Rule of Civil Procedure 12(b), a government motion to dismiss under Section 3730(c)(2)(A) is evaluated under an extremely deferential standard, although its precise contours are not yet settled in this Circuit.  *See United States ex rel. Borzilleri v. AbbVie, Inc.*, No. 15 Civ. 7881 (JMF), 2019 WL 3203000, at *1 (S.D.N.Y. July 16, 2019) (giving the government either an "unfettered" right to dismiss an action unless there is "fraud on the court," or requiring that it "demonstrate a valid government purpose for dismissal and a rational relation between dismissal and accomplishment of that purpose" (internal quotation marks and brackets omitted)).

Given this, the Government has conferred with the relator and the defendants, and the parties jointly propose the following briefing schedule—and further respectfully suggest that the Court adjourn without date the briefing schedule it already set for the defendants to move to dismiss the relator's complaint, ECF No. 17.  The parties propose that the Government file its motion to dismiss on **October 31, 2019**, that the relator file its opposition on **December 13, 2019**, and that the Government file its reply on **January 13, 2020**.

We thank the Court for its consideration of this request.

Respectfully,

GEOFFREY S. BERMAN
United States Attorney

By:     s/Jean-David Barnea
        JEAN-DAVID BARNEA
        Assistant United States Attorney
        Telephone:  (212) 637-2679
        Email: Jean-David.Barnea@usdoj.gov

# JA-56

Page 2

cc:    Counsel for Relator
       Counsel for Defendants
       BY ECF

Granted.  The Court hereby adjourns the briefing schedule for defendants' motion to dismiss
and sets the following schedule for the Government's motion to dismiss:  Government's
motion to dismiss is due October 31, 2019; realtor's opposition is due December 13, 2019;
and Government's reply is due January 13, 2020.

SO ORDERED.

_Paul A. Engelmayer_    8/29/19
_____

PAUL A. ENGELMAYER
United States District Judge

# JA-57

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America *ex rel.* ) | |
| Brutus Trading, LLC, ) | |
| Plaintiff, ) | |
| -against- ) | |
| ) | **Case No. 18-cv-11117** |
| Standard Chartered Bank ) | |
| Standard Chartered PLC, and ) | |
| Standard Chartered Trade Services Corporation, ) | |
| Defendants. ) | |

## <u>MOTION FOR LEAVE TO AMEND COMPLAINT</u>

Plaintiff, Brutus Trading, LLC, by counsel, moves the Court, pursuant to FRCivP 15(a),

for an Order granting Plaintiff leave to file the attached Second Amended Complaint. Counsel

for Defendants has authorized counsel for the movant to represent that Defendants take no

position on this Motion. For the reasons set forth in the accompanying Memorandum in Support

of the Motion for Leave to Amend Complaint, Plaintiff requests that its Motion be granted

because the amendment will clarify the claim asserted by Plaintiff and will not prejudice any

party to this action.

Dated September 20, 2019

Respectfully submitted,
BRUTUS TRADING, LLC
/s/
By_____
Patrick M. McSweeney
(Admitted *pro hac vice*)
McSweeney, Cynkar & Kachouroff, PLLC
3358 John Tree Hill Road
Powhatan, Virginia 23139
Tel. (804) 937-0895
Fax (703) 365-9593
patrick@mck-lawyers.com

Attorney for Plaintiff

# JA-58

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| United States of America, *ex rel.* | ) | |
| Brutus Trading, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 18-cv-11117** |
| -against- | ) | |
| | ) | |
| Standard Chartered Bank, | ) | **SECOND AMENDED** |
| | | **COMPLAINT** |
| Standard Chartered PLC and | ) | |
| Standard Chartered Trade Services Corporation, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## INTRODUCTION

Relator-Plaintiff Brutus Trading, LLC ("Relator"), through its attorneys, makes

this Second Amended Complaint and Demand for Jury Trial against Standard Chartered Bank

(SCB), Standard Chartered PLC and Standard Chartered Trade Services Corporation

(collectively "SCB").  Relator alleges, based upon personal knowledge, relevant documents and

information and belief, as follows:

## I.  NATURE OF THE CASE

1.      Relator brings this action on behalf of the United States against Defendants for

treble damages and civil penalties arising from Defendants' violations of the False Claims Act,

31 U.S.C. §§ 3729 *et seq.*

2.      This case arises out of the financing of brutal terrorist atrocities across the globe

through the elaborate inter-bank system in the United States by which banks clear and settle

credits and debits in their Eurodollar[1] accounts with other banks around the world on a daily

---

[1] "Eurodollar" refers to a time deposit denominated in U.S. dollars that is maintained by a bank outside the United
States.

basis. This U.S. dollar clearing and settlement system is central to the operation of the global economy, among other things providing financial institutions and nations with essential access to global trade-finance credit denominated in U.S. dollars.

3.      Because over half of the Iranian government's revenues and the vast majority of Iran's export revenues originate from the sale of oil and gas, a market largely denominated in U.S. dollars, known as "petrodollars," and because Iran's currency, the Rial, is one of the world's least valued currencies, the Iranian regime is dependent on access to the U.S. dollars it maintains in the Eurodollar market and the interest income on its petrodollar funds.

4.      Important for this case, this financial dynamic also means that Iran depends on access to U.S. dollars to fuel its efforts to acquire weapons of mass destruction and to buy the increasingly sophisticated weaponry relied upon by its terrorist proxies.  For example, moving beyond the "improvised explosive devices" ("IEDs") from which American, British, and other Coalition personnel in Iraq have been protected by armored vehicles, Iran finances the manufacture of "explosively formed penetrators" ("EFPs") that requires sophisticated manufacturing equipment not found in Iraq to produce the specially formed copper disk inside an EFP which is central to its lethality. The detonation of an EFP inverts the copper plate into a deadly slug traveling over a mile per second that can punch through armor even 300 feet away.

5.      Thus, in late 2005, shortly after EFPs were introduced, the BBC reported:

An armour-piercing version of the [IED] – blamed for the deaths of eight British soldiers this year – marks the latest advance in the insurgents' arsenal. The U.K. has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group, although Tehran has denied this.

6.      The United States designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act. The United States and other Western governments

intensified their actions against terrorism financing after the September 11, 2001 attacks on the United States.

7.      Nevertheless, Iran redoubled its efforts to access the U.S. financial system while evading U.S. sanctions intended to circumscribe Iran's access to that system. Iran's financing of terrorism as a fundamental element of its foreign policy – including sponsorship of terrorist attacks on Coalition Forces in Iraq – would have been severely constrained by U.S. economic sanctions without the covert operational and technical assistance it received from SCB and other financial institutions to move its funds undetected through the Eurodollar market.

8.      From early 2001 to at least 2014, SCB illegally moved hundreds of billions of dollars in thousands of transactions through the U.S. financial system on behalf of individuals, businesses, and financial institutions that were subject to U.S. economic sanctions because of their links to Iran. Executive Orders Nos. 13059, 13590, 13599, 13628, and 31 CFR Part 560. By operation of U.S. law, these funds vested in the United States and were forfeited to the United States at the time of each illicit transaction. *See* 18 U.S.C. §§ 981(a)(1)(C), 981(f) & 1956(c)(7)(D); 50 U.S.C. § 1705(a). Accordingly, the amount of each illicit transaction became at the time the transaction was effected an obligation of SCB "to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) & (b)(3).

9.      To avoid subsequent detection of these illegal transactions and revelation of the forfeited money involved in them, SCB knowingly falsified the electronic records and documentation by which these transactions were effected, knowingly falsified business records, and knowingly failed to maintain accurate books and records. In addition, the SCB knowingly made deceptive and misleading responses to the inquiries of Federal financial regulators. Finally, by knowingly making false and deceptive representations, SCB deprived the Justice Department

of full and accurate knowledge of the extent of SCB's illegal financial transactions, the full amount of SCB's existing obligations to pay or transmit hundreds of billions of dollars already forfeited to the Federal Government, and the fact that SCB's wrongdoing was ongoing.

10.     As a result of SCB's concealment of the extent and amount of their financial transactions in violation of the Iran sanctions and of the fact that such illegal transactions were ongoing, in 2012 the Justice Department agreed to defer prosecution of the SCB for those crimes and accept the forfeiture of an amount grossly below the true amount of SCB's then-existing obligations to pay or transmit money to the Federal Government.

11.     Thus, SCB knowingly concealed its obligations to pay or transmit money to the Federal Government in violation of 31 U.S.C. § 3729(a)(G). Accordingly, this action seeks damages (a) in the amount of money forfeited to, but not yet paid to, the Federal Government as a result of the SCB's illegal financial transactions between 2012 and at least 2014, or whenever those transactions truly ended, and (b) the full amount of money forfeited to, but not paid to, the Federal Government in 2012 as a result of SCB's illegal transactions between 2001 and 2012, less the amount forfeited by the SCB in 2012, all trebled. In addition, this action seeks the imposition of the maximum penalty for each concealed illegal financial transaction that gave rise to SCB's obligation to pay or transmit money to the Federal Government between 2001 and at least 2014, or whenever those transactions truly ended.

12.     At bottom, as the New York Department of Financial Services has put it: "Motivated by greed, [Standard Chartered Bank] acted … without any regard for the legal, reputational, and national security consequences of its flagrantly deceptive actions. Led by its senior management, SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran – dealings that indisputably helped

sustain a global threat to peace and stability." New York State Department of Financial Services, Order Pursuant to Banking Law § 39, *In the Matter of Standard Chartered Bank, New York Branch,* at 22 (Aug. 6, 2012).

13.     Indeed, SCB's staggering greed and its disdain for its obligations under U.S. law were strikingly on display in the brazen retort of Standard Chartered Bank's Group Executive Director, Richard Meddings: "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians?" *Id.* at 5.

14.     SCB's conduct is so reprehensible by any civilized measure of morality and justice that refusing to respond to such a question would be amply justified. Beneath the green-eyeshade complexity and deception of the international financial transactions involved in this case, the unavoidable fact is that SCB used its resources to help terrorists kill and wound American, British, and other Coalition military personnel and thousands of innocent civilians.

15.     That SCB would express such contempt for the sanctions regime -- designed to prevent the use of the revenues derived from SCB's sanctioned transactions to fund the despicable actions which resulted in such injuries and death -- underscores the compelling need for this action to force SCB to disgorge the full amount of the blood money that, by statute, it has forfeited to the United States pursuant to the sanctions regime.

## II.  **JURISDICTION & VENUE**

16.     This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331 (Federal question), § 1345 (United States as plaintiff) and 31 U.S.C. § 3732(a) (False Claims Act).

17.     This Court has personal jurisdiction over the Defendants named in the Complaint pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants can be found, resides,

and/or transacts business in the Southern District of New York and because an act proscribed by

31 U.S.C. § 3729 occurred within this District.  Section 3732(a) further provides for nationwide

service of process.

18.    This action is not precluded by the public disclosure bar of the False Claims Act,

31 U.S.C. § 3730(e)(4).  Upon information and belief, no "public disclosure" of the matters

alleged herein occurred before December 14, 2012, when Relator voluntarily provided

information to the United States Government not previous known by it.  This action is not "based

upon" any publicly available information and, in any event, Relator, through its principals, has

"direct and independent knowledge" of the instant allegations. Therefore, to the extent any of

these allegations are deemed to have been based upon a public disclosure, Relator is an "original

source" of this information within the meaning of the False Claims Act and is expressly not

subject to its public disclosure bar.

19.    Venue is proper in the Southern District of New York, under 28 U.S.C.

§§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because (a) the Defendants reside in this District,

(b) a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729

alleged in the Complaint occurred in this District, and (c) because at least one of the Defendants

can be found and transacts business within this District.

### III.    <u>PARTIES</u>

20.    The United States is the real party in interest plaintiff in this action.

21.    Relator, Brutus Trading, LLC ("Brutus"), is a Wyoming Limited Liability

Corporation, and brings this action for violations of the False Claims Act on behalf of itself and

the United States.  One of Brutus's principals was the Global Head of Transaction Banking and

Foreign Exchange Sales for Standard Chartered Bank. The other principal is an American

currency trader who is expert in trading systems including those used by SCB. He has advised

members of Congress and the U.S. Federal Reserve on global currency markets. Both principals

have spoken at global investment conferences on foreign exchange issues. Accordingly, both

possess extensive knowledge and experience with international foreign exchange transactions

and banking and possess personal knowledge to support and establish the claims asserted in this

Second Amended Complaint.

22.     Defendant Standard Chartered PLC (SC), is a leading international banking

institution with headquarters in London, England.  SC has $637 billion in assets with over 1,700

offices around the world.

23.     SC's wholly-owned subsidiary, Standard Chartered Bank, offers a complete range

of banking products and services to its personal, business and wholesale banking clients

worldwide.  Standard Chartered Bank has been licensed by the New York Department of

Financial Services ("DFS") to operate a foreign bank branch in New York State since 1976,

which branch is currently located at 1095 Avenue of the Americas, New York, NY 10036.  The

New York branch office is referred to hereinafter as SCB-NY. SCB-NY also constitutes a "U.S.

person" within the meanings of 31 C.F.R. § 560.314 and 18 U.S.C. § 2332d(b)(2).

24.     Defendant Standard Chartered Trade Services Corporation (SCB-NY), a wholly-

owned subsidiary of Standard Chartered Bank, is a Delaware corporation registered to do

business in New York State as a foreign business corporation.

### IV.     GENERAL ALLEGATIONS

25.     SCB-NY is the seventh largest U.S. dollar correspondent bank in the world,

clearing and settling approximately $195 billion per day.  While SCB claims not to service retail

customers in the United States, it does offer wholesale banking services, including trade finance

services, cash management, treasury, foreign exchange and interest rate products, commodity finance, and structured import and export finance services.

26.     SCB's conduct of the U.S. dollar clearing business requires it to clear transactions through SCB-NY and the correspondent U.S. dollar bank accounts domiciled in SCB-NY used to facilitate such clearing transactions.  As a result, SCB and SCB-NY must comply with the rules and regulations imposed by the U.S. Treasury's economic sanctions regulations.  In short, those regulations forbid or restrict the conduct of financial transactions by institutions located in the United States with certain foreign governments and their various instrumentalities and any person or entity that has been identified on the list of Specially Designated Nationals ("SDN") issued by the United States Treasury Department's Office of Foreign Assets Control ("OFAC").

### A.     <u>Prior Proceedings</u>

27.     On September 21, 2012, DFS and SCB entered into a Consent Order under New York Banking Law § 44. *See In Re Standard Chartered Bank, New York Branch,* Consent Order Under New York Banking Law § 44 (N.Y.S. Dep't of Fin'l Services) (Sept. 21, 2012) (the "Consent Order"). According to the Consent Order, from January 2001 through 2007, SCB illegally provided U.S. dollar clearing services to Iranian state and privately owned banks, corporations and individuals.  In processing such transactions, SCB stripped or omitted Iranian-identifying information from U.S. dollar wire payment messages to avoid having to comply with OFAC banking rules and regulations. Approximately 59,000 transactions with nominal value of approximately $250 billion were involved.  Consent Order ¶ ¶ 2-3.

28.     SCB agreed to pay a $340 million civil monetary penalty to DFS, consented to having a compliance monitor on premises, and agreed to conduct a comprehensive review of the bank's compliance programs, policies and procedure.

29.     Federal authorities addressed the same wrongdoing by SCB later in 2012. On December 10, 2012, SCB entered into a Deferred Prosecution Agreement (the "2012 DPA") with the Justice Department in which SCB consented to the filing of a criminal information by the United States Attorney's Office for the District of Columbia, which charged that from 2001 until 2007, SCB illegally facilitated U.S. dollar transactions for financial institutions and other parties affiliated with Iran. (A copy of the 2012 DPA is attached as Exhibit A and is incorporated by reference herein.) In the Factual Statement of the 2012 DPA, SCB acknowledged that beginning in "2001 and ending in 2007, SCB violated U.S. and New York State laws by illegally sending payments through the U.S. financial system on behalf of entities subject to U.S. economic sanctions." 2012 DPA, Factual Statement ¶ 2 (Exh. A); *see also id.* ¶¶ 42 & 43.  In addition, "[o]n October 30, 2006, SCB informed the [Federal Reserve Bank of New York] that it was ending its U.S.-dollar clearing activity for all the Iranian banks.  The bank ended its U.S.-dollar activity by March 2007." *Id.* ¶ 103.  Furthermore, "[f]rom August 2007, SCB suspended all new Iranian business in any currency." *Id.* ¶ 104.

30.     SCB acknowledged that "at least $227 million" was involved in the 2001 to 2007 transactions covered by the 2012 DPA, and agreed to forfeit that amount. 2012 DPA ¶ 3 (Exh. A).

31.     On December 10, 2012, SCB also entered into a settlement with OFAC, agreeing to pay $132,000,000 to settle its civil liability arising out of SCB's violations of OFAC's rules and regulations. *See* Settlement Agreement between OFAC and SCB, ¶ 32 (Dec. 10, 2012) ("OFAC Settlement Agreement").  The OFAC Settlement Agreement states that "SCB has taken remedial action by terminating its business and prohibiting new business since 2007 with Iranian customers."  OFAC Settlement Agreement, ¶ 26.  Under the OFAC Settlement Agreement,

SCB's obligation to pay the $132,000,000 penalty would be satisfied by payment of an equal or greater amount that satisfied any penalty assessed by United States or county officials. *Id.* ¶ 32.

32.     Finally, on December 10, 2012, SCB also consented to a Cease and Desist Order ("Cease and Desist Order") with the Federal Reserve and agreed to pay a civil money penalty of $100 million, once again for violating U.S. law in the processing of payments involving parties subject to OFAC sanctions from at least 2001 through early 2007.

### B.     Relator's False Claims Act Litigation

33.     On December 17, 2012, Relator filed its first False Claims Act lawsuit against the same Defendants as in this case. *See United States ex rel. Brutus Trading LLC v. Standard Chartered Bank, et al*., 12 CV 9160 (KBF) (S.D.N.Y.) (the "2012 Case").

34.     In that case, and in meetings that followed with the Federal and New York State authorities, the Relator brought to the attention of those authorities information, drawn from SCB's own records provided by the Relator, that SCB's course of conduct violating the Iran sanctions was far more extensive and elaborate during the 2001- 2007 period than had been portrayed to those authorities and, contrary to SCB's representations, was continuing. (This course of conduct by SCB exposed by the Relator's information is discussed below.)

35.     Indeed, the information provided by the Relator was so useful to the authorities that in early 2013 the FBI and Justice Department asked one of the principals of the Relator to try to get more data from a source in Dubai. The operation took several months to set up, but eventually that principal arranged for a contact with an individual in Dubai with that information, and delivered that information to the FBI on two data sticks containing 79 files showing thousands more illegal transactions by SCB through 2013 and 2014, along with other information. That contact has left Dubai.

36.     The 2012 Case was unsealed by the Court on May 10, 2017. On September 19, 2017, the 2012 Case was voluntarily dismissed without prejudice.

37.     The 2012 Case was effectively re-filed in the form of this case on November 28, 2018. The United States ultimately declined to intervene, and, by Order of March 20, 2019, the Court ordered this case to be unsealed on April 20, 2019.

### C.     SCB's Course of Conduct Violating the Iran Sanctions

38.     To evade the Iran sanctions in a clearing transaction, SCB had two basic tasks. First, SCB had to process the transaction in a way that would not trigger software programs designed to identify and stop transactions involving sanctioned parties. Second, SCB had to ensure that no record that the transaction involved a sanctioned party was created that could be subject to scrutiny after-the-fact either by in-house compliance officers or by government authorities. SCB had to adopt procedures so the illicit transaction would always execute and the Iranian connection would never be discovered.

39.     The method for SCB's violation of the sanctions on which the 2012 DPA focused was "wire-stripping" or "repairing," that is, the removal of any reference to Iran in the SWIFT[2] payment messages by which clearing transactions are effected. *See* 2012 DPA, Factual Statement ¶¶ 23, 26-28, 37 (Exh. A). Based on SCB's representations, the 2012 DPA accepted the notion that SCB had stopped this process in March 2006. *Id.,* ¶ 99.

40.     The 2012 DPA also identified only $227 million as "at least" the amount of illegal clearing transactions in which SCB engaged between 2001 and 2007. 2012 DPA ¶ 3 (Exh. A);

---

[2] "SWIFT" refers to the Society for Worldwide Interbank Financial Telecommunications, which is the international system to transmit payment messages to financial institutions around the world. SWIFT messages contain various informational fields that are manipulated in wire-stripping or repairing to avoid disclosing any Iranian connection in a clearing transaction.

Factual Statement ¶ 2 (Exh. A). And SCB promised not to engage in any more illicit clearing transactions. 2012 DPA ¶ 5 (Exh. A).

41.     SCB's scheme to capture the lucrative rewards of a line of business that depended on evading the Iran sanctions – indeed, that evasion *was* the service offered by SCB – was far more robust, cunning, and extensive than the picture presented to Justice Department authorities in negotiating the 2012 DPA. A conservative estimate of the annual value of clearing transactions processed by SCB violating the Iran sanctions (excluding exempt transactions) in the 2001-2007 period is approximately $40 billion. It was the Relator who, in filing the 2012 Case and related disclosures, brought the following facts to the attention of Federal and New York State authorities.

42.     SCB's course of conduct to develop its Iran-related business and to evade the Iran sanctions was no haphazard affair. That course of conduct was the handiwork of a deliberate, if concealed, organizational structure.

(a) Since at least 2002, SCB operated a program known internally to high level SCB officials as "Project Green."  This was a program run by trade finance experts and senior geographical branch chief executive officers, deliberately excluding compliance officers.  Project Green was initiated at SCB London Headquarters and was headed by SCB's Iraq and Afghanistan CEO Stuart Horsewood and Managing Director Vikram Kukreja, a trade finance expert. Horsewood considered Iran to be a "major new market" for SCB. Project Green was designed to assist, conspire with, aid and abet non-United States customers that have been made the subject of United States economic sanctions to evade those sanctions and engage in international financial transactions.  SCB continued

to operate Project Green at least until 2012, when SCB began the process of winding it down.

(b) SCB's Originations and Client Coverage Group ("OCC") covered all SCB clients and had more personnel than SCB's sales staff. OCC in Dubai was deployed to create fraudulent records that allowed Iranian-connected clients to open accounts without their Iranian connection being detected. In addition, OCC was very active in trying to get new clients in Iran even after 2010, when SCB was supposed to be "winding down" its Iran business. Indeed, the law does not allow for the "winding down" of illegal, sanctioned transactions. These transactions are crimes that must be halted.

(c) The Iran Group Risk Committee, which operated within SCB and was often referred to as the "IRC," was staffed by people from OCC, Global Cash Operations, and Global Trade Operations. The mandate of the Committee was to develop strategies to evade the Iran sanctions.

(d) The Iran Group was a designation by SCB of Iranian customers for the period 2008 to 2014. SCB maintained separately  all of the management information systems ("MIS") concerning all of SCB's Iranian-client transactions and profitability. The MIS disseminated this information throughout the SCB organization, from low-level employees up to the Deputy CEO of SCB, Mike Rees.

(e) The Iran Cont. Client Group within SCB focused on development of and services to a subset of SCB's Iran business, small to medium enterprises, many of which were located in Dubai.

(f) SCB-Dubai played a central role in SCB's scheme to evade the Iran sanctions in order to expand SCB's Iran business due to its proximity to Iran and the number of

Iranian businesses in Dubai. Indeed, the actions of SCB-Dubai personnel often concealed illegal clearing transactions from personnel in SCB-NY, who had to process every transaction clearing U.S. dollars.

(g) SCB's office in Iran – SCB-Tehran – was the "on-the-ground" representative of SCB with a significant outreach to potential Iranian clients.

43.     SCB employed various means, beyond the wire stripping or repairing addressed by the 2012 DPA, to aggressively evade the Iran sanctions and conceal the fact that it did so.

(a) Perhaps the most egregious measure SCB adopted to evade the Iran sanctions was the OLT3 system. OLT3 provided online trading for foreign exchange linked directly to the Straight-to-Bank SCB Client System, the main online portal to SCB's client accounts. OLT3 allowed Iranian clients to enter SCB's computer system on their own and conduct illegal foreign exchange transactions. OLT3 was designed to have no ability to suspend or block a deal potentially violating the sanctions and to create no record of the illegal transaction.

(b) SCB used hundreds of "sundry" accounts to conceal transactions violating the Iran sanctions. Sundry accounts have also been called "error" accounts because they were intended to be accounts in which to temporarily book a transaction in which a counterparty was not properly identified, or some other error was made.  As a result, such a transaction could not immediately be reconciled with an SCB customer account. Taking advantage of this device for the Iran scheme, SCB personnel would change some small part of the counterparty's name, such as changing a letter or dropping a word, so that the transaction would be executed, but then go into a sundry account. Because these revenues were not properly matched up to the customer, identifying whether the revenues were

derived from customers on OFAC's list of Specially Designated Nationals ("SDNs") or from entities otherwise associated with Iran, and so subject to sanctions, would prove very difficult, if not impossible, for any SCB-NY employee or Government official.

(c) Similarly, Customer Due Diligence records would be manipulated by the misspelling of names to avoid running afoul of the OFAC SDN list.

(d) Employees in SCB-Dubai would fill out and sign account paperwork for clients based in Iran, under the coordination of the Middle East North Africa OCC team, again to conceal the true account holder.

(e) In 2013, after the filing of the predecessor of this action and the related disclosures brought to light for Government authorities the central role of SCB-Dubai in SCB's course of conduct to evade the Iran sanctions, SCB engaged a consultant, Promontory Financial Group, LLC, to clean the SCB-Dubai servers of information that would disclose to investigators the extent and details of SCB's program to evade the Iran sanctions.

(f) A number of the accounts of Iranian-owned businesses were moved from the Iran Group to the SCB-Dubai Corporate Group to conceal their existence.

44.    Contrary to the representations that SCB made to induce the Justice Department to enter into the 2012 DPA, SCB continued to engage in U.S. dollar clearing and other financial transactions with and for the benefit of Iranian government entities and Iranian SDNs until at least 2014.

45.    SCB's records show that since at least 2006, SCB identified and targeted as customers, among others, the following Iranian government entities or SDNs:  Bank Keshavarzi, Bank Markazi, Bank Maskan, Bank Mellat, Bank Melli, Bank Tejarat, Export Development

Bank of Iran, Bank Saderat and Sepah Bank.  In addition, since at least 2008, SCB's client lists

included the National Iranian Oil Company ("NIOC") and its subsidiaries as clients.  In 2008,

OFAC identified NIOC as an entity owned or controlled by the Government of Iran within the

meaning of the Iranian Transactions Regulations.  OFAC also identified NIOC as an affiliate of

the Islamic Revolutionary Guard Corps ("IRGC").  OFAC added IRGC to the SDN list on

October 21, 2007.

46.    The following are examples (a) of the many trades performed by SCB on behalf

of banned Iranian government entities or Iranian related SDNs after 2007 or (b) of evidence that

SCB was performing transactions after 2007 on behalf of clients that were banned Iranian

entities, contrary to SCB's representations to representatives of the United States that "[f]rom

August 2007, SCB suspended all new Iranian business in any currency."

47.    In or about January 2009, SCB performed an export finance transaction for Bank

Tejerat, a bank owned by the Government of Iran.   Such a transaction necessarily involved

dollar clearing by SCB-NY.

48.    In or about January 2009, SCB performed three structured trade finance

transactions for National Iranian Tanker Company ("NITC"), an entity owned by the Iranian

government and a subsidiary of NIOC.  Such transactions necessarily involved dollar clearing by

SCB-NY.

49.    SCB conducted a U.S. dollar letter of credit transaction between Bank Markazi

and four exporters in or about December 2009.  Bank Markazi-Iran-CB was added to OFAC's

SDN list as of October 22, 2008.  Such a transaction necessarily involved dollar clearing by

SCB-NY.

50.     SCB performed a trade finance and cash management transaction for the Iran Ministry of Economic Affairs and Finance in or about December 2009.  Such a transaction necessarily involved dollar clearing by SCB-NY.

51.     SCB records further show that it performed transactions in August, November, and December 2009 with the Ministry of Energy of Iran Group, an agency of the Government of Iran, with nominal value of $2,546,419, and cash management and trade finance revenues to the bank in the amount of $259,602.77.  Significant transactional foreign exchange revenues were also earned from this client during the period from August 2009 through December 2009.   Such transactions including U.S. dollar foreign exchange trades necessarily involved dollar clearing by SCB-NY.

52.     According to SCB records, as of June 2008, Bank Saderat had the authority to conduct foreign exchange transactions directly through SCB with a $1 million limit per transaction and a total settlement limit of $10 million.  This meant that Bank Saderat was independently and remotely able to log into SCB's OLT3 computer system to initiate U.S. dollar foreign exchange transactions that necessarily involved SCB-NY.  In addition, the Industrial Development and Renovation Organization of Iran and the Iranian Offshore Engineering Company had on-line trading access and independent authority to engage in U.S. dollar foreign exchange transactions in 2008 and 2009. Similarly, Bank Tejerat still had an account at SCB-Dubai (Master No. 3239713) open in 2012.  Any such foreign exchange trades would have involved SCB-NY.

53.     As of 2008, SCB had on its books significant approved U.S. dollar foreign exchange trading limits for the following entities that were listed as SDNs:  Bank Sepah, Bank Keshavarzi, and the Iranian Export Development Bank.

54.     SCB's continued efforts to do business with banned Iranian entities continued into 2009 and beyond.  In March 2009, SCB executives developed a list of priority accounts to be targeted for business development because they each had "good revenue potential."  The target list included National Iranian Tanker Company and National Iranian Oil Company.

55.     In April 2009, SCB targeted Iran as a source of business as part of "The Curve Campaign," a global financial markets campaign to cross-sell interest rate products to selected high value potential clients and acquire term U.S. dollar deposits from these clients.

56.     SCB internal reports showed that as of August 2009, the bank enjoyed profits of $4,365,000 from Iranian related transactions and customers.

57.     A report of customer transactions from August 2009, showed eight transactions with Bank Tejerat, 10 transactions with Iranian Tanker Company, seven transactions with Iran & Dubai Co., LLC, and transactions with Pasian High Voltage, Khorasan Steel, and Khouzestan Steel Company.

58.     Between 2009 and 2014, SCB continued its course of conduct to execute illegal clearing transactions for its Iranian-connected or Iranian owned customers such as: Amesco, FZE ($6 billion), Bank Markazi Jomhouri Islami Iran ($5 billion), Bright Crescent Trading Co. ($2 billion), Caspian Petrochemical ($5 billion), Iran & Dubai Co. ($6 billion), Iran Overseas Investment Bank, Ltd. ($1 billion), M& H Trading ($5 billion), Mahan Air General Trading LLC ($2 billion), PICO International Dubai ($2 billion), Piston Trading ($2 billion), and Schlumberger Overseas SA/Well Services of Iran ($6 billion).

59.     A reasonable, conservative calculation of the dollar-value of the clearing transactions in violation of the Iran sanctions that SCB handled between 2009 and 2014 is $56.75 billion.

JA-76

**D.      The 2019 Amended Deferred Prosecution Agreement**

60.      On April 8, 2019, the Justice Department and SCB entered into an Amended

Deferred Prosecution Agreement (the "2019 DPA"). (A copy of the 2019 DPA is attached as

Exhibit B and is incorporated by reference herein.) The 2019 DPA included the original Factual

Statement from the 2012 DPA plus a Supplemental Statement of Facts ("Facts Supp.").

61.      In the 2019 DPA, SCB admitted that it had processed approximately 9,500

clearing transactions totaling $240 million in violation of the Iran sanctions between 2007 and

2011, contrary to what it had represented in the 2012 DPA.  2019 DPA, Fact Supp. ¶¶ 4-5

(Exh.B). These transactions involved two former SCB employees, identified only as Persons A

and B, *id.* ¶¶ 21-32, and an Iranian national, identified as Person C, who controlled two

companies, denominated as  C-1 and C-2, which were used in the conspiracy to violate the Iran

sanctions. *Id.*

62.      Person C is Mahmoud Reza Elyassi, who was indicted for conspiracy to violate

IEEPA and defraud the United States in an indictment unsealed on April 9, 2019. (A copy of the

indictment is attached as Exhibit C and is incorporated by reference.) On information and belief,

Elyassi is at present a fugitive.

63.      As part of the DPA, SCB agreed to forfeit $240 million, the amount involved in

the Elyassi-related transactions. 2019 DPA ¶ 11 (Exh. B).

64.      In 2012, the Relator disclosed information to the Government informing them for

the first time of the Elyassi conspiracy between 2007 and 2011 to violate the Iran sanctions. This

information included facts such as the existence of Elyassi as a customer of SCB, that his limits

in trading were set in U.S. dollars and that he collected his profits in U.S. dollars, that he had

authority to enter into trades 24/7 on SCB's online system, down to details such as his email contact for his business and telephone number.

65.     The disclosure by Relator of Elyassi-related information was part of the original, far more extensive disclosure of information concerning the illegal conduct of SCB made in connection with the predecessor of this case. It was this information that materially added to, and formed the basis  of, the Government's actions that concluded in the forfeiture of $240 million in the 2019 DPA, as described above. The Relator did not share in that amount forfeited to the Goernment.

66.     The 2019 DPA thus addressed a relatively small subset of the course of conduct by SCB in violation of the Iran sanctions that is the gravamen of this action. The 2019 DPA did not address the far greater sums that, by operation of statute, had been forfeited by SCB to the United States as a consequence of that conduct and that are the subject of this action. Nor did the 2019 DPA purport to forgive or in any manner waive SCB's obligation to pay those forfeited sums to the United States.

67.     31 U.S.C. §3739(c)(5) provides in pertinent part: "the Government may elect to pursue its claim through any alternative remedy available to the Goernment, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section."

68.     The money forfeited pursuant to the 2019 DPA constitutes  an alternative remedy to part of the claims made in this case within the meaning of 31 U.S.C. §3739(c)(5).

69.     Pursuant to 31 U.S.C. § 3739(c)(5), the Relator is entitled to its share of the $240 million forfeited to the Government under the 2019 DPA and the Relator will move this Court, with appropriate supporting testimony, to grant such relief.

### CAUSE OF ACTION
### (31 U.S.C. § 3729(a)(1)(G))

70.     The allegations in the foregoing paragraphs of this First Amended Complaint are incorporated here by reference.

71.     As set out above, the SCB adopted a course of conduct to conceal from the Government hundreds of billions of dollars of clearing transactions in which they engaged from 2001 through 2014 in violation of applicable United States sanctions on Iran.  As part of this scheme and course of conduct to conceal these enormously profitable transactions, the SCB concealed the extent of this illegal activity during the period 2001 through 2007 and concealed the fact that this illegal activity continued after that time in order to induce the Department of Justice to enter into a Deferred Prosecution Agreement with SCB in 2012 that required SCB to pay an amount billions of dollars less than the amounts of all the illegal transactions undertaken by SCB which had already been forfeited and which SCB was obliged and remain obliged to pay to the United States by operation of law:

(a) Title 18 U.S.C. § 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to … any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" is "subject to forfeiture to the United States."

(b) Further, Title 18 U.S.C. § 981(f) provides that "[a]ll right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section."

(c) A "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(D) means "an offense under … section 206 … of the International Emergency Economic Powers Act."

(d) Section 206 of the International Emergency Economic Powers Act (50 U.S.C. § 1705(a)) provides that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."

(e) Every transaction of SCB violating United States sanctions on Iran constitutes a violation of regulations and orders issued pursuant to the International Emergency Economic Powers Act, and, accordingly, by operation of 18 U.S.C. §§ 981(a)(1)(C) & (f), 18 U.S.C. § 1956(c)(7)(D), and 50 U.S.C. § 1705(a), every dollar in each of those transactions was forfeited to the United States at the instant those transactions took place.

72.     (a) By concealing the true amount of money that had already been forfeited to the United States by the illegal clearing transactions that occurred within the time period addressed by the 2012 Deferred Prosecution Agreement, an amount which SCB was obliged to pay the United States in full, and (b) by concealing the illegal clearing transactions in which SCB engaged after that period through 2014, the amounts of which have been forfeited and which SCB is obliged to pay to the United States, SCB knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

### PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of itself, and acting on behalf of, and in the name of, the United States of America, demands and prays that judgment be entered against SCB as follows:

1.      That the United States be awarded judgment in the amount of three times the amount of damages the United States has sustained because of SCB's actions (that is, the amount already forfeited to the United States by SCB but not yet paid by SCB), plus the maximum civil penalty for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a);

2.      That pre- and post-judgment interest be awarded;

3.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

3.      That Relator be awarded all costs of this action, including attorneys' fees and expenses, as provided by 31 U.S.C. § 3730(d).

4.      That this Court award such other and further relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

5.      Pursuant to FED. R. CIV. P. 38, Relator demands trial by jury of any and all issues in this action so triable by right.

Dated:      New York, New York
            September 20, 2019

Respectfully submitted,

BRUTUS TRADING, LLC

                    /s/
By:     _____
        Patrick M. McSweeney
        McSweeney, Cynkar & Kachouroff, PLLC
        3358 John Tree Hill Road
        Powhatan, VA 23139
        (804) 937-0895
        patrick@mck-lawyers.com

Robert J. Cynkar
McSweeney, Cynkar & Kachouroff, PLLC
10506 Milkweed Drive
Great Falls, VA 22066
(703) 621-3300
rcynkar@mck-lawyers.com

*Attorneys for Brutus Trading, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| United States of America *ex rel.* | ) | |
| Brutus Trading, LLC, | **)** | |
| Plaintiff, | ) | |
| -against- | ) | **Case No. 18-cv-11117** |
| | ) | |
| Standard Chartered Bank | ) | |
| Standard Chartered PLC, and | ) | |
| Standard Chartered Trade Services Corporation, | ) | |
| Defendants. | ) | |

## <u>DECLARATION OF PATRICK M. McSWEENEY</u>

I, Patrick M. McSweeney, state that the following facts are true and correct to the best of my knowledge, information and belief:

1.      I am counsel of record for Plaintiff-Relator Brutus Trading, LLC (Brutus) and have personal knowledge of the facts stated herein.

2.      Brutus has moved the Court for an Order granting it leave to file a Second Amended Complaint in this action.

3.      From the docket, it appears that prior counsel for Brutus filed the initial Complaint in this action in April 2019.

4.      On July 19, 2019, Brutus filed a First Amended Complaint by its counsel Robert J. Cynkar.

5.      Defendants have not filed responsive pleadings in this action.

6.      After the First Amended Complaint was filed, the United states indicated that it was not willing to agree that Brutus is entitled to share in the recovery obtained by the United States that it has obtained or will obtain from Defendants.

7.      Brutus concluded that it should clarify the First Amended Complaint regarding its claim to a share of any recovery obtained from Defendants.

8.      For the purpose stated in paragraph 7, paragraphs 62, 63, 64, 65, 67, 68 and 69 have been added to the Second Amended Complaint to clarify the claim asserted by Brutus for a share of the recovery obtained by the United States from Defendants.

9.      Brutus also concluded that references to certain entities in paragraph 42 were not sufficiently clear and accurate and that there may be confusion as a result.

10.     Paragraph 42 has been amended in the Second Amended Complaint to clarify and correct the references to several entities named therein.

11.     Other minor changes to correct punctuation and typographical errors have been made.


       I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

       Executed on September 19, 2019

                                                        /s/

                                        _____
                                        Patrick M. McSweeney
                                        McSweeney, Cynkar & Kachouroff, PLLC
                                        (Admitted *pro hac vice*)
                                        3358 John Tree Hill Road
                                        Powhatan, Virginia 23139
                                        (804) 937-0895
                                        Fax (703) 365-9593
                                        patrick@mck-lawyers.com

                                        *Attorney for Brutus Trading, LLC*


                    EXHIBIT A TO MEM. IN SUPPORT OF MOTION TO AMEND

# JA-84

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/23/2019

| | |
|---|---|
| United States of America *ex rel.* | ) |
| Brutus Trading, LLC, | ) |
| Plaintiff, | ) |
| -against- | ) |
| | ) |
| Standard Chartered Bank | ) |
| Standard Chartered PLC, and | ) |
| Standard Chartered Trade Services Corporation, | ) |
| Defendants. | ) |

Case No. 18-cv-11117

## MOTION FOR LEAVE TO AMEND COMPLAINT

Plaintiff, Brutus Trading, LLC, by counsel, moves the Court, pursuant to FRCivP 15(a),

for an Order granting Plaintiff leave to file the attached Second Amended Complaint. Counsel

for Defendants has authorized counsel for the movant to represent that Defendants take no

position on this Motion. For the reasons set forth in the accompanying Memorandum in Support

of the Motion for Leave to Amend Complaint, Plaintiff requests that its Motion be granted

because the amendment will clarify the claim asserted by Plaintiff and will not prejudice any

party to this action.

Dated September 20, 2019

Respectfully submitted,
BRUTUS TRADING, LLC

/s/

By_____
Patrick M. McSweeney
(Admitted *pro hac vice*)
McSweeney, Cynkar & Kachouroff, PLLC
3358 John Tree Hill Road
Powhatan, Virginia 23139
Tel. (804) 937-0895
Fax (703) 365-9593
patrick@mck-lawyers.com

Attorney for Plaintiff

Granted. The Court accepts filing of
the Second Amended Complaint.
The briefing schedule set out at Dkt.
21 remains in effect: Government's
motion to dismiss is due October
31, 2019; realtor's opposition is due
December 13, 2019; and
Government's reply is due January
13, 2020.

9/20/19

SO ORDERED. *Paul A. Engelmayer*

_____
PAUL A. ENGELMAYER
United States District Judge

1

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By: JEAN-DAVID BARNEA
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007
Tel. (212) 637-2679
Fax (212) 637-2686
Email Jean-David.Barnea@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BRUTUS TRADING, LLC, <br><br> Plaintiff, <br><br> v. <br><br> STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, and STANDARD CHARTERED TRADE SERVICES CORPORATION, <br><br> Defendants. | No. 18 Civ. 11117 (PAE) |

**NOTICE OF THE GOVERNMENT'S MOTION TO DISMISS**
**RELATOR'S SECOND AMENDED COMPLAINT**

PLEASE TAKE NOTICE that, upon the accompanying memorandum of law and the

declarations of Special Agents Matthew Komar and Wayne Boddy of the Federal Bureau of

Investigation; Alexandre Manfull of the U.S. Department of the Treasury's Office of Foreign

Assets Control; and Patrick Bryan of the Board of Governors of the Federal Reserve System,

plaintiff the United States of America, by its attorney, Geoffrey S. Berman, United States

Attorney for the Southern District of New York, hereby moves this Court to dismiss the second

amended complaint of relator Brutus Trading, LLC ("Relator"), pursuant to 31 U.S.C.

§ 3730(c)(2)(A).

PLEASE TAKE FURTHER NOTICE that pursuant to the Court's operative scheduling

order (ECF No. 25), Relator's opposition shall be filed no later than January 10, 2020.

Dated:   New York, New York
         November 21, 2019

                                        GEOFFREY S. BERMAN
                                        United States Attorney for the
                                        Southern District of New York

                              By:      s/Jean-David Barnea
                                        JEAN-DAVID BARNEA
                                        Assistant United States Attorney
                                        86 Chambers Street, 3rd Floor
                                        New York, NY 10007
                                        Tel. (212) 637-2679
                                        Fax (212) 637-2686
                                        Email Jean-David.Barnea@usdoj.gov

TO:   Patrick M. McSweeney, Esq.
      Robert J. Cynkar, Esq.
      Counsel for Relator (by ECF notification)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                           Plaintiff,

        v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

                           Defendants.

No. 18 Civ. 11117 (PAE)

## DECLARATION OF SPECIAL AGENT MATTHEW F. KOMAR

I, Special Agent Matthew F. Komar of the Federal Bureau of Investigation, hereby

declare the following pursuant to 28 U.S.C. § 1746:

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI")

since 2008.  From December 2010 to November 2014, I was assigned to a squad designated to

investigate securities fraud, money laundering and other financial crimes in New York, New

York.  Since December of 2014, I have been assigned to the FBI's office in Cleveland, Ohio.

2.      In December 2012, I was assigned as the lead agent in assisting the Civil Division

of the U.S. Attorney's Office for the Southern District of New York ("SDNY") in investigating

the allegations in a *qui tam* complaint filed by relator Brutus Trading, LLC (the "Relator"),

against Standard Chartered Bank, Standard Chartered plc, and Standard Chartered Trade

Services Corporation (together, "SCB" or the "Bank") in a case captioned *United States ex rel.*

*Brutus Trading LLC v. Standard Chartered Bank et al.*, No. 12 Civ. 9160 (KBF) (S.D.N.Y.).

3.      Starting in June 2011, I also served as the case agent for an investigation of SCB by the Criminal Division of the U.S. Attorney's Office for the District of Columbia and what is now known as the Money Laundering and Asset Recovery Section of the U.S. Department of Justice's Criminal Division (together, "DOJ"). This investigation initially resulted in a Deferred Prosecution Agreement between the Bank and DOJ dated December 10, 2012 (the "2012 DPA"). *See* Exhibit 1. After the *qui tam* complaint was filed, I assisted DOJ in its investigation of the Relator's allegations to determine whether SCB had violated the DPA and/or committed additional crimes. And, as further explained below, beginning in August 2013 until I left New York in 2014, I participated in a separate aspect of the investigation of SCB's conduct that ultimately—several years after my departure—resulted in an Amended Deferred Prosecution Agreement with the Bank on April 9, 2019 (the "2019 DPA").

4.      I make this declaration based on my own personal knowledge as well as a review of documents relating to these investigations, in support of the motion by the United States of America (the "United States") to dismiss the Relator's second amended complaint in the above-captioned case. This declaration does not set forth all of my knowledge of the matters discussed herein. All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

**A. The 2012 DPA with SCB and the Associated Investigation**

5.      In January 2010, SCB approached federal and state authorities to self-report that it had facilitated transactions in violation of U.S. sanctions laws. As a result, FBI and DOJ began an investigation of the Bank relating to this disclosure, to which I was assigned beginning in June 2011. Other federal and state agencies also began parallel investigations. The investigations uncovered, among other things, that, from 2001 to 2007, SCB had conspired to violate U.S. economic sanctions laws and processed a large number of illegal payments through

the U.S. financial system on behalf of entities subject to U.S. economic sanctions. As relevant here, SCB processed U.S. dollar transactions on behalf of several Iranian banks and companies, but altered the associated wire-transaction records to remove references to sanctioned countries or entities or processed the payments in a non-transparent manner so as to minimize the chances that the transactions would be caught by other banks' sanctions filters and blocked, rejected, or stopped for further investigation. The Bank informed DOJ that it had formally ended its relationships with customers based in Iran in 2006 (in U.S. dollars) and at the end of 2007 (in all other currencies).

6.     On December 10, 2012, SCB entered into the 2012 DPA with DOJ, which was filed in the U.S. District Court for the District of Columbia, *see United States v. Standard Chartered Bank*, No. 12 Cr. 262 (JEB) (D.D.C.). As part of the 2012 DPA, the Bank acknowledged that it had facilitated at least $227 million worth of illegal transactions, and agreed to forfeit $227 million to the United States. Among other things, the Bank also agreed to implement improved monitoring for sanctions violations. Around the same time as the 2012 DPA, several of the other agencies that were investigating similar misconduct at SCB also announced resolutions of their investigations, including the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the Board of Governors of the Federal Reserve System (the "Federal Reserve"), and the New York County District Attorney's Office ("DANY"), as well as what is now known as the New York State Department of Financial Services ("DFS"), which had publicly announced its findings a few months earlier.

**B. The Relator's First *Qui Tam* Complaint and Disclosure Statement**

7.     On December 17, 2012, approximately one week after the 2012 DPA and certain other agreements were finalized, the Relator—an entity created for the purpose of the lawsuit,

whose members are Julian Knight, a former SCB employee, and Robert Marcellus, a friend of Mr. Knight's who had banking experience—filed its original *qui tam* complaint under seal. *See* Exhibit 2.

8.   The Relator's complaint alleged that the Bank had misled DOJ and OFAC leading up to the 2012 DPA and 2012 OFAC settlement agreement by failing to disclose certain sanctions-violative transactions in which it had engaged with Iranian entities after 2007.[1] The complaint alleged that, despite its commitment to have ended its relationships with Iranian banks and companies located in Iran in 2006-07, the Bank continued to knowingly facilitate U.S. dollar transactions for its preexisting Iranian clients for several years after that date.

9.   Specifically, the Relator claimed that after 2007, SCB had knowingly facilitated specific trade-finance and foreign-exchange transactions on behalf of Iranian government agencies (such as Bank Markazi, which is Iran's central bank, and entities affiliated with the "Ministry of Energy of Iran Group"), and state-owned and private Iranian banks (such as Bank Saderat) and energy groups (such as the National Iranian Tanker Company and the Iranian Offshore Engineering Company)—including several that OFAC had listed as Specially Designated Nationals, *i.e.*, persons or entities with whom financial transactions in U.S. dollars are specifically prohibited. According to the Relator, these illegal transactions were part of an SCB program known as Project Green, which was run by high-level Bank officials and was designed to hide evidence of these transactions, including by booking the revenue the Bank earned from them in a special "sundry" account and by failing to include the clients' internal

---

[1] Relator amended its complaint on November 14, 2014, solely to add a claim that SCB had also misled the Federal Reserve in the same respect with regard to that agency's 2012 resolution with the Bank. *See* Exhibit 3.

4

customer identification numbers in the associated records. The Relator claimed that Project Green was wound down in 2012, in the lead-up to the 2012 DPA.

10.     Along with the *qui tam* complaint, the Relator provided SDNY with a disclosure statement that attached several internal SCB documents that Mr. Knight asserted were in his possession when he left the Bank. These documents included customer lists of SCB's Dubai branch that, as the Relator pointed out, included the Iranian entities described above. These documents also showed, according to the Relator, that the Bank had facilitated certain trade-finance and foreign-exchange transactions for these clients after 2007. Finally, the disclosure statement listed several current and former SCB employees who, according to the Relator, could corroborate the allegations in the *qui tam* complaint.

## C. The Investigation of the Relator's Allegations

11.     Shortly after the Relator's complaint was filed, SDNY notified several other agencies, including DOJ, OFAC, the Federal Reserve, DANY, and DFS, of the Relator's allegations and SDNY's investigation into them, and these other agencies began their own parallel investigations. As mentioned above, I was assigned as the lead agent both to the SDNY investigation of the *qui tam* complaint and to DOJ's parallel criminal investigation of the Bank.

12.     Our investigation began with a joint interview of Mr. Knight and Mr. Marcellus on January 16, 2013, which representatives from each of the above agencies attended. Mr. Knight told us that he had worked at SCB's Dubai branch from January 2009 to November 2011. He reported that, during that time, he had spoken with Bank employees about Project Green and was told it was related to sanctions evasion. He also described contacts between Bank employees and Iranian entities. He stated that he was not aware of any SCB accounts opened for

Iranian clients while he was at the Bank, but had heard that some SCB employees may have used their own names to open accounts for Iranian entities.

13.     Mr. Knight described some of the documents attached to the disclosure statement and described in the *qui tam* complaint.  According to these documents, he believed Iranian banks had active login capabilities for SCB's online foreign-exchange system at least as of 2009. These and other Iranian banks appeared on customer lists of SCB's Dubai branch that Relator provided.  Other documents he discussed appeared to reflect trade-finance and foreign-exchange transactions in U.S. dollars in 2008 and 2009 between SCB and Iranian banks, government agencies, and companies, such as the National Iranian Tanker Company and corporate entities associated with the "Iranian Ministry of Energy Group."  All of the entities referenced by these documents that Mr. Knight brought to our attention were clearly identifiable as Iranian or based in Iran.

14.     Mr. Marcellus told us that he had never worked at SCB, but was knowledgeable about the mechanics of foreign-exchange transactions.  He told us that when a bank such as SCB converted one non-U.S. dollar currency to another, especially currencies that were not commonly traded such as the United Arab Emirates dirham, it likely converted first into U.S. dollars and then into the other currency.  Relatedly, Mr. Knight explained that any transactions at SCB involving U.S. dollars would have necessarily had to involve the Bank's New York branch.

15.     Mr. Knight further stated that when he learned of the government investigation that led to the 2012 DPA, after he left the Bank, he reviewed Bank documents still in his possession, and decided to file a *qui tam* complaint.  Mr. Knight also provided the names of several SCB employees who he said could corroborate his allegations.

16.    After the interview, the Relator provided SDNY with additional SCB documents of the same type as those attached to the disclosure statement. These documents, which were shared with DOJ, FBI, and other agencies, showed similar information regarding possible transactions involving Iranian clients of SCB.

17.    DOJ, SDNY, and other agencies made several requests for information and documents to the Bank relating to the Relator's allegations, including a Civil Investigative Demand ("CID") issued by SDNY on February 4, 2013. In addition, after coordinating with the Relator's then-counsel, SDNY sent the Bank copies of most of the documents the Relator had provided with the disclosure statement, to request the Bank's explanation of them. I understand that these documents were first cleaned of metadata connecting them to Mr. Knight by the Relator's counsel.

18.    Over the next several months, SCB produced hundreds of thousands of pages of documents in response to these requests, which I and other members of the investigative team reviewed. We also obtained certain documents directly from former SCB employees whom we contacted, which we also reviewed.

19.    Furthermore, counsel for SCB gave two presentations, on February 8 and April 24, 2013, that addressed the transactions alleged by the Relator to be sanctions violations that the Bank failed to disclose before the 2012 DPA. At these presentations, the Bank's counsel reiterated that SCB had committed not to enter into any *new* U.S. dollar transactions with Iranian clients after 2006 and in other currencies after 2007, but that its existing commitments with those clients could not always be immediately broken off. Thus, most of the documents the Relator had provided related to the "wind down" of SCB's pre-2007 business with Iranian clients.

20.     In some instances, SCB had open transactions and commitments with its Iranian

clients that were outstanding when the Bank suspended its business with them, such as

outstanding loans, trade transactions (letters of credit), and bank accounts.  It therefore sought to

wind down those transactions in a manner compliant with U.S. sanctions rules by, for example,

permitting its Iranian clients to repay their outstanding loans from the Bank in currencies other

than U.S. dollars, or to withdraw their existing balances from bank accounts that were otherwise

blocked.[2]  These clients, who had ongoing wind-down transactions with the Bank, continued to

be included in client lists and the like until the underlying transactions were completely

unwound.  The Bank further reiterated that it had disclosed many of these clients and their

associated wind-down activity to DOJ and OFAC in 2011 as part of the investigation that led to

the 2012 DPA.

21.     SCB also disclosed that it had facilitated certain other U.S. dollar transactions for

these clients as an intermediary between two foreign banks, which was permitted under OFAC

rules until mid-2008.  As for the access that Iranian banks and other entities may have had to

conduct transactions using SCB's online foreign-transaction system, the Bank explained that

these entities had not engaged in any such transactions since early 2007, and indeed were not

given access to a new online banking system set up in late 2007 to which other SCB clients were

transitioned.

---

[2] Furthermore, the Bank explained that its internal reporting currency was the U.S. dollar,
so that any transaction in any currency would be reflected in the Bank's records in its U.S. dollar
value, even when the transaction actually took place in another currency.  Moreover, in some of
the documents, the category or heading of "Iran" confusingly referred to customers from certain
third-party countries, such as Kuwait and others in addition to Iran, that were managed from the
Bank's Dubai office, and thus some of the entities under this heading were neither Iranian nor
subject to sanctions.

22.     The documents produced by the Bank included several "wind down" reports, which detailed how its pre-2007 business with Iranian clients was wound down over the following years, including several such reports that the Bank had previously provided to DOJ and OFAC, as discussed above.  DOJ, SDNY, and the other agencies selected a sample of these transactions and asked SCB to provide more detailed information about them.  In response, the Bank produced records regarding these transactions as well as an independent report analyzing them, which confirmed the Bank's account of the transactions as wind-down activity.

23.     Furthermore, we interviewed many current and former employees of SCB, including most of the employees the Relator suggested that we contact.  Among other things, we learned that Project Green was the internal name that SCB had given to the matter that ultimately led to the 2012 DPA and related settlements.

24.     Our investigation into the Relator's allegations largely wrapped up in August 2013.  That investigation did not lead us to uncover any evidence of sanctions violations or violations of the 2012 DPA of the types alleged by the Relator.  Instead, we found that the information provided by the Relator related almost entirely to the Bank's winding down of its preexisting transactions with Iranian clients in a manner that did not appear to violate the U.S. sanctions laws, or to the presence of Iranian entities on client lists and similar types of records without any evidence that these clients had engaged in any illegal transactions.  We also verified that the Bank had previously disclosed most of the specific customer relationships at issue to DOJ and OFAC.

25.     Based on these findings, SDNY and DOJ concluded that they were not able to corroborate or validate the Relator's allegations.  SDNY informed Relator's counsel that it had not been able to substantiate the Relator's allegations, and intended to decline to intervene in the

*qui tam*. Furthermore, DOJ informed the Bank's counsel that it did not need to finish producing privilege logs for documents it had withheld from its productions in response to the CID and other requests.

### D. New Evidence Separately Emerges of Potential Sanctions Violations by SCB

26.     In 2013, I was also the case agent assigned to a separate, ongoing criminal investigation of another financial institution for providing financial services in violation of U.S. economic sanctions laws.

27.     On or about August 15, 2013, this other financial institution disclosed to DOJ and FBI information relating to certain U.S. dollar transactions it had processed involving a Dubai-based petrochemical company with Iranian links, which had a prior banking relationship with SCB, and its Iranian owner.

28.     This information was promptly disclosed to the team responsible for the 2012 DPA with SCB, as well as to SDNY.

29.     None of the information provided by the Relator prompted this disclosure by this other financial institution or led, even indirectly, to the DOJ's identification of the petrochemical company as an entity whose financial transactions would be subject to U.S. economic sanctions.

### E. The Investigation of SCB's Connection with the Petrochemical Company

30.     Shortly after learning, from the investigation of the other financial institution, about SCB's connection with the petrochemical company, DOJ and FBI asked SCB in August 2013 for information about its dealings with the company and its knowledge about the company's Iranian connections.  The petrochemical company was registered as a Dubai corporate entity, and ultimately owned by an Iranian national who had a Dubai residence permit.

31.     SDNY informed the Relator's counsel that the Government was investigating new information from another source, and had decided to keep the *qui tam* complaint under seal so as not to interfere with this investigation, and in recognition of the possibility that this new investigation might corroborate some of the Relator's allegations.

32.     Over the following months, the Bank produced documents in response to the investigating agencies' requests regarding its client relationship with the petrochemical company, as well as its "know your customer" ("KYC") processes at the Bank's Dubai branch, which I and the other members of the investigative team reviewed.  Furthermore, we interviewed current and former SCB employees regarding, among other things, the Bank's relationship with the petrochemical company and KYC procedures in Dubai.

33.     As a result of this investigation, we identified Bank records indicating that the petrochemical company was a front for an Iranian energy company.  This evidence included, among other things, a fax transmission from the petrochemical company's president to SCB's Dubai branch requesting that the Bank execute a U.S. dollar transaction from the company's account.  The fax header indicated that it was sent from an Iranian number and suggested to the Bank's employees that the company was connected to Iran.

**F.  The SCB Investigation Expands**

34.     Based on the discovery of the fax transmission from the president of the petrochemical company, in the spring of 2014, DOJ requested information from the Bank regarding faxes received by SCB's Dubai branch that requested the execution of U.S. dollar transactions and had headers indicating they were received from Iranian numbers.  A review of those fax transmissions showed that a substantial number of them came from a small number of customers, who became the focus of the next phase of our investigation.

11

35.     Those customers included two Dubai-incorporated companies controlled by an Iranian national who ordinarily resided in Iran named Mahmoud Reza Elyassi, who had a Dubai residence permit.  This was the first time the investigating agencies learned of potential wrongdoing by Mr. Elyassi in connection with this investigation.

36.     I understand that over the following several years, DOJ and FBI investigated the Bank's relationships with Mr. Elyassi's companies and others like it, but I was not part of that investigation.  I understand that this investigation ultimately led to the 2019 DPA.  Other FBI colleagues, including Special Agent Wayne C. Boddy, were the lead agents on the investigation in its later stages.

**G. The Relator's Second *Qui Tam* Complaint**

37.     I am aware that on September 19, 2017, the Relator voluntarily withdrew its *qui tam* case after it had been unsealed.  The following year, the Relator filed a second *qui tam* action against SCB, which it amended twice, most recently on September 23, 2019.  In the latest second amended *qui tam* complaint, which I have reviewed, the Relator alleges that its original complaint and disclosures were the source of the information that led to the agency investigations of SCB that culminated in the 2019 DPA and other related settlement agreements. This is not correct.

38.     First, the investigation of SCB that ultimately led to the 2019 DPA began after SDNY, DOJ, and FBI had initially determined that they could not corroborate the allegations in the original *qui tam* complaint, and the subsequent investigation prompted by the disclosure of the Bank's relationship with the petrochemical company did not change that determination.

39.     Furthermore, as explained above, the investigation that led to the 2019 DPA began as a result of the information DOJ and FBI learned from the separate, ongoing

investigation of a different financial institution, which revealed that SCB had a client relationship with the petrochemical company with Iranian connections discussed above. This led to the broader investigation of faxed instructions for U.S. dollar payments from Iran and other sanctioned countries, which I understand was one of the principal bases for the 2019 DPA.

40.     Moreover, the Relator's allegations are different in kind from what was uncovered in the later investigation of SCB. While the Relator claimed that the Bank continued after 2007 to process illegal transactions in U.S. dollars for its known, preexisting Iranian clients, our recent investigation found that the Bank, among other things, knowingly and willfully violated U.S. economic sanctions laws by processing U.S. dollar transactions through the United States on behalf of customers of SCB's Dubai branch with known Iranian connections. Most of these violations were the result of deficiencies in SCB's compliance program that allowed customers to order U.S. dollar transactions via fax and online payment instructions from Iran and other sanctioned countries. The criminal conspiracy that serves as the basis for the 2019 DPA primarily involved two former employees of SCB's Dubai branch who conspired to help the Bank's Iran-connected customers process U.S. dollar transactions through the United States in violation of U.S. law.

41.     With regard to Mr. Elyassi in particular, although the Relator notes that his name appears on certain client lists of SCB's Dubai branch that the Relator provided to SDNY in connection with its original *qui tam* complaint, that was not the reason why Mr. Elyassi and his activities became subject to investigation. It is true that Mr. Elyassi's name and companies appear on these client lists, among more than 1,400 other Bank clients. But at the time these lists were provided to SDNY, the Relator indicated that they were significant because they included the known Iranian entities identified in the Relator's disclosure statement and discussed during

our interview with Mr. Knight and Mr. Marcellus.  During our investigation of the Relator's *qui tam* allegations, the Relator never identified or pointed to Mr. Elyassi's name on those lists, or suggested that we should look into any of the hundreds of other listed Dubai-based SCB clients, including Mr. Elyassi's companies, and never suggested that Mr. Elyassi or his companies had engaged in any wrongdoing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:        November 21, 2019
              Cleveland, Ohio

Matthew F. Komar
Special Agent
Federal Bureau of Investigation

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| STANDARD CHARTERED BANK, | ) | |
| | ) | DEFERRED PROSECUTION |
| Defendant. | ) | AGREEMENT |
| | ) | |
| | ) | |
| | ) | |

Defendant Standard Chartered Bank ("SCB"), a financial institution registered and organized under the laws of England and Wales, by and through its attorneys, Sullivan & Cromwell LLP, hereby enters into this Deferred Prosecution Agreement (the "Agreement") with the Asset Forfeiture and Money Laundering Section of the United States Department of Justice, and the United States Attorney's Office for the District of Columbia (collectively, the "United States").

1. **Charges**: SCB agrees that it shall waive indictment and agrees to the filing of a one-count Criminal Information in the United States District Court for the District of Columbia, charging it with knowingly and willfully conspiring, in violation of Title 18, Section 371 to engage in transactions with entities associated with sanctioned countries, including Iran, Sudan, Libya, and Burma, in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations issued thereunder.

2. **Acceptance of Responsibility**: SCB accepts and acknowledges responsibility for its conduct and that of its employees as set forth in the Factual

**JA-102**

Case 1:18-cv-00272-AEB Document 22-1 Filed 11/01/19 Page 2 of 58
Case 1:12-cr-00262-JEB Document 2-1 Filed 12/10/12 Page 2 of 58

Statement attached hereto as Exhibit A and incorporated herein by reference (the "Factual Statement"). If the United States, pursuant to Paragraph 9 of this Agreement, initiates a prosecution that is deferred by this Agreement against SCB, SCB agrees that it will neither contest the admissibility of the Factual Statement or any other documents provided by SCB to the United States, nor contradict in any such proceeding the facts contained within the Factual Statement. Except as provided in Paragraph 4(i) below, SCB waives and forgoes any right under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other rule, that any plea, plea discussions, and any related statements made by or on behalf of SCB prior or subsequent to this Agreement, or any leads derived therefrom, shall be inadmissible, suppressed, or otherwise excluded from evidence at any judicial proceeding arising from this Agreement.

3.     **Forfeiture Amount**: As a result of SCB's conduct, including the conduct set forth in the Factual Statement, the parties agree that the United States could institute a civil and/or criminal forfeiture action against certain funds held by SCB and that such funds would be forfeitable pursuant to Title 18, United States Code, Sections 981 and 982. SCB hereby acknowledges that at least $227,000,000 was involved in transactions described in the Factual Statement, and that such conduct violated: Title 50, United States Code, Section 1705 and the regulations issued thereunder. In lieu of a criminal prosecution and related forfeiture, SCB hereby agrees to pay to the United States the sum of $227,000,000 (the "Forfeiture Amount"). SCB hereby agrees that the funds paid by SCB pursuant to this Agreement shall be considered substitute *res* for the purpose of forfeiture to the United States pursuant to Title 18, United States Code, Sections 981 and

2

982, and SCB releases any and all claims it may have to such funds. SCB shall pay the

Forfeiture Amount plus any associated transfer fees within five (5) business days of the

date on which this Agreement is approved by the Court, pursuant to payment instructions

as directed by the United States in its sole discretion.

4.      **Deferral of Prosecution**: In consideration of SCB's remedial actions to

date and its willingness to: (a) acknowledge and accept responsibility for its actions; (b)

voluntarily self-report its conduct and cooperate in this investigation; (c) have voluntarily

terminated the conduct set forth in the Factual Statement prior to the commencement of

the United States' investigation; (d) continue its cooperation with the United States as

stated in Paragraphs 5 and 6; (e) demonstrate its future good conduct and full compliance

with Financial Action Task Force international Anti-Money Laundering and Combating

Financing of Terrorism best practices and the Wolfsberg Anti-Money Laundering

Principles for Correspondent Banking; and (f) settle any and all civil and criminal claims

currently held by the United States for any act within the scope of or related to the

Factual Statement or this investigation, the United States agrees as follows:

(i)      This Agreement is effective for a period beginning on the date on

which the Information is filed, and ending 24 months from that date (the "Term"). SCB

expressly waives any and all rights to a speedy trial pursuant to the Sixth Amendment of

the United States Constitution for the Term of this Agreement. Moreover, if necessary,

SCB agrees: (1) to join the Government in seeking to exclude, pursuant to Title 18,

United States Code, Section 3161(h)(2), the Term of this Agreement from the time within

which trial of the offense charged in the Information must commence, for the purpose of

allowing SCB to demonstrate its good conduct; and (2) to waive any rights to a speedy

trial under Federal Rule of Criminal Procedure 48(b) and Local Criminal Rule 45.1 of the United States District Court for the District of Columbia.

(ii)     the United States shall, if SCB is in full compliance with all of its obligations under this Agreement, within thirty (30) days of the expiration of the Term of this Agreement set forth above in Paragraph 4(i), or less at the discretion of the United States, seek dismissal with prejudice of the Information filed against SCB pursuant to Paragraph 1 and this Agreement shall expire and be of no further force or effect.

5.     **Cooperation**: SCB agrees that it shall:

(a)  Continue to apply the OFAC sanctions list to the same extent as any United Nations ("U.N.") or European Union ("E.U.") sanctions or freeze lists are utilized to United States Dollar ("USD") transactions, the acceptance of customers, and all USD cross-border Society for Worldwide Interbank Financial Telecommunications ("SWIFT") incoming and outgoing messages involving payment instructions or electronic transfer of funds;

(b)  Except as otherwise permitted by United States law, not knowingly undertake any USD cross-border electronic funds transfer or any other USD transaction for, on behalf of, or in relation to any person or entity resident or operating in, or the governments of, Iran, North Korea, the Sudan (except for those regions and activities exempted from the United States embargo by Executive Order No. 13412), Syria, Cuba, or Burma;

(c)  Continue to complete Financial Economic Crime sanctions training, covering U.S., U.N., and E.U. sanctions and trade control laws for all employees (1) involved in the processing or investigation of USD payments and all employees and

officers who directly or indirectly are supervising these employees; (2) involved in execution of USD denominated securities trading orders and all employees and officers who directly or indirectly are supervising these employees; and (3) involved in transactions or business activities involving any nation or entity subject to U.S., E.U. or U.N. sanctions, including the execution of cross border payments. By June 30, 2013, SCB must certify the training has been completed;

(d)  Continue to apply its written policy requiring the use of the Society for Worldwide Interbank Financial Telecommunications ("SWIFT") Message Type ("MT") MT 202COV bank-to-bank payment message where appropriate under SWIFT Guidelines, and by June 30, 2013, certify continuing application of that policy;

(e)  Continue to apply and implement compliance procedures and training designed to ensure that the SCB compliance officer in charge of sanctions is made aware in a timely manner of any known requests or attempts by any entity (including, but not limited to, SCB's customers, financial institutions, companies, organizations, groups, or persons) to withhold or alter its name or other identifying information where the request or attempt appears to be related to circumventing or evading U.S. sanctions laws. SCB's Head of Compliance, or his or her designee, shall report to the United States, in a timely manner, the name and contact information, if available to SCB, of any entity that makes such a request;

(f)  Maintain the electronic database of SWIFT Message Transfer ("MT") payment messages and all documents and materials produced by SCB to the United States as part of this investigation relating to USD payments processed during the period

from 2001 through 2007 in electronic format for a period of two (2) years from the date of this Agreement;

(g)  Abide by any and all requirements of the Settlement Agreement, dated December 7, 2012, by and between OFAC and SCB regarding remedial measures or other required actions related to this matter;

(h)  Abide by any and all requirements of the Cease and Desist Order, dated December 7, 2012, by and between the Board of Governors of the Federal Reserve System and SCB regarding remedial measures or other required actions related to this matter;

(i)  Notify the United States of any criminal, civil, administrative or regulatory investigation or action of SCB or its current directors, officers, employees, consultants, representatives, and agents related to SCB's compliance with U.S. sanctions laws, to the extent permitted by the agency conducting the investigation or action and applicable law;

(j)  Use its good faith efforts to make available, at its cost, SCB's current and former directors, officers, employees, consultants, representatives, and agents when requested by the United States, to provide additional information and materials concerning this investigation or related inquiries, to testify including sworn testimony before a grand jury or in a judicial proceeding, and to be interviewed by law enforcement authorities;

(k)  Use its good faith efforts to identify additional witnesses who, to SCB's knowledge may have material information concerning this investigation, and notify the United States; and

Case 1:12-cr-00262-JEB Document 2-1 Filed 12/10/12 Page 7 of 58

(l)     Provide information, materials, and testimony as necessary or requested to identify or to establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or judicial proceeding.

6.     **Additional Cooperation:**   SCB agrees that for the term of this Agreement, in accordance with applicable laws, it shall supply and/or make available upon request by the United States any additional relevant documents, electronic data, or other objects in SCB's possession, custody, or control as of the date of this Agreement relating to any transaction within the scope of or relating to the Factual Statement. Nothing in this Agreement shall be construed to require SCB to produce any documents, records or tangible evidence that are protected by the attorney-client privilege or work product doctrine or British or other applicable confidentiality, criminal, or data protection laws.   To the extent that a United States request requires transmittal through formal government channels, SCB agrees to use its best efforts to facilitate such a transfer and agrees not to oppose any request made in accordance with applicable law either publicly or privately.

7.     **Government Commitments**:   In return for the full and truthful cooperation of SCB and compliance with the terms and conditions of this Agreement, the United States agrees that it shall not seek to prosecute SCB, its corporate parents, subsidiaries, affiliates, successors, or assigns for any act within the scope of or related to the Factual Statement or this investigation from 2001 through the date of this Agreement unless: (a) other than the transactions that have already been disclosed and documented to the United States, SCB knowingly and willfully transmitted or approved the

transmission of USD-denominated funds through the United States or involving a U.S. person in violation of U.S. law that went to or came from persons or entities designated at the time of the transaction by the Office of Foreign Assets Control as a Specially Designated Terrorist, a Specially Designated Global Terrorist, a Foreign Terrorist Organization, or a proliferator of Weapons of Mass Destruction (an "Undisclosed Special SDN Transaction"); or (b) in the sole discretion of the United States, there is a willful and material breach of this Agreement.  In the event of a breach resulting in a prosecution of SCB or a prosecution related to an Undisclosed Special SDN Transaction, the United States may use any information provided by or on behalf of SCB to the United States or any investigative agency, whether prior to or subsequent to this Agreement, and/or any leads derived from such information, including the attached Factual Statement.

8.    **Waiver of Rights**:  SCB hereby further expressly agrees that within six (6) months of a willful and material breach of this Agreement by SCB, any violations of federal law that were not time-barred by the applicable statute of limitations as of the date of this Agreement, including any claims covered by the tolling agreement signed by the parties, and that: (a) relate to the Factual Statement; or (b) were hereinafter discovered by the United States, may in the sole discretion of the United States be charged against SCB, notwithstanding the provisions or expiration of any applicable statute of limitations.  In the event of a willful and material breach, SCB expressly waives:  any challenges to the venue or jurisdiction of the United States District Court for the District of Columbia; any right to be charged by an Indictment returned by a grand jury, and agrees to be prosecuted on the Information filed in this matter or a superseding Information arising from the facts presented in the Factual Statement.

9.      **Breach of the Agreement**:  If the United States determines that SCB has committed a willful and material breach of any provision of this Agreement, the United States shall provide written notice to SCB's counsel of the alleged breach and provide SCB with a two-week period from the date of receipt of said notice, or longer at the discretion of the United States, in which to make a presentation to the United States to demonstrate that no breach has occurred or, to the extent applicable, that the breach is not willful or material, or has been cured.  The parties expressly understand and agree that if SCB fails to make the above-noted presentation within such time period, it shall be presumed that SCB is in willful and material breach of this Agreement.  The parties further understand and agree that the United States' exercise of discretion under this paragraph is not subject to review in any court or tribunal outside the Department of Justice and the United States Attorney's Office for the District of Columbia.  In the event of a breach of this Agreement that results in a prosecution, such prosecution may be premised upon any information provided by or on behalf of SCB to the United States or any investigative agencies, whether prior to or subsequent to this Agreement, and/or any leads derived from such information, including the attached Factual Statement, unless otherwise agreed to by the United States and SCB in writing at the time the information was provided to the United States.

10.     **Requirement to Obey the Law:**  If the United States determines during the term of this Agreement that SCB has committed any federal crime after the date of the signing of this Agreement, SCB shall, in the sole discretion of the United States, thereafter be subject to prosecution for any federal crimes of which the United States has knowledge, including but not limited to the conduct described in the Factual Statement.

# JA-110

The discovery by the United States of any purely historical criminal conduct that did not take place during the term of the Agreement will not constitute a breach of this provision.

11.    **Parties Bound by the Agreement**:  This Agreement and all provisions set forth herein bind SCB, which agrees to ensure that its wholly-owned subsidiaries, and any successors and assigns, comply with the requirements and obligations set forth in this Agreement.  It is further understood that this Agreement and all provisions set forth herein are binding on the United States.  It is further understood that this Agreement does not bind any federal agencies, or any state or local authorities, although the United States will bring the cooperation of SCB and its compliance with its other obligations under this Agreement to the attention of federal, state, or local prosecuting offices or regulatory agencies, if requested by SCB or its attorneys.  Nothing in this Agreement restricts in any way the ability of the United States, any other federal department or agency, or any state or local government from proceeding criminally, civilly, or administratively, against any current or former directors, officers, employees, or agents of SCB or against any other entities or individuals.  The parties to this Agreement intend that the Agreement does not confer or provide any benefits, privileges, immunities, or rights to any other individual or entity other than the parties hereto.

12.    **Public Statements**:  SCB expressly agrees that it shall not cause to be made, through its attorneys, board of directors, agents, officers, employees, consultants or authorized agents (including, contractors, subcontractors, or representatives), including any person or entity controlled by any of them, any public statement contradicting the acceptance of responsibility by SCB set forth above or the facts described in the Factual Statement.  Any such public statement by SCB, its attorneys, board of directors, agents,

officers, employees, consultants, contractors, subcontractors, or representatives, including any person or entity controlled by any of them, shall, subject to the cure rights of SCB set forth below, constitute a willful and material breach of this Agreement as governed by Paragraph 9 of this Agreement, and SCB would thereafter be subject to prosecution pursuant to the terms of this Agreement. The decision of whether any public statement by any such person contradicting the acceptance of responsibility by SCB set forth above or the facts described in, the Factual Statement will be imputed to SCB, for the purpose of determining whether SCB has breached this Agreement, shall be in the sole discretion of the United States. Upon the United States' notification to SCB of a public statement by any such person that in whole or in part contradicts the acceptance of responsibility by SCB set forth above or the facts described in the Factual Statement, SCB may avoid breach of this Agreement by publicly repudiating such statement within 5 business days after notification by the United States. SCB shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Factual Statement. This Paragraph does not apply to any statement made by any present or former office, director, employee, or agent of SCB in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of SCB. Subject to this paragraph, SCB retains the ability to provide information or take legal positions in litigation or other regulatory proceedings in which the United States or the New York County District Attorney's Office is not a party.

# JA-112

Case 1:18-cv-00072-AEB Document 22-1 Filed 12/10/19 Page 12 of 58
Case 1:12-cr-00262-DEB Document 2-1 Filed 12/10/12 Page 12 of 58

13.     SCB agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, SCB shall first consult the United States to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the United States and SCB; and (b) whether the United States has no objection to the release.

14.     **Sales or Mergers**:  SCB agrees that if it sells, merges, or transfers all or substantially all of its business operations or assets as they exist as of the date of this Agreement to a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser/successor/transferee to the obligations described in this Agreement. Any such provision in a contract of sale, merger, or transfer shall not expand or impose additional obligations on SCB or the purchaser, successor or transferee as they relate to Paragraphs 5 and 6 of this Agreement.

15.     **Conduct Covered by Agreement**:  It is further understood that this Agreement does not relate to or cover any conduct by SCB other than for any act within the scope of the Factual Statement or this investigation.

16.     **Public Filing**:  SCB and the United States agree that this Agreement (and its attachments) and an Order deferring prosecution shall be publicly filed in the United States District Court for the District of Columbia.

17.     **Complete Agreement**:  This Agreement sets forth all the terms of the Agreement between SCB and the United States.  There are no promises, agreements, or conditions that have been entered into other than those expressly set forth in this

Agreement, and none shall be entered into and/or be binding upon SCB or the United States unless signed by the United States, SCB's attorneys, and a duly authorized representative of SCB. This Agreement supersedes any prior promises, agreements, or conditions between SCB and the United States. SCB agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement and it agrees to abide by all terms and obligations of this Agreement as described herein.

# JA-114

### Acknowledgment on behalf of Standard Chartered Bank

I, Dr. Tim Miller, Director, Property, Research & Assurance, the duly authorized representative of Standard Chartered Bank, hereby expressly acknowledge the following: (1) that I have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Information and Statement of Facts; (2) that I have had an opportunity to discuss this Agreement fully and freely with Standard Chartered Bank's counsel, Sullivan & Cromwell LLP; (3) that Standard Chartered Bank fully and completely understands each and every one of the terms of this Agreement; (4) that Standard Chartered Bank is fully satisfied with the advice and representation provided to it by its counsel, Sullivan & Cromwell LLP; (5) that I am authorized, on behalf of Standard Chartered Bank, to enter into this Agreement; and (6) that Standard Chartered Bank has signed this Agreement knowingly and voluntarily.

Standard Chartered Bank

7 | XII | 2012
DATE

Dr. Tim Miller
Director, Property, Research & Assurance
Standard Chartered Bank

14

# JA-115

**Acknowledgment by Defense Counsel for Standard Chartered Bank**

We, Samuel W. Seymour and Nicolas Bourtin, the attorneys representing Standard Chartered Bank, hereby expressly acknowledge the following: (1) that we have reviewed and discussed this Agreement with our client; (2) that we have explained fully each one of the terms of the Agreement to our client; (3) that we have answered fully each and every question put to us by our client regarding the Agreement; and (4) that we believe our client fully and completely understands all of the Agreement's terms.

Dec. 7, 2012
_____
DATE

_____
Samuel W. Seymour
Sullivan & Cromwell LLP

Dec. 7, 2012
_____
DATE

_____
Nicolas Bourtin
Sullivan & Cromwell LLP

15

# JA-116

***On Behalf of the Government***

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

12/7/12
DATE

George P. Varghese
Special Assistant United States Attorney
National Security Section

LANNY A. BREUER
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

12/8/12
DATE

Clay Porter
Trial Attorney
Asset Forfeiture and Money Laundering Section

16

# JA-117

## EXHIBIT A -- FACTUAL STATEMENT

### Introduction

1.    This Factual Statement is made pursuant to, and is part of, the Deferred Prosecution Agreement dated December 7, 2012, between the Criminal Division of the United States Department of Justice, and the United States Attorney's Office for the District of Columbia (collectively, "DOJ") and Standard Chartered Bank ("SCB"), a United Kingdom bank, and between the New York County District Attorney's Office ("DANY") and SCB.

2.    Starting in early 2001 and ending in 2007, SCB violated U.S. and New York State laws by illegally sending payments through the U.S. financial system on behalf of entities subject to U.S. economic sanctions. SCB knowingly and willfully engaged in this criminal conduct, which caused both affiliated and unaffiliated U.S. financial institutions to process transactions that otherwise should have been rejected, blocked, or stopped for investigation pursuant to regulations promulgated by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") relating to transactions involving sanctioned countries and parties.[1]

3.    Further, SCB made statements that were misleading to OFAC in 2003 in the course of explaining why SCB had effected payments that violated U.S. sanctions laws.

4.    SCB also provided incomplete information in relation to sanctioned country payments in its submissions and responses to SCB's U.S. bank regulators, the Federal Reserve Bank of New York ("FRBNY") and the New York State Banking Department ("NYSBD"),[2] during a targeted Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") examination and

---

[1]  In addition to sanctioning individual countries, OFAC publishes a Specially Designated National List. This list includes individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific.

[2]  NYSBD was recently incorporated into the New York Department of Financial Services ("DFS").

look-back review mandated by a written agreement entered into with FRBNY and NYSBD in October 2004. This failure to inform was despite the fact that SCB and the regulators had agreed that financial transactions with OFAC sanctioned entities posed a de facto AML risk.

5.     SCB's criminal conduct included, among other things, (i) processing payments through its branches in London ("SCB London") and Dubai ("SCB Dubai") on behalf of sanctioned customers without reference to the payments' origin; (ii) eliminating payment data that would have revealed the involvement of sanctioned countries; and (iii) using alternative payment methods to mask the involvement of sanctioned countries. SCB's unlawful actions, which occurred both inside and outside the United States, caused financial institutions located in the United States to unknowingly provide banking services to sanctioned entities, prevented detection by U.S. regulatory and law enforcement authorities of financial transactions that violated U.S. sanctions, and caused false entries to be made in the business records of financial institutions located in New York, New York.

6.     This conduct occurred in various business units within SCB in locations around the world, and certain payment practices were done with the knowledge and approval of senior corporate managers and the legal and compliance departments of SCB.

### SCB's Business Organization and Assets

7.     SCB was formed in 1969 through the merger of two banks, the Standard Bank of British South Africa and the Chartered Bank of India, Australia and China. SCB is currently one of the world's largest international banks, with over 1,700 branches, offices, and outlets in more than 70 countries. Headquartered in London, SCB has operations in consumer, corporate and institutional banking, and treasury services and operates principally in Asia, Africa, and the Middle East.

# JA-119

8.    In 2012, SCB had over $500 billion in assets.  SCB is listed on the London and Hong Kong stock exchanges as well as on the Bombay and National Stock Exchanges in India.

9.    Since 1976, SCB has had a license issued by the state of New York to operate as a foreign bank branch in New York, New York ("SCB New York").  The branch provides only wholesale banking services, primarily U.S.-dollar clearing for international wire payments.  SCB New York is the seventh largest dollar clearer in the world, clearing approximately 195 billion in U.S. dollar payments per day.

## Applicable Law

*The Iranian Sanctions*

10.    On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat."

11.    President Clinton followed this with Executive Order No. 12959, issued on May 6, 1995, which imposed comprehensive trade and financial sanctions on Iran.  These sanctions prohibit, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the United States or United States persons, wherever located.  This includes persons in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transhipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran.  On August 19, 1997, President Clinton issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders").  The Executive Orders authorized the United States Secretary of the

Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITRs"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

12.    With the exception of certain exempt transactions, the ITRs prohibit, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts. The ITRs also prohibit transactions by any U.S. person who evades or avoids, has the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs. The ITRs were in effect at all times relevant to the conduct described below.

13.    While the ITRs promulgated for Iran prohibited United States Dollar ("USD") transactions, they contained a specific exemption for USD transactions that did not directly credit or debit a U.S. financial institution. This exemption is commonly known as the "U-turn exemption."

14.    The U-turn exemption permitted banks to process Iranian USD transactions that began and ended with a non-U.S. financial institution, but were cleared through a U.S. correspondent bank. In a relevant part, the ITR provided that U.S. banks were "authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer . . . is by order of a foreign bank which is not an Iranian entity from its own account in a domestic bank . . . to an account held by a domestic bank . . . for a [second] foreign bank which is not an Iranian entity." 31 CFR §560.516(a)(1). That is, a U.S. dollar transaction to or for the benefit of Iran could be routed through the U.S. as long as a non-U.S. offshore bank originated the transaction and the transaction terminated with a non-U.S.

# JA-121

offshore bank. These U-turn transactions were only permissible where no U.S. person or entity had direct contact with the Iranian bank or customer and were otherwise permissible (e.g., the transactions were not on behalf of a Specially Designated National, ("SDN")).[3]

15.     Effective November 10, 2008, OFAC revoked the U-turn exemption for Iranian transactions. As of that date, U.S. depository institutions were no longer authorized to process Iranian U-turn payments.

*The Libyan Sanctions*

16.     On January 7, 1986, President Ronald W. Reagan issued Executive Order No. 12543, which imposed broad economic sanctions against Libya. Executive Order No. 12544 followed one day later, which ordered the blocking of all property and interests in property of the Government of Libya. President George H.W. Bush strengthened those sanctions in 1992 pursuant to Executive Order No. 12801. These sanctions remained in effect until September 22, 2004, when President George W. Bush issued Executive Order No. 13357, which terminated the national emergency with regard to Libya and revoked the sanction measures imposed by the prior Executive Orders.

*The Sudanese Sanctions*

17.     On November 3, 1997, President Clinton issued Executive Order No. 13067, which imposed a trade embargo against Sudan and blocked all property and interests in property of the Government of Sudan. President George W. Bush strengthened those sanctions in 2006 pursuant to Executive Order No. 13412 (collectively, the "Sudanese Executive Orders"). The Sudanese Executive Orders prohibited virtually all trade and investment activities between the

---

[3] OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, OFAC targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called "Specially Designated Nationals" or "SDNs."

United States and Sudan, including, but not limited to, broad prohibitions on: (a) the importation into the United States of goods or services from Sudan; (b) the exportation or re-exportation of any goods, technology, or services from the United States or by a United States person to Sudan; and (c) trade- and service-related transactions with Sudan by United States persons, including financing, facilitating, or guaranteeing such transactions. The Sudanese Executive Orders further prohibited "[a]ny transaction by a United States person or within the United States that evades or avoids, has the purposes of evading or avoiding, or attempts to violate any of the prohibitions set forth in [these orders]." With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudanese Sanctions generally prohibited the export of services to Sudan from the United States.

*The Burmese Sanctions*

18.     On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by U.S. persons and U.S. persons' facilitation of new investment in Burma by foreign persons.

19.     On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta, and issued Executive Order No. 13310, which blocked all property and interest in property of other individuals and entities meeting the criteria set forth in that order. President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked. Executive Order No. 13310 also prohibited the importation into the United States of articles that are a product of Burma and the exportation or re-exportation to Burma of financial services from the United States, or by U.S. persons,

# JA-123

wherever located. The "exportation or reexportation of financial services to Burma" is defined to include the transfer of funds, directly or indirectly, from the United States.

## DOJ Charge

20.     DOJ has alleged, and SCB accepts, that its conduct, as described herein, violated Title 18, United States Code, Section 371, by conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), specifically Title 50, United States Code, Section 1705, which makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of the regulations prohibiting the export of services from the United States to Iran, Libya, Sudan, and Burma.

## DANY Charge

21.     DANY has alleged, and SCB accepts, that its conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, "with intent to defraud, . . . 1. [m]ake[] or cause[] a false entry in the business records of an enterprise [(defined as any company or corporation)] . . . or 4. [p]revent[] the making of a true entry or cause[] the omission thereof in the business records of an enterprise." It is a felony under Section 175.10 of the New York State Penal Law if a violation under Section 175.05 is committed and the person or entity's "intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof."

## SCB's Iranian Conduct

### The CBI Account

22.     SCB provided banking services to Iranian clients starting in or about 1993. In early 2001, the Central Bank of Iran (the "CBI") asked SCB to act as its correspondent bank with respect to international U.S.-dollar payments, including payments relating to oil sales by the

# JA-124

National Iranian Oil Company. At that time, the CEO of SCB's Iran representative office[4] wrote a memo in support of expanding the CBI account, noting that "[t]o be the bank handling Iran's oil receipts would be very prestigious for SCB. In essence, SCB would be acting as Treasurer to the CBI/the country."

23.     As part of the agreement, the CBI instructed SCB London to remove any reference to Iran in the SWIFT[5] payment messages transiting through SCB New York. According to the CEO of SCB's Iran representative office, the CBI's "concern in all negotiations with SCB was not including their name in payment transactions." As one SCB employee wrote about the CBI account, "this account must remain completely secret to the U.S." While the CBI claimed that the reason was to avoid delays in processing payments,[6] the CEO of SCB's Iran representative office explained in an interview with federal and state law enforcement authorities, that he believed the Iranians' real concern was that the U.S. government would gain information about the Iranians' business dealings if the payments were transparent.[7] In essence, the CBI made clear to SCB that payment processing that showed the CBI's involvement in the transaction was not an option if SCB was to receive the business.

24.     Prior to taking on the Iranian business, SCB Group's Legal Department consulted with external U.S. counsel, who opined that, with respect to U-turn transactions, it did not matter whether the information as to the Iranian origin or destination of the payment was specified in

---

[4] SCB opened an Iranian representative office in Tehran in 1993. In 2005, the CBI granted SCB a license to open a branch in the Kish Free Trade Zone on Kish Island, Iran. The Kish Island branch opened in September 2005 but has never been fully operational. SCB has now closed the representative office and the Kish Island branch.
[5] SWIFT is the Society for Worldwide Interbank Financial Telecommunications which is the international system to transmit payment messages with other financial institutions around the world, including U.S. correspondent banks. SWIFT messages contain various informational fields.
[6] Delays may be caused when a payment message is stopped by a filter known as an OFAC filter, which is a software program designed, in part, to identify transactions involving sanctioned parties. Once the transaction is stopped, a bank employee manually reviews the transaction to confirm whether it is an impermissible payment or instead a false positive or an exempted/licensed payment.
[7] As referred to herein, transparent payments generally reveal the originating party, the ultimate beneficiary, and all intermediate payment steps.

the payment messages to SCB New York. In a follow-up memorandum, however, that same external counsel wrote that the Iranian information could be removed from payment messages "as long as [SCB] New York otherwise knows or has the ability to know that such payments are of a type that are authorized under the ITR...." The external counsel concluded by stating, "it is advisable that [SCB] London and [SCB] New York between themselves agree to a standard operating procedure for such payments or that such payments be identified in a way that both [SCB] London and [SCB] New York may readily determine that such payments conform to and are consistent" with the ITR. Despite this legal advice, no such operating procedure was ever put into place.

25.     The majority of the CBI's payments were processed by SCB London as cover payments or serial bank-to-bank payments. Typically, a cover payment is executed through a combination of the two types of SWIFT messages: an MT 103 message, which is the de facto standard for cross-border customer credit transfers, and an MT 202 message, which is the de facto standard for bank-to-bank credit transfers. In a cover payment, an MT 103 is sent from the originator's bank to the ultimate beneficiary's bank, but the funds are actually transferred through the United States via an MT 202 to a U.S. correspondent bank. In a serial bank-to-bank payment, there is only a single payment message generated: an MT 202 to a U.S. correspondent bank.

26.     As a general rule, at SCB London, the payment processing system automatically populated information about the ordering bank from the incoming payment message into Field 52 of the outgoing MT 202 message that was to be sent to SCB New York, which served as SCB London's U.S. correspondent bank.[8]  To process the CBI's payments without revealing their

---

[8]     According to SWIFT protocols in effect prior to 2009, Field 52 in a MT 202 was an optional field used to specify the financial institution of the ordering customer, when the customer was different from the sender of the message.

Iranian origin however, SCB London's payment processing team put in place "a special instruction to overtype the field 52 of the outgoing message to SCBLGB2L until we can educate [the CBI] to quote what we want." [9]  Later, SCB London provided specific instructions to the CBI to omit its unique SWIFT code in one field of its payment messages and to place SCB London's SWIFT code in another field to conceal the payment's origin.  Specifically, an SCB employee wrote:

> Dear [CBI Representative],
> Based on SWIFT messages that we have received from you to date could we request that you make the following amendments to future messages as this will help us to process the messages more efficiently -
> …
> (2) MT 202  In Field 21, we suggest that you omit BMJITH as part of the reference.  We are concerned that, as this is very close to your SWIFT code, there is a risk that our outgoing payment message may be rejected in New York if this is included.
> Please place our SWIFT code, SCBLGB2L, in Field 52.
> Thank you for your cooperation.
> …
> Kind regards,
> [SCB London employee] [10]

27.  As a result of this e-mail, the CBI began inserting SCB London's unique SWIFT code in field 52 of its MT 202 messages, as well as omitting BMJITH from field 21.  Between 2001 and 2006, the CBI sent approximately 2,226 messages with a total value of $28.9 billion to SCB London.  These messages contained the SCBLGB2L code in field 52, and were sent onto SCB New York for processing either as a cover payment or serial bank-to-bank payment.  These

---

SWIFT revised its messaging protocols in 2009 to ensure that originating and beneficiary data is included in all customer cover payments.

[9] SCBLGB2L refers to the unique SWIFT code for SCB London.  The effect of the instruction was to mask the fact that the payment originated from the CBI, and instead made it appear that the message originated from SCB London.  As a result, SCB New York (as well as any other intermediary bank in the U.S.) would have no way of knowing that the payment it was processing was on behalf of the CBI.

[10]  According to SWIFT protocols, Field 21 in a MT 202 message is used to contain a reference to a related transaction.  As mentioned above, Field 52 in a MT202 is used to specify the financial institution of the ordering customer, when the customer is different from the sender of the message.  BMJITH was a common reference term used by the CBI in its payment messages, which most likely referred to the CBI's full Farsi name, Bank Markazi Jomhouri Islami Tehran.

payments, while modified to prevent the U.S. clearing bank from recognizing them as Iranian-originated, were nonetheless compliant with the then-existent U-turn exemption.

28.     In the instances in which the CBI failed to insert SCB London's SWIFT code in the payment messages, SCB London's payment processing staff did so manually.  From 2001 through January 2007, in approximately 458 payment messages comprising $2.3 billion of transactions, SCB London manually inserted its own SWIFT code into field 52.  In addition to field 52, SCB London staff also removed any other Iranian references in the outgoing payment messages to New York.  As one SCB employee explained, "Re the process for effecting [the CBI]'s payment instructions - field 52 (ordering institution) is quoted by [the CBI] in their MT202 as SCBLGB2L, if this is not done SCB London over-type field 52 as SCBLGB2L.  This means there is no reference to [the CBI]."  These payments, while modified to prevent the U.S. clearing bank from recognizing them as Iranian-originated, were nonetheless compliant with the then-existing U-turn exemption.

29.     While both the cover and serial bank-to-bank payments for the CBI followed U-turn routing– that is, the transactions began and ended with a non-U.S. financial institution, and therefore qualified as a permissible transaction under the U-turn exemption, SCB employees believed that both affiliated and unaffiliated U.S. banks would not process any Iran-related transactions, legal or illegal, from SCB.  Moreover, SCB employees believed that if Iran-related transactions were transparent, they would be subject to substantial delays despite the fact that the payments were lawful.  The procedures for handling Iranian payments were designed to make sure the payments were processed in the United States quickly and with no delay.

The Additional Iranian Bank Business

30.     In July 2003, SCB learned that a competitor was exiting the Iranian business completely.  As a result, SCB sought to pick up this business and add U.S.-dollar accounts for five Iranian banks at SCB London:  Bank Melli, Bank Sepah, Persia International Bank, Bank Saderat, and Bank Mellat.  While SCB sought internal approvals to open accounts for the five banks, there were a number of discussions about whether payments sent through to SCB New York should be transparent.  The five Iranian banks objected to transparency in payment messages sent to the United States.

31.     As it had with the CBI business, prior to taking on the new Iranian business, SCB Group's Legal Department consulted with external U.S. counsel about whether Iranian payment messages to SCB New York needed to be transparent.  In response, an attorney at one U.S. law firm, who had previously advised in 2001 that lawful U-turns transactions could be processed on an undisclosed basis as long as SCB New York was aware of them, wrote, "I should point out that permissible U-Turn transactions should be done on a fully disclosed basis, that is, SCB (London)... should disclose all details of the transaction.  Not to do so could place SCB (New York) seriously in harm's way under the law and should be a condition for moving forward with any transaction."

32.     Following the legal advice, SCB New York informed SCB Group that it would insist upon full transparency in payment messages.  In response, SCB London informed SCB New York personnel that this process they were objecting to had been occurring for some time:  non-transparent payment messages were already being processed for the CBI.  For example, on October 17, 2003, an SCB London employee sent an e-mail to an SCB New York employee explaining the procedures to replace the CBI's SWIFT code with SCB London's code.

Specifically, the e-mail stated, "Please see below some examples of payments received from [the CBI] and how SCB London handles them. [SCB London employee]'s NOTE refers to how we avoid divulging the Iranian ordering party and replace SCBLGB2L as the ordering party." When informed of the situation, the CEO of SCB Americas stated that "it is my understanding that we must cease and desist all these current transactions with Iranian customers that don't fully disclose the remitter and beneficiary since it's not a question of interpretation but rather is clearly the law as regards these types of transactions."

33.     As a result of SCB New York's insistence on transparency, the CEO of SCB's Iran representative office informed his SCB colleagues that a full transparency requirement "will be a deal breaker as well as impact our banking license request in Iran."[11] Concerned about losing their Iranian business and due to conflicting legal advice, SCB requested advice from a second external U.S. law firm. In October 2003, the second U.S. law firm wrote, "[i]t is our view that these regulations require [SCB New York] to obtain information on the remitter and beneficiary to process U-turn transactions." In response, SCB Head of the Middle East requested further discussion with the attorneys, "given the significant loss of business this opinion will cause to the Bank if confirmed." Specifically, he asked whether, if SCB London provided full transactional details to SCB New York about Iranian payments, SCB New York would be obligated to pass that information along to other U.S. banks in the payment chain. In response, the second U.S. law firm wrote that while they were "unaware of any express requirement that would mandate that SCB NY pass along remitter and beneficiary information to the receiving bank," the failure to do so "would potentially expose SCB NY to risk...."

34.     In October 2003, an SCB employee sent an email to the head of the compliance and legal departments at SCB New York discussing SCB's procedures for handling Iranian

---

[11] At this time, SCB was in the process of applying for its first bank branch in Iran.

payments in the context of bringing on the new business. The SCB employee wrote that SCB London had been processing non-transparent U-turns for the CBI and would continue to do so for the new Iranian banks. Another SCB employee informed SCB New York that SCB Dubai also used non-transparent payments for Iranian customers. Thus, the head of compliance and legal in New York knew of these practices as early as October 2003.

35.  In January 2004, SCB made the decision to proceed with the Iranian business, but conduct "offshore due diligence" of the transactions at SCB London. As one SCB employee wrote in an e-mail in 2003, SCB New York's Head of Legal "would be comfortable with the proposed course of action but on the basis that the Group was only processing legitimate U-turn transactions and a rigorous vetting process was in place." Another SCB London lawyer wrote, "[SCB New York Head of Legal] is happy with leaving the originator swift code field blank. This is on the basis that London are responsible for the OFAC checks...But this is something he would not say in writing."

36.  In making the decision to acquiesce to the Iranians' request for non-transparency, SCB understood that there was potential risk. As one of the SCB lawyers wrote:

> There is a view within SCB that it would be very unlikely that the current method of processing u-turns would come to the attention of US regulators, as all the evidence would be offshore and that while SCB as a group remains confident, and has procedures in place outside SCB NY, to ensure that only compliant u-turns are allowed, any potential breach would be one of form rather than substance and treated leniently.
> …
> if the US authorities do indeed find a breach in the method of processing u-turns there is no guarantee they will treat it as an isolated or minor incident. Taken with other issues which have come up in the past there is a risk that they may decide that a severe penalty is appropriate.

37.  To process the five new Iranian banks' payments, SCB London operations personnel initially decided to replace the Iranian banks' SWIFT code with that of SCB London,

as SCB London was already doing with the CBI. When a senior lawyer with SCB London learned of this, he objected to the practice, however, stating that "clearly that is not satisfactory." He stated that the practice of replacing the CBI's SWIFT code with SCB London's code could be misleading, "because a US bank would be getting false information." Instead, it was agreed that the Iranian SWIFT bank code would be replaced with a "." in the payment messages to SCB New York, which he considered the same as leaving it blank. The final procedure (which SCB referred to as "repairing") for processing Iranian payments instructed SCB London's payment processing staff to:

> Ensure that if the field 52 of the payment is blank or that of the remitting bank that it is overtyped at the repair stage to a "." This will change the outgoing field 52 of the MT103 to a field 52D of "." (Note: if this is not done then the Iranian Bank SWIFT code may appear - depending upon routing - in the payment message being sent to SCBLUS33).[12]

SCB London's payment processing staff screened all outgoing payment messages against a list of OFAC-sanctioned entities maintained by SCB London.

38.     On February 13, 2004, SCB London opened all five Iranian USD accounts. The accounts operated in this non-transparent manner - that is, using the "repairing" procedure - until approximately May 2006. During this time period, SCB London processed 2,708 payment messages, comprising a total of $41.6 billion, in which the incoming message contained SCB London's SWIFT code, and the SCB London employees replaced the code with a "." in the outgoing message. Moreover, SCB London received an additional 2,481 messages, comprising a total of $37.9 billion, in which field 52 was blank or included a reference to an Iranian bank, and SCB London employees inserted a "." in the outgoing message. Like the payments for the CBI, SCB London processed the payments as both cover payments and serial bank-to-bank transactions. The vast majority of these payments, while modified to prevent the U.S. clearing

---

[12] SCBLUS33 is the SWIFT code for SCB New York.

bank from recognizing them as Iranian, nonetheless complied with the then-existent U-turn exemption.

39.    In addition to the U-turn compliant payments, however, there were also approximately 99 payments totaling $7.4 million in transactions from SCB London for Iranian banks that either terminated in the United States, in violation of IEEPA, or otherwise had a U.S. connection.

<u>Iranian Business at SCB Dubai</u>

40.    In addition to the CBI and the five Iranian banks at SCB London, SCB Dubai conducted Iranian business, for both Iranian banks and Iranian corporate customers. To process these transactions, SCB Dubai received incoming payment instructions as either SWIFT payment messages or payment orders. SCB Dubai then typically processed the transactions as cover payments, which were the standard format in SCB Dubai for all customer payments in currencies foreign to the destination country regardless of the country of origin of the customer. The first SWIFT message, a MT 103, was a payment message to a non-U.S. bank informing them of an incoming U.S.-dollar payment on behalf of the Iranian customer; the second SWIFT message, a MT 202, was a cover payment sent to SCB New York for processing. The cover payment messages sent to New York did not contain any references to the Iranian origin of the payments as was usual for all cover payments at that time.

41.    Upon learning of the use of cover payments for Iranian accounts at SCB Dubai, SCB's Regional Head of Financial Crime Risk wrote in 2003, "I received this memo below and I am concerned that we might be breaking the sanctions. We may not be exactly breaking the law, but we may be breaking the spirit of the law and may possibly get our NY branch into hot

water." Despite these concerns, SCB Dubai's practice of using cover payments for customer payments in currencies foreign to the destination country, including Iranian accounts, continued.

42.    From 2001 through 2007, approximately $3.9 billion of non-transparent Iranian transactions were sent from SCB Dubai through SCB NY. The vast majority of these payments, while undetectable as Iranian payments to the U.S. clearing bank, were nonetheless compliant with the then-existent U-turn exemption.

43.    However, in addition to the U-turn compliant payments, there were also at least $13.4 million in transactions from SCB Dubai involving Iranian entities that terminated in the United States, or were otherwise connected with the United States, in violation of IEEPA.

## Total SCB Iranian Business

44.    In total, from 2001 through 2007, the vast majority of SCB's business dealings with Iranian clients, approximately $241.9 billion, consisted of sending U.S.-dollar denominated payments through SCB New York to other foreign banks, and therefore complied with the then-existing U-turn exemption. In addition to the U-turn compliant payments, there were also $23.0 million in transactions SCB processed for Iranian customers that terminated in the United States, or were otherwise connected with the United States, in violation of IEEPA.

## SCB's Libyan, Sudanese, and Burmese Conduct

### The Dromos Initiative

45.    In addition to the business with Iran, SCB conducted business involving other sanctioned countries, including Libya, Sudan, and Burma, primarily from SCB London and SCB Dubai. Most of these payments were processed using the cover payment method and began and ended with a non-U.S. financial institution. Unlike the ITR, however, there was no U-turn exemption for payments related to any other sanctioned country. Therefore, all payments for

these countries, including those that followed U-turn routing, were prohibited by U.S. law, unless specifically licensed by OFAC.

46.     In 2002, SCB sought to implement a policy change, known as the Dromos Initiative, which would end the use of cover payments for U.S.-dollar customer payments.  The purpose of the Dromos Initiative was to increase fees earned by sending only serial payments through SCB New York, since SCB New York could charge customers more for sending an MT 103 message than an MT 202.

47.     A consequence of the Dromos Initiative was the exposure of SCB's cover payment method for payments involving sanctioned countries, some of which were on behalf of charitable organizations and the U.K. government.  Prior to Dromos, these payments were sent using the cover method, which ensured that U.S. banks received only the MT 202 message, which did not include originator or originating bank information.  Dromos required the use of a single MT 103 message to the U.S. banks.  The MT 103 message was required to contain the originator and originating bank information, and thus were transparent to U.S. correspondent banks.  Indeed, SCB bank managers recognized that implementing Dromos would likely result in the rejection of U.S.-dollar payments on behalf of or to such customers involving sanctioned countries by U.S. correspondent banks.  Thus, payment processors were expressly directed *not* to use the Dromos method for U.S.-dollar payments relating to Iranian banks, the U.K. government, and charitable and development organizations in sanctioned countries.  Moreover, payment processors used non-Dromos for other sanctioned organizations.

48.     For example, in a late 2002 e-mail to bank managers and payment processors, one senior SCB London manager stated the following about processing payments for government and development organizations doing business with sanctioned countries:

# JA-135

Case 1:12-cv-00252-AEB Document 22-1 Filed 12/10/12 Page 35 of 58
Case 1:12-cf-00262-OEB Document 2-1 Filed 12/10/12 Page 35 of 58

A problem that was raised [in using DROMOS] is the fact that SCB London effect payments into Sudan, Libya, Iraq and North Korea. These are countries with sanctions placed on them by USA but not UK. If we send USD MT100s direct to SCB NY for beneficiaries based in these countries there is a high risk that under OFAC the payments will be rejected / frozen. In the circumstances payments into these countries must continue to be handled as they are no i.e. with direct MT100 to the beneficiary bank and only MT202 cover to SCB NY.

49.     In the same e-mail, the senior SCB London manager instructed another bank manager to ensure that payment processors not process such payments through the United States to or from sanctioned countries via Dromos. Thus, SCB instituted a limited internal practice of using cover payments for certain kinds of sanctioned customer payments, even as it globally informed its employees, on numerous occasions, that violating OFAC regulations could result in criminal charges. In that e-mail, the SCB London manager stated that Dromos should be implemented for corporate customers and that they would "wait to see how Dromos effects them."

### The Blocked Libyan Payment

50.     In June 2003, an employee in SCB London's payments department received a payment request from the British Foreign and Commonwealth Office to remit U.S.-dollar funds to the British embassy located in Tripoli, Libya. In an effort to comply with the Dromos Initiative, the SCB London employee did not send the payment via the cover method; rather, the payment was sent to SCB New York via one single payment message that indicated that the payment was destined for Libya, a U.S. sanctioned country at the time. The payment was detected by SCB New York's OFAC filter and blocked. In the process of attempting to have the payment released, the SCB London employee explained to a bank manager that:

> As we are aware that there are US sanctions against Tripoli, the *correct procedure* [emphasis added] would be to remit the USD . . . to New York with no mention of the beneficiary or their bank. A separate MT100 instruction would then be sent . . . to apply the funds . . . for the beneficiary's account. Instead, due to the new

DROMOS procedures which state that all payments should be sent via SCB New York, a MT100 was sent to New York quoting the full beneficiary details.

The SCB London employee ended the e-mail by explaining that:

> I have reeffected the payment today using the correct payment method and I will be debiting the cover from the potential loss account until such time that we received the funds back from New York.

As reflected in this email, rather than wait for an investigation and possible OFAC license, SCB simply resubmitted the blocked payment via the "correct" method with the offending payment details stripped, or "repaired."

51.     This incident so concerned SCB New York employees that a senior SCB New York manager sent an e-mail to a supervisor in SCB London stating:

> I trust by now that [senior compliance officer] has discussed with you the recent US$ transfer that SCB London was trying to make to Libya and that we caught and stopped. Many of the issues surrounding this transaction have caused us serious concerns about the overall state of awareness by our sister units of the US legislation regarding dollar transfer to certain locations and in particular, evidence that it may be ignored as a matter of practice by some of our units.

52.     An internal investigation conducted by a SCB London lawyer was commenced regarding the "correct procedure" for the re-effected payment.  At the outset of the internal investigation, the SCB London lawyer noted in an e-mail that "[SCB London's Head of Operations] confirmed to me that the practice of routing payments to OFAC sanctions targets in this manner is a common one in London."

53.     In response to the lawyer's e-mail, SCB London's Head of Operations wrote, "I do not recall using these words or in that context. For example, I would suggest 'payments being common' [sic] cannot possibly be correct. I think the whole issue would be better dicussed [sic] verbally." Following the verbal discussion with the SCB London Head of Operations, the SCB London lawyer concluded:

There is no "procedure" in London for avoiding the OFAC filter.... There is no departmental operating instruction ("DOI") directing SCB UK to avoid the OFAC filter and providing guidance on how to do it. At worst there is an informal practice, that may have been used infrequently.

54. The SCB London payment processors incorrectly believed that the payment was lawful because it was being processed on behalf of the U.K. government. The reference to a non-transparent payment process, however, caused concern among SCB New York employees.

55. At SCB New York, the Head of Legal wrote an e-mail explaining that as a result of the blocked Libyan payment, "SCB NY became aware for the first time that SCB UK has a process for avoiding SCB NY's OFAC filters." The SCB New York lawyer went on to note that the internal investigation led by the SCB London lawyer revealed no widespread practice or procedure for circumventing SCB New York's OFAC filter via cover payments. During the course of the investigation, however, SCB New York learned there were six additional prior payments to the British embassy in Libya, five of which were sent through SCB New York via non-transparent cover payments. SCB never attempted to get a license for the payments.

56. During the internal investigation into the Libyan payments, senior bank managers and internal lawyers drafted a "Global Broadcast" that would remind all SCB branches worldwide of OFAC requirements. One internal lawyer memorialized the "action points" in a meeting with senior bank managers — "[w]e need to revise the existing GIC [Global Instruction] with respect to US$ payments to OFAC countries."

57. On August 11, 2003, the Global Broadcast was sent. It stated:

The Bank should not process any US Dollar denominated transactions for any OFAC designated party, unless the Bank has a written license from OFAC authorizing that transaction or US counsel has advised that the transaction is permitted by OFAC...Disciplinary steps will be taken against staff that breach this policy.

# JA-138

<u>SCB's Letter to OFAC</u>

58.    At about the same time SCB was revising its global instructions on U.S. sanctions, senior bank managers and internal and external lawyers were discussing how to get the blocked payment released as well as how to inform OFAC of the potential sanctions breach. As a result, SCB New York decided to approach OFAC to obtain licenses for the Libyan transactions relating to payments on behalf of the U.K. embassy staff. One such payment had been blocked and the funds frozen. As noted, that payment had been re-submitted via the cover payment and the funds successfully transferred to Libya. In applying for the license, SCB did not reveal to OFAC that it had already re-sent the blocked payment via the cover method in contravention of sanctions.

59.    As a result of this omission, SCB and SCB New York senior bank managers and lawyers, along with the assistance of an external U.S. lawyer, self-reported this matter in a letter to OFAC setting out the history and purpose of all the eight Libyan payments, including the re-submission of the blocked payment by a cover payment. The letter included the following statements to OFAC:

> SCB (London) has advised us that, while all eight payment instructions were in conformity with UK law, the use of cover payments was contrary to Standard Chartered Bank's global instructions relating to OFAC sanctioned countries that would have precluded the initiation of such cover payment instructions. We are told by SCB (London) that the foregoing [eight Libyan-related payments] constitutes an isolated case effected in good faith for the UK Government on the belief that such payments were in accordance with applicable law. Further SCB (London) has advised that pending OFAC's issuance of a license to SCB (NY), all further payments related to the British Embassy in Libya will be effected in pounds sterling.
>
> SCB (NY) has made it very clear that it considers the foregoing activity to be unacceptable and that no similar actions relating to remittances on behalf of the UK Government or any other person should be taken for whatever reason because such actions are contrary to the policies and procedures of SCB (NY), and they potentially place SCB (NY) unknowingly in harm's way. To further remind all

branches of their obligations, the Bank's Group Head of Legal and Compliance has sent a group-wide notification reminding SCB operations across the world of their obligations with respect to USD payments under OFAC economic sanctions programs.

60. These statements were misleading in the following two ways. First, the letter claimed that the use of cover payments was "contrary to Standard Chartered Bank's global instructions relating to OFAC sanctioned countries." In fact, SCB used the cover payment method to effect billions of dollars in payments, lawful and unlawful, through SCB New York originating from or for the benefit of customers in Iran, Libya, Burma and Sudan—all U.S. sanctioned countries; and continued to do so in the years following the letter. Second, the letter described the eight Libyan payments as an "isolated case." However, prior to sending the letter, SCB effected 70 Libyan-related cover payments between 2001 and 2003 for approximately $12.1 million. Moreover, senior bank managers and internal lawyers learned about the use of cover payments for sanctioned countries *before* the letter was sent to OFAC.

61. Contemporaneous communications from within SCB Group and SCB New York demonstrate that the bank's senior management recognized that some of the representations in the OFAC letter were misleading. For example, a senior bank manager in SCB's Wholesale Banking Legal and Compliance Department expressed concern over the truthfulness of certain statements in the letter to OFAC during the drafting process, acknowledging that the use of cover payments was a long-standing feature of the banking practice and SCB had not changed its method of routing payments. Another SCB London employee also noted that there was no SCB Group policy that prohibited the use of cover payments from or for the benefit or sanctioned customers.

62. Nevertheless, the letter was sent to OFAC on August 12, 2003, stating that "the use of cover payments was contrary to Standard Chartered Bank's global instructions relating to

OFAC sanctioned countries that would have precluded the initiation of such cover payment instructions."

<u>SCB's Continued Cover Payment Business</u>

63.     Two days before the letter was sent to OFAC, a payment from the World Health Organization, an SCB London customer, was sent through SCB New York, to the Myanmar Foreign Trade Bank, a SDN, and was effected via the cover method.    The payment was not detected by SCB New York.   In addition, as noted above and detailed below, cover payments related to sanctioned countries and entities continued on occasion for the next three years.

64.     Senior bank managers and internal lawyers investigated why the Burmese payment was effected via cover and not via the Dromos method (one single payment message that included all of the payment details).

65.     An internal lawyer noted his findings.

> My enquiries of the staff in [SCB London] have not been satisfactory.  The individual handling the payment referred me to his team leader who expressed the view that at that time the team took the view that any payment that could conceivable give rise to an *OFAC problem* (emphasis added) should always be dealt with non-dromos . . . .

66.     After sending the letter to OFAC claiming that SCB did not process cover payments related to sanctioned countries, SCB knowingly and willfully continued to process payments related to sanctioned countries via the cover method so that the payments would not be detected by SCB New York.  For example, prior to and after the letter was sent to OFAC, SCB knowingly and willfully transacted millions of dollars in unlawful payments related to Sudan through the U.S. via the cover method.

67.     Prior to sending the OFAC letter, SCB sent 70 cover payments, with a total value of $12.1 million, through SCB New York related to Libya.  Subsequent to the OFAC letter, SCB

sent an additional 62 unlicensed cover payments, with a total value of approximately $150,000, through SCB New York related to Libya. The cover payments related to Libyan transactions stopped when the Libyan sanctions were lifted in 2004.

68.     Regarding Sudanese transactions, prior to the letter sent to OFAC, SCB sent approximately 71 cover payments, with a total value of $15.9 million through SCB New York related to Sudan. After the letter to OFAC, SCB sent approximately 217 cover payments, with a total value of $79.3 million, through SCB New York related to Sudan.

69.     Regarding Burmese transactions, SCB sent a total of 11 payments, with a total value of approximately $790,000, through SCB New York related to Burma. All of these cover payments occurred after the letter was sent to OFAC stating that cover payments were not used for payments related to sanctioned countries.

70.     In addition to the payments related to sanctioned countries, SCB processed U.S.-dollar payments using the cover payment method involving SDNs as well. Specifically, from 2001 through 2007, SCB predominantly used cover payments to process 116 U.S.-dollar transactions, with a total value of $9.9 million, involving SDNs through the United States. Thus, SCB's use of cover payments in part had the specific effect of depriving its U.S. correspondents, as well as U.S. regulatory and law enforcement officials, of information pertaining to transactions undertaken by SDNs.

71.     As a result, SCB engaged in prohibited U.S.-dollar transactions without being detected by U.S. financial institutions, including SCB New York, regulators, or law enforcement authorities, and caused U.S. financial institutions, including SCB New York, to process transactions that otherwise should have been rejected or blocked.

### SCB's Trade Finance Business

72.     SCB London also processed certain prohibited trade-finance transactions involving banks and importers or exporters from countries subject to OFAC sanctions. These trade finance transactions included import and export letters of credit, inward and outward documentary collections, and guarantees. These transactions involved USD payments and/or the export of goods originating in the U.S. to sanctioned countries. Among the payments processed by SCB London in connection with these trade-finance transactions were 56 payments with an aggregate value of approximately $46 million involving a Sudanese SDN.

### SCB's Written Agreement and Lookback

73.     As mentioned above, SCB holds a banking license issued by the state of New York to operate as a foreign bank branch in New York, New York. SCB New York primarily conducts a U.S.-dollar clearing business, but also provides other wholesale banking services. Pursuant to Section 3105(c) of Title 12 of the United States Code, SCB New York is subject to examination by the Federal Reserve Board. Moreover, pursuant to New York State Banking Law Section 10, SCB New York is subject to examination by NYSBD, which is now incorporated into DFS, as well.

74.     In November 2003, a joint examination of SCB New York was conducted by the FRBNY and the NYSBD. In its final report to the bank, the FRBNY and NYSBD concluded that "[t]he monitoring of funds transfer activity was found to be ineffective against safeguarding against legal, reputational and compliance risks associated with suspicious and unusual activity in U.S. dollar funds transfer." Moreover, the report stated, "[t]he identification and control of risk exposures is lacking, and considered far below the level expected for a high-risk profile institution such as SCNY." The examiners also noted, "we view the condition of the [Bank

Secrecy Act/Anti-Money Laundering] compliance framework as inadequate, especially in view of the large volume in U.S. dollar clearing business and the high-risk nature of a large portion of the underlying accounts." Finally, the report concluded by stating that:

> We have shared our concern with head office and branch senior management regarding the high level of risk exposure to Standard Chartered Bank due to these inadequacies. Management has responded by promising its full attention to this matter and started a plan of corrective action. A prompt and satisfactory resolution of the deficiencies is of utmost importance, and we expect both the head office and branch management to assign this situation the highest priority and provide full support to the plan.

75. As a result of the deficiencies identified in the 2003 examination, the FRBNY and NYSBD entered into a Written Agreement[13] with SCB Group and SCB New York on October 7, 2004 (hereinafter "the Written Agreement"). The Written Agreement was signed by the then Chief Executive of SCB and the then CEO of SCB Americas. The Written Agreement noted that:

> the Bank and the New York Branch are taking steps to enhance due diligence policies and procedures relating to the New York Branch's funds transfer clearing operations and correspondent accounts for non-U.S. banks and are addressing risks associated with these lines of business, including legal and reputational risks, by implementing industry sound practices designed to identify and effectively manage such risks.

76. As part of the Written Agreement, SCB and SCB New York agreed to do a look-back review of the branch's activity from July 2002 to September 2004 (hereinafter "the Lookback") to determine if there was any suspicious activity which should have been reported pursuant to Federal Reserve and New York state banking regulations. Specifically, the purpose of the Lookback was to detect money laundering and other suspicious activity, rather than OFAC violations, though OFAC elements were incorporated into the screening methodology as

---

[13] A Written Agreement is a public enforcement action by which the regulators have identified several areas of concern about the bank's operations, and the bank agrees to take remedial steps to correct the regulators' concerns.

# JA-144

Case 1:12-cv-01052-AJE Document 22-1 Filed 12/10/12 Page 44 of 58
Case 1:12-cf-00262-JEB Document 2-1 Filed 12/10/12 Page 44 of 58

described further below.  The scope of the Lookback covered all accounts and transactions "at, by, or through" SCB New York during the Lookback period.

77.     The work plan (the "Work Plan") SCB/Deloitte submitted to the FRBNY and NYSBD in November 2004 focused on a risk-based assessment of AML deficiencies in SCB New York's correspondent banking services.  One aspect of the work plan discussed screening SCB New York's wire payment data against the OFAC list of sanctioned countries and SDNs.  The first monthly progress report, submitted in December 2004, discussed in detail the methodology for assessing the money laundering risks represented in the data.  The report expressly listed a number of categories to be included in the risk assessment.  The criteria for "Country/Jurisdiction Risk Ranking" included "OFAC sanctioned countries" and "Terrorist Financing Sponsors/Financiers."  The criteria for "Customer Risk Ranking" included "OFAC SDN and Blocked Persons List."  Despite this detailed risk-rating methodology agreed to by the regulators and the bank, which should have identified all payments involving OFAC sanctioned countries, billions of dollars of transactions were not disclosed.  Moreover, SCB did not disclose to the regulators that SCB New York was processing non-transparent payments for customers in sanctioned countries during the Lookback period.  Instead, SCB limited its review and report to only transactional information available to SCB New York.  As a result, approximately $88.0 billion of non-transparent Iranian U.S.-dollar transactions that passed through SCB New York during the Lookback period were not included in the review.  As one FRBNY examiner explained in an interview with federal and state law enforcement authorities, "the FRBNY was misled, and the Lookback did not meet its objective because SCB may have eliminated some of the suspicious transactions."

Case 1:12-cr-00262-EB Document 2-1 Filed 12/10/12 Page 45 of 58

### SCB's Lookback Methodology

78.     On October 27, 2004, SCB contracted with Deloitte and Touche, LLP ("Deloitte") to work with SCB staff to review SCB New York's wire activity as part of the Lookback. To review the millions of wires processed at, by, or through SCB New York during the Lookback period, SCB and Deloitte devised a methodology to identify potentially suspicious activity. One of the methods for segmenting the data was whether the wire transfer involved a "high-risk jurisdiction." The SCB/Deloitte plan identified high-risk countries as, "OFAC, Non-Cooperative Countries and Territories ('NCCTs'), UN Sanctioned Countries, Money Laundering, Terrorist Financing." SCB/Deloitte proposed that:

> Wire transfer activity will then be analyzed for countries that have been
> designated high risk jurisdictions. The countries involved in the transaction will
> be determined based on the country of domicile of the customer as well as the
> country information that is included within the transaction (Originator, Originator
> Bank, Sending Bank, Beneficiary and Beneficiary Bank).

Thus, if the wire transfer contained a reference to an OFAC sanctioned country in any of the fields mentioned above, it would be designated as relating to a high-risk jurisdiction. Accordingly, "OFAC Sanctioned Countries" were weighted as a 5, the highest rating in SCB/Deloitte's risk rating methodology. Moreover, pursuant to SCB/Deloitte's methodology, a transaction containing a reference to an OFAC sanctioned country generated an automatic alert, which led to the transaction automatically being reviewed by the Lookback team. By contrast, "all SCB branches and affiliates maintaining an account with SCB NY are categorized with the same risk level of zero."

79.     The payment data contained in the systems of SCB New York had few, if any, references to sanctioned customers, Iranian or otherwise. This was because the data that would have caused an alert – originator or originating bank information – had been stripped from the

payment messages by SCB's offshore affiliates. The stripped data was not contained in the records of SCB New York. During the Lookback review, SCB did not volunteer the data or inform the regulators of its policy of using cover payments or repairing payment messages on behalf of customers in sanctioned countries, despite the involvement of high-level SCB executives with knowledge of this information.

80.     On January 10, 2005, pursuant to the Written Agreement, SCB and SCB New York submitted their December Progress Report to the FRBNY and NYSBD. In the report, SCB and SCB New York explained that the Lookback team had identified approximately 16 million relevant payment messages during the Lookback time period. Of the 16 million messages, 5.5 million, with a total value of $4.0 trillion, represented customer transactions, while 10.5 million messages, with a total value of $35.5 trillion, represented bank-to-bank transactions. The report noted that all the payment messages, both customer and bank-to-bank, were parsed by the country listing in eight different fields of the wire transfer: "beneficiary bank address, beneficiary address, credit party address, debit party address, intermediary address, ordering bank address, originator address, and sending bank address." In appendix A of the report, SCB listed the "top countries by number of transactions for addresses where the country/jurisdictions have been identified for each of the eight (8) address fields." Appendix A of the report comprised eight tables, one for each of the address fields, and listed top twenty countries for each field. Iran was not listed in any of the eight tables, despite the fact that, pursuant to the Work Plan SCB/Deloitte submitted to the FRBNY, it should have been.

81.     To analyze the payment messages, SCB first reviewed SCB New York's customer transactions, and then reviewed its bank-to-bank transactions. [14] With respect to customer

---

[14]  SCB identified the transactions by the SWIFT payment message type used. Customer transactions were defined as SWIFT MT 100 series message types, while bank-to-bank were defined as SWIFT MT 200 series message types.

transactions, SCB/Deloitte provided the regulators with an overview of the total number of customer transactions by country which passed through SCB New York during the Lookback period. The table included in the February Progress Report listed two hundred and twenty-eight countries along with their corresponding country risk rating, number of originators, number of originating transactions, total origination amount, number of beneficiaries, number of beneficiary transactions, and total beneficiary amount. The table included a listing for Iran, in which SCB/Deloitte reported that there were approximately $172 million worth of identified originating transactions, and $118 million of beneficiary transactions. The Iran entry, along with the entries for Cuba, Iraq, and Sudan, were accompanied by double asterisks, however. At the end of the table, it stated the following:

> Note**: Cuba, Iran, Iraq (till 5/22/2003) and Sudan are OFAC comprehensive sanctions list. This assignment of customers to these countries may have been in error due to the country extraction process from the address fields. For example, if an address field has only the word 'Miranda', this address potentially may have been mis-assigned to Iran as the country name is embedded in the address field.

In sum, SCB/Deloitte reported that there were at most only $172 million worth of originating Iranian customer transactions and $118 million of beneficiary Iranian customer transactions that passed through SCB New York, and that those figures may have been overstated. The partner at Deloitte who was leading the Lookback project explained in an interview that the purpose of the asterisks was to note that these transactions may have been a "false hit."

## SCB's Lookback Results for Customer Transactions

82.     After identifying the universe of customer transactions, SCB/Deloitte applied its risk-rating methodology to determine which of the customer transactions merited further review by the Lookback team for potential suspicious activity. In its March 2005 Progress Report to the FRBNY and NYSBD, SCB/Deloitte reported the results of its risk-rating methodology applied to

# JA-148

the customer transactions. In total, SCB/Deloitte's risk-rating methodology resulted in approximately 27,155 alerts requiring further review by the Lookback team. In its March Progress Report, SCB/Deloitte segmented the alerts by country, and reported two hundred and twenty-three countries from which alerts had been generated. While SCB/Deloitte reported alerts generated from OFAC sanctioned countries such as Libya, Burma, and Syria, no alerts were generated for transactions involving Iran.

83. Since the methodology was supposed to automatically generate an alert on any transaction involving a sanctioned country, the absence of any Iranian transactions in the March Progress Report indicated that there were no Iranian customer transactions. Moreover, as the partner at Deloitte who was leading the Lookback project explained, a logical reading of the results was that the Iranian payments with the double asterisks that had been disclosed as part of the total universe of customer payments in the prior monthly report to the regulators were in fact "false positives."[15] At the same time, data contained in SCB's offshore centers revealed that SCB New York had processed $92.5 million in Iranian customer payments.

## SCB's Lookback Results for Bank-to-Bank Transactions

84. Following the analysis of the customer transactions, SCB/Deloitte examined the bank-to-bank transactions which occurred at SCB New York during the Lookback period. In the July Progress Report, SCB/Deloitte reiterated that they would provide the regulators information about all suspicious bank-to-bank payments. The bank-to-bank payments were subdivided into standard bank-to-bank transfers and cover payments. With respect to bank-to-bank transactions, SCB/Deloitte wrote, "[a]s stated previously, since there is limited information provided in the

---

[15] In the Final Consultant's Report given to the regulators at the end of the Lookback in October 2005, SCB/Deloitte included the customer transactions universe table from the February Progress Report with Iran listed with the double asterisks, as well as the table of alerts by country from the March Progress Report, which indicated no alerted transactions involving Iran.

bank-to-bank transactions, all potentially high risk transactions conducted by particular banks in specific jurisdictions will be included in a report detailing the findings." SCB/Deloitte stated that they would provide "a listing of all bank pairings where the transactions involved high-risk countries/jurisdictions."

85.     The regulators continued to focus on the risks associated with customer payments, asking SCB New York to focus on covers for customer transactions as opposed to true bank to bank payments. For example, at a meeting in May of 2005, a regulator asked whether SCB New York could divide the bank to bank data into "pure bank to banks" and cover payments. In response, an SCB New York employee stated, "we will review the financial institutions involved in the transactions to determine the level of risk [the] institution presents to SCB [and] will review the dollar amounts, country/jurisdiction to further enhance our 'risk-based' approach."

86.     With respect to cover payments,[16] SCB/Deloitte informed the regulators that where there was information about the underlying transaction, such as the originator or beneficiary information, the customer information was reviewed pursuant to the methodology used for the customer transactions. Where such information was not available, SCB/Deloitte explained that "the team will identify the banks and countries involved in the transactions for both 'for further credit' and 'cover' payments transactions and submit a report summarizing the bank pairings (debit/credit parties) and country patterns found within these transactions." As one SCB New York employee involved in the Lookback explained to the regulators:

---

[16] The FRBNY and NYSBD regulators asked whether SCB/Deloitte would be identifying cover payments. One of the FRBNY examiners provided search terms that could be used to identify cover payments, including "'Cover', 'cvr', 'MT10', 'MT 10', 'MT-10', or 'PUPID.'" SCB/Deloitte used the examiner-provided terms to search for potential cover payments passing through SCB New York, but failed to disclose that SCB London payments system generated the term "CO" to identify cover payments. As one SCB London employee wrote on April 4, 2003, "The only way that you can tell that the MT202 being sent to SCBLUS33 is a cover payment is the inclusion of the letter 'CO' at the end of the field 20 line...." As a result of this failure to disclose this coding system, SCB/Deloitte failed to identify $58.8 billion of additional cover payments.

For cover payments, direct messages go through the banks involved in the transactions, which makes it difficult to determine what the funds will be used for. However, we will review the financial institutions involved in the transactions to determine the level of risk that institution presents to SCB. Additionally, we will review the dollar amounts, county/jurisdiction to further enhance our 'risk-based' approach.

87.     In its final report, SCB/Deloitte reported the results of its review of the bank-to-bank transactions.    The report had three tables which identified suspicious bank-to-bank transactions to the regulators.    The first table listed potentially suspicious bank-to-bank transactions by country.  There was no entry for Iran included in the table.  The report also listed the suspicious bank-to-bank transactions by customer.   No transactions on behalf of Iranian banks were included in the table.  Finally, the report listed bank and country pairings where the total transaction dollars were greater than $1 million over the transaction review timeframe for cover and further credit payments, and the top twenty banks with adverse information where the total transaction dollars were greater than $1 million over the transaction review timeframe for standard bank-to-bank transactions. Once again, no Iranian banks were listed.

88.     In total, there were approximately $88.0 billion of non-transparent Iranian U.S.-dollar transactions which passed through SCB New York during the Lookback period, of which $92.5 million were customer transactions, and the remaining were bank-to-bank transactions.  Of the Iranian non-transparent bank-to-bank transactions, there were approximately $25.0 billion of non-transparent serial bank-to-bank transactions, and $63.0 billion of non-transparent cover payments.  Despite this large volume of payments, nowhere in the monthly reports or the final Lookback report did SCB disclose its non-transparent Iranian business which passed through SCB New York to the FRBNY and NYSBD.  Because SCB only reviewed wire information available to SCB New York, none of the non-transparent Iranian U.S.-dollar transactions that passed through SCB New York during the Lookback period were included in the review.  As one

# JA-151

FRBNY examiner involved in the Lookback explained in an interview with federal and state law enforcement authorities, "[i]t was implicit that SCB New York did not do business with Iran because they were not in the report or discussed in the methodology."

89.     The partner at Deloitte who led the Lookback project explained in an interview with federal and state law enforcement authorities that, based on the methodology used by SCB/Deloitte, Iranian transactions should have been reviewed because they originated from a high-risk jurisdiction. Even if the Iranian payments were lawful U-Turn payments, the Deloitte partner stated that they should have generated an alert so they could have been validated as legitimate. Because the Iranian payments were non-transparent, however, many were risk-ranked as zero as they appeared to be coming from SCB London or SCB Dubai, rather than as automatic alerts involving an OFAC sanctioned country.

90.     That Iranian payments were of concern to U.S. authorities was plainly evident to senior executives in New York and London during the same time period that the Lookback review was being conducted. For example, in an e-mail dated May 13, 2005 , the Head of Operations at SCB New York sent an email to the CEO of SCB Americas and the SCB Group Head of Compliance in London bearing the subject line "ABN AMRO – VERY CONFIDENTIAL." The e-mail stated:

> Gents:
>
> We have been informed from unofficial, off the record sources, that the consulting firm that is performing the transactional review at ABN Amro has uncovered and the bank has admitted, that their branch network was sending dollar payments through the New York office disguising the beneficiary of the transactions using cover payments.
>
> We are told informally and off the record, that the Fed and Treasury Dept is planning on fining ABN tens of millions of dollars. [17]

---

[17]     ABN was a multi-national bank, headquartered in the Netherlands. On July 23, 2004, ABN entered into a Written Agreement with numerous regulators including the FRBNY and the NYSBD. During a look-back review

# JA-152

91.  Prompted by this and other information about ABN AMRO Bank N.V. ("ABN")'s non-transparent Iranian practices, SCB Group sought legal advice regarding its handling of Iranian transactions.  From June 2005 through January 2006, two law firms advised SCB Group that the use of non-transparent payment processes, including cover payments, could expose SCB to regulatory action or criminal prosecution.

92.  In its final report to the regulators in October 2005, SCB included an assessment of its OFAC Analysis.  The analysis read as follows: "All transactions were screened against the OFAC/SDN list provided by D&T.  Potential hits were identified and reviewed by the Bank's OFAC Officer.  The review concluded that the payments were either blocked and reported as required or were 'false positives.'  As a result, no additional OFAC filings during the Transaction Review period were warranted."

93.  SCB did not provide complete information in the Lookback results with respect to reporting on the breakdown between customer payments and bank-to-bank payments, the volume of sanctioned country payments, and the number of alerts related to sanctioned countries.

## SCB's Internal Investigation

### SCB's Exit from the Iranian Business

94.  In March 2005, the CEO of SCB Dubai noted that ABN was ending its U.S.-dollar business with Iran due to concerns raised by regulators in the United States.  Specifically, he wrote that ABN was "worried about the treatment the bank is receiving inside [the] U.S. generally (Written agreement, etc.) and on assumption there may be a linkage with Iran or that in

---

mandated by the terms of the Written Agreement, it was discovered that ABN's branch in New York was processing non-transparent payment messages sent by ABN's global branch network for customers in sanctioned countries.  On December 19, 2005, ABN entered into a consent cease and desist order with the regulators, including the FRBNY and NYSBD, and paid a combined civil monetary penalty of $80 million to the regulators, OFAC, and the Financial Crimes Enforcement Network.  On May 10, 2010, ABN entered into a deferred prosecution agreement with the United States Department of Justice and forfeited $500 million in connection with its illegal conduct.

# JA-153

their judgement [sic] they might be going forward." This information led to a bank-wide review of SCB's sanctions compliance, and specifically SCB's business with Iran.

95.     As part of the sanctions review, an SCB Group lawyer contacted external counsel in the United States, who advised that "[b]ank regulators have been more active in taking enforcement actions against banks that do not have controls in place that are designed to identify suspicious activity taking place in or through U.S. banks." The external counsel concluded by noting, "we understand that various bank regulators also have increasing interest in ensuring that banks are complying with the OFAC regulations and that they are not taking actions that could be viewed as having as their purpose the evasion of the OFAC regulations." SCB also obtained advice from another U.S. law firm, which reaffirmed the view that "[t]he US authorities are taking very seriously apparent evasions by some banks of Libyan and Iranian sanctions by means of cover payments."

96.     In August 2005, SCB formed Project Gazelle, which was tasked with reviewing SCB's business with Iran. As the Project Gazelle team reviewed the Iranian business at SCB London, concern grew as it became aware of the issue of removing Iranian references and replacing them with a "." in the SWIFT payment messages, a process referred to earlier as "repair." One SCB senior manager in the legal and compliance department wrote, "read in isolation, [the repair practice] is clearly a process designed to hide, deliberately, the Iranian connection of payments. I am concerned that, in the absence of any other effective, coherent, operational instructions, it would be difficult to resist the inference that the intention of the process is to enable payments to be made that are prohibited by the sanctions." The SCB manager concluded by stating, "Even if we have robust, detailed, procedures for checking that all the criteria for a permitted U-turn payment are fulfilled, I do not believe that we should continue

# JA-154

Case 1:12-cv-00262-JEB Document 22-1 Filed 12/10/12 Page 54 of 58
Case 1:12-cr-00262-JEB Document 2-1 Filed 12/10/12 Page 54 of 58

the repair process, in view of its potential for misuse to mislead our New York branch, and the perception that it was designed for such purpose [sic]."

97.     In November 2005, a memo prepared by the Project Gazelle team addressed to the Group Management Committee noted, "there is a clear risk that the repair process could be perceived as a deliberate measure to conceal the Iranian connection from SCB New York and therefore to evade their controls for filtering potential sanction-breaching payments." Furthermore, "Even if the procedures in London/Dubai for checking each U-turn payment were very robust, US authorities may well view the repair process negatively, even if strictly lawful. In circumstances where a non-complying payment were made and discovered, the existence of the repair process would likely result in a heavier penalty than might otherwise be applied." Despite these concerns, no decision was made at the time and the repair process continued at SCB London.

98.     In January 2006, SCB Group again received advice from external U.S. counsel about the issue.  In their advice, the U.S. lawyers wrote, "we have noted that there is great uncertainty at the moment as to whether anything less than full transparency in payment instructions sent to U.S. depository institutions on behalf of sanctioned banks could be construed by a prosecutor or regulator as intentional deception of a U.S. depository institution, even where SCB has taken reasonable steps to ensure that the payment would not breach the Iranian sanctions regime."  Moreover, the U.S. lawyers noted that the intentional removal of information "could raise issues under various sections of the U.S. criminal code relating to intentional misstatements or omissions of material information if sent to a U.S. depository institution."  The lawyers concluded by stating, "we cannot say that there is no risk that a U.S. prosecutor or

regulator would not try to argue that the foreign bank intentionally misled the U.S. clearing bank by not identifying the payment as one subject to the U.S. sanctions regime."

99.    As a result of this advice, in March 2006, SCB stopped the "repair" process, but continued to process transparent Iranian U-Turn payments pursuant to the U-turn exemption, which remained in force.

100.    In September 2006, during an on-site examination of SCB New York by the FRBNY and NYSBD, a FRBNY examiner asked whether the bank was processing Iranian U-Turn payments.  The SCB New York employees stated that the branch was, leading the examiner to ask for information about the volume and value of the U-Turn transactions.  As a result of the request, SCB New York pulled information about the volume and value of the Iranian U-Turns processed in 2005 and 2006.

101.    Upon reviewing the numbers, SCB New York employees were surprised at the dollar value of Iranian U-Turn transactions processed by the branch, as well as the apparent increase in the number of transactions from 2005.  In response, the then-CEO of SCB Americas sent a detailed memo to his superiors at SCB explaining his concerns about SCB's continued business with Iran.  In the memo, the then-CEO of SCB Americas wrote:

> We understand the Group's current strategy is one of continuing to provide banking services to customers with legitimate business with Iran, doing business with significant, reputable Iranian corporates and providing U-turn arrangements for Iran's major banks.  Firstly we believe this needs urgent reviewing at Group level to evaluate if the returns and strategic benefits are...still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group.  Secondly, there is equally importantly potential risk of subjecting management in US and in London (e.g. you and I) and elsewhere to personal reputational damage and/or serious criminal liability.  Finally we risk limiting the Groups [sic] ability to exit the Written Agreement in a timely fashion with the resultant implications for our growth ambition and strategic freedom that goes way beyond just the US.

# JA-156

102.     Prompted in part by the memo from the then-CEO of SCB Americas, on October 10, 2006, SCB made the decision to exit the Iranian business.  As one SCB senior manager wrote, "it was decided that we should terminate our clearing and account services for Iranian banks." As he further explained:

> The catalyst for the call and the decision was a memo from [SCB Americas CEO] to [the Group Executive Director] reporting that the New York State Banking Department and the Federal Reserve Bank examiners had stated that they would be looking at Iranian U-turn transactions as part of their inspection commencing on 13 November and that the NY branch have been asked to submit to the regulators weekly information on the value and volume of Iranian U-turns processed in the New York Branch.
> ...
> The decision was based on the increasing pressure being exerted on international banks to sever ties with Iran.

103.     On October 30, 2006, SCB informed the FRBNY that it was ending its U.S.-dollar clearing activity for all the Iranian banks.  The bank ended its U.S.-dollar activity by March 2007.

104.     From August 2007, SCB suspended all new Iranian business in any currency.

<u>SCB's Self-Disclosure and Cooperation</u>

105.     Having previously informed the Financial Services Authority, its home country regulator in the United Kingdom, SCB approached federal and state authorities in January 2010 to self-report its conduct.  SCB acknowledged and accepted responsibility for its conduct.

106.     Throughout the course of this investigation, SCB has fully cooperated with U.S. authorities.  SCB undertook a voluntary and comprehensive internal review of its historical payment processing and sanctions compliance practices, which has included the following:

a.     An extensive review of records, including hard copy and electronic documents;

b.     Numerous interviews of current and former employees;

c.     A transaction review conducted by an outside consultant, which included, but was

not limited to review of more than 150 million payment messages and trade transactions across various accounts related to OFAC-sanctioned countries, including an analysis of underlying SWIFT transmission data associated with U.S.-dollar activity for accounts of banks in OFAC-sanctioned countries;

d.     A voluntarily waiver of the attorney-client and work product privileges with respect to legal advice concerning compliance with U.S. sanctions during the entire review period, including all the legal advice cited herein;

e.     Regular and detailed updates to DANY and DOJ on the results of its investigation and forensic SWIFT data analyses, and responding to additional specific requests of DANY and DOJ;

f.     Detailed written reports of the Bank's investigation;

g.     An agreement to toll any applicable statutes of limitation; and

h.     Making current and former SCB employees available for interviews by U.S. authorities.

### SCB's Remediation

107.     SCB has also taken voluntary steps to enhance and optimize its sanctions compliance programs, including by:

a.   Terminating relationships with sanctioned banks and entities and closing its Iranian representative office and branch;

b.   Substantially increasing personnel and resources devoted to sanctions compliance, including appointing a senior U.S.-based employee to oversee its sanctions screening compliance program;

c.   Enhancing its U.S.-dollar transactions screening systems;

Case 1:12-cr-00262-JEB  Document 2  Filed 12/10/12  Page 56 of 58

d.  Designing and implementing improved sanctions compliance training for all staff;

e.  Enhancing its global sanctions compliance policies and procedures, including a general prohibition on new transactions on behalf of U.S. designated terrorists, narcotics traffickers, or WMD proliferators in all currencies;

108.  SCB has also agreed, as part of its cooperation with DANY and DOJ, to undertake the further work necessary to further enhance and optimize its sanctions compliance programs.  SCB has also agreed to cooperate in DANY and DOJ's ongoing investigations into these banking practices.  Furthermore, SCB has agreed to continue to comply with the Wolfsberg Anti-Money Laundering Principles of Correspondent Banking.

David A. Koenigsberg
Menz Bonner Komar & Koenigsberg LLP
444 Madison Avenue, 39th Floor
New York, New York   10022
Tel.:  (212) 223-2100
Email: dkoenigsberg@mbkklaw.com

*Attorneys for Relator Brutus Trading, LLC*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* BRUTUS TRADING,  LLC, | | 12 Civ. _____ |
| | : | |
| Plaintiffs, | : | **FILED UNDER SEAL** **Pursuant to 31 U.S.C.** **§ 3730(b)** |
| | : | |
| -against- | : | |
| STANDARD CHARTERED BANK, STANDARD CHARTERED PLC and STANDARD CHATERED TRADE SERVICES CORPORATION, | : : : | **COMPLAINT** **JURY TRIAL DEMANDED** |
| | : | |
| Defendants. | : | |

--------------------------------------------------------------x

## Introduction

Relator-Plaintiff Brutus Trading, LLC ("Relator"), through its attorneys, Menz
Bonner Komar & Koenigsberg LLP, makes this Complaint and Demand for Jury Trial under
seal, against Standard Chartered Bank, Standard Chartered PLC and Standard Chartered Trade
Services Corporation ("collectively Defendants").  Relator alleges, based upon personal
knowledge, relevant documents and information and belief, as follows:

## I.  NATURE OF ACTION

1.      Relator brings this action on behalf of the United States against

Defendants for treble damages and civil penalties arising from Defendants' violations of the

False Claims Act, 31 U.S.C. § 3729 *et seq.*

2.      In connection with providing foreign exchange bank services to

international customers, Defendants made false statements to the United States and thereby (a)

knowingly presented and caused to be presented false and fraudulent claims for payment and

approval; (b) knowingly made, used, and caused to be made and used, false records and

statements material to false and fraudulent claims; (c) knowingly, made, used or caused to be

used, false records or statements material to an obligation to pay or transmit money and/or

concealed, avoided and decreased an obligation to pay money; and (d) conspired to defraud the

United States by means of false statements and false claims; all in violation of 31 U.S.C.

§§ 3729(a)(1) (A), (B), (C) & (G).

## II.  JURISDICTION & VENUE

3.      This Court has subject matter jurisdiction over the claims alleged in this

Complaint under 28 U.S.C. § 1331 (Federal question), § 1345 (United States as plaintiff) and 31

U.S.C. § 3732(a) (False Claims Act).

4.      This Court has personal jurisdiction over the Defendants named in the

Complaint pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants can be found,

resides, and/or transacts business in the Southern District of New York and because an act

proscribed by 31 U.S.C. § 3729 occurred within this District.  Section 3732(a) further provides

for nationwide service of process.

5.      This action is not jurisdictionally precluded by the public disclosure bars

of the Federal False Claims Act, 31 U.S.C. § 3730(e)(4).  Upon information and belief, there has

been no "public disclosure" of the matters alleged herein and this action is not "based upon" any

such disclosure.  Notwithstanding the foregoing, Relator, through its principals, has "direct and

independent knowledge" of the instant allegations and voluntarily provided the information to

the United States Government before filing this action.  Therefore, to the extent any of these

allegations are deemed to have been based upon a public disclosure, Relator is an "original

source" of this information within the meaning of the False Claims Act and is expressly not

subject to its public disclosure bar.

6.      Venue is proper in the Southern District of New York, under 28 U.S.C.

§§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because (a) the Defendants reside in this District,

(b) a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729

alleged in the Complaint occurred in this District, and (c) because at least one of the Defendants

can be found and transacts business within this District.

### III.     PARTIES

7.      The United States is the real party in interest plaintiff in this action.

8.      Relator Brutus Trading, LLC ("Brutus"), is a Wyoming Limited Liability

Corporation, and brings this action for violations of the False Claims Act on behalf of itself and

the United States.  Brutus's principals possess extensive knowledge and experience with

international foreign exchange transactions and banking and possess personal knowledge to

support and establish the claims asserted in this Complaint.

9.     Defendant Standard Chartered PLC ("SC"), is a leading international banking institution with headquarters in London, England.  SC has over 1,700 offices around the world.

10.     SC's wholly-owned subsidiary, Standard Chartered Bank ("SCB"), offers a complete range of banking products and services to its personal, business and wholesale banking clients worldwide.  SCB has been licensed by the New York State Banking Department[1] to operate a foreign bank branch in New York State since 1976, which branch is currently located at 1095 Avenue of the Americas, New York, NY 10036.  The New York branch office is referred to hereinafter as SCB-NY.

11.     Defendant Standard Chartered Trade Services Corporation, a wholly-owned subsidiary of SCB, is a Delaware corporation registered to do business in New York State as a foreign business corporation.

### IV.     STANDARD CHARTERED'S ILLEGAL CONDUCT

#### A.     The Bank's Project Green and Sundry Account Practices

12.     SCB-NY primarily conducts a U.S. dollar clearing business which clears approximately $195 billion per day on the Clearing House International Payment System ("CHIPS").  While SCB claims not to service retail customers in the United States, it does offer wholesale banking services, including trade finance services, cash management, treasury, foreign exchange and interest rate products, commodity finance, and structured import and export finance services.  As of March 31, 2012, SCB-NY held $40.8 billion in total assets.

13.     Defendants' conduct of the U.S. dollar clearing business requires it to clear transactions through SCB-NY and the correspondent U.S. dollar bank accounts domiciled

---

[1]     In 2011, the State's Banking Department and Insurance Department were merged to create the New York Department of Financial Services ("DFS").

in SCB-NY, used to facilitate such clearing transactions.  As a result, SCB and SCB-NY must

comply with the rules and regulation imposed by the U.S. Treasury's economic sanctions

regulations.  In short, those regulations forbid or restrict the conduct of financial transactions by

institutions located in the United States with certain foreign governments and their various

instrumentalities and any person or entity that has been identified on the list of Specially

Designated Nationals ("SDN") issued by the United States Treasury Department's Office of

Foreign Assets Control ("OFAC").

  14. Notwithstanding its legal obligation to comply with the U.S. sanctions

regulations, since at least 2002, SC operated a program known internally to high level SC

officials as "Project Green."  This was a program run by trade finance experts and senior

geographical branch chief executive officers with no compliance officers involved in its

management.  Project Green was designed to assist, conspire, aid and abet non-United States

customers that have been made the subject of United States economic sanctions to evade those

sanctions and engage in international financial transactions.  SC continued to operate Project

Green until 2012, when SC began the process of winding down Project Green.

  15. In addition to pursuing a policy of assisting, conspiring, aiding, and

abetting its clients to operate in defiance of international economic sanctions, SC also failed to

operate with proper financial controls and procedures in the processing and settling of foreign

exchange transactions for its foreign customers.  One example of SC's loose financial controls

was the "Transaction Bank Sundry Foreign Exchange Account," in "OLT3" – the online trading

system for all of the bank's transactional business.  This system was at the heart of SCB's client

back office Straight 2 Bank ("S2B") operation.  This account was where SC booked banking

revenues from transactions that were not properly matched up and settled on SCB's books.  As a

result of failing to have proper controls for closing out transactions, by 2008 the Transaction

Bank Sundry Foreign Exchange Account had grown to a balance of approximately $100 million

in unassigned revenues.  The revenues assigned to this account should have been matched to the

branches of the client relationship managers and the branches that provided services to the

bank's clients for the particular transaction, but instead were left without being properly

attributed.  In addition, because these revenues were not properly matched up to the customer,

identifying whether the revenues were derived from customers on the SDN list or from entities

associated with foreign governments, such as Iran, subject to economic sanctions, would prove

very difficult, if not impossible, for any SCB-NY employee.

16.     Normally, transactions performed for clients are associated with the

bank's internal client identifier code number, labeled as the "SCI Customer ID" number.  This

number is used on internal bank spread sheets to associate transactions and revenues with the

particular client.   Banking employees have computer access to the SCI Customer ID number to

obtain on-line the customers' profile information and transaction history.  A New York based

employee conducting a U.S. dollar clearing transaction for a customer would be able to query the

bank's customer data base using the SCI Customer ID to pull up a full profile of that customer.

17.     For example, if the bank processed a U.S. dollar clearing transaction for a

client that earned the bank a fee of $50,000, up to 1/3 of that fee should have been booked as

revenue earned by the SCB-NY branch for the services it performed in processing the U.S. dollar

clearing transaction.  But, because those revenues were not assigned to any particular branch,

revenues that should have been assigned to the New York branch were not included in the

income and assets of the New York branch.

**B.    The Bank's Settlement with the
N.Y. Department of Financial Services**

18.    On August 6, 2012, the New York Department of Financial Services

("DFS") issued an order pursuant to New York Banking Law § 39 requiring SCB-NY to explain

why SCB-NY's license to operate in New York should not be revoked due to SCB's violations

of various bank secrecy and anti-money laundering laws. *See In Re Standard Chartered Bank,*

*New York Branch,* Order Pursuant to Banking Law § 39 (N.Y.S. Dep't of Fin'l Services) (Aug.

6, 2012) (the "Order"). The Order explained in great detail that SCB had concealed from

regulators at DFS and OFAC, approximately 59,000 transactions conducted for Iranian clients

that violated rules and regulations issued by DFS and OFAC.  The Order provided that the

Department's investigation initially focused upon SCB's systematic misconduct on behalf of

Iranian customers but the investigation also uncovered evidence of similar schemes to do

business with other countries that were subject to U.S. sanctions.  Order at n. 1.

19.    On September 21, 2012, DFS and SCB entered into a Consent Order under

New York Banking Law § 44 (the "Consent Order"), whereby SCB agreed to pay a civil

monetary penalty to DFS in the amount of $340 million, and SCB consented to having a

compliance monitor on premises who reported directly to DFS and to conduct a comprehensive

review of the bank's compliance programs, policies and procedure.

20.    According to the Consent Order, from January 2001 through 2007, SCB

provided U.S. dollar clearing services to Iranian state and privately owned banks, corporations

and individuals.  In processing such transactions, SCB removed or omitted Iranian information

from U.S. dollar wire payment messages to avoid having to comply with OFAC banking rules

and regulations.  This removal or stripping of wire transfer identifying information occurred with

respect to approximately 59,000 transactions with nominal value of approximately $250 billion. Consent Order ¶¶ 2-3.

21.     By its terms, the size of the civil penalty was determined based upon the 59,000 transactions that occurred during the period January 2001 through 2007 that SCB had disclosed to DFS in the course of the Department's investigation.  Thus, in the Consent Order, DFS agreed that so long as SCB complied with the terms of the Consent Order, "no further action will be taken by the Department against SCB for the conduct set forth in the Consent Order or the August 6th Order, including the investigation referenced in footnote 1 of the August 6th Order."  Consent Order ¶ 21.  The Consent Order provided, however, that "the Department may undertake enforcement action against SCB for transactions or conduct that SCB did not disclose to the Department in written materials that SCB submitted to the Department in connection with this matter."  Consent Order ¶ 21.

### C.     The Bank's Settlement with the United States Departments of Treasury and Justice

22.     On December 10, 2012, SCB entered into a settlement with OFAC, agreeing to pay $132,000,000 to settle its civil liability arising out of SCB's violations of OFAC's rules and regulations. *See* Settlement Agreement between OFAC and SCB, ¶ 32 (Dec. 10, 2012) ("OFAC Settlement Agreement").  The OFAC Settlement Agreement states that "SCB has taken remedial action by terminating its business and prohibiting new business since 2007 with Iranian customers."  OFAC Settlement Agreement, ¶ 26.

23.     On December 10, 2012, SCB consented to the filing of a criminal information by the United States Attorney's Office for the District of Columbia, which charged that from 2001 until 2007, SCB facilitated U.S. Dollar transactions for financial institutions and other parties affiliated with Iran.  Information, *United States v. Standard Chartered Bank,* 12-

# JA-167

Case 1:18-cv-10117-PAE   Document 32   Filed 11/21/19   Page 9 of 14
Case 1:12-cv-03160-KBF   Document 36   Filed 05/10/17   Page 9 of 14

CR.-262 (JEB) (D.D.C. Dec. 10, 2012) (Dkt. # 1).   The same day, SCB entered into a Deferred

Prosecution Agreement ("DPA") with the Asset Forfeiture and Money Laundering Section of the

United States Department of Justice and the United States Attorney's Office for the District of

Columbia.   *United States v. Standard Chartered Bank,* 12-CR-262 (D.D.C.) (Dkt. # 2).   Pursuant

to the DPA, SCB agreed to pay the United States forfeiture in the amount of $227,000,000.   DPA

¶ 3.   The payment was made in order to "settle any and all civil and criminal claims currently

held by the United States for any act within the scope of or related to the Factual Statement,"

Exhibit A to the DPA, and for which SCB accepted and acknowledged responsibility.   *Id.* at ¶¶ 2,

4(f).

24.      According to the Factual Statement, beginning in "2001 and ending in

2007, SCB violated U.S. and New York State laws by illegally sending payments through the

U.S. financial system on behalf of entities subject to U.S. economic sanctions."   Factual

Statement ¶ 2; *see also id.* ¶¶ 42 & 43.   In addition, "[o]n October 30, 2006, SCB informed the

[Federal Reserve Bank of New York] that it was ending its U.S.-dollar clearing activity for all

the Iranian banks.   The bank ended its U.S.-dollar activity by March 2007."   *Id.* ¶ 103.   The

Factual Statement further states that "[f]rom August 2007, SCB suspended all new Iranian

business in any currency."   *Id.* ¶ 104.

### D.      Defendants Fraudulently Induced the Settlements With the Treasury and Justice Departments

25.      Contrary to the representations that defendants made to induce the

Treasury and Justice Departments to enter into the OFAC Settlement Agreement and the DPA,

after 2007, defendants knowingly engaged in U.S. dollar clearing and other financial transactions

with and for the benefit of Iranian government entities and Iranian SDNs in at least 2008 and

2009.

26.     Defendants' records show that since at least 2006, SC and SCB identified and targeted as customers the following Iranian government entities or SDNs: Bank Keshavarzi, Bank Markazi, Bank Maskan, Bank Mellat, Bank Melli, Bank Tejarat, Export Development Bank of Iran, Bank Saderat and Sepah Bank.  In addition, since at least 2008, SCB's client lists included the National Iranian Oil Company ("NIOC") and its subsidiaries as clients.  In 2008, OFAC identified NIOC as an entity owned or controlled by the Government of Iran within the meaning of the Iranian Transactions Regulations.  OFAC also identified NIOC as an affiliate of the Islamic Revolutionary Guard Corps ("IRGC").  OFAC added IRGC to the SDN list on October 21, 2007.

27.     The following are examples of the many trades performed by SCB on behalf of banned Iranian government entities or Iranian related SDNs after 2007 or evidence that SCB was performing transactions after 2007 on behalf of clients that were banned Iranian entities, contrary to SCB's representations to representatives of the United States that "[f]rom August 2007, SCB suspended all new Iranian business in any currency."  *See* ¶ 24, *supra.*

28.     In or about January 2009, SCB performed an export finance transaction for Bank Tejerat, a bank owned by the Government of Iran.   Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

29.     In or about January 2009, SCB performed three structured trade finance transactions for National Iranian Tanker Company ("NITC"), an entity owned by the Iranian government and a subsidiary of NIOC.  Relator understands that such transactions necessarily involved dollar clearing by SCB's New York branch.[2]

---

[2]     OFAC fined a U.S. corporation, General Reinsurance, for making reinsurance payments in 2005 for the benefit of NITC.

30.     SCB conducted a U.S. dollar letter of credit transaction between Bank
Markazi and four exporters in or about December 2009.  Bank Markazi-Iran-CB was added to
OFAC's SDN list as of October 22, 2008.   Relator understands that such a transaction
necessarily involved dollar clearing by SCB's New York branch.

31.     SCB performed a trade finance and cash management transaction for the
Iran Ministry of Economic Affairs and Finance in or about December 2009.  Relator understands
that such a transaction necessarily involved dollar clearing by SCB's New York branch.

32.     SCB records further show that it performed transactions in August,
November and December 2009 with the Ministry of Energy of Iran Group, an agency of the
Government of Iran, with nominal value of $2,546,419, and cash management and trade finance
revenues to the bank in the amount of $259,602.77.  Significant transactional foreign exchange
revenues were also earned from this client during the period from August 2009 through
December 2009.   Relator understands that such transactions including U.S. dollar foreign
exchange trades necessarily involved dollar clearing by SCB's New York branch.

33.     According to SCB records, as of June 2008, Bank Saderat had the
authority to conduct foreign exchange transactions directly through SCB with a $1 million limit
per transaction and a total settlement limit of $10 million.  This meant that Bank Saderat was
independently and remotely able to log into SCB's OLT3 computer system to initiate U.S. dollar
foreign exchange transactions that necessarily involved SCB-NY.  In addition, each of the
Industrial Development and Renovation Organization of Iran and the Iranian Offshore
Engineering Company had on-line trading access and independent authority to engage in U.S.
dollar foreign exchange transactions in 2008 and 2009.  Any such foreign exchange trades would
have involved SCB-NY.

# JA-170

34.     As of 2008, SCB had on its books significant approved U.S. dollar foreign exchange trading limits for the following entities that were listed as SDNs:  Bank Sepah, Bank Keshavarzi, and the Iranian Export Development Bank.

## FIRST CAUSE OF ACTION
### (31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G))

35.     Relator incorporates by reference paragraphs 1 through 34 of this Complaint, as if fully set forth herein.

36.     Defendants, by failing to disclose to the United States Treasury and Justice Departments that after 2007 they were performing U.S. dollar foreign exchange transactions for Iranian government entities and Iranian SDNs, made false statements to the Treasury and Justice Departments to induce  them to settle their investigation for less than they would have if the true and complete facts had been disclosed.   By failing to disclose fully all facts concerning defendants' dealings with Iranian government entities and Iranian SDNs, defendants  (a) knowingly presented, and caused to be presented false and fraudulent claims for payment and approval; (b) knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims; (c) knowingly made, used or caused to be used, a false record or statement material to an obligation to pay or transmit money, or concealed, avoided and decreased an obligation to pay money; and (d) conspired to defraud the United States of America by getting false and fraudulent claims allowed or paid; all in violation of 31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G).

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of itself, and acting on behalf of, and in the name, of the United States of America, demands and prays that judgment be entered against the Defendants as follows:

1.      That judgment shall be entered against Defendants in the amount of three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000.00 for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a), with interest; and

2.      That Relator shall be awarded the maximum amount available under 31 U.S.C. § 3730(d) of the Federal False Claims Act for bringing this action, namely, 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes in the matter (or pursues its claim through any alternate remedy available to the United States, 31 U.S.C. § 3730(c)(5)), or, alternatively, 30 percent of the proceeds of the action or settlement of the claim, if the Government declines to intervene.

3.      That Relator shall be awarded all reasonable expenses necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d).

4.      And, such other relief shall be granted in the favor of the United States and Relator as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

5.      Relator hereby demands trial by jury of any issue of fact triable of right by

a jury.

Dated:      New York, New York
            December 17, 2012

                        Respectfully submitted,

                        MENZ BONNER KOMAR & KOENIGSBERG LLP

                        By:   _David A. Koenigsberg_

                              David A. Koenigsberg

                        444 Madison Avenue, 39th Floor
                        New York, New York 10022
                        Tel.:  (212) 223-2100

                        *Attorneys for Brutus Trading, LLC*

David A. Koenigsberg
Menz Bonner Komar & Kocnigsberg LLP
444 Madison Avenue, 39th Floor
New York, New York   10022
Tel.:  (212) 223-2100
Email: dkoenigsberg@mbkklaw.com

*Attorneys for Relator Brutus Trading, LLC*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA, *ex rel.*
BRUTUS TRADING,  LLC,                                                    12 Civ. 9160 (KBF)

                         Plaintiffs,    :          **FILED UNDER SEAL**
                                      :          **Pursuant to 31 U.S.C.**
                                      :          **<u>§ 3730(b)</u>**
    -against-                        :
                                             **FIRST AMENDED**
STANDARD CHARTERED BANK,      :          **<u>COMPLAINT</u>**
STANDARD CHARTERED PLC and
STANDARD CHATERED TRADE SERVICES  :
CORPORATION,                          **<u>JURY TRIAL DEMANDED</u>**
                                      :

                      Defendants.    :
-------------------------------------------------------------x

### <u>Introduction</u>

       Relator-Plaintiff Brutus Trading, LLC ("Relator"), through its attorneys, Menz

Bonner Komar & Koenigsberg LLP, makes this Complaint and Demand for Jury Trial under

seal, against Standard Chartered Bank, Standard Chartered PLC and Standard Chartered Trade

Services Corporation ("collectively Defendants").  Relator alleges, based upon personal

knowledge, relevant documents and information and belief, as follows:

## I. NATURE OF ACTION

1.     Relator brings this action on behalf of the United States against Defendants for treble damages and civil penalties arising from Defendants' violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

2.     In connection with providing foreign exchange bank services to international customers, Defendants made false statements to the United States and thereby (a) knowingly presented and caused to be presented false and fraudulent claims for payment and approval; (b) knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims; (c) knowingly, made, used or caused to be used, false records or statements material to an obligation to pay or transmit money and/or concealed, avoided and decreased an obligation to pay money; and (d) conspired to defraud the United States by means of false statements and false claims; all in violation of 31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G).

## II. JURISDICTION & VENUE

3.     This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331 (Federal question), § 1345 (United States as plaintiff) and 31 U.S.C. § 3732(a) (False Claims Act).

4.     This Court has personal jurisdiction over the Defendants named in the Complaint pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants can be found, resides, and/or transacts business in the Southern District of New York and because an act proscribed by 31 U.S.C. § 3729 occurred within this District.  Section 3732(a) further provides for nationwide service of process.

5. This action is not jurisdictionally precluded by the public disclosure bars of the Federal False Claims Act, 31 U.S.C. § 3730(e)(4). Upon information and belief, there has been no "public disclosure" of the matters alleged herein and this action is not "based upon" any such disclosure. Notwithstanding the foregoing, Relator, through its principals, has "direct and independent knowledge" of the instant allegations and voluntarily provided the information to the United States Government before filing this action. Therefore, to the extent any of these allegations are deemed to have been based upon a public disclosure, Relator is an "original source" of this information within the meaning of the False Claims Act and is expressly not subject to its public disclosure bar.

6. Venue is proper in the Southern District of New York, under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because (a) the Defendants reside in this District, (b) a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729 alleged in the Complaint occurred in this District, and (c) because at least one of the Defendants can be found and transacts business within this District.

## III.  PARTIES

7. The United States is the real party in interest plaintiff in this action.

8. Relator Brutus Trading, LLC ("Brutus"), is a Wyoming Limited Liability Corporation, and brings this action for violations of the False Claims Act on behalf of itself and the United States. Brutus's principals possess extensive knowledge and experience with international foreign exchange transactions and banking and possess personal knowledge to support and establish the claims asserted in this Complaint.

3

9. Defendant Standard Chartered PLC ("SC"), is a leading international banking institution with headquarters in London, England. SC has over 1,700 offices around the world.

10. SC's wholly-owned subsidiary, Standard Chartered Bank ("SCB"), offers a complete range of banking products and services to its personal, business and wholesale banking clients worldwide. SCB has been licensed by the New York State Banking Department[1] to operate a foreign bank branch in New York State since 1976, which branch is currently located at 1095 Avenue of the Americas, New York, NY 10036. The New York branch office is referred to hereinafter as SCB-NY.

11. Defendant Standard Chartered Trade Services Corporation, a wholly-owned subsidiary of SCB, is a Delaware corporation registered to do business in New York State as a foreign business corporation.

IV. **STANDARD CHARTERED'S ILLEGAL CONDUCT**

A. **The Bank's Project Green and Sundry Account Practices**

12. SCB-NY primarily conducts a U.S. dollar clearing business which clears approximately $195 billion per day on the Clearing House International Payment System ("CHIPS"). While SCB claims not to service retail customers in the United States, it does offer wholesale banking services, including trade finance services, cash management, treasury, foreign exchange and interest rate products, commodity finance, and structured import and export finance services. As of March 31, 2012, SCB-NY held $40.8 billion in total assets.

13. Defendants' conduct of the U.S. dollar clearing business requires it to clear transactions through SCB-NY and the correspondent U.S. dollar bank accounts domiciled

---

[1] In 2011, the State's Banking Department and Insurance Department were merged to create the New York Department of Financial Services ("DFS").

4

in SCB-NY, used to facilitate such clearing transactions. As a result, SCB and SCB-NY must comply with the rules and regulation imposed by the U.S. Treasury's economic sanctions regulations. In short, those regulations forbid or restrict the conduct of financial transactions by institutions located in the United States with certain foreign governments and their various instrumentalities and any person or entity that has been identified on the list of Specially Designated Nationals ("SDN") issued by the United States Treasury Department's Office of Foreign Assets Control ("OFAC").

14.     Notwithstanding its legal obligation to comply with the U.S. sanctions regulations, since at least 2002, SC operated a program known internally to high level SC officials as "Project Green." This was a program run by trade finance experts and senior geographical branch chief executive officers with no compliance officers involved in its management. Project Green was designed to assist, conspire, aid and abet non-United States customers that have been made the subject of United States economic sanctions to evade those sanctions and engage in international financial transactions. SC continued to operate Project Green until 2012, when SC began the process of winding down Project Green.

15.     In addition to pursuing a policy of assisting, conspiring, aiding, and abetting its clients to operate in defiance of international economic sanctions, SC also failed to operate with proper financial controls and procedures in the processing and settling of foreign exchange transactions for its foreign customers. One example of SC's loose financial controls was the "Transaction Bank Sundry Foreign Exchange Account," in "OLT3" -- the online trading system for all of the bank's transactional business. This system was at the heart of SCB's client back office Straight 2 Bank ("S2B") operation. This account was where SC booked banking revenues from transactions that were not properly matched up and settled on SCB's books. As a

result of failing to have proper controls for closing out transactions, by 2008 the Transaction Bank Sundry Foreign Exchange Account had grown to a balance of approximately $100 million in unassigned revenues. The revenues assigned to this account should have been matched to the branches of the client relationship managers and the branches that provided services to the bank's clients for the particular transaction, but instead were left without being properly attributed. In addition, because these revenues were not properly matched up to the customer, identifying whether the revenues were derived from customers on the SDN list or from entities associated with foreign governments, such as Iran, subject to economic sanctions, would prove very difficult, if not impossible, for any SCB-NY employee.

16.     Normally, transactions performed for clients are associated with the bank's internal client identifier code number, labeled as the "SCI Customer ID" number. This number is used on internal bank spread sheets to associate transactions and revenues with the particular client. Banking employees have computer access to the SCI Customer ID number to obtain on-line the customers' profile information and transaction history. A New York based employee conducting a U.S. dollar clearing transaction for a customer would be able to query the bank's customer data base using the SCI Customer ID to pull up a full profile of that customer.

17.     For example, if the bank processed a U.S. dollar clearing transaction for a client that earned the bank a fee of $50,000, up to 1/3 of that fee should have been booked as revenue earned by the SCB-NY branch for the services it performed in processing the U.S. dollar clearing transaction. But, because those revenues were not assigned to any particular branch, revenues that should have been assigned to the New York branch were not included in the income and assets of the New York branch.

6

**B.** **The Bank's Settlement with the**
**N.Y. Department of Financial Services**

18.     On August 6, 2012, the New York Department of Financial Services

("DFS") issued an order pursuant to New York Banking Law § 39 requiring SCB-NY to explain

why SCB-NY's license to operate in New York should not be revoked due to SCB's violations

of various bank secrecy and anti-money laundering laws. *See In Re Standard Chartered Bank,*

*New York Branch,* Order Pursuant to Banking Law § 39 (N.Y.S. Dep't of Fin'l Services) (Aug.

6, 2012) (the "Order"). The Order explained in great detail that SCB had concealed from

regulators at DFS and OFAC, approximately 59,000 transactions conducted for Iranian clients

that violated rules and regulations issued by DFS and OFAC.  The Order provided that the

Department's investigation initially focused upon SCB's systematic misconduct on behalf of

Iranian customers but the investigation also uncovered evidence of similar schemes to do

business with other countries that were subject to U.S. sanctions.  Order at n. 1.

19.     On September 21, 2012, DFS and SCB entered into a Consent Order under

New York Banking Law § 44 (the "Consent Order"), whereby SCB agreed to pay a civil

monetary penalty to DFS in the amount of $340 million, and SCB consented to having a

compliance monitor on premises who reported directly to DFS and to conduct a comprehensive

review of the bank's compliance programs, policies and procedure.

20.     According to the Consent Order, from January 2001 through 2007, SCB

provided U.S. dollar clearing services to Iranian state and privately owned banks, corporations

and individuals.  In processing such transactions, SCB removed or omitted Iranian information

from U.S. dollar wire payment messages to avoid having to comply with OFAC banking rules

and regulations.  This removal or stripping of wire transfer identifying information occurred with

respect to approximately 59,000 transactions with nominal value of approximately $250 billion. Consent Order ¶ ¶ 2-3.

21.     By its terms, the size of the civil penalty was determined based upon the 59,000 transactions that occurred during the period January 2001 through 2007 that SCB had disclosed to DFS in the course of the Department's investigation.  Thus, in the Consent Order, DFS agreed that so long as SCB complied with the terms of the Consent Order, "no further action will be taken by the Department against SCB for the conduct set forth in the Consent Order or the August 6th Order, including the investigation referenced in footnote 1 of the August 6th Order."  Consent Order ¶ 21.  The Consent Order provided, however, that "the Department may undertake enforcement action against SCB for transactions or conduct that SCB did not disclose to the Department in written materials that SCB submitted to the Department in connection with this matter."  Consent Order ¶ 21.

### C.     The Bank's $327 Million Settlement with the United States Departments of the Treasury and Justice and the Federal Reserve Board of Governors

22.     On December 10, 2012, SCB entered into a global settlement with the United States Departments of the Treasury and Justice and the Board of Governors of the Federal Reserve System (the "Federal Reserve") by agreeing to pay a total of $327 million for SCB's violations of the laws and regulations administered by OFAC.

23.     On December 10, 2012, SCB entered into a settlement with OFAC, agreeing to pay $132,000,000 to settle its civil liability arising out of SCB's violations of OFAC's rules and regulations.  *See* Settlement Agreement between OFAC and SCB, ¶ 32 (Dec. 10, 2012) ("OFAC Settlement Agreement").  The OFAC Settlement Agreement states that "SCB has taken remedial action by terminating its business and prohibiting new business since 2007

with Iranian customers." OFAC Settlement Agreement, ¶ 26. Under the OFAC Settlement

Agreement, SCB's obligation to pay the $132,000,000 would be satisfied by payment of an equal

or greater amount that satisfied the penalty assessed by United States or county officials. *Id.*

¶ 32.

24.     On December 10, 2012, SCB consented to the filing of a criminal

information by the United States Attorney's Office for the District of Columbia, which charged

that from 2001 until 2007, SCB facilitated U.S. Dollar transactions for financial institutions and

other parties affiliated with Iran. Information, *United States v. Standard Chartered Bank,* 12-

CR.-262 (JEB) (D.D.C. Dec. 10, 2012) (Dkt. # 1). The same day, SCB entered into a Deferred

Prosecution Agreement ("DPA") with the Asset Forfeiture and Money Laundering Section of the

United States Department of Justice and the United States Attorney's Office for the District of

Columbia. *United States v. Standard Chartered Bank,* 12-CR-262 (D.D.C.) (Dkt. # 2). Pursuant

to the DPA, SCB agreed to pay the United States forfeiture in the amount of $227,000,000. DPA

¶ 3. The payment was made in order to "settle any and all civil and criminal claims currently

held by the United States for any act within the scope of or related to the Factual Statement,"

Exhibit A to the DPA, and for which SCB accepted and acknowledged responsibility. *Id.* at ¶¶ 2,

4(f).

25.     According to the Factual Statement, beginning in "2001 and ending in

2007, SCB violated U.S. and New York State laws by illegally sending payments through the

U.S. financial system on behalf of entities subject to U.S. economic sanctions." Factual

Statement ¶ 2; *see also id.* ¶¶ 42 & 43. In addition, "[o]n October 30, 2006, SCB informed the

[Federal Reserve Bank of New York] that it was ending its U.S.-dollar clearing activity for all

the Iranian banks. The bank ended its U.S.-dollar activity by March 2007." *Id.* ¶ 103. The

Factual Statement further states that "[f]rom August 2007, SCB suspended all new Iranian business in any currency." *Id.* ¶ 104.

      26.     On December 10, 2012, SCB consented to a Cease and Desist Order ("Cease and Desist Order ") with the Federal Reserve. The Cease and Desist Order recites that the Federal Reserve, along with DOJ, the District Attorney of New York ("DANY") and OFAC "have been conducting an investigation into the practices of the Bank concerning the transmission of funds to and from the United States by and through entities and individuals subject to sanctions regimes . . . administered by OFAC." Cease and Desist Order at 2. In addition, SCB consented to an Order of Assessment of a Civil Money Penalty ("Order of Assessment") by the Federal Reserve in the amount of $100 million. The Order of Assessment states "in order to resolve the investigations, Standard Chartered has agreed to enter into settlement agreements with DOJ, DANY, and OFAC." Order of Assessment at 2. The Order of Assessment states that the Federal Reserve had obtained information that "[f]rom at least 2001 through early 2007" SCB had violated U.S. law in the processing of payments involving parties subject to OFAC sanctions. Order of Assessment at 3. As a consequence, the Federal Reserve assessed SCB a "civil money penalty" in the amount of $100,000,000, with $65,000,000 assessed for violations of OFAC regulations and $35,000,000 assessed for providing false information to Federal Reserve examiners. Order of Assessment at 5. But, in negotiating the settlement with each of the Government agencies, SCB failed to fully disclose and concealed the complete extent of the bank's "unsafe and unsound practices" with regard to its dealings with sanctioned entities and individuals.

### D. Defendant Fraudulently Induced the Settlements With the Treasury and Justice Departments and the Federal Reserve

27.     Contrary to the representations that defendants made to induce the Treasury and Justice Departments and the Federal Reserve to enter into the OFAC Settlement Agreement, the DPA, and the Federal Reserve's Cease and Desist Order and Order of Assessment, after 2007, defendants knowingly engaged in U.S. dollar clearing and other financial transactions with and for the benefit of Iranian government entities and Iranian SDNs in at least 2008 and 2009.

28.     Defendants' records show that since at least 2006, SC and SCB identified and targeted as customers the following Iranian government entities or SDNs: Bank Keshavarzi, Bank Markazi, Bank Maskan, Bank Mellat, Bank Melli, Bank Tejarat, Export Development Bank of Iran, Bank Saderat and Sepah Bank. In addition, since at least 2008, SCB's client lists included the National Iranian Oil Company ("NIOC") and its subsidiaries as clients. In 2008, OFAC identified NIOC as an entity owned or controlled by the Government of Iran within the meaning of the Iranian Transactions Regulations. OFAC also identified NIOC as an affiliate of the Islamic Revolutionary Guard Corps ("IRGC"). OFAC added IRGC to the SDN list on October 21, 2007.

29.     The following are examples of the many trades performed by SCB on behalf of banned Iranian government entities or Iranian related SDNs after 2007 or evidence that SCB was performing transactions after 2007 on behalf of clients that were banned Iranian entities, contrary to SCB's representations to representatives of the United States that "[f]rom August 2007, SCB suspended all new Iranian business in any currency." *See* ¶ 24, *supra.*

30.     In or about January 2009, SCB performed an export finance transaction for Bank Tejerat, a bank owned by the Government of Iran.  Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

31.     In or about January 2009, SCB performed three structured trade finance transactions for National Iranian Tanker Company ("NITC"), an entity owned by the Iranian government and a subsidiary of NIOC.  Relator understands that such transactions necessarily involved dollar clearing by SCB's New York branch.[2]

32.     SCB conducted a U.S. dollar letter of credit transaction between Bank Markazi and four exporters in or about December 2009.  Bank Markazi-Iran-CB was added to OFAC's SDN list as of October 22, 2008.   Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

33.     SCB performed a trade finance and cash management transaction for the Iran Ministry of Economic Affairs and Finance in or about December 2009.  Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

34.     SCB records further show that it performed transactions in August, November and December 2009 with the Ministry of Energy of Iran Group, an agency of the Government of Iran, with nominal value of $2,546,419, and cash management and trade finance revenues to the bank in the amount of $259,602.77.  Significant transactional foreign exchange revenues were also earned from this client during the period from August 2009 through December 2009.  Relator understands that such transactions including U.S. dollar foreign exchange trades necessarily involved dollar clearing by SCB's New York branch.

---

[2]     OFAC fined a U.S. corporation, General Reinsurance, for making reinsurance payments in 2005 for the benefit of NITC.

# JA-185

35.    According to SCB records, as of June 2008, Bank Saderat had the authority to conduct foreign exchange transactions directly through SCB with a $1 million limit per transaction and a total settlement limit of $10 million. This meant that Bank Saderat was independently and remotely able to log into SCB's OLT3 computer system to initiate U.S. dollar foreign exchange transactions that necessarily involved SCB-NY. In addition, each of the Industrial Development and Renovation Organization of Iran and the Iranian Offshore Engineering Company had on-line trading access and independent authority to engage in U.S. dollar foreign exchange transactions in 2008 and 2009. Any such foreign exchange trades would have involved SCB-NY.

36.    As of 2008, SCB had on its books significant approved U.S. dollar foreign exchange trading limits for the following entities that were listed as SDNs: Bank Sepah, Bank Keshavarzi, and the Iranian Export Development Bank.

37.    As a result of SCB's false statements and concealment of information and obligations from the Government during the negotiations, the global settlement amount of $327,000,000 would have been materially greater, and each component of the $327,000,000 would have been materially greater.

## FIRST CAUSE OF ACTION
### (31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G))

38.    Relator incorporates by reference paragraphs 1 through 34 of this Complaint, as if fully set forth herein.

39.    Defendants, by failing to disclose to the United States Treasury and Justice Departments and the Federal Reserve that after 2007 they were performing U.S. dollar foreign exchange transactions for Iranian government entities and Iranian SDNs, made false statements to the Treasury and Justice Departments and the Federal Reserve to induce them and

13

each of them to settle their investigation for less than they would have if the true and complete facts had been disclosed. By failing to disclose fully all facts concerning defendants' dealings with Iranian government entities and Iranian SDNs, defendants (a) knowingly presented, and caused to be presented false and fraudulent claims for payment and approval; (b) knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims; (c) knowingly made, used or caused to be used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, all in violation of 31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G).

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of itself, and acting on behalf of, and in the name, of the United States of America, demands and prays that judgment be entered against the Defendants as follows:

1.    That judgment shall be entered against Defendants in the amount of three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000.00 for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a), with interest; and

2.    That Relator shall be awarded the maximum amount available under 31 U.S.C. § 3730(d) of the Federal False Claims Act for bringing this action, namely, 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes in the matter (or pursues its claim through any alternate remedy available to the United States, 31 U.S.C. § 3730(c)(5)), or, alternatively, 30 percent of the proceeds of the action or settlement of the claim, if the Government declines to intervene.

3. That Relator shall be awarded all reasonable expenses necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d).

4. And, such other relief shall be granted in the favor of the United States and Relator as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

5. Relator hereby demands trial by jury of any issue of fact triable of right by a jury.

Dated:    New York, New York
           November 14, 2014

           Respectfully submitted,

           MENZ BONNER KOMAR & KOENIGSBERG LLP

           By:      _David A. Koenigsberg_

                David A. Koenigsberg

           444 Madison Avenue, 39th Floor
           New York, New York 10022
           Tel.: (212) 223-2100

           *Attorneys for Brutus Trading, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

        Plaintiff,

    v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

        Defendants.

No. 18 Civ. 11117 (PAE)

## DECLARATION OF SPECIAL AGENT WAYNE C. BODDY

I, Special Agent Wayne C. Boddy of the Federal Bureau of Investigation, hereby declare the following pursuant to 28 U.S.C. § 1746:

1.    I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2011. From July 2012 to April 2019, I was assigned to a squad designated to investigate securities fraud, money laundering and other financial crimes in New York City. Since April 2019, I have been assigned to the New York office's Cyber Division.

2.    Beginning in February 2015, I worked on, and later became the case agent for, an investigation of Standard Chartered Bank ("SCB" or the "Bank") with the Criminal Division of the U.S. Attorney's Office for the District of Columbia and what is now known as the Money Laundering and Asset Recovery Section of the U.S. Department of Justice's Criminal Division (together, "DOJ"). This investigation eventually resulted in an amended Deferred Prosecution Agreement with SCB on April 9, 2019 (the "2019 DPA") (Exhibit 1), which I understand was an amendment to an original Deferred Prosecution Agreement with the Bank dated December 10,

2012 (the "2012 DPA").  Other agencies, including the U.S. Department of the Treasury's Office

of Foreign Assets Control ("OFAC"), the Board of Governors of the Federal Reserve System

(the "Federal Reserve"), the New York County District Attorney's Office ("DANY"), and the

New York State Department of Financial Services ("DFS"), conducted parallel investigations

into the Bank.

3.      I make this declaration based on my own personal knowledge as well as a review

of documents relating to these investigations, in support of the motion by the United States of

America (the "United States") to dismiss the second amended complaint of relator Brutus

Trading, LLC (the "Relator"), in the above-captioned case.  This declaration does not set forth all

of my knowledge of the matters discussed herein.  All dates and amounts set forth are

approximate and to the best of my recollection, unless otherwise noted.

## A. The SCB Investigation

4.      When I joined the SCB investigation, DOJ and FBI had already received from the

Bank information regarding faxes received by SCB's Dubai branch that requested the execution

of U.S. dollar transactions and had headers indicating they were received from Iranian numbers.

A review of those fax transmissions showed that a substantial number of them came from a small

number of customers, who had become the focus of the next phase of our investigation.

5.      Those customers included two Dubai-incorporated companies controlled by

Mahmoud Reza Elyassi, an Iranian national who ordinarily resided in Iran and who, as explained

below, was subsequently indicted by a federal grand jury empaneled in the District of Columbia

in connection with this investigation.  Over the following several years, DOJ and FBI

investigated the Bank's relationships with Mr. Elyassi's companies and others like them.  As part

of its cooperation with our investigation, the Bank conducted an extensive and thorough internal

investigation, voluntarily made foreign-based employees available for interviews, and produced voluminous documentary materials to us. We reviewed these materials and interviewed a significant number of witnesses.

6.      Prior to my arrival on the investigative team, DOJ and FBI had investigated SCB's relationship with a Dubai-based petrochemical company with links to Iran, for which the Bank had facilitated U.S. dollar transactions. Similar to the petrochemical company, Mr. Elyassi's companies, while nominally based in Dubai, were controlled by an Iranian national who ordinarily resided in Iran (but had a Dubai residence permit) and conducted the majority of their business operations in Iran. The investigation further identified two SCB employees who had conspired with Mr. Elyassi to manage his businesses' accounts, conceal the businesses' Iranian connections, and facilitate transactions in U.S. dollars for these businesses. These former SCB employees knew that Mr. Elyassi's companies were processing U.S. dollar transactions for the benefit of Iranian individuals and companies in violation of U.S. economic sanctions, among other things.

7.      Specifically, we found, among other things, that Mr. Elyassi and his co-conspirators registered numerous corporate entities in the United Arab Emirates and used those companies as fronts for a money-exchange business located in Iran. From at least 2007 through 2011, Mr. Elyassi used a business account at SCB's Dubai branch to cause U.S. dollar transactions to be sent and received through the U.S. financial system for the benefit of individuals and entities ordinarily resident in Iran. The SCB employees, among other things, counseled Mr. Elyassi about how to structure his transactions in order to avoid scrutiny by SCB's compliance personnel.

3

8.     Information that Mr. Elyassi (and others) had sent faxes from Iranian fax numbers led to a further inquiry as to whether SCB customers had accessed the Bank's online banking platform from Iranian Internet Protocol ("IP") addresses.  This inquiry revealed that, among others, one of Mr. Elyassi's companies had initiated significant numbers of U.S. dollar transactions in this manner.

## B.  The Conclusion of the SCB Investigation

9.     On April 9, 2019, DOJ announced that it had entered into the 2019 DPA with the Bank.  This agreement resolved SCB's criminal liability for the conduct of the above-referenced two employees who conspired with Mr. Elyassi to conduct U.S. dollar transactions in violation of U.S. economic sanctions.  In the 2019 DPA, SCB agreed to the forfeiture of $240 million pursuant to 18 U.S.C. § 981(a) (the full amount of the value of the willful sanctions-violative transactions relating to Mr. Elyassi) and to a fine of $480 million (twice the amount of those transactions).  Also on April 9, 2019, DOJ announced that a grand jury had, on April 5, 2019, returned an indictment charging Mr. Elyassi with conspiracy to defraud the United States and to violate U.S. economic sanctions laws, and with conspiracy to launder money.  *See* Exhibit 2.

10.     Other agencies that participated in parallel investigations of SCB, including OFAC, the Federal Reserve, DANY, and DFS, also announced settlements or consensual resolutions with the Bank around this time.

## C.  The Relator's *Qui Tam* Complaint

11.     I understand that the Relator in this case initially filed a *qui tam* complaint against SCB on December 17, 2012, alleging that SCB had misled DOJ and OFAC into entering into the 2012 DPA and OFAC's 2012 settlement with the Bank by failing to disclose U.S. dollar transactions the Bank had facilitated for its preexisting Iranian customers in 2008 and 2009.

12.     I am told that these allegations were investigated by the Civil Division of the U.S. Attorney's Office for the Southern District of New York ("SDNY") in 2012 and 2013.

13.     While our investigation of the Bank, discussed above, remained ongoing, on May 10, 2017, the Court unsealed the Relator's *qui tam* case. *See* Exhibit 3. SDNY informed the Relator's counsel that, over the intervening years, the investigation had not uncovered any evidence supporting the Relator's allegations, but notified him that DOJ and OFAC, among other agencies, were pursuing an investigation of the Bank for unrelated sanctions violations. On July 14, 2017, SDNY filed a notice that the United States was not intervening in the Relator's *qui tam* case. *See* Exhibit 4.

14.     On September 19, 2017, after the Bank notified the Relator that it intended to move to dismiss the *qui tam* complaint, Relator voluntarily withdrew the action. *See* Exhibits 5, 6.

15.     On November 28, 2018, about one year after the Relator had voluntarily withdrawn its first *qui tam* complaint, the Relator filed a second *qui tam* complaint, commencing the present action. *See* Exhibit 7. The new complaint essentially reiterated the allegations of the Relator's previously withdrawn complaint. The Government declined to intervene in the new case in March 2019.

16.     On July 18, 2019, and again on September 23, 2019, the Relator—now represented by new counsel—amended the complaint in its second *qui tam* action. *See* Exhibits 8, 9. In these new complaints, the Relator alleges that its complaint and disclosures were the source of the information that led to the latest investigation of SCB and ultimately the 2019 DPA and other settlement agreements. This is incorrect.

17.     The investigation in which I participated, which led to the 2019 DPA, was not based in any way on information provided by the Relator.  Rather, the investigation began as the result of a separate criminal investigation of a different financial institution.  This other investigation led DOJ and FBI to explore SCB's relationships with the petrochemical company discussed above.  And the revelation that this petrochemical company had submitted instructions for U.S. dollar payments to SCB via fax led to a broader investigation of SCB's clients who submitted payment requests by fax or online, resulting in our discovery of Mr. Elyassi's companies.

18.     Moreover, the two SCB employees who conspired with Mr. Elyassi were not included in any of the lists of names that the Relator provided for us to consider investigating or interviewing, nor did we investigate their actions until after we learned of Mr. Elyassi's companies as a result of the Iran-originated faxes.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:          November **21**, 2019
                New York, New York

                                    Wayne C. Boddy
                                    Special Agent
                                    Federal Bureau of Investigation

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No: 12-CR-262 (JEB)** |
| | : | |
| STANDARD CHARTERED BANK, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

## AMENDED DEFERRED PROSECUTION AGREEMENT

Defendant Standard Chartered Bank ("SCB"), by its undersigned and authorized representatives, hereby enters into this Amended Deferred Prosecution Agreement (the "Agreement") with the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section, and the United States Attorney's Office for the District of Columbia (collectively, the "Offices").

## Background

On December 10, 2012, the Offices and SCB entered into a Deferred Prosecution Agreement for a term of two years with an attached Factual Statement [Dkt. Entry No. 2] (the "2012 DPA"). Along with the DPA, the Offices filed a criminal Information (the "2012 Information") charging SCB with knowingly and willfully conspiring, in violation of Title 18, United States Code, Section 371, to violate the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations issued thereunder ("IEEPA"), for the time period from 2001 through 2007. [Dkt. Entry No. 1]

The United States subsequently obtained new information through an unrelated investigation relating to possible additional historical violations of U.S. sanctions laws and regulations by SCB, which took place after the time period specified in the Factual Statement incorporated into the 2012 DPA. On December 9, 2014, the parties amended the 2012 DPA

extending its term for an additional three years to allow SCB additional time to demonstrate fulfilment of its obligations under the 2012 DPA and to allow the Offices additional time to investigate possible additional violations of the law [Dkt. Entry 8] (the "2014 Amendment").  The 2014 Amendment also required SCB to retain an independent compliance monitor.  The parties entered into four subsequent amendments further extending the term of the 2012 DPA through April 10, 2019.  [Dkt. Entry Nos. 10-13]

The Offices and SCB hereby enter into this amended Agreement amending and superseding in its entirety the 2012 DPA, as amended.  The terms and conditions of the Agreement are as follows:

## Criminal Information and Acceptance of Responsibility

1.      SCB acknowledges and agrees to the filing of a two-count superseding criminal Information in the United States District Court for the District of Columbia (the "Superseding Information"), charging it with two counts of knowingly and willfully conspiring, in violation of Title 18, United States Code, Section 371 to violate IEEPA.  In so doing, SCB:  (a) knowingly waives its right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and Local Criminal Rule 45.1 of the United States District Court for the District of Columbia; and (b) knowingly waives any objection with respect to venue to any charges by the Offices arising out of the conduct described in the Factual Statements attached hereto as Exhibits A and B, and consents to the filing of the Superseding Information, as provided under the terms of this Agreement, in the United States District Court for the District of Columbia.

2.      SCB admits, accepts, and acknowledges responsibility for its conduct and that of

its officers, directors, employees and agents as charged in the Superseding Information, and as set

forth in the Factual Statement attached hereto as Exhibit A (the "2012 Factual Statement") and the

Supplemental Factual Statement attached hereto as Exhibit B, both of which are incorporated

herein by reference (collectively, the "Factual Statements"), and that the allegations described in

the Superseding Information and the facts described in the Factual Statements are true and

accurate.  If the Offices, pursuant to Paragraphs 22 through 26 of this Agreement, pursue a

prosecution that is deferred by this Agreement, SCB stipulates to the admissibility of the Factual

Statements in any such proceeding, including any trial, guilty plea, civil forfeiture proceeding, or

sentencing proceeding, and will not contradict anything in the Factual Statements at any such

proceeding.

### Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the 2012

Information was filed, and ending on April 9, 2021 (the "Term").  SCB agrees, however, that, in

the event the Offices determine, in their sole discretion, that SCB has knowingly violated any

provision of this Agreement or has failed to completely perform or fulfill each of SCB's

obligations under this Agreement, an extension or extensions of the Term may be imposed by the

Offices, in their sole discretion, for up to a total additional time period of one year, without

prejudice to the Offices' right to proceed as provided in Paragraphs 22 through 26 below.  Any

extension of the Term of the Agreement extends all terms of this Agreement, for an equivalent

period.  Conversely, in the event the Offices find, in their sole discretion, that there exists a change

in circumstances sufficient to eliminate the need for the reporting requirement in Paragraph 16,

and that the other provisions of this Agreement have been satisfied, the Term of the Agreement may be terminated early.

### Relevant Considerations

4.    The Offices enter into this Agreement based on the individual facts and circumstances presented by this case and SCB, including:

(a)    SCB did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Offices the conduct described in the Supplemental Factual Statement attached hereto as Exhibit B prior to the commencement in 2013 of the investigation into potential additional sanctions violations following the 2012 DPA;

(b)    the nature and seriousness of the offense conduct, which involved SCB's export of U.S. financial services to Iran and other sanctioned countries in violation of U.S. economic sanctions laws and regulations;

(c)    SCB's history of criminal conduct involving the illegal export of U.S. financial services to sanctioned countries, including Iran, as reflected in the 2012 DPA;

(d)    SCB's inadequate disclosure to the Offices prior to entering the 2012 DPA of known deficiencies in SCB's sanctions compliance program that allowed customers to order U.S. dollar transactions through payment instructions initiated from sanctioned countries, including Iran;

(e)    SCB's willingness to acknowledge and accept responsibility for the actions of its officers, directors, employees and agents as charged in the Superseding Information and the Factual Statements;

(f)    SCB's willingness to take disciplinary action against employees who were involved in the conduct;

(g)     SCB's provision to the Offices of all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Factual Statements, which expanded and advanced the Offices' investigation;

(h)     SCB's commitment to continue its cooperation with the Offices as set forth in Paragraphs 5 and 6;

(i)     SCB's remediation efforts to date, including SCB's comprehensive improvement of its U.S. economic sanctions compliance program, including, but not limited to, the following remedial steps taken by SCB:  forming a special board committee with responsibility for overseeing SCB's overall financial crime compliance program; implementing additional and more rigorous U.S. sanctions policies and procedures, including numerous controls recommended by the independent compliance monitor imposed under the 2014 DPA Amendment; hiring new senior leadership and staff in its legal and financial crime compliance functions; certifying that it has trained relevant employees on complying with U.S. economic sanctions laws and regulations; implementing additional measures to block payment instructions from countries subject to U.S. sanctions laws and regulations; providing compliance training programs for SCB's global correspondent banking clients; upgrading its customer due diligence, transaction screening, and other compliance tools and technology; and improving its ability to assess and measure its sanctions compliance risk, to ensure its U.S. economic sanctions compliance program is effective;

(j)     SCB's agreement to continue to improve its sanctions and Bank Secrecy Act and Anti-Money Laundering ("BSA/AML") compliance programs as set forth in Paragraphs 13 and 14 and to undertake additional compliance reporting obligations set forth in Paragraphs 16 through 18;

     (k)     SCB's work in devising, implementing, and supporting new models of industry collaboration and public-private partnerships to detect and prevent financial crime;

     (l)     SCB's cooperation in this investigation, pursuant to the terms of the 2012 DPA, including by conducting a thorough internal investigation, voluntarily making foreign-based employees available for interviews, producing documents and evidence to the Offices from foreign countries, and collecting and translating voluminous evidence and information for the Offices, which met and exceeded the cooperation that was required under the 2012 DPA; and

     (m)     SCB's certification, through its Chief Executive Officer and Global Co-Head of Financial Crime Compliance that, in good faith reliance on information provided to the Chief Executive Officer and Global Co-Head of Financial Crime Compliance by key employees within SCB, based upon their information and belief, SCB has disclosed to the Offices all potential circumvention of U.S. economic sanctions of which they are aware as required by paragraph 5(e) of the 2012 DPA, no matter how preliminary the evidence, between entering into the 2012 DPA and the date of the execution of this Agreement.

**Future Cooperation and Disclosure Requirements**

     5.     SCB shall cooperate fully with the Offices in any and all matters within the scope of or related to the Factual Statements and any other conduct under investigation by the Offices, at any time during the Term of this Agreement, subject to applicable laws and regulations, until the date upon which all investigations and prosecutions arising out of such conduct are concluded, whether or not those investigations and prosecutions are concluded within the Term specified in Paragraph 3.  At the request of the Offices, SCB shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of SCB, or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants,

or any other party, in any and all matters within the scope of or related to the Factual Statements and other conduct under investigation by the Offices, or any other component of the U.S. Department of Justice at any time during the Term of this Agreement, subject to all applicable laws and regulations. SCB's cooperation pursuant to this Paragraph is subject to applicable laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, SCB must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and SCB bears the burden of establishing the validity of any such assertions. SCB agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

(a)     SCB shall truthfully disclose all factual information with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which SCB has any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of SCB to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of SCB.

(b)     Upon request of the Offices, SCB shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Paragraph 5(a) above on behalf of SCB. It is further understood that SCB must at all times provide complete, truthful, and accurate information.

(c)     SCB shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of SCB. This obligation includes, but is not limited to, sworn testimony before a

federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.   Cooperation under this paragraph shall include identification of witnesses who, to the knowledge of SCB, may have material information regarding the matters under investigation.

(d)     With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, SCB consents to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Offices, in their sole discretion, shall deem appropriate.

(e)     SCB shall provide information, materials, and testimony as necessary or requested to identify or to establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or judicial proceeding.

6.     In addition to the obligations in Paragraph 5, during the Term of the Agreement, should SCB's board of directors, officers, senior management or legal and compliance personnel learn of non-frivolous evidence or allegations of any violation of U.S. economic sanctions laws or regulations, by SCB or any of its employees acting within the scope of their employment, SCB shall promptly report such evidence or allegations to the Offices.  Nothing in this Agreement shall be construed to require SCB to produce any information, documents, records or tangible evidence that are protected by the attorney-client privilege, the work product doctrine, or other applicable confidentiality, criminal or data protection laws, or are subject to the rules and regulations of SCB's regulators regarding the disclosure of confidential supervisory information, or to otherwise take any steps in violation any applicable laws and regulations.

**Payment of Monetary Penalty**

7.      The Offices and SCB agree that, based on the factors set forth in Title 18, United States Code, Sections 3571(d) and 3572(a), a fine of $480 million is appropriate in this case (the "Total Fine Amount").  The Total Fine Amount represents twice the value of the transactions described in Paragraph 31 of the Supplemental Factual Statement.  SCB and the Offices agree that the Total Fine Amount is appropriate given the facts and circumstances of this case, including the nature and seriousness of SCB's conduct and SCB's prior history of sanctions violations.  Any payments made toward satisfaction of the Total Fine Amount are final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Offices that the Total Fine Amount is the maximum fine that may be imposed in any future prosecution, and the Offices are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Offices agree that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment relating to the conduct described in the Factual Statements.  SCB acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Fine Amount.

8.      The Offices recognize that SCB has agreed to pay $292,210,160 to the New York County District Attorney's Office in connection with its concurrent settlement of the related criminal action.  SCB has also agreed to pay the following monetary penalties in connection with concurrent regulatory actions:  (a) $163,687,500 to the Board of Governors of the Federal Reserve System ("FRB"); (b) $180,000,000 to the New York Department of Financial Services ("NYDFS"); and (c) GBP 102,163,200 to the United Kingdom's Financial Conduct Authority.

# JA-203

The Offices agree that a portion of these related payments totalling $427,789,840 shall be credited against the Total Fine Amount.

9.     SCB agrees that a payment in the amount of at least $52,210,160, equal to the Total Fine Amount less the applicable credits described in Paragraph 8 above, plus any associated transfer fees, shall be made by wire transfer pursuant to instructions provided by the Offices within five (5) business days of the execution date of the Agreement.  SCB releases any and all claims it may have to such funds, and further certifies that it passes clean title to these funds, which are not the subject of any lien, security agreement or other encumbrance.  Transferring encumbered funds or failing to pass clean title to the funds in any way will be considered a breach of this agreement.  SCB shall indemnify the Offices for any costs it incurs associated with the passing of clean title to the funds.

## Forfeiture

10.    **2012 Forfeiture Amount**:  As a result of SCB's conduct set forth in the 2012 Factual Statement attached as Exhibit A and count one of the Superseding Information, the parties agreed on December 10, 2012 that the Offices could institute a civil and/or criminal forfeiture action against certain funds held by SCB and that such funds would be forfeitable pursuant to Title 18, United States Code, Sections 981 and 982.  SCB acknowledged that at least $227,000,000 was involved in transactions described in the 2012 Factual Statement, and that such conduct violated IEEPA.  In lieu of a criminal prosecution and related forfeiture, SCB agreed to pay to the United States the sum of $227,000,000 (the "2012 Forfeiture Amount") as substitute *res* for the purpose of forfeiture to the United States pursuant to Title 18, United States Code, Sections 981 and 982, and SCB released any and all claims it may have had to such funds.  SCB's obligations with respect to the 2012 Forfeiture Amount have been fully satisfied as of the execution of this Agreement.

11.    **Additional Forfeiture Amount**:  As a result of the conduct described in count two of the Superseding Information and the Supplemental Factual Statement attached as Exhibit B, SCB agrees to forfeit an additional $240,000,000 to the United States (the "Additional Forfeiture Amount") pursuant to this Agreement.  SCB agrees that the facts contained in the Superseding Information and the Supplemental Factual Statement attached as Exhibit B establish that the Additional Forfeiture Amount is subject to civil forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1).  SCB releases any and all claims it may have to the funds used to pay the Additional Forfeiture Amount.

(a)    By this agreement, SCB expressly waives any constitutional, statutory, or other challenge to the forfeiture of the Additional Forfeiture Amount, including that the forfeiture constitutes an excessive fine or punishment, and consents to the forfeiture of the Additional Forfeiture Amount to the United States.  SCB agrees that it will not file a claim or otherwise contest the forfeiture of the Additional Forfeiture Amount and will not assist or direct a third party in asserting any claim to the Additional Forfeiture Amount.

(b)    SCB agrees to execute any additional documents as necessary for the United States to complete the forfeiture of the funds used to pay the Additional Forfeiture Amount, including any forms evidencing SCB's consent to forfeiture and waiver of timely notice.  SCB also waives all rights to service or notice of any documents filed to effect the forfeiture, and any objection to *in rem* jurisdiction as to the Additional Forfeiture Amount.

(c)    SCB shall transfer the Additional Forfeiture Amount and any associated transfer fees to the United States within five (5) business days of the execution of this Agreement (or as otherwise directed by the United States following such period).  Such payment shall be made pursuant to instructions provided by the Offices in their sole discretion.  If SCB fails to timely

make the payment required under this paragraph, interest (at the rate specified in Title 28, United States Code, Section 1961) shall accrue on the unpaid balance through the date of payment, unless the Offices, in their sole discretion, choose to reinstate prosecution pursuant to Paragraphs 22 through 26 below.  SCB certifies that the funds used to pay the Additional Forfeiture Amount are not the subject of any lien, security agreement, or other encumbrance.  Transferring encumbered funds or failing to pass clean title to these funds in any way will be considered a breach of the Agreement.

(d)     SCB agrees that the Additional Forfeiture Amount shall be treated as a penalty to be paid to the United States government for all purposes, including all tax purposes.  SCB agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any fine or forfeiture paid pursuant to this Agreement.

(e)     The Additional Forfeiture Amount paid is final and shall not be refunded should the Offices later determine that SCB has breached this Agreement and commence a prosecution against SCB.  In the event of a breach of this Agreement and subsequent prosecution, the Offices may pursue additional civil and criminal forfeiture in excess of the Additional Forfeiture Amount.  The Offices agree that in the event of a subsequent breach and prosecution relating to the conduct set forth in the Factual Statements, it will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever fine or forfeiture the Court shall impose as part of its judgment.  SCB understands that such a recommendation will not be binding on the Court.

**Conditional Release from Liability**

12.     Subject to Paragraphs 22 through 26, the Offices agree, except as provided in this Agreement, that they shall not seek to prosecute SCB, its corporate parents, subsidiaries,

successors, or assigns for any act relating to any of the conduct described in the attached Factual

Statements or the April 9, 2019 settlement agreement between SCB and the U.S. Department of

the Treasury, Office of Foreign Assets Control ("OFAC") described in Paragraph 13(g) below.

The Offices, however, may use any information related to the conduct described in the attached

Factual Statements against SCB:  (a) in a prosecution for perjury or obstruction of justice; (b) in a

prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any

crime of violence; (d) in a prosecution or other proceeding relating to any additional violation of

U.S. sanctions or the bank's BSA/AML compliance program; or (e) in a prosecution or other

proceeding relating to a violation of any provision of Title 26 of the United States Code.

(a)     This Agreement does not provide any protection for any criminal or civil case

against SCB that is not related to the conduct described in the Factual Statements or Superseding

Information or the April 9, 2019 settlement agreement between SCB and OFAC described in

Paragraph 13(g) below.

(b)     This Agreement does not provide any protection against prosecution for any

future conduct by SCB.

(c)     In addition, this Agreement does not provide any protection against any

prosecution of any individuals, regardless of their affiliation with SCB.

<u>**Corporate Compliance Program**</u>

13.     SCB represents that it has implemented and will continue to implement a

compliance program designed to prevent and detect violations of U.S. economic sanctions laws

and regulations, including IEEPA, throughout its operations, including the operations of SCB's

subsidiaries, affiliates, and majority-owned or controlled joint ventures whose operations include

managing client accounts for clients subject to sanctions administered by OFAC, processing

payments denominated in U.S. dollars ("USD"), and directly or indirectly supervising such operations.   In order to address any deficiencies in its sanctions compliance program, SCB represents that it has undertaken, and will continue to undertake in the future, the following sanctions compliance obligations:

(a)      To the extent not prohibited by applicable law, continue to apply OFAC's Specially Designated Nationals and Blocked Persons list to USD transactions, the acceptance of customers, and all USD cross-border Society for Worldwide Interbank Financial Telecommunications ("SWIFT") incoming and outgoing messages involving payment instructions or electronic transfer of funds;

(b)      Continue to not knowingly undertake any USD cross-border electronic funds transfer or any other USD transaction that utilizes or relies on the U.S. financial system for, on behalf of, or in relation to any person or entity resident or operating in, or the governments of, Iran, North Korea, Syria, Cuba, Crimea, or Zimbabwe that is prohibited by U.S. law or OFAC regulations;

(c)      Continue to complete global sanctions training, covering United States, United Nations, and European Union sanctions and trade control laws for all employees (1) involved in the processing or investigation of USD payments and all employees and officers who directly or indirectly supervise these employees; (2) involved in execution of USD-denominated securities trading orders and all employees and officers who directly or indirectly supervise these employees; and (3) involved in transactions or business activities involving any nation or entity subject to U.S., E.U., or U.N. sanctions, including the execution of cross border payments;

(d)      Continue to apply its written policy requiring the use of the SWIFT Message Type MT 202COV bank-to-bank payment message where appropriate under SWIFT Guidelines;

(e)     Continue to apply and implement compliance procedures and training designed to ensure that the SCB compliance officer in charge of sanctions is made aware in a timely manner of attempts by any person or entity (including, but not limited to, SCB's employees, customers, financial institutions, companies, organizations, groups, or persons) to circumvent or evade U.S. sanctions laws, including, but not limited to, circumvention attempts involving deceptive business practices, suspected Iranian front companies or undisclosed money service businesses, or any other infiltration attempts.   SCB's Global Co-Head of Financial Crime Compliance, or his or her designee, shall report to the Offices, as part of the Quarterly Reports required by Paragraph 16, the name and contact information, if available to SCB, of any entity that makes such an attempt, subject to applicable laws and regulations;

(f)     Maintain the electronic database of SWIFT payment messages and all documents and materials produced by SCB to the Offices as part of this investigation relating to USD payments processed during the period from 2001 through 2011 in electronic format for the Term of this Agreement;

(g)     Abide by any and all requirements of the Settlement Agreements, dated April 9, 2019, by and between OFAC and SCB regarding remedial measures or other required actions;

(h)     Abide by any and all requirements of the Cease and Desist Order, dated April 9, 2019, by and between the FRB and SCB regarding remedial measures or other required actions;

(i)     Abide by any and all requirements of the Consent Order, April 9, 2019, by and between the NYDFS and SCB regarding remedial measures or other required actions;

(j)     SCB shall share with the Offices any reports, disclosures, or information that SCB, by the terms of the settlement agreements and orders referenced in Paragraph 13(g) through 13(i) of this Agreement, is required to provide to OFAC, FRB, and NYDFS, subject to the rules

and regulations of SCB's regulators regarding the disclosure of confidential supervisory information. SCB further agrees that any independent compliance consultant or monitor imposed by FRB or NYDFS shall, at SCB's expense and with the consent of FRB and/or NYDFS, submit to the Offices any report that it submits to FRB or NYDFS.

14.     With respect to BSA/AML compliance, SCB shall continue its ongoing efforts to implement and maintain an effective BSA/AML compliance program in accordance with the requirements of the BSA and the directives and orders of any U.S. regulator of SCB or its affiliates. In order to demonstrate its continued commitment to improving its financial crime compliance, SCB agrees to continue its implementation of an upgraded AML transaction monitoring system in its international clearing hubs, and SCB shall document the effective implementation and configuration of the system and provide such documentation to the Offices.

15.     Within thirty (30) days of the execution date of this Agreement, SCB shall notify employees with responsibility for sanctions and BSA/AML compliance of SCB's compliance obligations under this Agreement and the criminal conduct admitted to in the Factual Statements and shall certify to the Offices in SCB's first Quarterly Report (as required by Paragraph 16) that such notification has been completed and shall provide the Offices with a copy of such notice.

## Corporate Compliance Reporting

16.     For the Term of the Agreement, SCB shall provide the Offices with quarterly reports within thirty (30) days after the end of each calendar quarter ("Quarterly Reports") describing the status of SCB's continued improvements to its sanctions or BSA/AML compliance programs as required by Paragraphs 13 and 14 of this Agreement, the regulator settlements described in Paragraphs 13(g) through 13(i) above, or by any other consent order, cease-and-desist order, or equivalent order issued by any of its U.S. federal or state regulators. The Quarterly

# JA-210

Reports must include specific and detailed accounts of SCB's sanctions and BSA/AML compliance improvements and shall identify any violations of U.S. economic sanctions laws that have come to the attention of SCB's legal and compliance personnel during the reporting period. In the event the Offices find that there exists a change of circumstances sufficient to eliminate the need for any portion of the reporting requirements set forth in this Paragraph, the Offices may, in their sole discretion, choose to suspend or terminate the reporting requirements in whole or in part. As the reports may include proprietary, financial, confidential, and competitive business information, and as public disclosure could impede government investigations, these reports shall remain non-public except as otherwise agreed to by the parties in writing. The Offices in their sole discretion may determine that disclosure would further the discharge of their duties and responsibilities or is otherwise required by law, and under such circumstances may disclose the reports after providing SCB notice of their intent to disclose (but not the identity of the party to whom the disclosure will be made) and an opportunity to be heard as to any necessary redactions or other concerns.

17. During the Term of this Agreement, the Offices, as they deem necessary and upon request to SCB, shall, subject to applicable laws and regulations:  (a) be provided by SCB with access to any and all non-privileged books, records, accounts, correspondence, files, and any and all other documents or other electronic records, including emails, of SCB and its representatives, agents, affiliates that it controls, and employees, relating to any matters described or identified in the Quarterly Reports; and (b) have the right to interview any officer, employee, agent, consultant, or representative of SCB concerning any non-privileged matter described or identified in the Quarterly Reports.

17

# JA-211

18.     SCB shall notify the Offices of any criminal, civil, administrative or regulatory investigation, inquiry, or action, of SCB or its current directors, officers, employees, consultants, representatives, and agents related to SCB's compliance with U.S. economic sanctions laws and regulations, U.S. federal money laundering laws, or the Bank Secrecy Act, to the extent permitted by the agency conducting the investigation or action and applicable laws and regulations, including, without limitation, rules and regulations regarding the disclosure of confidential supervisory information.   Subject to approval by its regulators, it is understood that SCB shall promptly notify the Offices of (a) any deficiencies, failings, or matters requiring attention with respect to SCB's sanctions or BSA/AML compliance program identified in an examination report by any U.S. federal or state regulatory authority within ten (10) business days of approval from such regulator to share such information; and (b) any steps taken or planned to be taken by SCB to address the identified deficiency, failing, or matter requiring attention.   The Offices may, in their sole discretion, direct SCB to provide other reports about its sanctions or BSA/AML compliance program as warranted.

## No Extension of Independent Compliance Monitor

19.     As part of the 2014 Amendment, SCB agreed to retain an independent compliance monitor (the "Monitor") for a term of three years from the date on which the Monitor was retained by SCB.   The parties subsequently agreed to extend the Monitor's term through March 31, 2019. Given the progress in SCB's ongoing remediation and compliance efforts, including the comprehensive enhancement of SCB's U.S. economic sanctions compliance program, the parties agree that no further extension of the Monitor's term is necessary.

18

## Deferral of Prosecution

20.     In consideration of the undertakings agreed to by SCB herein, including (a) past and future cooperation as described herein; (b) payment of a monetary penalty and forfeiture amounts; and (c) remedial actions to date and the undertakings agreed to by SCB herein, the Offices agree that any prosecution of SCB for the conduct set forth in the Factual Statements and the Superseding Information be and hereby is deferred for the Term of this Agreement.  To the extent there is conduct disclosed by SCB that does not concern any act within the scope of or related to the Factual Statements or the settlement agreement between SCB and OFAC, as described in Paragraphs 13(g) above, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

21.     The Offices further agree that if SCB fully complies with all of its obligations under this Agreement, the Offices will not continue the criminal prosecution against SCB described in Paragraph 1 and, at the conclusion of this Term, the Agreement shall expire.  Within thirty (30) days of the expiration of the Term of this Agreement set forth above in Paragraph 3, or less at the discretion of the Offices, the Offices shall seek dismissal with prejudice of the Superseding Information filed against SCB described in Paragraph 1, and agree not to file charges in the future against SCB based on the conduct described in this Agreement and the attached Factual Statements.

## Breach of the Agreement

22.     If, during the Term, SCB (a) commits any felony under United States federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its certification about disclosure of any circumventions of U.S. economic sanctions known to SCB as of the execution date of this Agreement as set forth

in Paragraph 4(m), and disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 13; or (e) otherwise fails to completely perform or fulfill each of SCB's obligations under the Agreement, SCB shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Superseding Information described in Paragraph 1, which may be pursued by the Offices in the U.S. District Court for the District of Columbia, or any other appropriate venue.  Determination of whether SCB has breached the Agreement and whether to pursue prosecution of SCB shall be in the Offices' sole discretion.  Any such prosecution relating to the conduct described in the attached Factual Statements or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement, subject to any tolling agreements between the Offices and SCB, may be commenced against SCB, notwithstanding the expiration of the statute of limitations, between the execution date of this Agreement and the expiration of the Term plus one (1) year. Thus, by signing this Agreement, SCB agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, SCB agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term, plus one year, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

23.      If the Offices determine that SCB has breached any provision of this Agreement, the Offices shall provide written notice to SCB's counsel of the alleged breach prior to instituting

any prosecution resulting from such breach.  Within thirty (30) days of receipt of such notice, SCB shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions SCB has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of SCB.

24.     In the event that the Offices determine that SCB has breached this Agreement:  (a) all statements made by or on behalf of SCB to the Offices or to the Court, including the attached Factual Statements, and any testimony given by SCB before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against SCB; and (b) SCB shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of SCB prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, SCB, will be imputed to SCB for the purpose of determining whether SCB has violated any provision of this Agreement shall be in the sole discretion of the Offices.

25.     SCB acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if SCB breaches this Agreement and the matter proceeds to judgment.  SCB further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

Case 1:12-cv-00262-JEB   Document 16-1   Filed 04/09/19   Page 22 of 92

26.     No later than ninety (90) days prior to the expiration of the Term of this Agreement, and again on the date of the expiration of the Term of this Agreement, SCB, through its Chief Executive Officer and Global Co-Head of Financial Crime Compliance, will certify to the Offices that, in good faith reliance on information provided to the Chief Executive Officer and Global Co-Head of Financial Crime Compliance by key employees within SCB, based upon their information and belief, SCB has met its disclosure obligations under Paragraph 6 of this Agreement.  Any certification made pursuant to this Paragraph shall be deemed a material statement and representation by SCB to the executive branch of the United States for purposes of Title 18, United States Code, Section 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale or Merger of SCB

27.     Except as may otherwise be agreed by the parties in connection with a particular transaction, SCB agrees that in the event that, during the Term, it sells, merges, or transfers business operations or assets that are material to SCB's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Factual Statements, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, or transfer, it shall include in any contract for sale, merger, or transfer, a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Offices' ability to declare a breach under this Agreement is applicable in full force to that entity. SCB agrees that the failure to include these provisions in the transaction will make any such transaction null and void.  SCB shall provide notice to the Offices at least thirty (30) days prior to undertaking any such sale, merger, or transfer.  The Offices shall notify SCB prior to such

transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement.  If at any time during the Term SCB engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 22 to 26 of this Agreement.  Nothing herein shall restrict SCB from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

## Public Filing

28.     SCB and the Offices agree that this Agreement (and its attachments) shall be publicly filed in the United States District Court for the District of Columbia.

## Public Statements by SCB

29.     SCB expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for SCB make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by SCB set forth above or the facts described in the attached Factual Statements.  Any such contradictory statement shall, subject to cure rights of SCB described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 22 through 26 of this Agreement.  The decision of whether any public statement by any such person contradicting the acceptance of responsibility by SCB set forth above or in the facts described in the Factual Statements will be imputed to SCB for the purpose of determining whether SCB has breached this Agreement shall be in the sole discretion of the Offices.  If the Offices determine

that a public statement by any such person contradicts, in whole or in part, the acceptance of responsibility by SCB set forth above or a statement contained in the Factual Statements, the Offices shall so notify SCB, and SCB may avoid a breach of this Agreement by publicly repudiating such statement within five (5) business days after notification.  SCB shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Factual Statements provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Factual Statements.  This paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of SCB in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of SCB.

30.     SCB agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, SCB shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and SCB; and (b) whether the Offices have any objection to the release.  Statements by SCB, its direct or indirect subsidiaries, or affiliates at any press conference concerning this matter shall not be inconsistent with such a press release.

31.     The Offices agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of SCB's cooperation and remediation.  By agreeing to provide this information to such authorities, the Offices are not agreeing to advocate on behalf of SCB, but rather are agreeing to provide facts to be evaluated independently by such authorities.

Case 1:13-cv-00262-JEB   Document 16-1   Filed 04/09/19   Page 25 of 92

### Limitations on Binding Effect of Agreement

32.     This Agreement is binding on SCB and the Offices, but specifically does not bind any other component of the U.S. Department of Justice, other federal agencies, or any state, local or foreign agencies, or any other authorities, although the Offices will bring the cooperation of SCB and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by SCB.  Nothing in this Agreement restricts in any way the ability of the Offices, any other federal department or agency, or any state or local government from proceeding criminally, civilly, or administratively, against any current or former directors, officers, employees, or agents of SCB or against any other entities or individuals.  The parties to this Agreement intend that the Agreement does not confer or provide any benefits, privileges, immunities, or rights to any other individual or entity other than the parties hereto.

### Notice

33.     Any notice to the Offices under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail addressed to:

> Chief, Money Laundering and Asset Recovery Section
> Criminal Division
> U.S. Department of Justice
> 1400 New York Ave. N.W.
> Washington, D.C. 20005

with copy to:

> United States Attorney
> U.S. Attorney's Office for the District of Columbia
> 555 4th Street NW
> Washington, D.C. 20530

Any notice to SCB under this Agreement shall be given by personal delivery, overnight delivery by recognized delivery service, or registered or certified mail addressed to:

Patricia Sullivan
Global Co-Head, Financial Crime Compliance
Standard Chartered Bank
1 Basinghall Avenue
London GT LON EC2V 5DD, United Kingdom

Notice shall be effective upon actual receipt by the Offices or SCB.

## Exhibits

34.     The exhibits to this Agreement are integral parts of the Agreement and are incorporated into this Agreement as though fully set forth in the Agreement.

## Execution in Counterparts

35.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.   Further, all facsimile and digital images of signatures shall be treated as originals for all purposes.   The execution date shall be the last date when all signatories have signed the Agreement.

## Complete Agreement

36.     This Agreement, including its attachments, sets forth all the terms of the Agreement between SCB and the Offices.   There are no promises, agreements, or conditions that have been entered into other than those expressly set forth in this Agreement, and none shall be entered into and/or be binding upon SCB or the Offices unless signed by the Offices, SCB's attorneys, and a duly authorized representative of SCB.   This Agreement supersedes any prior promises, agreements, or conditions between SCB and the Offices.   SCB agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement and it agrees to abide by all terms and obligations of this Agreement as described herein.   No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Offices, the attorneys for SCB and a duly authorized representative of SCB.

**AGREED:**

**FOR STANDARD CHARTERED BANK:**

Date: April 8, 2019   By: _____

Torry Berntsen
Chief Executive Officer
Americas & Regional Head CIB
Standard Chartered Bank

Date: April 8, 2019   By: _____

Denis J. McInerney, Esq.
Davis Polk & Wardwell LLP

Date: April 8, 2019   _____

Samuel W. Seymour, Esq.
Sullivan & Cromwell LLP

Date: _____

H. Christopher Boehning, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP

**FOR THE U.S. DEPARTMENT OF JUSTICE:**

JESSIE K. LIU
UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA

ALESSIO D. EVANGELISTA
PRINCIPAL ASSISTANT UNITED STATES ATTORNEY

4-9-19
DATE

By: _____
Michael J. Friedman
Peter C. Lallas
Assistant United States Attorneys

BRIAN A. BENCZKOWSKI
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

DEBORAH L. CONNOR
CHIEF, MONEY LAUNDERING AND ASSET
   RECOVERY SECTION

4-9-19
DATE

By: _____
Jennifer L. Wine
Trial Attorney, Bank Integrity Unit

# JA-222

Case 1:12-cv-00262-JEB   Document 16-1   Filed 04/09/19   Page 29 of 92

### *Exhibit A*

2012 Factual Statement

## EXHIBIT A -- FACTUAL STATEMENT

### Introduction

1.     This Factual Statement is made pursuant to, and is part of, the Deferred Prosecution Agreement dated December 7, 2012, between the Criminal Division of the United States Department of Justice, and the United States Attorney's Office for the District of Columbia (collectively, "DOJ") and Standard Chartered Bank ("SCB"), a United Kingdom bank, and between the New York County District Attorney's Office ("DANY") and SCB.

2.     Starting in early 2001 and ending in 2007, SCB violated U.S. and New York State laws by illegally sending payments through the U.S. financial system on behalf of entities subject to U.S. economic sanctions.  SCB knowingly and willfully engaged in this criminal conduct, which caused both affiliated and unaffiliated U.S. financial institutions to process transactions that otherwise should have been rejected, blocked, or stopped for investigation pursuant to regulations promulgated by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") relating to transactions involving sanctioned countries and parties.[1]

3.     Further, SCB made statements that were misleading to OFAC in 2003 in the course of explaining why SCB had effected payments that violated U.S. sanctions laws.

4.     SCB also provided incomplete information in relation to sanctioned country payments in its submissions and responses to SCB's U.S. bank regulators, the Federal Reserve Bank of New York ("FRBNY") and the New York State Banking Department ("NYSBD"),[2] during a targeted Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") examination and

---

[1]  In addition to sanctioning individual countries, OFAC publishes a Specially Designated National List.  This list includes individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific.

[2]  NYSBD was recently incorporated into the New York Department of Financial Services ("DFS").

look-back review mandated by a written agreement entered into with FRBNY and NYSBD in October 2004. This failure to inform was despite the fact that SCB and the regulators had agreed that financial transactions with OFAC sanctioned entities posed a de facto AML risk.

5.     SCB's criminal conduct included, among other things, (i) processing payments through its branches in London ("SCB London") and Dubai ("SCB Dubai") on behalf of sanctioned customers without reference to the payments' origin; (ii) eliminating payment data that would have revealed the involvement of sanctioned countries; and (iii) using alternative payment methods to mask the involvement of sanctioned countries. SCB's unlawful actions, which occurred both inside and outside the United States, caused financial institutions located in the United States to unknowingly provide banking services to sanctioned entities, prevented detection by U.S. regulatory and law enforcement authorities of financial transactions that violated U.S. sanctions, and caused false entries to be made in the business records of financial institutions located in New York, New York.

6.     This conduct occurred in various business units within SCB in locations around the world, and certain payment practices were done with the knowledge and approval of senior corporate managers and the legal and compliance departments of SCB.

### SCB's Business Organization and Assets

7.     SCB was formed in 1969 through the merger of two banks, the Standard Bank of British South Africa and the Chartered Bank of India, Australia and China. SCB is currently one of the world's largest international banks, with over 1,700 branches, offices, and outlets in more than 70 countries. Headquartered in London, SCB has operations in consumer, corporate and institutional banking, and treasury services and operates principally in Asia, Africa, and the Middle East.

8.    In 2012, SCB had over $500 billion in assets. SCB is listed on the London and Hong Kong stock exchanges as well as on the Bombay and National Stock Exchanges in India.

9.    Since 1976, SCB has had a license issued by the state of New York to operate as a foreign bank branch in New York, New York ("SCB New York"). The branch provides only wholesale banking services, primarily U.S.-dollar clearing for international wire payments. SCB New York is the seventh largest dollar clearer in the world, clearing approximately 195 billion in U.S. dollar payments per day.

### Applicable Law

*The Iranian Sanctions*

10.    On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat."

11.    President Clinton followed this with Executive Order No. 12959, issued on May 6, 1995, which imposed comprehensive trade and financial sanctions on Iran. These sanctions prohibit, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the United States or United States persons, wherever located. This includes persons in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transhipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran. On August 19, 1997, President Clinton issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the

Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITRs"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

12.     With the exception of certain exempt transactions, the ITRs prohibit, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts.  The ITRs also prohibit transactions by any U.S. person who evades or avoids, has the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs.  The ITRs were in effect at all times relevant to the conduct described below.

13.     While the ITRs promulgated for Iran prohibited United States Dollar ("USD") transactions, they contained a specific exemption for USD transactions that did not directly credit or debit a U.S. financial institution.  This exemption is commonly known as the "U-turn exemption."

14.     The U-turn exemption permitted banks to process Iranian USD transactions that began and ended with a non-U.S. financial institution, but were cleared through a U.S. correspondent bank.  In a relevant part, the ITR provided that U.S. banks were "authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer . . . is by order of a foreign bank which is not an Iranian entity from its own account in a domestic bank . . . to an account held by a domestic bank . . . for a [second] foreign bank which is not an Iranian entity." 31 CFR §560.516(a)(1).  That is, a U.S. dollar transaction to or for the benefit of Iran could be routed through the U.S. as long as a non-U.S. offshore bank originated the transaction and the transaction terminated with a non-U.S.

offshore bank. These U-turn transactions were only permissible where no U.S. person or entity had direct contact with the Iranian bank or customer and were otherwise permissible (e.g., the transactions were not on behalf of a Specially Designated National, ("SDN")).[3]

15.    Effective November 10, 2008, OFAC revoked the U-turn exemption for Iranian transactions. As of that date, U.S. depository institutions were no longer authorized to process Iranian U-turn payments.

*The Libyan Sanctions*

16.    On January 7, 1986, President Ronald W. Reagan issued Executive Order No. 12543, which imposed broad economic sanctions against Libya. Executive Order No. 12544 followed one day later, which ordered the blocking of all property and interests in property of the Government of Libya. President George H.W. Bush strengthened those sanctions in 1992 pursuant to Executive Order No. 12801. These sanctions remained in effect until September 22, 2004, when President George W. Bush issued Executive Order No. 13357, which terminated the national emergency with regard to Libya and revoked the sanction measures imposed by the prior Executive Orders.

*The Sudanese Sanctions*

17.    On November 3, 1997, President Clinton issued Executive Order No. 13067, which imposed a trade embargo against Sudan and blocked all property and interests in property of the Government of Sudan. President George W. Bush strengthened those sanctions in 2006 pursuant to Executive Order No. 13412 (collectively, the "Sudanese Executive Orders"). The Sudanese Executive Orders prohibited virtually all trade and investment activities between the

---

[3] OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, OFAC targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called "Specially Designated Nationals" or "SDNs."

United States and Sudan, including, but not limited to, broad prohibitions on: (a) the importation into the United States of goods or services from Sudan; (b) the exportation or re-exportation of any goods, technology, or services from the United States or by a United States person to Sudan; and (c) trade- and service-related transactions with Sudan by United States persons, including financing, facilitating, or guaranteeing such transactions. The Sudanese Executive Orders further prohibited "[a]ny transaction by a United States person or within the United States that evades or avoids, has the purposes of evading or avoiding, or attempts to violate any of the prohibitions set forth in [these orders]." With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudanese Sanctions generally prohibited the export of services to Sudan from the United States.

*The Burmese Sanctions*

18.     On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by U.S. persons and U.S. persons' facilitation of new investment in Burma by foreign persons.

19.     On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta, and issued Executive Order No. 13310, which blocked all property and interest in property of other individuals and entities meeting the criteria set forth in that order. President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked. Executive Order No. 13310 also prohibited the importation into the United States of articles that are a product of Burma and the exportation or re-exportation to Burma of financial services from the United States, or by U.S. persons,

wherever located. The "exportation or reexportation of financial services to Burma" is defined to include the transfer of funds, directly or indirectly, from the United States.

## DOJ Charge

20. DOJ has alleged, and SCB accepts, that its conduct, as described herein, violated Title 18, United States Code, Section 371, by conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), specifically Title 50, United States Code, Section 1705, which makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of the regulations prohibiting the export of services from the United States to Iran, Libya, Sudan, and Burma.

## DANY Charge

21. DANY has alleged, and SCB accepts, that its conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, "with intent to defraud, . . . 1. [m]ake[] or cause[] a false entry in the business records of an enterprise [(defined as any company or corporation)] . . . or 4. [p]revent[] the making of a true entry or cause[] the omission thereof in the business records of an enterprise." It is a felony under Section 175.10 of the New York State Penal Law if a violation under Section 175.05 is committed and the person or entity's "intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof."

## SCB's Iranian Conduct

### The CBI Account

22. SCB provided banking services to Iranian clients starting in or about 1993. In early 2001, the Central Bank of Iran (the "CBI") asked SCB to act as its correspondent bank with respect to international U.S.-dollar payments, including payments relating to oil sales by the

National Iranian Oil Company. At that time, the CEO of SCB's Iran representative office[4] wrote a memo in support of expanding the CBI account, noting that "[t]o be the bank handling Iran's oil receipts would be very prestigious for SCB. In essence, SCB would be acting as Treasurer to the CBI/the country."

23.     As part of the agreement, the CBI instructed SCB London to remove any reference to Iran in the SWIFT[5] payment messages transiting through SCB New York. According to the CEO of SCB's Iran representative office, the CBI's "concern in all negotiations with SCB was not including their name in payment transactions." As one SCB employee wrote about the CBI account, "this account must remain completely secret to the U.S." While the CBI claimed that the reason was to avoid delays in processing payments,[6] the CEO of SCB's Iran representative office explained in an interview with federal and state law enforcement authorities, that he believed the Iranians' real concern was that the U.S. government would gain information about the Iranians' business dealings if the payments were transparent.[7] In essence, the CBI made clear to SCB that payment processing that showed the CBI's involvement in the transaction was not an option if SCB was to receive the business.

24.     Prior to taking on the Iranian business, SCB Group's Legal Department consulted with external U.S. counsel, who opined that, with respect to U-turn transactions, it did not matter whether the information as to the Iranian origin or destination of the payment was specified in

---

[4] SCB opened an Iranian representative office in Tehran in 1993. In 2005, the CBI granted SCB a license to open a branch in the Kish Free Trade Zone on Kish Island, Iran. The Kish Island branch opened in September 2005 but has never been fully operational. SCB has now closed the representative office and the Kish Island branch.

[5] SWIFT is the Society for Worldwide Interbank Financial Telecommunications which is the international system to transmit payment messages with other financial institutions around the world, including U.S. correspondent banks. SWIFT messages contain various informational fields.

[6] Delays may be caused when a payment message is stopped by a filter known as an OFAC filter, which is a software program designed, in part, to identify transactions involving sanctioned parties. Once the transaction is stopped, a bank employee manually reviews the transaction to confirm whether it is an impermissible payment or instead a false positive or an exempted/licensed payment.

[7] As referred to herein, transparent payments generally reveal the originating party, the ultimate beneficiary, and all intermediate payment steps.

the payment messages to SCB New York. In a follow-up memorandum, however, that same external counsel wrote that the Iranian information could be removed from payment messages "as long as [SCB] New York otherwise knows or has the ability to know that such payments are of a type that are authorized under the ITR...." The external counsel concluded by stating, "it is advisable that [SCB] London and [SCB] New York between themselves agree to a standard operating procedure for such payments or that such payments be identified in a way that both [SCB] London and [SCB] New York may readily determine that such payments conform to and are consistent" with the ITR. Despite this legal advice, no such operating procedure was ever put into place.

25.     The majority of the CBI's payments were processed by SCB London as cover payments or serial bank-to-bank payments. Typically, a cover payment is executed through a combination of the two types of SWIFT messages: an MT 103 message, which is the de facto standard for cross-border customer credit transfers, and an MT 202 message, which is the de facto standard for bank-to-bank credit transfers. In a cover payment, an MT 103 is sent from the originator's bank to the ultimate beneficiary's bank, but the funds are actually transferred through the United States via an MT 202 to a U.S. correspondent bank. In a serial bank-to-bank payment, there is only a single payment message generated: an MT 202 to a U.S. correspondent bank.

26.     As a general rule, at SCB London, the payment processing system automatically populated information about the ordering bank from the incoming payment message into Field 52 of the outgoing MT 202 message that was to be sent to SCB New York, which served as SCB London's U.S. correspondent bank.[8] To process the CBI's payments without revealing their

---

[8]     According to SWIFT protocols in effect prior to 2009, Field 52 in a MT 202 was an optional field used to specify the financial institution of the ordering customer, when the customer was different from the sender of the message.

Iranian origin however, SCB London's payment processing team put in place "a special

instruction to overtype the field 52 of the outgoing message to SCBLGB2L until we can educate

[the CBI] to quote what we want." [9]   Later, SCB London provided specific instructions to the

CBI to omit its unique SWIFT code in one field of its payment messages and to place SCB

London's SWIFT code in another field to conceal the payment's origin.   Specifically, an SCB

employee wrote:

> Dear [CBI Representative],
> Based on SWIFT messages that we have received from you to date could we
> request that you make the following amendments to future messages as this will
> help us to process the messages more efficiently -
> …
> (2) MT 202  In Field 21, we suggest that you omit BMJITH as part of the
> reference.  We are concerned that, as this is very close to your SWIFT code, there
> is a risk that our outgoing payment message may be rejected in New York if this
> is included.
> Please place our SWIFT code, SCBLGB2L, in Field 52.
> Thank you for your cooperation.
> …
> Kind regards,
> [SCB London employee] [10]

27.     As a result of this e-mail, the CBI began inserting SCB London's unique SWIFT

code in field 52 of its MT 202 messages, as well as omitting BMJITH from field 21.  Between

2001 and 2006, the CBI sent approximately 2,226 messages with a total value of $28.9 billion to

SCB London.  These messages contained the SCBLGB2L code in field 52, and were sent onto

SCB New York for processing either as a cover payment or serial bank-to-bank payment.  These

---

SWIFT revised its messaging protocols in 2009 to ensure that originating and beneficiary data is included in all
customer cover payments.

[9] SCBLGB2L refers to the unique SWIFT code for SCB London.  The effect of the instruction was to mask the fact
that the payment originated from the CBI, and instead made it appear that the message originated from SCB
London.  As a result, SCB New York (as well as any other intermediary bank in the U.S.) would have no way of
knowing that the payment it was processing was on behalf of the CBI.

[10]   According to SWIFT protocols, Field 21 in a MT 202 message is used to contain a reference to a related
transaction.  As mentioned above, Field 52 in a MT202 is used to specify the financial institution of the ordering
customer, when the customer is different from the sender of the message.  BMJITH was a common reference term
used by the CBI in its payment messages, which most likely referred to the CBI's full Farsi name, Bank Markazi
Jomhouri Islami Tehran.

payments, while modified to prevent the U.S. clearing bank from recognizing them as Iranian-originated, were nonetheless compliant with the then-existent U-turn exemption.

28.     In the instances in which the CBI failed to insert SCB London's SWIFT code in the payment messages, SCB London's payment processing staff did so manually. From 2001 through January 2007, in approximately 458 payment messages comprising $2.3 billion of transactions, SCB London manually inserted its own SWIFT code into field 52. In addition to field 52, SCB London staff also removed any other Iranian references in the outgoing payment messages to New York. As one SCB employee explained, "Re the process for effecting [the CBI]'s payment instructions - field 52 (ordering institution) is quoted by [the CBI] in their MT202 as SCBLGB2L, if this is not done SCB London over-type field 52 as SCBLGB2L. This means there is no reference to [the CBI]." These payments, while modified to prevent the U.S. clearing bank from recognizing them as Iranian-originated, were nonetheless compliant with the then-existing U-turn exemption.

29.     While both the cover and serial bank-to-bank payments for the CBI followed U-turn routing– that is, the transactions began and ended with a non-U.S. financial institution, and therefore qualified as a permissible transaction under the U-turn exemption, SCB employees believed that both affiliated and unaffiliated U.S. banks would not process any Iran-related transactions, legal or illegal, from SCB. Moreover, SCB employees believed that if Iran-related transactions were transparent, they would be subject to substantial delays despite the fact that the payments were lawful. The procedures for handling Iranian payments were designed to make sure the payments were processed in the United States quickly and with no delay.

### The Additional Iranian Bank Business

30.     In July 2003, SCB learned that a competitor was exiting the Iranian business completely.  As a result, SCB sought to pick up this business and add U.S.-dollar accounts for five Iranian banks at SCB London:  Bank Melli, Bank Sepah, Persia International Bank, Bank Saderat, and Bank Mellat.  While SCB sought internal approvals to open accounts for the five banks, there were a number of discussions about whether payments sent through to SCB New York should be transparent.  The five Iranian banks objected to transparency in payment messages sent to the United States.

31.     As it had with the CBI business, prior to taking on the new Iranian business, SCB Group's Legal Department consulted with external U.S. counsel about whether Iranian payment messages to SCB New York needed to be transparent.  In response, an attorney at one U.S. law firm, who had previously advised in 2001 that lawful U-turns transactions could be processed on an undisclosed basis as long as SCB New York was aware of them, wrote, "I should point out that permissible U-Turn transactions should be done on a fully disclosed basis, that is, SCB (London)... should disclose all details of the transaction.  Not to do so could place SCB (New York) seriously in harm's way under the law and should be a condition for moving forward with any transaction."

32.     Following the legal advice, SCB New York informed SCB Group that it would insist upon full transparency in payment messages.  In response, SCB London informed SCB New York personnel that this process they were objecting to had been occurring for some time:  non-transparent payment messages were already being processed for the CBI.  For example, on October 17, 2003, an SCB London employee sent an e-mail to an SCB New York employee explaining the procedures to replace the CBI's SWIFT code with SCB London's code.

Specifically, the e-mail stated, "Please see below some examples of payments received from [the CBI] and how SCB London handles them. [SCB London employee]'s NOTE refers to how we avoid divulging the Iranian ordering party and replace SCBLGB2L as the ordering party." When informed of the situation, the CEO of SCB Americas stated that "it is my understanding that we must cease and desist all these current transactions with Iranian customers that don't fully disclose the remitter and beneficiary since it's not a question of interpretation but rather is clearly the law as regards these types of transactions."

33.     As a result of SCB New York's insistence on transparency, the CEO of SCB's Iran representative office informed his SCB colleagues that a full transparency requirement "will be a deal breaker as well as impact our banking license request in Iran."[11]  Concerned about losing their Iranian business and due to conflicting legal advice, SCB requested advice from a second external U.S. law firm. In October 2003, the second U.S. law firm wrote, "[i]t is our view that these regulations require [SCB New York] to obtain information on the remitter and beneficiary to process U-turn transactions." In response, SCB Head of the Middle East requested further discussion with the attorneys, "given the significant loss of business this opinion will cause to the Bank if confirmed." Specifically, he asked whether, if SCB London provided full transactional details to SCB New York about Iranian payments, SCB New York would be obligated to pass that information along to other U.S. banks in the payment chain. In response, the second U.S. law firm wrote that while they were "unaware of any express requirement that would mandate that SCB NY pass along remitter and beneficiary information to the receiving bank," the failure to do so "would potentially expose SCB NY to risk...."

34.     In October 2003, an SCB employee sent an email to the head of the compliance and legal departments at SCB New York discussing SCB's procedures for handling Iranian

---

[11] At this time, SCB was in the process of applying for its first bank branch in Iran.

payments in the context of bringing on the new business. The SCB employee wrote that SCB

London had been processing non-transparent U-turns for the CBI and would continue to do so

for the new Iranian banks. Another SCB employee informed SCB New York that SCB Dubai

also used non-transparent payments for Iranian customers. Thus, the head of compliance and

legal in New York knew of these practices as early as October 2003.

35.     In January 2004, SCB made the decision to proceed with the Iranian business, but

conduct "offshore due diligence" of the transactions at SCB London. As one SCB employee

wrote in an e-mail in 2003, SCB New York's Head of Legal "would be comfortable with the

proposed course of action but on the basis that the Group was only processing legitimate U-turn

transactions and a rigorous vetting process was in place." Another SCB London lawyer wrote,

"[SCB New York Head of Legal] is happy with leaving the originator swift code field blank.

This is on the basis that London are responsible for the OFAC checks...But this is something he

would not say in writing."

36.     In making the decision to acquiesce to the Iranians' request for non-transparency,

SCB understood that there was potential risk. As one of the SCB lawyers wrote:

> There is a view within SCB that it would be very unlikely that the current method
> of processing u-turns would come to the attention of US regulators, as all the
> evidence would be offshore and that while SCB as a group remains confident, and
> has procedures in place outside SCB NY, to ensure that only compliant u-turns
> are allowed, any potential breach would be one of form rather than substance and
> treated leniently.
> ...
> if the US authorities do indeed find a breach in the method of processing u-turns
> there is no guarantee they will treat it as an isolated or minor incident. Taken
> with other issues which have come up in the past there is a risk that they may
> decide that a severe penalty is appropriate.

37.     To process the five new Iranian banks' payments, SCB London operations

personnel initially decided to replace the Iranian banks' SWIFT code with that of SCB London,

as SCB London was already doing with the CBI. When a senior lawyer with SCB London learned of this, he objected to the practice, however, stating that "clearly that is not satisfactory." He stated that the practice of replacing the CBI's SWIFT code with SCB London's code could be misleading, "because a US bank would be getting false information." Instead, it was agreed that the Iranian SWIFT bank code would be replaced with a "." in the payment messages to SCB New York, which he considered the same as leaving it blank. The final procedure (which SCB referred to as "repairing") for processing Iranian payments instructed SCB London's payment processing staff to:

> Ensure that if the field 52 of the payment is blank or that of the remitting bank that it is overtyped at the repair stage to a ".". This will change the outgoing field 52 of the MT103 to a field 52D of ".". (Note: if this is not done then the Iranian Bank SWIFT code may appear - depending upon routing - in the payment message being sent to SCBLUS33).[12]

SCB London's payment processing staff screened all outgoing payment messages against a list of OFAC-sanctioned entities maintained by SCB London.

38.  On February 13, 2004, SCB London opened all five Iranian USD accounts. The accounts operated in this non-transparent manner - that is, using the "repairing" procedure - until approximately May 2006. During this time period, SCB London processed 2,708 payment messages, comprising a total of $41.6 billion, in which the incoming message contained SCB London's SWIFT code, and the SCB London employees replaced the code with a "." in the outgoing message. Moreover, SCB London received an additional 2,481 messages, comprising a total of $37.9 billion, in which field 52 was blank or included a reference to an Iranian bank, and SCB London employees inserted a "." in the outgoing message. Like the payments for the CBI, SCB London processed the payments as both cover payments and serial bank-to-bank transactions. The vast majority of these payments, while modified to prevent the U.S. clearing

---

[12] SCBLUS33 is the SWIFT code for SCB New York.

bank from recognizing them as Iranian, nonetheless complied with the then-existent U-turn exemption.

39.     In addition to the U-turn compliant payments, however, there were also approximately 99 payments totaling $7.4 million in transactions from SCB London for Iranian banks that either terminated in the United States, in violation of IEEPA, or otherwise had a U.S. connection.

<u>Iranian Business at SCB Dubai</u>

40.     In addition to the CBI and the five Iranian banks at SCB London, SCB Dubai conducted Iranian business, for both Iranian banks and Iranian corporate customers. To process these transactions, SCB Dubai received incoming payment instructions as either SWIFT payment messages or payment orders. SCB Dubai then typically processed the transactions as cover payments, which were the standard format in SCB Dubai for all customer payments in currencies foreign to the destination country regardless of the country of origin of the customer. The first SWIFT message, a MT 103, was a payment message to a non-U.S. bank informing them of an incoming U.S.-dollar payment on behalf of the Iranian customer; the second SWIFT message, a MT 202, was a cover payment sent to SCB New York for processing. The cover payment messages sent to New York did not contain any references to the Iranian origin of the payments as was usual for all cover payments at that time.

41.     Upon learning of the use of cover payments for Iranian accounts at SCB Dubai, SCB's Regional Head of Financial Crime Risk wrote in 2003, "I received this memo below and I am concerned that we might be breaking the sanctions. We may not be exactly breaking the law, but we may be breaking the spirit of the law and may possibly get our NY branch into hot

water." Despite these concerns, SCB Dubai's practice of using cover payments for customer payments in currencies foreign to the destination country, including Iranian accounts, continued.

42.     From 2001 through 2007, approximately $3.9 billion of non-transparent Iranian transactions were sent from SCB Dubai through SCB NY. The vast majority of these payments, while undetectable as Iranian payments to the U.S. clearing bank, were nonetheless compliant with the then-existent U-turn exemption.

43.     However, in addition to the U-turn compliant payments, there were also at least $13.4 million in transactions from SCB Dubai involving Iranian entities that terminated in the United States, or were otherwise connected with the United States, in violation of IEEPA.

### Total SCB Iranian Business

44.     In total, from 2001 through 2007, the vast majority of SCB's business dealings with Iranian clients, approximately $241.9 billion, consisted of sending U.S.-dollar denominated payments through SCB New York to other foreign banks, and therefore complied with the then-existing U-turn exemption. In addition to the U-turn compliant payments, there were also $23.0 million in transactions SCB processed for Iranian customers that terminated in the United States, or were otherwise connected with the United States, in violation of IEEPA.

### **SCB's Libyan, Sudanese, and Burmese Conduct**

### The Dromos Initiative

45.     In addition to the business with Iran, SCB conducted business involving other sanctioned countries, including Libya, Sudan, and Burma, primarily from SCB London and SCB Dubai. Most of these payments were processed using the cover payment method and began and ended with a non-U.S. financial institution. Unlike the ITR, however, there was no U-turn exemption for payments related to any other sanctioned country. Therefore, all payments for

these countries, including those that followed U-turn routing, were prohibited by U.S. law, unless specifically licensed by OFAC.

46.     In 2002, SCB sought to implement a policy change, known as the Dromos Initiative, which would end the use of cover payments for U.S.-dollar customer payments. The purpose of the Dromos Initiative was to increase fees earned by sending only serial payments through SCB New York, since SCB New York could charge customers more for sending an MT 103 message than an MT 202.

47.     A consequence of the Dromos Initiative was the exposure of SCB's cover payment method for payments involving sanctioned countries, some of which were on behalf of charitable organizations and the U.K. government. Prior to Dromos, these payments were sent using the cover method, which ensured that U.S. banks received only the MT 202 message, which did not include originator or originating bank information. Dromos required the use of a single MT 103 message to the U.S. banks. The MT 103 message was required to contain the originator and originating bank information, and thus were transparent to U.S. correspondent banks. Indeed, SCB bank managers recognized that implementing Dromos would likely result in the rejection of U.S.-dollar payments on behalf of or to such customers involving sanctioned countries by U.S. correspondent banks. Thus, payment processors were expressly directed *not* to use the Dromos method for U.S.-dollar payments relating to Iranian banks, the U.K. government, and charitable and development organizations in sanctioned countries. Moreover, payment processors used non-Dromos for other sanctioned organizations.

48.     For example, in a late 2002 e-mail to bank managers and payment processors, one senior SCB London manager stated the following about processing payments for government and development organizations doing business with sanctioned countries:

> A problem that was raised [in using DROMOS] is the fact that SCB London effect payments into Sudan, Libya, Iraq and North Korea. These are countries with sanctions placed on them by USA but not UK. If we send USD MT100s direct to SCB NY for beneficiaries based in these countries there is a high risk that under OFAC the payments will be rejected / frozen. In the circumstances payments into these countries must continue to be handled as they are no i.e. with direct MT100 to the beneficiary bank and only MT202 cover to SCB NY.

49.     In the same e-mail, the senior SCB London manager instructed another bank manager to ensure that payment processors not process such payments through the United States to or from sanctioned countries via Dromos. Thus, SCB instituted a limited internal practice of using cover payments for certain kinds of sanctioned customer payments, even as it globally informed its employees, on numerous occasions, that violating OFAC regulations could result in criminal charges. In that e-mail, the SCB London manager stated that Dromos should be implemented for corporate customers and that they would "wait to see how Dromos effects them."

## The Blocked Libyan Payment

50.     In June 2003, an employee in SCB London's payments department received a payment request from the British Foreign and Commonwealth Office to remit U.S.-dollar funds to the British embassy located in Tripoli, Libya. In an effort to comply with the Dromos Initiative, the SCB London employee did not send the payment via the cover method; rather, the payment was sent to SCB New York via one single payment message that indicated that the payment was destined for Libya, a U.S. sanctioned country at the time. The payment was detected by SCB New York's OFAC filter and blocked. In the process of attempting to have the payment released, the SCB London employee explained to a bank manager that:

> As we are aware that there are US sanctions against Tripoli, the *correct procedure* [emphasis added] would be to remit the USD . . . to New York with no mention of the beneficiary or their bank. A separate MT100 instruction would then be sent . . . to apply the funds . . . for the beneficiary's account. Instead, due to the new

DROMOS procedures which state that all payments should be sent via SCB New York, a MT100 was sent to New York quoting the full beneficiary details.

The SCB London employee ended the e-mail by explaining that:

> I have reeffected the payment today using the correct payment method and I will be debiting the cover from the potential loss account until such time that we received the funds back from New York.

As reflected in this email, rather than wait for an investigation and possible OFAC license, SCB simply resubmitted the blocked payment via the "correct" method with the offending payment details stripped, or "repaired."

51.    This incident so concerned SCB New York employees that a senior SCB New York manager sent an e-mail to a supervisor in SCB London stating:

> I trust by now that [senior compliance officer] has discussed with you the recent US$ transfer that SCB London was trying to make to Libya and that we caught and stopped. Many of the issues surrounding this transaction have caused us serious concerns about the overall state of awareness by our sister units of the US legislation regarding dollar transfer to certain locations and in particular, evidence that it may be ignored as a matter of practice by some of our units.

52.    An internal investigation conducted by a SCB London lawyer was commenced regarding the "correct procedure" for the re-effected payment. At the outset of the internal investigation, the SCB London lawyer noted in an e-mail that "[SCB London's Head of Operations] confirmed to me that the practice of routing payments to OFAC sanctions targets in this manner is a common one in London."

53.    In response to the lawyer's e-mail, SCB London's Head of Operations wrote, "I do not recall using these words or in that context. For example, I would suggest 'payments being common' [sic] cannot possibly be correct. I think the whole issue would be better dicussed [sic] verbally." Following the verbal discussion with the SCB London Head of Operations, the SCB London lawyer concluded:

There is no "procedure" in London for avoiding the OFAC filter.... There is no departmental operating instruction ("DOI") directing SCB UK to avoid the OFAC filter and providing guidance on how to do it. At worst there is an informal practice, that may have been used infrequently.

54. The SCB London payment processors incorrectly believed that the payment was lawful because it was being processed on behalf of the U.K. government. The reference to a non-transparent payment process, however, caused concern among SCB New York employees.

55. At SCB New York, the Head of Legal wrote an e-mail explaining that as a result of the blocked Libyan payment, "SCB NY became aware for the first time that SCB UK has a process for avoiding SCB NY's OFAC filters." The SCB New York lawyer went on to note that the internal investigation led by the SCB London lawyer revealed no widespread practice or procedure for circumventing SCB New York's OFAC filter via cover payments. During the course of the investigation, however, SCB New York learned there were six additional prior payments to the British embassy in Libya, five of which were sent through SCB New York via non-transparent cover payments. SCB never attempted to get a license for the payments.

56. During the internal investigation into the Libyan payments, senior bank managers and internal lawyers drafted a "Global Broadcast" that would remind all SCB branches worldwide of OFAC requirements. One internal lawyer memorialized the "action points" in a meeting with senior bank managers — "[w]e need to revise the existing GIC [Global Instruction] with respect to US$ payments to OFAC countries."

57. On August 11, 2003, the Global Broadcast was sent. It stated:

The Bank should not process any US Dollar denominated transactions for any OFAC designated party, unless the Bank has a written license from OFAC authorizing that transaction or US counsel has advised that the transaction is permitted by OFAC...Disciplinary steps will be taken against staff that breach this policy.

### SCB's Letter to OFAC

58.    At about the same time SCB was revising its global instructions on U.S.

sanctions, senior bank managers and internal and external lawyers were discussing how to get

the blocked payment released as well as how to inform OFAC of the potential sanctions breach.

As a result, SCB New York decided to approach OFAC to obtain licenses for the Libyan

transactions relating to payments on behalf of the U.K. embassy staff. One such payment had

been blocked and the funds frozen. As noted, that payment had been re-submitted via the cover

payment and the funds successfully transferred to Libya. In applying for the license, SCB did

not reveal to OFAC that it had already re-sent the blocked payment via the cover method in

contravention of sanctions.

59.    As a result of this omission, SCB and SCB New York senior bank managers and

lawyers, along with the assistance of an external U.S. lawyer, self-reported this matter in a letter

to OFAC setting out the history and purpose of all the eight Libyan payments, including the re-

submission of the blocked payment by a cover payment. The letter included the following

statements to OFAC:

> SCB (London) has advised us that, while all eight payment instructions were in
> conformity with UK law, the use of cover payments was contrary to Standard
> Chartered Bank's global instructions relating to OFAC sanctioned countries that
> would have precluded the initiation of such cover payment instructions. We are
> told by SCB (London) that the foregoing [eight Libyan-related payments]
> constitutes an isolated case effected in good faith for the UK Government on the
> belief that such payments were in accordance with applicable law. Further SCB
> (London) has advised that pending OFAC's issuance of a license to SCB (NY), all
> further payments related to the British Embassy in Libya will be effected in
> pounds sterling.
>
> SCB (NY) has made it very clear that it considers the foregoing activity to be
> unacceptable and that no similar actions relating to remittances on behalf of the
> UK Government or any other person should be taken for whatever reason because
> such actions are contrary to the policies and procedures of SCB (NY), and they
> potentially place SCB (NY) unknowingly in harm's way. To further remind all

branches of their obligations, the Bank's Group Head of Legal and Compliance has sent a group-wide notification reminding SCB operations across the world of their obligations with respect to USD payments under OFAC economic sanctions programs.

60.     These statements were misleading in the following two ways. First, the letter claimed that the use of cover payments was "contrary to Standard Chartered Bank's global instructions relating to OFAC sanctioned countries." In fact, SCB used the cover payment method to effect billions of dollars in payments, lawful and unlawful, through SCB New York originating from or for the benefit of customers in Iran, Libya, Burma and Sudan—all U.S. sanctioned countries; and continued to do so in the years following the letter. Second, the letter described the eight Libyan payments as an "isolated case." However, prior to sending the letter, SCB effected 70 Libyan-related cover payments between 2001 and 2003 for approximately $12.1 million. Moreover, senior bank managers and internal lawyers learned about the use of cover payments for sanctioned countries *before* the letter was sent to OFAC.

61.     Contemporaneous communications from within SCB Group and SCB New York demonstrate that the bank's senior management recognized that some of the representations in the OFAC letter were misleading. For example, a senior bank manager in SCB's Wholesale Banking Legal and Compliance Department expressed concern over the truthfulness of certain statements in the letter to OFAC during the drafting process, acknowledging that the use of cover payments was a long-standing feature of the banking practice and SCB had not changed its method of routing payments. Another SCB London employee also noted that there was no SCB Group policy that prohibited the use of cover payments from or for the benefit or sanctioned customers.

62.     Nevertheless, the letter was sent to OFAC on August 12, 2003, stating that "the use of cover payments was contrary to Standard Chartered Bank's global instructions relating to

OFAC sanctioned countries that would have precluded the initiation of such cover payment instructions."

## SCB's Continued Cover Payment Business

63.     Two days before the letter was sent to OFAC, a payment from the World Health Organization, an SCB London customer, was sent through SCB New York, to the Myanmar Foreign Trade Bank, a SDN, and was effected via the cover method.   The payment was not detected by SCB New York.  In addition, as noted above and detailed below, cover payments related to sanctioned countries and entities continued on occasion for the next three years.

64.     Senior bank managers and internal lawyers investigated why the Burmese payment was effected via cover and not via the Dromos method (one single payment message that included all of the payment details).

65.     An internal lawyer noted his findings.

> My enquiries of the staff in [SCB London] have not been satisfactory.   The individual handling the payment referred me to his team leader who expressed the view that at that time the team took the view that any payment that could conceivable give rise to an *OFAC problem* (emphasis added) should always be dealt with non-dromos . . . .

66.     After sending the letter to OFAC claiming that SCB did not process cover payments related to sanctioned countries, SCB knowingly and willfully continued to process payments related to sanctioned countries via the cover method so that the payments would not be detected by SCB New York.  For example, prior to and after the letter was sent to OFAC, SCB knowingly and willfully transacted millions of dollars in unlawful payments related to Sudan through the U.S. via the cover method.

67.     Prior to sending the OFAC letter, SCB sent 70 cover payments, with a total value of $12.1 million, through SCB New York related to Libya.  Subsequent to the OFAC letter, SCB

sent an additional 62 unlicensed cover payments, with a total value of approximately $150,000, through SCB New York related to Libya. The cover payments related to Libyan transactions stopped when the Libyan sanctions were lifted in 2004.

68.     Regarding Sudanese transactions, prior to the letter sent to OFAC, SCB sent approximately 71 cover payments, with a total value of $15.9 million through SCB New York related to Sudan. After the letter to OFAC, SCB sent approximately 217 cover payments, with a total value of $79.3 million, through SCB New York related to Sudan.

69.     Regarding Burmese transactions, SCB sent a total of 11 payments, with a total value of approximately $790,000, through SCB New York related to Burma. All of these cover payments occurred after the letter was sent to OFAC stating that cover payments were not used for payments related to sanctioned countries.

70.     In addition to the payments related to sanctioned countries, SCB processed U.S.-dollar payments using the cover payment method involving SDNs as well. Specifically, from 2001 through 2007, SCB predominantly used cover payments to process 116 U.S.-dollar transactions, with a total value of $9.9 million, involving SDNs through the United States. Thus, SCB's use of cover payments in part had the specific effect of depriving its U.S. correspondents, as well as U.S. regulatory and law enforcement officials, of information pertaining to transactions undertaken by SDNs.

71.     As a result, SCB engaged in prohibited U.S.-dollar transactions without being detected by U.S. financial institutions, including SCB New York, regulators, or law enforcement authorities, and caused U.S. financial institutions, including SCB New York, to process transactions that otherwise should have been rejected or blocked.

### SCB's Trade Finance Business

72.      SCB London also processed certain prohibited trade-finance transactions involving banks and importers or exporters from countries subject to OFAC sanctions.  These trade finance transactions included import and export letters of credit, inward and outward documentary collections, and guarantees.  These transactions involved USD payments and/or the export of goods originating in the U.S. to sanctioned countries.  Among the payments processed by SCB London in connection with these trade-finance transactions were 56 payments with an aggregate value of approximately $46 million involving a Sudanese SDN.

### SCB's Written Agreement and Lookback

73.      As mentioned above, SCB holds a banking license issued by the state of New York to operate as a foreign bank branch in New York, New York.  SCB New York primarily conducts a U.S.-dollar clearing business, but also provides other wholesale banking services.  Pursuant to Section 3105(c) of Title 12 of the United States Code, SCB New York is subject to examination by the Federal Reserve Board.  Moreover, pursuant to New York State Banking Law Section 10, SCB New York is subject to examination by NYSBD, which is now incorporated into DFS, as well.

74.      In November 2003, a joint examination of SCB New York was conducted by the FRBNY and the NYSBD.  In its final report to the bank, the FRBNY and NYSBD concluded that "[t]he monitoring of funds transfer activity was found to be ineffective against safeguarding against legal, reputational and compliance risks associated with suspicious and unusual activity in U.S. dollar funds transfer."  Moreover, the report stated, "[t]he identification and control of risk exposures is lacking, and considered far below the level expected for a high-risk profile institution such as SCNY."  The examiners also noted, "we view the condition of the [Bank

Secrecy Act/Anti-Money Laundering] compliance framework as inadequate, especially in view of the large volume in U.S. dollar clearing business and the high-risk nature of a large portion of the underlying accounts." Finally, the report concluded by stating that:

> We have shared our concern with head office and branch senior management regarding the high level of risk exposure to Standard Chartered Bank due to these inadequacies. Management has responded by promising its full attention to this matter and started a plan of corrective action. A prompt and satisfactory resolution of the deficiencies is of utmost importance, and we expect both the head office and branch management to assign this situation the highest priority and provide full support to the plan.

75.     As a result of the deficiencies identified in the 2003 examination, the FRBNY and NYSBD entered into a Written Agreement[13] with SCB Group and SCB New York on October 7, 2004 (hereinafter "the Written Agreement"). The Written Agreement was signed by the then Chief Executive of SCB and the then CEO of SCB Americas. The Written Agreement noted that:

> the Bank and the New York Branch are taking steps to enhance due diligence policies and procedures relating to the New York Branch's funds transfer clearing operations and correspondent accounts for non-U.S. banks and are addressing risks associated with these lines of business, including legal and reputational risks, by implementing industry sound practices designed to identify and effectively manage such risks.

76.     As part of the Written Agreement, SCB and SCB New York agreed to do a look-back review of the branch's activity from July 2002 to September 2004 (hereinafter "the Lookback") to determine if there was any suspicious activity which should have been reported pursuant to Federal Reserve and New York state banking regulations. Specifically, the purpose of the Lookback was to detect money laundering and other suspicious activity, rather than OFAC violations, though OFAC elements were incorporated into the screening methodology as

---

[13] A Written Agreement is a public enforcement action by which the regulators have identified several areas of concern about the bank's operations, and the bank agrees to take remedial steps to correct the regulators' concerns.

described further below.  The scope of the Lookback covered all accounts and transactions "at, by, or through" SCB New York during the Lookback period.

77.     The work plan (the "Work Plan") SCB/Deloitte submitted to the FRBNY and NYSBD in November 2004 focused on a risk-based assessment of AML deficiencies in SCB New York's correspondent banking services.  One aspect of the work plan discussed screening SCB New York's wire payment data against the OFAC list of sanctioned countries and SDNs. The first monthly progress report, submitted in December 2004, discussed in detail the methodology for assessing the money laundering risks represented in the data.  The report expressly listed a number of categories to be included in the risk assessment.  The criteria for "Country/Jurisdiction Risk Ranking" included "OFAC sanctioned countries" and "Terrorist Financing Sponsors/Financiers."  The criteria for "Customer Risk Ranking" included "OFAC SDN and Blocked Persons List."  Despite this detailed risk-rating methodology agreed to by the regulators and the bank, which should have identified all payments involving OFAC sanctioned countries, billions of dollars of transactions were not disclosed.  Moreover, SCB did not disclose to the regulators that SCB New York was processing non-transparent payments for customers in sanctioned countries during the Lookback period.  Instead, SCB limited its review and report to only transactional information available to SCB New York.  As a result, approximately $88.0 billion of non-transparent Iranian U.S.-dollar transactions that passed through SCB New York during the Lookback period were not included in the review.  As one FRBNY examiner explained in an interview with federal and state law enforcement authorities, "the FRBNY was misled, and the Lookback did not meet its objective because SCB may have eliminated some of the suspicious transactions."

### SCB's Lookback Methodology

78.     On October 27, 2004, SCB contracted with Deloitte and Touche, LLP ("Deloitte") to work with SCB staff to review SCB New York's wire activity as part of the Lookback. To review the millions of wires processed at, by, or through SCB New York during the Lookback period, SCB and Deloitte devised a methodology to identify potentially suspicious activity. One of the methods for segmenting the data was whether the wire transfer involved a "high-risk jurisdiction." The SCB/Deloitte plan identified high-risk countries as, "OFAC, Non-Cooperative Countries and Territories ('NCCTs'), UN Sanctioned Countries, Money Laundering, Terrorist Financing." SCB/Deloitte proposed that:

> Wire transfer activity will then be analyzed for countries that have been designated high risk jurisdictions. The countries involved in the transaction will be determined based on the country of domicile of the customer as well as the country information that is included within the transaction (Originator, Originator Bank, Sending Bank, Beneficiary and Beneficiary Bank).

Thus, if the wire transfer contained a reference to an OFAC sanctioned country in any of the fields mentioned above, it would be designated as relating to a high-risk jurisdiction. Accordingly, "OFAC Sanctioned Countries" were weighted as a 5, the highest rating in SCB/Deloitte's risk rating methodology. Moreover, pursuant to SCB/Deloitte's methodology, a transaction containing a reference to an OFAC sanctioned country generated an automatic alert, which led to the transaction automatically being reviewed by the Lookback team. By contrast, "all SCB branches and affiliates maintaining an account with SCB NY are categorized with the same risk level of zero."

79.     The payment data contained in the systems of SCB New York had few, if any, references to sanctioned customers, Iranian or otherwise. This was because the data that would have caused an alert – originator or originating bank information – had been stripped from the

payment messages by SCB's offshore affiliates. The stripped data was not contained in the records of SCB New York. During the Lookback review, SCB did not volunteer the data or inform the regulators of its policy of using cover payments or repairing payment messages on behalf of customers in sanctioned countries, despite the involvement of high-level SCB executives with knowledge of this information.

80.     On January 10, 2005, pursuant to the Written Agreement, SCB and SCB New York submitted their December Progress Report to the FRBNY and NYSBD. In the report, SCB and SCB New York explained that the Lookback team had identified approximately 16 million relevant payment messages during the Lookback time period. Of the 16 million messages, 5.5 million, with a total value of $4.0 trillion, represented customer transactions, while 10.5 million messages, with a total value of $35.5 trillion, represented bank-to-bank transactions. The report noted that all the payment messages, both customer and bank-to-bank, were parsed by the country listing in eight different fields of the wire transfer: "beneficiary bank address, beneficiary address, credit party address, debit party address, intermediary address, ordering bank address, originator address, and sending bank address." In appendix A of the report, SCB listed the "top countries by number of transactions for addresses where the country/jurisdictions have been identified for each of the eight (8) address fields." Appendix A of the report comprised eight tables, one for each of the address fields, and listed top twenty countries for each field. Iran was not listed in any of the eight tables, despite the fact that, pursuant to the Work Plan SCB/Deloitte submitted to the FRBNY, it should have been.

81.     To analyze the payment messages, SCB first reviewed SCB New York's customer transactions, and then reviewed its bank-to-bank transactions. [14] With respect to customer

---

[14] SCB identified the transactions by the SWIFT payment message type used. Customer transactions were defined as SWIFT MT 100 series message types, while bank-to-bank were defined as SWIFT MT 200 series message types.

transactions, SCB/Deloitte provided the regulators with an overview of the total number of customer transactions by country which passed through SCB New York during the Lookback period. The table included in the February Progress Report listed two hundred and twenty-eight countries along with their corresponding country risk rating, number of originators, number of originating transactions, total origination amount, number of beneficiaries, number of beneficiary transactions, and total beneficiary amount. The table included a listing for Iran, in which SCB/Deloitte reported that there were approximately $172 million worth of identified originating transactions, and $118 million of beneficiary transactions. The Iran entry, along with the entries for Cuba, Iraq, and Sudan, were accompanied by double asterisks, however. At the end of the table, it stated the following:

> Note**: Cuba, Iran, Iraq (till 5/22/2003) and Sudan are OFAC comprehensive sanctions list. This assignment of customers to these countries may have been in error due to the country extraction process from the address fields. For example, if an address field has only the word 'Miranda', this address potentially may have been mis-assigned to Iran as the country name is embedded in the address field.

In sum, SCB/Deloitte reported that there were at most only $172 million worth of originating Iranian customer transactions and $118 million of beneficiary Iranian customer transactions that passed through SCB New York, and that those figures may have been overstated. The partner at Deloitte who was leading the Lookback project explained in an interview that the purpose of the asterisks was to note that these transactions may have been a "false hit."

### SCB's Lookback Results for Customer Transactions

82. After identifying the universe of customer transactions, SCB/Deloitte applied its risk-rating methodology to determine which of the customer transactions merited further review by the Lookback team for potential suspicious activity. In its March 2005 Progress Report to the FRBNY and NYSBD, SCB/Deloitte reported the results of its risk-rating methodology applied to

the customer transactions.   In total, SCB/Deloitte's risk-rating methodology resulted in approximately 27,155 alerts requiring further review by the Lookback team.   In its March Progress Report, SCB/Deloitte segmented the alerts by country, and reported two hundred and twenty-three countries from which alerts had been generated.   While SCB/Deloitte reported alerts generated from OFAC sanctioned countries such as Libya, Burma, and Syria, no alerts were generated for transactions involving Iran.

83.   Since the methodology was supposed to automatically generate an alert on any transaction involving a sanctioned country, the absence of any Iranian transactions in the March Progress Report indicated that there were no Iranian customer transactions.   Moreover, as the partner at Deloitte who was leading the Lookback project explained, a logical reading of the results was that the Iranian payments with the double asterisks that had been disclosed as part of the total universe of customer payments in the prior monthly report to the regulators were in fact "false positives."[15]   At the same time, data contained in SCB's offshore centers revealed that SCB New York had processed $92.5 million in Iranian customer payments.

### SCB's Lookback Results for Bank-to-Bank Transactions

84.   Following the analysis of the customer transactions, SCB/Deloitte examined the bank-to-bank transactions which occurred at SCB New York during the Lookback period.   In the July Progress Report, SCB/Deloitte reiterated that they would provide the regulators information about all suspicious bank-to-bank payments.   The bank-to-bank payments were subdivided into standard bank-to-bank transfers and cover payments.   With respect to bank-to-bank transactions, SCB/Deloitte wrote, "[a]s stated previously, since there is limited information provided in the

---

[15]   In the Final Consultant's Report given to the regulators at the end of the Lookback in October 2005, SCB/Deloitte included the customer transactions universe table from the February Progress Report with Iran listed with the double asterisks, as well as the table of alerts by country from the March Progress Report, which indicated no alerted transactions involving Iran.

bank-to-bank transactions, all potentially high risk transactions conducted by particular banks in specific jurisdictions will be included in a report detailing the findings." SCB/Deloitte stated that they would provide "a listing of all bank pairings where the transactions involved high-risk countries/jurisdictions."

85.     The regulators continued to focus on the risks associated with customer payments, asking SCB New York to focus on covers for customer transactions as opposed to true bank to bank payments. For example, at a meeting in May of 2005, a regulator asked whether SCB New York could divide the bank to bank data into "pure bank to banks" and cover payments. In response, an SCB New York employee stated, "we will review the financial institutions involved in the transactions to determine the level of risk [the] institution presents to SCB [and] will review the dollar amounts, country/jurisdiction to further enhance our 'risk-based' approach."

86.     With respect to cover payments,[16] SCB/Deloitte informed the regulators that where there was information about the underlying transaction, such as the originator or beneficiary information, the customer information was reviewed pursuant to the methodology used for the customer transactions. Where such information was not available, SCB/Deloitte explained that "the team will identify the banks and countries involved in the transactions for both 'for further credit' and 'cover' payments transactions and submit a report summarizing the bank pairings (debit/credit parties) and country patterns found within these transactions." As one SCB New York employee involved in the Lookback explained to the regulators:

---

[16] The FRBNY and NYSBD regulators asked whether SCB/Deloitte would be identifying cover payments. One of the FRBNY examiners provided search terms that could be used to identify cover payments, including "'Cover', 'cvr', 'MT10', 'MT 10', 'MT-10', or 'PUPID.'" SCB/Deloitte used the examiner-provided terms to search for potential cover payments passing through SCB New York, but failed to disclose that SCB London payments system generated the term "CO" to identify cover payments. As one SCB London employee wrote on April 4, 2003, "The only way that you can tell that the MT202 being sent to SCBLUS33 is a cover payment is the inclusion of the letter 'CO' at the end of the field 20 line...." As a result of this failure to disclose this coding system, SCB/Deloitte failed to identify $58.8 billion of additional cover payments.

For cover payments, direct messages go through the banks involved in the transactions, which makes it difficult to determine what the funds will be used for. However, we will review the financial institutions involved in the transactions to determine the level of risk that institution presents to SCB. Additionally, we will review the dollar amounts, county/jurisdiction to further enhance our 'risk-based' approach.

87.     In its final report, SCB/Deloitte reported the results of its review of the bank-to-bank transactions.   The report had three tables which identified suspicious bank-to-bank transactions to the regulators.   The first table listed potentially suspicious bank-to-bank transactions by country.  There was no entry for Iran included in the table.  The report also listed the suspicious bank-to-bank transactions by customer.  No transactions on behalf of Iranian banks were included in the table.  Finally, the report listed bank and country pairings where the total transaction dollars were greater than $1 million over the transaction review timeframe for cover and further credit payments, and the top twenty banks with adverse information where the total transaction dollars were greater than $1 million over the transaction review timeframe for standard bank-to-bank transactions. Once again, no Iranian banks were listed.

88.     In total, there were approximately $88.0 billion of non-transparent Iranian U.S.-dollar transactions which passed through SCB New York during the Lookback period, of which $92.5 million were customer transactions, and the remaining were bank-to-bank transactions.  Of the Iranian non-transparent bank-to-bank transactions, there were approximately $25.0 billion of non-transparent serial bank-to-bank transactions, and $63.0 billion of non-transparent cover payments.  Despite this large volume of payments, nowhere in the monthly reports or the final Lookback report did SCB disclose its non-transparent Iranian business which passed through SCB New York to the FRBNY and NYSBD.  Because SCB only reviewed wire information available to SCB New York, none of the non-transparent Iranian U.S.-dollar transactions that passed through SCB New York during the Lookback period were included in the review.  As one

FRBNY examiner involved in the Lookback explained in an interview with federal and state law enforcement authorities, "[i]t was implicit that SCB New York did not do business with Iran because they were not in the report or discussed in the methodology."

89.     The partner at Deloitte who led the Lookback project explained in an interview with federal and state law enforcement authorities that, based on the methodology used by SCB/Deloitte, Iranian transactions should have been reviewed because they originated from a high-risk jurisdiction. Even if the Iranian payments were lawful U-Turn payments, the Deloitte partner stated that they should have generated an alert so they could have been validated as legitimate. Because the Iranian payments were non-transparent, however, many were risk-ranked as zero as they appeared to be coming from SCB London or SCB Dubai, rather than as automatic alerts involving an OFAC sanctioned country.

90.     That Iranian payments were of concern to U.S. authorities was plainly evident to senior executives in New York and London during the same time period that the Lookback review was being conducted. For example, in an e-mail dated May 13, 2005 , the Head of Operations at SCB New York sent an email to the CEO of SCB Americas and the SCB Group Head of Compliance in London bearing the subject line "ABN AMRO – VERY CONFIDENTIAL." The e-mail stated:

> Gents:
>
> We have been informed from unofficial, off the record sources, that the consulting firm that is performing the transactional review at ABN Amro has uncovered and the bank has admitted, that their branch network was sending dollar payments through the New York office disguising the beneficiary of the transactions using cover payments.
>
> We are told informally and off the record, that the Fed and Treasury Dept is planning on fining ABN tens of millions of dollars. [17]

---

[17] ABN was a multi-national bank, headquartered in the Netherlands. On July 23, 2004, ABN entered into a Written Agreement with numerous regulators including the FRBNY and the NYSBD. During a look-back review

91.    Prompted by this and other information about ABN AMRO Bank N.V. ("ABN")'s non-transparent Iranian practices, SCB Group sought legal advice regarding its handling of Iranian transactions. From June 2005 through January 2006, two law firms advised SCB Group that the use of non-transparent payment processes, including cover payments, could expose SCB to regulatory action or criminal prosecution.

92.    In its final report to the regulators in October 2005, SCB included an assessment of its OFAC Analysis. The analysis read as follows: "All transactions were screened against the OFAC/SDN list provided by D&T. Potential hits were identified and reviewed by the Bank's OFAC Officer. The review concluded that the payments were either blocked and reported as required or were 'false positives.' As a result, no additional OFAC filings during the Transaction Review period were warranted."

93.    SCB did not provide complete information in the Lookback results with respect to reporting on the breakdown between customer payments and bank-to-bank payments, the volume of sanctioned country payments, and the number of alerts related to sanctioned countries.

### SCB's Internal Investigation

### SCB's Exit from the Iranian Business

94.    In March 2005, the CEO of SCB Dubai noted that ABN was ending its U.S.-dollar business with Iran due to concerns raised by regulators in the United States. Specifically, he wrote that ABN was "worried about the treatment the bank is receiving inside [the] U.S. generally (Written agreement, etc.) and on assumption there may be a linkage with Iran or that in

---

mandated by the terms of the Written Agreement, it was discovered that ABN's branch in New York was processing non-transparent payment messages sent by ABN's global branch network for customers in sanctioned countries. On December 19, 2005, ABN entered into a consent cease and desist order with the regulators, including the FRBNY and NYSBD, and paid a combined civil monetary penalty of $80 million to the regulators, OFAC, and the Financial Crimes Enforcement Network. On May 10, 2010, ABN entered into a deferred prosecution agreement with the United States Department of Justice and forfeited $500 million in connection with its illegal conduct.

their judgement [sic] they might be going forward." This information led to a bank-wide review of SCB's sanctions compliance, and specifically SCB's business with Iran.

95.    As part of the sanctions review, an SCB Group lawyer contacted external counsel in the United States, who advised that "[b]ank regulators have been more active in taking enforcement actions against banks that do not have controls in place that are designed to identify suspicious activity taking place in or through U.S. banks." The external counsel concluded by noting, "we understand that various bank regulators also have increasing interest in ensuring that banks are complying with the OFAC regulations and that they are not taking actions that could be viewed as having as their purpose the evasion of the OFAC regulations." SCB also obtained advice from another U.S. law firm, which reaffirmed the view that "[t]he US authorities are taking very seriously apparent evasions by some banks of Libyan and Iranian sanctions by means of cover payments."

96.    In August 2005, SCB formed Project Gazelle, which was tasked with reviewing SCB's business with Iran. As the Project Gazelle team reviewed the Iranian business at SCB London, concern grew as it became aware of the issue of removing Iranian references and replacing them with a "." in the SWIFT payment messages, a process referred to earlier as "repair." One SCB senior manager in the legal and compliance department wrote, "read in isolation, [the repair practice] is clearly a process designed to hide, deliberately, the Iranian connection of payments. I am concerned that, in the absence of any other effective, coherent, operational instructions, it would be difficult to resist the inference that the intention of the process is to enable payments to be made that are prohibited by the sanctions." The SCB manager concluded by stating, "Even if we have robust, detailed, procedures for checking that all the criteria for a permitted U-turn payment are fulfilled, I do not believe that we should continue

the repair process, in view of its potential for misuse to mislead our New York branch, and the perception that it was designed for such purpose [sic]."

97.     In November 2005, a memo prepared by the Project Gazelle team addressed to the Group Management Committee noted, "there is a clear risk that the repair process could be perceived as a deliberate measure to conceal the Iranian connection from SCB New York and therefore to evade their controls for filtering potential sanction-breaching payments." Furthermore, "Even if the procedures in London/Dubai for checking each U-turn payment were very robust, US authorities may well view the repair process negatively, even if strictly lawful. In circumstances where a non-complying payment were made and discovered, the existence of the repair process would likely result in a heavier penalty than might otherwise be applied." Despite these concerns, no decision was made at the time and the repair process continued at SCB London.

98.     In January 2006, SCB Group again received advice from external U.S. counsel about the issue.  In their advice, the U.S. lawyers wrote, "we have noted that there is great uncertainty at the moment as to whether anything less than full transparency in payment instructions sent to U.S. depository institutions on behalf of sanctioned banks could be construed by a prosecutor or regulator as intentional deception of a U.S. depository institution, even where SCB has taken reasonable steps to ensure that the payment would not breach the Iranian sanctions regime."  Moreover, the U.S. lawyers noted that the intentional removal of information "could raise issues under various sections of the U.S. criminal code relating to intentional misstatements or omissions of material information if sent to a U.S. depository institution."  The lawyers concluded by stating, "we cannot say that there is no risk that a U.S. prosecutor or

regulator would not try to argue that the foreign bank intentionally misled the U.S. clearing bank by not identifying the payment as one subject to the U.S. sanctions regime."

99.     As a result of this advice, in March 2006, SCB stopped the "repair" process, but continued to process transparent Iranian U-Turn payments pursuant to the U-turn exemption, which remained in force.

100.    In September 2006, during an on-site examination of SCB New York by the FRBNY and NYSBD, a FRBNY examiner asked whether the bank was processing Iranian U-Turn payments. The SCB New York employees stated that the branch was, leading the examiner to ask for information about the volume and value of the U-Turn transactions. As a result of the request, SCB New York pulled information about the volume and value of the Iranian U-Turns processed in 2005 and 2006.

101.    Upon reviewing the numbers, SCB New York employees were surprised at the dollar value of Iranian U-Turn transactions processed by the branch, as well as the apparent increase in the number of transactions from 2005. In response, the then-CEO of SCB Americas sent a detailed memo to his superiors at SCB explaining his concerns about SCB's continued business with Iran. In the memo, the then-CEO of SCB Americas wrote:

> We understand the Group's current strategy is one of continuing to provide banking services to customers with legitimate business with Iran, doing business with significant, reputable Iranian corporates and providing U-turn arrangements for Iran's major banks. Firstly we believe this needs urgent reviewing at Group level to evaluate if the returns and strategic benefits are...still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group. Secondly, there is equally importantly potential risk of subjecting management in US and in London (e.g. you and I) and elsewhere to personal reputational damage and/or serious criminal liability. Finally we risk limiting the Groups [sic] ability to exit the Written Agreement in a timely fashion with the resultant implications for our growth ambition and strategic freedom that goes way beyond just the US.

102.    Prompted in part by the memo from the then-CEO of SCB Americas, on October 10, 2006, SCB made the decision to exit the Iranian business. As one SCB senior manager wrote, "it was decided that we should terminate our clearing and account services for Iranian banks." As he further explained:

> The catalyst for the call and the decision was a memo from [SCB Americas CEO] to [the Group Executive Director] reporting that the New York State Banking Department and the Federal Reserve Bank examiners had stated that they would be looking at Iranian U-turn transactions as part of their inspection commencing on 13 November and that the NY branch have been asked to submit to the regulators weekly information on the value and volume of Iranian U-turns processed in the New York Branch.
> ...
> The decision was based on the increasing pressure being exerted on international banks to sever ties with Iran.

103.    On October 30, 2006, SCB informed the FRBNY that it was ending its U.S.-dollar clearing activity for all the Iranian banks. The bank ended its U.S.-dollar activity by March 2007.

104.    From August 2007, SCB suspended all new Iranian business in any currency.

### SCB's Self-Disclosure and Cooperation

105.    Having previously informed the Financial Services Authority, its home country regulator in the United Kingdom, SCB approached federal and state authorities in January 2010 to self-report its conduct. SCB acknowledged and accepted responsibility for its conduct.

106.    Throughout the course of this investigation, SCB has fully cooperated with U.S. authorities. SCB undertook a voluntary and comprehensive internal review of its historical payment processing and sanctions compliance practices, which has included the following:

a.      An extensive review of records, including hard copy and electronic documents;

b.      Numerous interviews of current and former employees;

c.      A transaction review conducted by an outside consultant, which included, but was

not limited to review of more than 150 million payment messages and trade transactions across various accounts related to OFAC-sanctioned countries, including an analysis of underlying SWIFT transmission data associated with U.S.-dollar activity for accounts of banks in OFAC-sanctioned countries;

d.      A voluntarily waiver of the attorney-client and work product privileges with respect to legal advice concerning compliance with U.S. sanctions during the entire review period, including all the legal advice cited herein;

e.      Regular and detailed updates to DANY and DOJ on the results of its investigation and forensic SWIFT data analyses, and responding to additional specific requests of DANY and DOJ;

f.      Detailed written reports of the Bank's investigation;

g.      An agreement to toll any applicable statutes of limitation; and

h.      Making current and former SCB employees available for interviews by U.S. authorities.

### SCB's Remediation

107.    SCB has also taken voluntary steps to enhance and optimize its sanctions compliance programs, including by:

a.  Terminating relationships with sanctioned banks and entities and closing its Iranian representative office and branch;

b.  Substantially increasing personnel and resources devoted to sanctions compliance, including appointing a senior U.S.-based employee to oversee its sanctions screening compliance program;

c.  Enhancing its U.S.-dollar transactions screening systems;

d.  Designing and implementing improved sanctions compliance training for all staff;

e.  Enhancing its global sanctions compliance policies and procedures, including a general prohibition on new transactions on behalf of U.S. designated terrorists, narcotics traffickers, or WMD proliferators in all currencies;

108.   SCB has also agreed, as part of its cooperation with DANY and DOJ, to undertake the further work necessary to further enhance and optimize its sanctions compliance programs.  SCB has also agreed to cooperate in DANY and DOJ's ongoing investigations into these banking practices.  Furthermore, SCB has agreed to continue to comply with the Wolfsberg Anti-Money Laundering Principles of Correspondent Banking.

# JA-265

### *Exhibit B*

Supplemental Factual Statement

**EXHIBIT B -- SUPPLEMENTAL STATEMENT OF FACTS**

1.     This Supplemental Factual Statement is incorporated by reference in, and is part of, the Amended Deferred Prosecution Agreement dated April 9, 2019, between the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section, the United States Attorney's Office for the District of Columbia (collectively, "DOJ") and Standard Chartered Bank ("SCB"), a United Kingdom bank, and the Amended Deferred Prosecution Agreement dated April 9, 2019 between the New York County District Attorney's Office ("DANY") and SCB (together, the "Amended DPAs").  This Supplemental Factual Statement supplements the prior factual statement attached as Exhibit A (the "2012 Factual Statement") to the parties' deferred prosecution agreements, entered on December 10, 2012 (the "2012 DPAs"), and attached as Exhibit A to the Amended DPAs.

2.     SCB agrees and stipulates that the information contained in this Supplemental Factual Statement is true and accurate.  SCB admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.  Should DOJ or DANY pursue the prosecutions that are deferred by the Amended DPAs, SCB agrees that it will neither contest the admissibility of, nor contradict, this Supplemental Factual Statement in any such proceedings.  The following facts, together with the facts set forth in the 2012 Factual Statement, establish beyond a reasonable doubt the charges set forth below and in the Superseding Information filed in conjunction with the DOJ's Amended DPA.

**Introduction**

3.     SCB is a financial institution registered and organized under the laws of England and Wales and headquartered in London.  It is one of the world's largest international banks, with operations in more than sixty markets around the world, including operations in Asia, Africa, the

Middle East, Europe and the Americas.  Since 1976, SCB has held a license issued by the state of New York to operate as a foreign bank branch in New York, New York ("SCB New York").  SCB New York provides U.S. dollar clearing services for international wire payments, which can involve, among other things, the conversion of payments from a foreign currency into U.S. dollars.  SCB New York is subject to oversight and regulation by the Board of Governors of the Federal Reserve System, as well as the New York State Department of Financial Services.

4.      Starting in at least 2007, up through and including 2011, SCB knowingly and willfully violated U.S. and New York State laws by processing U.S. dollar transactions through the United States on behalf of customers of SCB's Dubai branch with known Iranian connections and causing financial services to be exported from the United States to Iran in violation of U.S. economic sanctions.  The manner in which SCB assisted these customers in evading U.S. sanctions also caused U.S. financial institutions located in New York to process transactions that otherwise should have been rejected, blocked or stopped for investigation pursuant to U.S. economic sanctions involving Iran.

5.      As a result of this conduct, SCB processed approximately 9,500 transactions totaling approximately $240 million through the U.S. financial system, including SCB New York, on behalf of SCB customers in violation of U.S. sanctions.   Each of the financial records underlying these transactions contained false entries or omitted truthful information, in that the financial records did not accurately reflect the Iranian connections of the parties involved.

6.      More than half of the U.S. dollar transactions described herein were the result of deficiencies in SCB's compliance program that allowed customers to order U.S. dollar transactions via fax and online payment instructions submitted from sanctioned countries, including Iran.  SCB compliance employees in the United Arab Emirates ("UAE") were aware of these sanctions risks

as early as May 2010, but did not take sufficient steps to identify the location of customers at the time that payment instructions were submitted, allowing transactions to be initiated from sanctioned countries, including Iran.  While the criminal conduct described herein was not known to high-level SCB officials as of the execution of the 2012 DPAs, certain high-level SCB officials that presented to U.S. law enforcement regarding SCB's sanctions compliance during the initial investigation were aware that SCB customers located in sanctioned countries were accessing SCB's online banking system from Iran to initiate payments, and did not share this information with U.S. law enforcement prior to execution of the 2012 DPAs.  The Offices do not allege that this omission was deliberate.

7.     Once presented with evidence of post-2007 sanctions violations, SCB provided substantial cooperation in the government's investigation of the criminal conduct that occurred from 2007 through 2011, including, among other things, providing significant evidence of criminal wrongdoing by SCB employees and customers involved in the scheme.  In addition, since mid-2013, SCB has engaged in significant remediation of its U.S. economic sanctions compliance program.

**Individuals and Entities Involved in the Conspiracy with SCB**

8.     Person A worked at SCB's branch office in Dubai, United Arab Emirates ("SCB Dubai") as a Relationship Manager from November 2007 through September 2014.  As a Relationship Manager, Person A was the main point of contact between SCB Dubai and numerous small and medium enterprise ("SME") companies that were in his portfolio.  Person A interacted with his customers frequently:  answering questions, conducting research, and representing the customer's interests to other SCB components, including SCB Dubai's foreign exchange desk.

3

9.      Person B worked at SCB Dubai from approximately January 2008 to January 2014 as a Treasury Sales Manager.  Person B handled sales of foreign exchange services for SME customers of SCB Dubai, including encouraging and helping to facilitate foreign exchange transactions, including U.S. dollar foreign exchange transactions.  Treasury Sales Managers partnered with Relationship Managers to develop customer relationships.

10.     Person C was an Iranian national who ordinarily resided in Iran.  Person C controlled Company C-1 and Company C-2, both of which conducted the majority of their business operations in Iran.  Company C-1 was a customer of SCB Dubai from around December 2006 through February 2011.  Company C-2 was a customer of SCB Dubai from around February 2011 through September 2011.  Both Company C-1 and Company C-2 conducted U.S. dollar financial transactions through their accounts at SCB Dubai.

### U.S. Sanctions on Iran

11.     The International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701 to 1706 ("IEEPA"), granted the President of the United States a broad spectrum of powers necessary to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." Title 50, United States Code, Section 1701(a).

12.     The President exercised these IEEPA powers through Executive Orders that imposed economic sanctions to address particular emergencies and delegate IEEPA powers for the administration of those sanctions programs.  On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the

United States," and declaring "a national emergency to deal with that threat."  On May 6, 1995,

the President issued Executive Order No. 12959, which imposed comprehensive trade and

financial sanctions on Iran.  These sanctions prohibited, among other things, the exportation, re-

exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods,

technology, or services from the United States or U.S. persons, wherever located.  This includes

persons in a third country with knowledge or reason to know that such goods, technology, or

services are intended specifically for supply, transshipment, or re-exportation, directly or

indirectly, to Iran or the Government of Iran.  On August 19, 1997, the President issued Executive

Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959

(collectively, the "Executive Orders").  The most recent continuation of this national emergency

was executed on March 12, 2019.  84 Fed. Reg. 9219 (Mar. 13, 2019).

   13.  The Executive Orders authorized the U.S. Secretary of the Treasury to promulgate

rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the

Secretary of the Treasury promulgated the Iranian Transactions and Regulations ("ITRs"),[1] 31

C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.  With the exception

of certain exempt transactions, the ITRs prohibited, among other things, the export of financial

services to Iran, including prohibiting U.S. depository institutions from servicing Iranian accounts,

and directly crediting or debiting Iranian accounts, without a license from the United States

Department of the Treasury, Office of Foreign Assets Control ("OFAC").  31 C.F.R. § 560.204.

The ITRs defined "Iranian accounts" to include accounts of "persons who are ordinarily resident

in Iran, except when such persons are not located in Iran" and explicitly prohibited the exportation

of financial services performed on behalf of a person in Iran or where the benefit of such services

---

[1] On October 22, 2012, OFAC renamed and reissued the ITRs as the Iranian Transactions and Sanctions Regulations.  All of the conduct described herein took place prior to the renaming.

was received in Iran.  31 C.F.R. §§ 560.320, 560.410.  The ITRs also prohibited unlicensed transactions by any U.S. person who evades or avoids, has the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs.  The ITRs were in effect at all times relevant to the conduct described herein.

14.     OFAC was located in the District of Columbia.

15.     Pursuant to Title 50, United States Code, Section 1705, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under IEEPA, including the ITRs.

**DOJ Charge**

16.     DOJ alleges, and SCB admits, that SCB's conduct, as described herein, violated Title 18, United States Code, Section 371, because SCB and its co-conspirators knowingly and willfully conspired to violate IEEPA, which makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of the regulations prohibiting the export of services from the United States to Iran.

**DANY Charge**

17.     DANY alleges, and SCB admits, that SCB's conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, "with intent to defraud, . . . (1) [m]ake[] or cause[] a false entry in the business records of an enterprise [(defined as any company or corporation)] . . . or (4) [p]revent[] the making of a true entry or cause[] the omission thereof in the business records of an enterprise."  It is a felony under Section 175.10 of the New York State Penal Law if a violation under Section 175.05 is committed and the person's or entity's "intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof."  DANY further alleges, and SCB further admits, that SCB's conduct, as

described herein, violated New York State Penal Law Section 105.05, which makes it a crime

when, with intent that "conduct constituting . . . a felony be performed, [a person] agrees with one

[or] more persons to engage in or cause the performance of such conduct."

### The 2012 Deferred Prosecution Agreements

18.     In December 2012, DOJ and DANY each entered into a two-year deferred

prosecution agreement (together, the "2012 DPAs") with SCB resolving a multi-year investigation

into, among other things, U.S. sanctions violations by SCB occurring from 2001 to 2007 involving

SCB's intentional altering of payment instructions for U.S. dollar payments in order to hide the

involvement of sanctioned countries and entities.[2]

19.     In mid-2012, during the negotiation of the 2012 DPAs, SCB represented to U.S.

law enforcement and regulatory agencies that it had stopped doing new business involving Iran in

2007, and since then had been winding down its legacy Iranian business relationships that

originated before 2007.  SCB also represented that it had made significant improvements to its

compliance program since 2007, and it would not rest in its efforts to maintain a best-in-class

sanctions and financial crime risk compliance program.  SCB officials also detailed to U.S. law

enforcement and regulatory agencies in mid-2012 examples of the work it was currently doing to

identify customers of SCB Dubai who may have been attempting to undertake business with Iran

using deceptive practices, and to exit those banking relationships.

20.     After entering into the 2012 DPAs, U.S. law enforcement learned through an

unrelated investigation that SCB may have unlawfully processed U.S. dollar transactions for

---

[2] SCB's 2001 to 2007 conduct is described in Paragraphs 22 to 104 of the 2012 Factual Statement.  In connection with the 2012 DPA with DOJ, SCB agreed to the filing of a criminal information charging SCB with knowingly and willfully conspiring, in violation of Title 18, United States Code, Section 371, to engage in transactions with entities associated with sanctioned countries, including Iran, Sudan, Libya, and Burma, in violation of IEEPA and the regulations promulgated thereunder.

corporate and individual customers with possible ties to Iran and other U.S. sanctioned countries after 2007.  SCB agreed to cooperate in DOJ and DANY's investigation into SCB's post-2007 conduct.

### The 2007-2011 Criminal Conspiracy

21.     After SCB enacted a policy to suspend new Iranian business in August 2007, certain SCB Dubai customers with ties to Iran sought to continue to conduct U.S. dollar financial transactions with Iranian entities using deceptive means.  Persons A and B, both employees and agents of SCB, were aware of certain customers' Iranian connections and use of deception, and conspired with those customers after August 2007, to cause U.S. financial services to be exported to Iran in violation of IEEPA and regulations promulgated thereunder.

22.     Persons A and B willfully conspired with several people and entities to help Iran-connected customers of SCB Dubai conduct U.S. dollar transactions and cause U.S. financial services to be exported to Iran through SCB.  Persons A and B helped Iranian nationals located in Dubai open commercial bank accounts at SCB Dubai, with knowledge that in some instances the commercial entities were fronts for Iranian businesses.  Persons A and B also helped Iranian nationals operating such accounts to conduct U.S. dollar financial transactions and to facilitate the transfer of U.S. dollars through the United States for the benefit of Iranian entities.

23.     One of the Iran-connected customers of SCB Dubai was Person C, who operated business accounts on behalf of Company C-1 and Company C-2.  Person A was the relationship manager for Person C's business accounts from November 2007 through August 2011.  Person B helped facilitate foreign currency transactions, including in U.S. dollars, for Person C's business accounts from July 2008 through August 2011.

24.    Person C ordinarily resided in Iran while operating the business accounts for Company C-1 and Company C-2 from 2007 through 2011.  SCB's core banking system listed Person C as an Iranian person with both UAE and Iranian contact information, including Iranian fax and phone numbers beginning with the +98 country code prefix for Iran.  SCB records also contained copies of Person's C's Iranian passport.  In addition, SCB records included a 2007 know-your-customer ("KYC") form for Company C-1 stating that the customer had a facility in Iran and exported materials from Iran to various countries.  The contact information for Company C-1 listed in SCB's records included at least two Iranian phone numbers each of which began with the +98 country code prefix for Iran.  In July 2008, during two separate phone calls recorded by SCB Dubai, Person C told Person B that Person C was in Iran, and later invited Person B to visit in Iran.

25.    SCB employees, including Person A and Person B and others, knew that Person C's business organizations were operated from Iran and conducted U.S. dollar transactions through the United States for the benefit of Iranian entities.  Between April 2008 and November 2010, SCB stopped multiple payments for Company C-1 based upon Iran-related references in the payment instructions, including the names of various cities in Iran, as well references related to Iranian shipping lines.  In June 2009 and September 2009, SCB blocked two outgoing payments from Company C-1 to Iranian beneficiary banks.  In August 2010 and again in January 2011, SCB was aware that outgoing payments from Company C-1 were rejected by other financial institutions, including beneficiary banks and correspondent banks, due to Company C-1's Iranian connections. In each instance, SCB employees were aware of the payments stopped due to Iranian connections.

26.    Person A and Person B also provided false and misleading information to SCB compliance in order to disguise Person C's Iranian connections.  For example, on or about August 24, 2008, Person A responded to an SCB compliance inquiry about Company C-1 by stating,

among other things, that Company C-1 did not have any branches outside the UAE without disclosing the information provided on Company C-1's 2007 KYC form. Likewise, when SCB and other financial institutions rejected payment requests from SCB on behalf of Company C-1 and Company C-2, Person A and Person B helped conceal the transactions' Iranian connections through lies and omissions.

27.     In December 2010, SCB decided to exit its banking relationship with Company C-1 based in part on the numerous payment requests that were stopped by SCB and other correspondent and beneficiary banks because of Iranian sanctions concerns as described. Person A and Person B helped Person C open a new business account under a new name, Company C-2, so that Person C could continue conducting U.S. dollar transactions through the United States without suffering similar rejections. Although a non-Iranian co-conspirator of Person C was the nominal owner of Company C-2, Person A and Person B knew that Person C controlled Company C-2. In a January 19, 2011, telephone call recorded by SCB Dubai, Person C asked Person A to extend the closure of Company C-1's account to give Person C time to open the account for Company C-2:

> Person C:  "You know, about this eh I want to ask [can you please] make eh extend [f]or [C]ompany [C-1] for thirty-one January, because I am waiting for the answer of eh [Company C-2]?"
>
> Person A:  "Okay let me try."
>
> Person C:  "Please please"
>
> Person A:  "Okay let me try.  Okay okay."
>
> Person C:  "Please, thank you very much, thank you and call me please"

Company C-2's account with SCB Dubai was opened on or about February 14, 2011, and Company C-1's account with SCB Dubai was closed on or about February 13, 2011. On February 15, 2011, Person C called Person A on a recorded SCB telephone line and confirmed that Company C-1's account was closed and Company C-2's account was opened. On February 23, 2011, a

customer account record identified Person C as an authorized signatory/dealer on Company C-2's account. Documents contained in SCB's records also show that much of the contact information (telephone number, mobile phone number, fax number, and mailing address) for Company C-2 was the same as Company C-1.

28.     Person A and Person B also instructed Person C on how to structure financial transactions that would not raise suspicion of an Iranian connection or other illegality. For example, on or about March 9, 2011, in a telephone call recorded by SCB Dubai, Person A told Person C not to send payments to Iranian individuals directly from Company C-2's account, but rather, to have a co-conspirator transfer the funds from Company C-2's account to his personal account at SCB Dubai and then send the payments to the Iranian individuals in order to avoid having Company C-2's account closed:

> Person A:  "I am telling you once these go there will be no next time then you'll come back and they will say we will need to close the account [be]cause now even one payment is going [to an individual who] is Iranian."
>
> Person C: "Mm"
>
> Person A:  "[The payment] will be stuck. And once it is stuck . . . then you will come back to me when no no don't close the account then nothing left and I am telling you."
>
> Person C: "Mm"
>
> Person A:  "[The second individual payee] is Iranian, I know [the third individual payee] is Iranian, [and the first individual payee] is Iranian."
>
> Person C:   "Mmm how we can do this?"
>
> Person A: "I am telling you, ask ask [co-conspirator] to transfer funds from [Company C-2's account at SCB-Dubai] to his personal account [at SCB-Dubai]. From [his] personal account he can make these five payments."

SCB Dubai closed Company C-2's account in September 2011 due to sanctions concerns.

29.     Person A and Person B conspired with other Iran-connected individuals and business organizations during their employment with SCB Dubai during much of the same period and using many of the same tactics as they used with Person C.

30.     Person A and Person B willfully engaged in this misconduct knowing that it was in violation of U.S. law.  Their conduct was within the scope of their employment with SCB Dubai and their intent was, at least in part, to generate revenue for SCB and to maintain their employment with SCB Dubai.

31.     As part of the conspiracy, SCB willfully processed approximately 9,500 U.S. dollar transactions through the United States from November 2007 through August 2011, totaling approximately $240 million, on behalf of Company C-1 and Company C-2.

32.     At no time did SCB or its co-conspirators apply for, receive, or possess a license or authorization from OFAC for the conduct set forth herein.  SCB and its co-conspirators failed to provide truthful, accurate, and full information to SCB New York regarding the true source and purpose of the financial transactions described in Paragraph 31.  The transactions caused SCB New York to create financial records that contained false or misleading entries or omissions.

**Fax and Online Payment Instructions Submitted from Iran**

33.     More than half of the criminal transactions SCB processed for Company C-1 and Company C-2—totaling more than $120 million—were the result of particular deficiencies in SCB's compliance program which allowed customers to order U.S. dollar transactions via fax and online payment instructions from sanctioned countries, including Iran.  Company C-1 and Company C-2 submitted payment instructions from fax numbers bearing the +98 country code for Iran to request more than $104 million in U.S. dollar transactions from SCB Dubai.  Company C-

1 and Company C-2 also utilized SCB's online banking platforms to direct more than $15 million in additional U.S. dollar transactions from Internet Protocol ("IP") addresses assigned to Iran.

34.     These compliance deficiencies allowed thousands of payment instructions to be issued by individuals located inside a comprehensively sanctioned country such as Iran, and caused hundreds of millions of U.S. dollars to be processed through the United States without a license from OFAC.  With respect to both the faxed and online payment instructions, SCB possessed sufficient information to identify the location of the customers submitting the orders, but was too slow to block payments initiated from sanctioned countries.  SCB's failure to act promptly on this information resulted in additional criminal transactions being conducted by Company C-1 and Company C-2 as well as numerous sanctions-violative transactions on behalf of other individuals and entities in sanctioned countries.

35.     SCB Dubai compliance officials were aware of the risk of transactions being initiated through payment instructions submitted by customers located in Iran and other sanctioned countries as early as May 2010.  By March 2012, high-level SCB officials that presented to U.S. law enforcement regarding SCB's sanctions compliance during the initial investigation were aware of the online access issue whereby customers could conduct transactions from IP addresses registered to sanctioned countries, but they did not share their awareness of this issue with U.S. law enforcement or regulatory agencies prior to entry of the 2012 DPAs in December 2012.  SCB officials did not disclose these issues until presented with evidence of the compliance deficiencies during the government's investigation into the post-2007 sanctions violations.  The Offices do not allege that this omission was deliberate.  SCB did not comprehensively block online access from sanctioned countries until 2014.

**SCB's Knowledge of Heightened Iranian Sanctions Risk at SCB Dubai**

36.     After SCB suspended all new Iranian business in 2007, bank officials were aware that Iranian entities were seeking to circumvent SCB's new rule.  By at least December 2009, SCB officials knew that SCB Dubai's SME business posed a higher Iranian sanctions risk because of, among other things: (1) the close physical proximity of Dubai to Iran; (2) the large number of Iranian nationals operating SMEs in Dubai; and (3) corporate clients associated with Iranian nationals (*e.g.* shareholders, directors, and authorized signatories).   Additionally, senior SCB officials were aware of the risk that UAE-based general trading companies ("GTCs") operated by Iranian nationals could be subsidiaries or branches of parent companies in Iran.

37.     By 2010 at the latest, SCB officials knew of the risk that UAE-based GTCs could use their relationships with SCB Dubai to attempt to circumvent U.S. sanctions on Iran.  For example, SCB officials knew that some Iranian nationals who were not resident in the UAE nonetheless presented UAE residency visas to SCB Dubai employees to open business accounts, raising the risk of sanctions violations.  As of early 2011, SCB officials knew that financial transactions from GTC customers of SCB Dubai were being rejected by other SCB branches and by other banks due to the involvement of Iranian parties.  In May 2011, high-level SCB compliance employees had compiled a list of GTC customers of SCB Dubai whose transactions were being declined based upon, in part, potential Iranian sanctions violations.  In June 2011, SCB Dubai officials also were aware that several GTC customers of SCB Dubai were presenting checks drawn on Iranian bank accounts, and that some of these customers appeared to be engaged in substantial trade routed through Iranian banks.  In response, SCB compliance personnel undertook a variety of efforts to mitigate the risk of Iranian infiltration, but those efforts were insufficient.

38.     SCB's sanctions compliance program was not equipped to confront the risks of banking SMEs in Dubai, and it failed to timely detect and prevent the criminal conduct described above.   SCB's sanctions compliance program was insufficiently staffed and inadequately resourced.   Although SCB was aware that certain SCB Dubai corporate customers, including SMEs, posed higher risk of Iranian sanctions violation, SCB did not dedicate sufficient compliance employees to review the customer due diligence and KYC documents that could have more fully informed SCB of the extent of the problem.   In fact, SCB Dubai fell so far behind in reviewing these documents that it took years to clear the backlog.

39.     SCB's representations to U.S. law enforcement in 2012 about its compliance program did not sufficiently disclose the deficiencies in its compliance program which allowed the criminal conduct described above to occur.   SCB claimed at that time that it had made significant improvements since 2007, and was committed to maintaining a best-in-class program.   SCB also described to U.S. law enforcement several examples in which SCB's compliance program successfully identified SCB Dubai customers attempting to evade sanctions controls.   In fact, as early as 2008, SCB compliance officials knew that the bank was not timely reviewing and updating customer due diligence forms, and had not devoted sufficient resources to complete the task.   SCB was slow to make required improvements to its inadequate compliance program after the 2012 DPAs were executed.

### SCB's Remediation and Cooperation

40.     Since mid-2013, SCB has engaged in significant remediation, including the comprehensive enhancement of its U.S. economic sanctions compliance program and significant improvements to its financial crime compliance program.

Case 1:12-cv-00262-JEB   Document 16-1   Filed 04/09/19   Page 88 of 92

41.     Once presented with evidence of potential post-2007 sanctions violations, SCB provided substantial cooperation in the government's investigation of the criminal conduct that occurred from 2007 through 2011.   SCB conducted an extensive and thorough internal investigation, voluntarily made foreign-based employees available for interviews, and produced voluminous documentary materials to DOJ and DANY.  In addition, SCB produced to DOJ and DANY significant evidence of criminal wrongdoing perpetrated by certain of its agents and employees.  While much of SCB's cooperation was required by the 2012 DPAs, SCB's efforts exceeded the cooperation that was required by the 2012 DPAs.

# JA-282

Case 1:12-cv-00262-JEB   Document 16-1   Filed 04/09/19   Page 89 of 92

### *Exhibit C*

Certificate of Corporate Resolutions

*Exhibit C*

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Standard Chartered Bank ("SCB") has been engaged in discussions with the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section and the United States Attorney's Office for the District of Columbia (collectively, the "Offices") regarding issues arising in relation to historical violations of U.S. sanctions laws and regulations; and

WHEREAS, in order to resolve such discussions, it is proposed that SCB enter into a certain agreement with the Offices; and

WHEREAS, SCB's Group General Counsel, David Fein, together with outside counsel for SCB, have advised the Court of SCB[1] of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices;

Therefore, the Court has RESOLVED that:

1.       SCB (a) acknowledges the filing of the two-count Superseding Information charging SCB with knowingly and willfully conspiring to violate International Emergency Economic Powers Act, in violation of Title 18, United States Code, Section 371, and Title 50, United States Code, Section 1701 *et seq*., and the regulations issued thereunder; (b) waives indictment on such charges and enters into an amended deferred prosecution agreement with the Offices; (c) agrees to forfeit $240 million to the United States; and (d) agrees to accept a monetary penalty against SCB totalling $52,210,160, and to pay such penalty to the United States Treasury with respect to the conduct described in count two of the Superseding Information;

---

[1] The "Court" is the governing body of SCB and is composed of executive and independent non-executive directors.

2.      SCB accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the Offices arising out of the conduct described in the attached Factual Statements of any objection with respect to venue and consents to the filing of the Superseding Information, as provided under the terms of this Agreement, in the United States District Court for the District of Columbia; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Factual Statements or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The Chief Executive Officer, Americas and Regional Head CIB, of SCB, Torry Berntsen, is hereby authorized, empowered and directed, on behalf of SCB, to execute the Amended Deferred Prosecution Agreement;

4.      The Chief Executive Officer, Americas and Regional Head CIB, of SCB, Torry Berntsen, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Chief Executive Officer, Americas and Regional Head CIB, of SCB, Torry Berntsen, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of SCB.

Date: __8 April 2019__

By: _____
Bill Winters
Group Chief Executive
Standard Chartered Bank